## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FELLOWSHIP OF CHRISTIAN ATHLETES,**
8701 Leeds Rd.
Kansas City, MO 64129

**FELLOWSHIP OF CHRISTIAN ATHLETES**
**OF JACKSON-REED HIGH SCHOOL**
3950 Chesapeake St NW
Washington, D.C. 20016

                Plaintiffs,

v.

**DISTRICT OF COLUMBIA**,
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, D.C. 20004

**LEWIS D. FEREBEE**, Chancellor of D.C. Public
Schools; and **CINTHIA L. RUIZ**, Chief Integrity
Officer at D.C. Public Schools, in their official and
personal capacities,
1200 First Street, NE
Washington, D.C. 20002

                Defendants.

Civil Action No. 1:24-cv-01332

**COMPLAINT**
(Jury Requested)

Daniel H. Blomberg (D.C. Bar No. 1032624)
Joseph C. Davis* (D.C. Bar No. 1047629)
Kelly R. Oeltjenbruns* (D.C. Bar No. 1658786)
Richard C. Osborne* (N.J. Bar No. 402232022)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
dblomberg@becketlaw.org

*Counsel for Plaintiffs*

*pro hac vice application forthcoming*

**COME NOW** Plaintiffs and plead as follows:

## INTRODUCTION

1.      The issues in this case are exceptionally urgent and important—but for Plaintiff the Fellowship of Christian Athletes ("FCA"), they unfortunately aren't new.

2.      FCA, a religious ministry for student-athletes and coaches, had hoped that when a California school denied an FCA student club's recognized status in 2019, it was an aberration. It wasn't.

3.      The District of Columbia Public School system ("DCPS"), an agency of the District of Columbia ("the District"), did the same to a high-school club in Washington, D.C., based on the club's requirements that its leaders sincerely believe what it believes. Indeed, DCPS determined that *any* attempt to limit club leadership to those who agree with the religious club's goals and mission was discrimination under D.C. law. So it kicked FCA off campus because of FCA's religious beliefs.

4.      Back in San Jose, California, the en banc Ninth Circuit told the school district there that its derecognition of FCA likely violated myriad First Amendment and statutory rights. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc) (*FCA-San Jose*). So FCA was restored, and student-athletes were once again able to gather on-campus, fellowship together, and discuss their faith. (Meanwhile, for its trouble, the school district came away from the dispute nearly $6 million lighter. *See* Revised Consented Entry of Jdgmt. and Perm. Inj., *FCA-San Jose*, No. 4:20-cv-2798 (N.D. Cal. Apr. 26, 2024), Dkt. 237).

5.      Likewise, public colleges that have thrown out religious student groups for similar reasons in Iowa and Michigan have recently been found to have violated clearly established constitutional rights.

6.      Unfazed by San Jose's experience (and Iowa's and Michigan's), DCPS apparently thinks the Constitution works differently in Washington, D.C.

7.      Schools in the D.C. area and all over the world have enjoyed the on-campus

1

presence of FCA. FCA exists to lead every coach and athlete into a growing relationship with Jesus Christ and His Church, which it accomplishes through local on-campus groups called "huddles."

8.     Because these huddles' student leaders teach and share the religious mission and vision of FCA, those student leaders need to sincerely agree with FCA's beliefs and vision.

9.     But DCPS takes the remarkable position that this violates D.C. law; to DCPS, FCA huddles cannot choose only Christian leaders and must be willing to accept Jewish, Muslim, or atheist ones. As DCPS put it, FCA could be "reinstat[ed]" only on the "condition[ ]" that it changed its rules to permit "any member of the school community [to] be a 'Leader,' regardless of ... religious affiliation, or personal belief."

10.     While it disapproves FCA's practice of asking its leaders to share its faith, DCPS permits its schools to recognize myriad noncurricular clubs that enforce leadership requirements (and even *membership* requirements). At Jackson-Reed alone, several clubs' descriptions impose requirements; the Disabled Student Alliance is "for disabled students and their allies," like the Asian Student Union is "for students of Asian heritage," and like the Wise Club offers a "separate space for young women." These limits seem reasonable; they create focused, helpful spaces for involved students.

11.     But by reserving to itself the discretion to allow *these* clubs to choose their leaders based on beliefs or characteristics, DCPS impermissibly singles out *FCA* for discriminatory treatment by stripping FCA of its recognized status for doing the same thing.

12.     Worse, DCPS has granted itself discretionary exemptions from the policies it is imposing against FCA, running numerous programs that exclude students based on race, sex, or ethnicity.

13.     DCPS's selective enforcement violates the Free Exercise and Free Speech Clauses of the First Amendment. And, even apart from the unfairness, DCPS's policy also runs afoul of federal law because banning a religious student group from having religious leaders inherently regulates the content of the group's speech (in violation of the federal Equal Access Act), substantially burdens that religious exercise without compelling reason (in violation of the federal

Religious Freedom Restoration Act), and fundamentally interferes with the internal operation of a religious group (in violation of the First Amendment's Religion Clauses).

14.    After DCPS kicked FCA off Jackson-Reed's campus, FCA unsuccessfully spent months going through the DCPS appeal process and asking DCPS to reconsider. Then, once the Ninth Circuit decision issued, FCA sent it to DCPS, hoping that the en banc court might change DCPS's mind. But DCPS never responded.

15.    DCPS thus knows that derecognizing Jackson-Reed FCA is unfair, illegal, and unconstitutional.

16.    In the meantime, students who want to start an FCA huddle at Jackson-Reed High School have been sidelined.

17.    But not to worry, DCPS claims, because Jackson-Reed FCA can either trade its federal constitutional and statutory rights for official recognition, or it can keep those rights and forgo the critical benefits recognition confers. FCA and the local Jackson-Reed huddle can do neither. FCA operates cooperatively with the schools it is in, and official student recognition permits huddles to solicit members, advertise, and use campus facilities. It is nigh impossible to operate without recognized status. And FCA huddles simply cannot have student leaders that do not share their religious beliefs; there would be no point in calling themselves the "Fellowship of Christian Athletes" if there were nothing "Christian" (or for that matter, athletic) about the club.

18.    DCPS has plainly violated the law. Its discrimination against FCA, unlawful burdening of FCA's religious exercise, and interference in FCA's internal religious affairs must end.

## PARTIES

19.    Plaintiff Fellowship of Christian Athletes ("FCA") is a religious nonprofit corporation incorporated in Oklahoma and whose principal place of business is in Missouri. FCA is a religious ministry active on thousands of school campuses throughout the United States, including in the District of Columbia. FCA brings this suit on behalf of itself and its student leaders

in the District. FCA has been recognized by the Internal Revenue Service as an organization described in section 501(c)(3) of the Internal Revenue Code.

20.     Plaintiff Fellowship of Christian Athletes of Jackson-Reed High School ("Jackson-Reed FCA") is an unincorporated association which seeks to conduct religious ministry at Jackson-Reed High School, a member school of D.C. Public Schools ("Jackson-Reed"). The association is a certified local student-club affiliate of FCA and was a recognized student organization at Jackson-Reed until fall 2022. Jackson-Reed FCA brings this suit on behalf of its current and potential student leaders and members who want official recognition as a student club in the District.

21.     Defendant District of Columbia is being sued because of the actions of its subordinate agency, District of Columbia Public Schools ("DCPS"). *See* D.C. Code § 38-171; *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 22 (D.D.C. 2012). DCPS is the corporate entity that is responsible for the day-to-day management of D.C.'s public schools. DCPS is likewise responsible for receiving claims of discrimination at a D.C. public school, investigating them, and issuing letters of resolution through its Comprehensive Alternative Resolution & Equity Team ("CARE"). DCPS receives federal funding.

22.     Defendant Lewis D. Ferebee is the Chancellor of DCPS and its chief executive officer. D.C. Code § 38-174(a). Dr. Ferebee exercises all powers necessary and appropriate to operate the schools and school system and to implement applicable provisions of District and federal law. *Id*. § 38-174(c)(3). Dr. Ferebee was appointed by Mayor Bowser. Dr. Ferebee is sued in both his official and personal capacity.

23.     Defendant Cinthia L. Ruiz is the Chief Integrity Officer at DCPS and oversees DCPS CARE investigations and resolutions. Ms. Ruiz was responsible for upholding DCPS's derecognition of Jackson-Reed FCA and barring FCA-affiliated clubs from DCPS schools, and is sued in both her official and personal capacity.

24.     All Defendants are persons acting under the color of state law. 42 U.S.C. § 1983.

25.     Official-capacity Defendants are subject to suit for prospective relief under the *Ex*

*parte Young* doctrine. 209 U.S. 123 (1908).

## JURISDICTION AND VENUE

26.     This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. This action is also brought under the D.C. Human Rights Act, D.C. Code § 2-1401.01, et seq. This Court has jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

27.     The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

28.     Defendants' constitutional violations are actionable pursuant to 42 U.S.C. § 1983.

29.     Venue lies in this district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *FCA's rich history of serving students on campuses around the nation and world*

30.     FCA was founded in 1954 as a Christian ministry to lead every coach and athlete into a growing relationship with Jesus Christ and His Church. FCA's vision is to see the world transformed by Jesus Christ through the influence of coaches and athletes. *See* FCA, *Vision and Mission*, https://perma.cc/EGQ9-YVYC.

31.     For more than sixty years, FCA has helped student-athletes form "huddles" on college, high-school, and middle-school campuses to encourage each other to grow in their faith through prayer and Bible study. Today, FCA has over 18,000 huddles that meet worldwide, many of which exist on public university and high school campuses across the United States.

32.     FCA has regional organizations aimed at implementing its mission in particular geographic contexts. These regions include the Carolinas, the Great Lakes, the Mid-Atlantic, and the Midwest. *See* FCA, *Regional Staff Websites*, https://perma.cc/QS7G-RUDN.

33.     Each region has a regional head. Within these regions, states and the District of Columbia are overseen by state directors.

34.     In addition to its huddle ministry, FCA also operates athletic camps and other community services for tens of thousands of students every year.

35.     In all it does, FCA seeks to "demonstrate steadfast commitment to Jesus Christ and His Word through Integrity, Serving, Teamwork, and Excellence." *See* FCA, *Vision and Mission*, https://perma.cc/EGQ9-YVYC.

36.     As a Christian community, FCA is led by representatives who share FCA's mission and religious beliefs. This includes FCA's student leaders. FCA's mission and the association of FCA's representatives are an exercise and expression of FCA's Christian beliefs. *See, e.g., id.* (explaining FCA's "Engage, Equip, Empower" strategy to make disciples of Christ).

37.     FCA strives for excellence in all it does. Indeed, for 16 consecutive years, FCA has received 4-Star top ratings from Charity Navigator, America's largest organization rating the fiscal management of charities. This puts FCA in the top 1% of all charities rated.

38.     Through FCA's Mid-Atlantic Region, FCA operates locally to serve the greater DMV-area ("FCA DC"). One of FCA's largest ministries is its summer sports camps, where students can improve their athletic skills while building community and learning about the Christian faith. And to ensure as many students as possible can attend these camps FCA DC offers $30,000 annually in scholarships. FCA DC also partners with the D.C. Dream Center, a community center in Southeast D.C. dedicating to holistically serving the needs of the community. There, FCA DC offers a free community huddle once a month, where participants gather, eat pizza, talk about faith, and play sports. FCA DC also runs local "all-abilities" camps for athletes with disabilities from the local community.

39.     Beyond providing a place for Christian students to fellowship together, FCA serves D.C.-area schools because building community among students and encouraging service-oriented character development helps students grow and feel welcome, safe, and motivated at school. A recent report by the D.C. Policy Center found that 60% of high school students in D.C. were "chronically absent" in the 2022-23 school year, which means they missed more than 10% of school days. *See* D.C. Policy Center, *State of D.C. Schools*, https://perma.cc/4D42-GQK8. Per the report, this presents "one of the greatest challenges for D.C.'s public schools, especially at high schools." *Id*. at 32. And this chronic absenteeism is due in part to students suffering from increased

mental health and safety concerns and increased social stress in the wake of COVID-19. *Id*. at 33-34.

40.     FCA's huddle ministry helps meet these critical problems facing D.C. schools. FCA huddles typically meet on campus during the school day, which gives students an additional reason to be on campus. FCA also provides free lunch for students, a meal many wouldn't have otherwise.

41.     FCA likewise fosters friendships among students and a sense of community, especially among students who share common values concerning alcohol use, dating, community service, and other areas. A recent study found that high-quality friendships facilitate the development of autonomous, healthy motivation in school. This helps keep teens in school, which ultimately leads to healthier, more vibrant lives. *See* Véronneau & Trempe, *Promoting good friendship: A weapon to fight high school dropout* (2023), https://perma.cc/G5GB-AP24. Solid, life-giving friendships among students is one byproduct of FCA's presence on campus through student huddles.

42.     Further, studies have found that participation in religious groups on college campuses is positively associated with social integration, emotional well-being, academic success, and greater awareness of people from different races and cultures. *E.g.,* Bryant, *The Effects of Involvement in Campus Religious Communities on College Student Adjustment and Development* (2007), https://bit.ly/3U7EzxX. These benefits are true in high schools, as well, and extend to youth who are involved in such groups, but not personally religious. Adamczyk, et al., *The Effect of Religion-Supported Programs on Health-Related Behaviors in Adolescence* (2012), https://bit.ly/3UoKKyZ.

43.     For this reason, administrators, teachers, and coaches within DCPS have in past years thanked and praised FCA for its operations, and have even requested FCA's presence on campus.

44.     FCA's Christian Community Statement articulates its religious vision, mission, beliefs, and expectations. This Statement sets forth the core religious beliefs that FCA exercises and expresses as a faith community. These beliefs affirm the divinity of Christ, the Trinity, and

Christian views on salvation, as well as FCA's convictions on sexual conduct, the value and equality of all persons as individuals made in God's image, the rejection of racism and bias, and the prohibitions of misusing controlled substances, alcohol, tobacco, and cannabis. All FCA representatives, including staff and student leaders, must agree with the Christian Community Statement because they are an "integral part" of FCA's community and "responsible for defining, cultivating, leading, and representing [FCA's] Christian community as an expression and exercise of [FCA's] Christian Beliefs." *See* FCA DC, *Christian Community Statement*, https://perma.cc/48RA-28VT.

45.     FCA student huddles meet regularly to advance FCA's religious mission and reach others for Christ. One of the primary purposes of these meetings is to express FCA's religious beliefs. And FCA's student leaders are the primary messengers for sharing FCA's beliefs and values to both the members of their huddles and the student bodies of their respective schools.

46.     FCA huddles are open to students of all faiths or none, and there is no membership requirement for students who participate in affiliated huddles. All students on campus are welcome to become members of FCA huddles.

47.     While anyone is welcome to be a member of or participate in FCA huddles, FCA requires its student leaders to agree with FCA's core Christian beliefs. This leadership requirement is necessary because, as described above, student leaders are the primary embodiment of FCA's faith and Christian message.

48.     In addition, student leaders determine the content of an FCA huddle's message. For example, they spearhead the groups' religious meetings and Bible studies; lead and participate in prayer, worship, and religious teaching; help decide the religious content of meetings; select guest speakers and identify religious topics to cover during events; personally minister to their peers individually; plan and schedule ministry events on campus; communicate FCA's message when interacting with administrators, staff, faculty, and students at their schools; and plan outreach and student activities to advance the huddle's religious mission.

49.     Student leaders also impact the mission of FCA significantly at the national level.

Student leaders are encouraged and invited to share their perspective with FCA, which FCA staff use to inform FCA's mission. Moreover, FCA's Board is selected based on nominations from field staff in consultation with those in their community, which includes student leaders. FCA thus understands that it would undermine its religious mission and message if student leaders rejected its religious beliefs or intentionally and unrepentantly acted contrary to them.

### *DCPS and Jackson-Reed liberally permit student groups to organize with official recognition*

50.     DCPS schools receive federal financial assistance and are subject to the authority and control of DCPS administrators.

51.     DCPS allows students to create and organize their own student groups, per processes determined by individual schools in their discretion. These student groups are not required to relate to the school curriculum and are allowed to meet on campus during noninstructional time. DCPS schools boast a diverse array of noncurricular, officially-recognized student organizations.

52.     Jackson-Reed in particular liberally recognizes student clubs, and it's easy to start one. A faculty sponsor or prospective club member submits information to the school, including proposed meeting times, the names of the faculty sponsor and involved students, and the club's purpose, objectives, and proposed activities. Clubs can be recognized within hours of submission.

53.     At Jackson-Reed, official club recognition comes with many benefits. This includes the ability to meet on-campus and host school-sanctioned events during school hours; inclusion in the school activity fair where faculty sponsors and/or club members are visible for prospective members to see and join clubs; access to advertisement spaces in central locations on campus; listing on the school website; permission to use the name "Jackson-Reed" in club social media handles; the ability to apply for funds from the Jackson-Reed parent-teacher-student organization (PTSO); and access to faculty sponsors, who are eligible for a stipend for sponsoring a club.

54.     Jackson-Reed's website boasts that over 200 clubs and activities are available for students, and lists about 60 such clubs. *See* Jackson-Reed High School, *Clubs*,

https://perma.cc/2ARW-JEGZ.

55.    Many of these are noncurricular clubs. For example, Jackson-Reed officially recognizes:

- the Wise Club ("separate space for young women to meet to explore key learning areas of development such as goal setting, critical thinking, social emotional intelligence/personal development, identifying purpose and promoting healthy relationships"),

- National Society of Black Engineers ("dedicated to increasing the number of culturally responsible Black Engineers who excel academically, succeed professionally and positively impact the community"),

- Girls Who Code ("provide a space for girls interested in coding"),

- the Gender Sexuality Alliance ("provide a safe space for LGBTQIA+ students within Jackson-Reed HS, as well as create a space for allies to show support and build community"),

- the Black Student Union ("provide a safe space for students to express their thoughts on issues in the Black community but also to unwind in a loving and supportive environment"),

- the Jewish Student Union ("learn about and celebrate Jewish traditions and culture"),

- the Disability Student Alliance ("fun club for disabled students and their allies to come together"),

- Cooking Club ("discover the culture of cooking"),

- Dungeons & Dragons Club ("about DnD, a fun role-playing game"),

- Ping Pong Club ("give students a chance to learn and practice ping pong"),

- Wealth Club ("improve financial knowledge through financial education"),

- Arab Student Union ("providing a safe space for Arab students and their allies, as well as a forum for discussion of issues facing the Middle East and its diaspora"),

- The Birds & The Bees Sexual Health Club (providing "a safe, fun, and open space to discuss and explore taboo topics, while doing exciting outreach projects," such as "condom packing"),

and many more.

56.     Other DCPS schools tout even more noncurricular clubs. Banneker High School, for example, sports a Men of Strength (MOST) Club ("to provide[ ] young men with a structured and supportive space to build individualized definitions of healthy masculinity"); EcoRise (open to students "interested in taking care of Mother Earth" and "promoting sustainable practices"); and an International Club (which "[c]elebrates the cultural diversity of Banneker and the world" by "coordinat[ing] between representatives of" still other "affinity groups," like "LatinX" and the African Student Union). *See* Banneker Clubs Fall 2022-23, https://perma.cc/D5SW-LYVD. Another DCPS school, School Without Walls, touts Women in Stem (to "giv[e] girls at SWW support and encouragement to get involved in STEM activities and careers"), the Muslim Student Association (to "strengthen the Muslim community at walls through community service hours at local mosques" and "to spread awareness on Muslim issues and educate people about Islam to stop the spread of harmful stereotypes"), the Jewish Culture Club ("to provide Jewish students with a place to connect to their community and talk about their Judaism"), and more. *See* School Without Walls, *Clubs*, https://perma.cc/W7GA-SXH3.

57.     Each one of these groups triggers the requirements of the Equal Access Act, 20 U.S.C. §§ 4071-4074, on their respective campuses.

### *FCA in DC Public Schools and Jackson-Reed*

58.     FCA has operated within the District of Columbia for more than 30 years, and for years has had a presence on DCPS campuses, including at Jackson-Reed.

59.     Like all FCA huddles, FCA huddles within DCPS exist to create a community where students with a common interest in sports can learn about Jesus Christ. They therefore advance FCA's mission by providing a community where students can discuss their faith, study

the Bible, pray, and worship together.

60.     It is vital that these huddles can meet on campus. Campus access provides a free, safe, convenient, and consistent space for students to meet and to recruit more students. Further, student huddles usually meet immediately before, immediately after, or during the school day, so meeting in a separate location presents transportation and logistical difficulties. It is very difficult—if not impossible—to have safety and continuity (and thereby exist) without the ability to meet on-campus. And being barred from equal access to campus as a non-recognized group places a stigma on groups that further diminishes recruitment and group health.

61.     Under the religious mission and practices of FCA, the huddles at DCPS schools welcome all students to join their discussions, activities, and events and anyone can join as members.

62.     During the events alleged in this complaint, no FCA huddle in D.C. had membership requirements beyond merely being enrolled in the respective school and attending FCA huddle meetings.

63.     As discussed above, only the huddle's student leaders are required to share FCA's Christian faith. That is because FCA's student leaders hold an important spiritual leadership role within their student groups and as representatives of FCA. They are given a leadership role, held to biblical standards for leadership, and perform several important religious functions for the group. One of their primary duties is leading Bible studies and facilitating discussions about Christian principles. Additionally, leaders lead group prayer, organize and participate in religious outreach, and organize prayer vigils and other events. Each of the student leaders of an FCA huddle are held out as role models for the club and expected to be able to perform any of the religious duties of the club. While they may have other duties specific to their leadership role (such as secretary or treasurer duties), their primary responsibility is to express and model FCA's religious beliefs.

64.     Student leaders must affirm FCA's Christian Community Statement and fill out a Student   Leader   Application.   *See*   FCA   DC,   *Student   Leadership   Application*,

https://perma.cc/LUS8-MPS7. The application is designed so a prospective student leader walks through the Christian Community Statement and the Application with FCA staff, a faculty advisor, or a parent.

65.     Requiring that student leaders agree with FCA's religious beliefs is a matter of basic institutional integrity. To retain its identity and to carry out its religious mission, FCA must have leaders who themselves embrace and follow FCA's religious beliefs and organizational mission. Otherwise, FCA's entire mission—its Bible studies, its prayers, its worship—would be hollow, inauthentic, and unlikely to endure.

66.     This is also a matter of personal integrity for potential leaders and members. FCA cannot and will not ask students who do not share its beliefs to act inauthentically by leading members in prayer or conveying FCA's religious beliefs. Nor can FCA ask its members to authentically participate in prayer and worship led by insincere leaders.

67.     Because FCA is a religious organization, it is not enough that its student leadership simply regurgitate its views or act out its religious activities such as worship. Instead, leaders must sincerely believe the same core religious tenets that FCA does. Otherwise, part of what FCA's huddles would be expressing to students is that sincerely personal faith is unnecessary, and that it is sufficient to "go through the motions" in the Christian life. FCA does not believe that is true. Fake faith is not faith at all. Pretending to believe is harmful both for the individual leader in question and those she or he leads.

68.     Affiliation with FCA allows local huddles to participate in inter-scholastic retreats, worship, service activities and events that enrich and add significantly to the students' religious training and experience.

69.     No student has ever filed a complaint about any FCA huddle in D.C.

70.     After COVID, in fall 2022, Jackson-Reed administrators, teachers, and coaches expressed interest in bringing FCA back to campus as an officially recognized student group. These individuals understood both the impact FCA huddles have on their campuses and the value of having a faith community among their student athletes.

13

71.     In September 2022, Jackson-Reed FCA received official recognition as a student group.

72.     Jackson-Reed FCA was then included in the online list of recognized student groups at Jackson-Reed and was given a dedicated web page describing its club, just like other recognized student clubs.

73.     The huddle's faculty advisor participated at Jackson-Reed's student club fair, at which students and faculty advisors advertise their clubs to the student body. At the student club fair, several students signed up to join the Jackson-Reed FCA huddle.

74.     The Jackson-Reed Huddle was set to have its first meeting on October 13, 2022.

***Jackson-Reed coach files a grievance against Jackson-Reed FCA***

75.     Two weeks later, a Jackson-Reed part-time freshman baseball coach, Paul Legere, learned that Jackson-Reed had recognized FCA as a student group.

76.     Because he disagreed with FCA's religious beliefs, he objected to their renewed presence on campus. As he explained in a social media message to local FCA staff, "[t]here is no place for a group like FCA in a public school."

77.     On September 29, 2022, Legere filed a grievance with DCPS's CARE Team—the body responsible for receiving claims of discrimination, sexual harassment, bullying, or any unfair treatment a student, parent, or visitor encounters at a D.C. public school. He alleged that FCA violated D.C. Mun. Regs. tit. 5, § 5-B2405.1(e), which applies DCPS's student grievance procedure to alleged violations of the D.C. Human Rights Act.

78.     Under the Human Rights Act, "[i]t is an unlawful discriminatory practice ... for an educational institution ... to deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon ... religion … [or] sexual orientation." D.C. Code § 2-1402.41.

79.     And under DCPS's Notice of Non-Discrimination, "[i]n accordance with" the

Human Rights Act, "DCPS does not discriminate" or "tolerate[ ]" "[d]iscrimination" "on the basis of ... religion … [or] sexual orientation." *See* DCPS, Notice of Non-Discrimination, https://perma.cc/N5PG-8SAC.

80.     Legere alleged that Jackson-Reed had violated these laws by "allowing the Fellowship of Christian Athletes, who discriminates against the Lesbian, Gay, Bisexual, Transgender & Queer (LGBTQ) community, to sponsor a club on their campus."

81.     On information and belief, this is the only complaint that has been filed against FCA huddles within DCPS in the 30 years that FCA has operated in the District of Columbia.

### *DCPS investigates the grievance*

82.     After Legere filed his complaint, the DCPS investigative team ordered Jackson Reed to "immediately cease operations of the Jackson-Reed FCA while the complaint is pending." Jackson-Reed principal Sah Brown emailed Jackson-Reed FCA's faculty advisor on October 7, 2022, conveying that DCPS "requested that we pause on operating the Fellowship of Christian Athletes" at Jackson-Reed. Per Principal Brown's email, Jackson-Reed FCA was removed from the club listings and website and the faculty advisor, Mr. Franke, was asked to tell students that the club was "on a pause." As a result, FCA could not hold its kick-off meeting then scheduled for October 13, 2022.

83.     Because of the investigation, Jackson-Reed FCA never had the chance to meet that fall and has been barred from meeting ever since.

84.     DCPS's investigator expressly attributed its cease-and-desist order to "the allegations raised by the complainant and the content of certain information distributed by the Jackson Reed FCA." In response to a further inquiry from Jackson-Reed FCA's faculty sponsor, the investigator elaborated DCPS's view: "The premise of the organization is discriminatory in that the pledge says that you must turn away from an impure lifestyle of which they list as homosexual activities."

85.     Under DCPS procedures, the agency must acknowledge the grievance within 1-2

days, investigate the grievance, and issue a letter of resolution within 10-30 days. *See Student/Parent/Visitor Grievance Process*, District of Columbia Public Schools, https://perma.cc/MDR4-L9Z5?type=image.

86.     As part of the investigation, the DCPS team interviewed three individuals: Mr. Legere, the complainant; Grant Franke, the Jackson-Reed huddle's faculty advisor; and Chris Rich, the Vice President of Field Ministry for the Mid-Atlantic region. DCPS also reviewed Jackson-Reed FCA's Instagram page, the huddle's page on the Jackson-Reed website, an email from Mr. Legere to Principal Brown, and an FCA student leadership application.

87.     DCPS's investigator also asked Jackson-Reed FCA's faculty advisor for follow-up information, including "a list of names of students who participated in the group," "who attended the [coach's] meeting," "[w]hat made Jackson Reed want to bring the club back into the school," "who used to run the club," and whether "any meetings or planning sessions taken place, if so, can you provide me some names of individuals who attended (coaches and students)."

88.     DCPS did not tell FCA where it obtained a copy of the document its described as the "FCA Student Leadership Application." Neither FCA DC nor Jackson-Reed FCA used such an application for huddles at the time, and it is not the Student Leadership Application that FCA DC now uses. Mr. Rich informed DCPS of these facts during his hour-long interview with the DCPS investigator on October 31, 2022, in addition to answering other questions about FCA's religious beliefs and practices. He explained that while student leaders of FCA-affiliated clubs are expected to affirm FCA's religious beliefs and conduct themselves accordingly, neither FCA DC nor Jackson-Reed FCA required student leader candidates to sign any forms.

### *DCPS kicks Jackson-Reed FCA off campus without informing FCA*

89.     On November 22, 2022, DCPS issued a decision signed by the Director of DCPS's CARE Team, Anitra Allen. DCPS found that FCA violated the D.C. Human Rights Act and DCPS's Notice of Non-Discrimination incorporating the same. DCPS found the following facts:

- On September 29, 2022, it was reported via email that Jackson Reed HS has allowed and

16

supported a group on the campus of Jackson Reed HS, called the Fellowship of Christian Athletes (FCA).

- [Complainant] further reported that the FCA openly discriminates against the LGBTQ community and the FCA makes the participants sign a sexual purity statement which prohibits homosexual acts.

- [Faculty advisor] reported to DCPS CARE that the FCA at Jackson Reed HS is an opportunity for student athletes to explore spirituality and faith.

- [Faculty advisor] reported to DCPS CARE that the club is open to everyone.

- [Faculty advisor] reported to DCPS CARE that this was their first time working with the FCA and they did not sign a pledge and none of the student participants were asked to sign a pledge.

- [Mr. Rich] reported to DCPS CARE that the FCA requires their student leaders to go through a student leader process and their ministry leaders to go through a ministry leader process.

- [Mr. Rich] reported to DCPS CARE that FCA leaders could be adults and students.

- [Mr. Rich] reported to DCPS CARE that the sexual purity statement says that the leaders will not engage in heterosexual premarital sex or homosexual acts.

- [Mr. Rich] reported to DCPS CARE that no one is discriminated from the club because of race, gender, or sexual orientation, but the leaders are held to a higher standard and are asked to sign the sexual purity statement as a part of the leadership process.

- [Mr. Rich] reported to DCPS CARE that the leaders are asked to sign the statement, but it is voluntary.

90.     Based on these facts, DCPS found Mr. Legere's complaint of discrimination "substantiated" because "the language in the sexual purity statement prohibiting homosexuality constitutes a violation of policy."

91.     DCPS got the facts wrong. As Mr. Rich explained to DCPS, the huddle at Jackson-Reed had never required its leaders to sign a standalone "sexual purity statement." In fact, no FCA club in the Mid-Atlantic region—which covers D.C., Delaware, Maryland, New Jersey, Pennsylvania, and Virginia—requires prospective student leaders to sign such a statement.

92.     And, as Mr. Rich also explained to DCPS, FCA huddles *do* ask their student leaders to agree with FCA's core religious beliefs and community standards, since those leaders express the religious beliefs of the club and direct the club's prayer, religious teaching, and other services. And that includes FCA's religious beliefs and standards regarding the Bible's teachings on sexual

morality, including its belief that sexual relations outside of marriage (biblically understood) are inconsistent with God's call to holiness in His followers' lives.

93.    So DCPS's apparently willful misstatements about the signed statement aside, its decision amounted to a remarkable insistence that for FCA to be recognized on DCPS campuses, it must be willing to have its views represented on campus by students who reject those views.

94.    The DCPS decision forced Jackson-Reed High School to "disassociate from the national Fellowship for Christian Athletes (FCA) organization," which—among other things—required removing Jackson-Reed FCA from the online list of recognized clubs and deleting Jackson-Reed's club website. It was required to take these actions by November 28, 2022, less than a week later and just after the Thanksgiving holiday.

95.    The DCPS decision also invited Jackson-Reed FCA to break its affiliation with FCA National and "create a new organization independent of FCA."

96.    Although DCPS provided its decision to Mr. Legere and Jackson-Reed, it refused to do so for either FCA or its faculty advisor.

97.    FCA and its faculty advisor first learned about the decision through a report in the student newspaper, The Beacon, which was published the same day as DCPS's decision. A school official had thus already given the student reporters a copy of the decision.

98.    The Beacon's article stated that DCPS "barred" FCA from Jackson-Reed because "[FCA's] 'sexual purity' statement violates D.C. laws and policies on human rights and antidiscrimination." It also included an interview with Legere, who praised the decision and explained that while he was "not sure if this ruling w[ould] withstand a challenge by the FCA," it would "at least … ensure that kids/families involved at Jackson-Reed are fully aware of what they are taking part in." *DCPS ruling blocks Christian athlete group chapter at Jackson-Reed*, The Beacon (Nov. 22, 2022), https://perma.cc/B5H5-DLHD.

99.    Then, shortly after the article was published, Legere posted publicly on social media about the article, writing, "Thank you to the amazing students at the Jackson-Reed Beacon for covering this story!!"

*FCA appeals DCPS's Decision*

100.    FCA and its faculty advisor made repeated unsuccessful requests to obtain a copy of the decision against FCA. DCPS eventually gave FCA's faculty advisor a copy on December 5, but he was instructed not to provide it to FCA.

101.    FCA learned on or about December 5 that DCPS's decision indicated that an appeal of the decision had to be filed within 10 days of receipt of the decision. Thus, even though DCPS continued to refuse to provide a copy of the decision to FCA, out of an abundance of caution, FCA filed its appeal on December 15, 2022 to ensure the appeal would be timely. A week after FCA filed its appeal, on December 22, DCPS finally provided FCA a copy of the decision.

102.    FCA's appeal asked to be reinstated for two primary reasons. First, DCPS had incorrectly found that FCA required its leaders to sign a sexual purity statement—even though both FCA witnesses clarified that no such signing requirement existed. Second, regardless of any signed statement, excluding FCA for asking its leaders to agree with its faith violated the D.C. Human Rights Act, federal civil rights laws, and the First Amendment.

103.    Under the District's grievance appeal process, DCPS had 10 school days to respond to FCA. Accounting for winter break, their response was due January 9, 2023. DCPS did not respond on January 9, 2023.

104.    When DCPS still had not responded on January 11, 2023, FCA requested an update. The District answered several hours later that FCA's appeal was "still being reviewed by [its] legal team." Just over an hour after that, DCPS sent FCA a letter denying FCA's appeal.

105.    The letter was signed by Kimberly Martin, the Instructional Superintendent for Cluster VIII within DCPS. Cluster VIII includes Jackson-Reed.

106.    In a decision virtually identical to its November 22, 2022 decision, DCPS repeated the following findings:

- The Jackson-Reed FCA huddle is open to all students. No one is discriminated from the club because of race, gender or sexual orientation.

- FCA requires their student leaders to go through a student leader process and their ministry

leaders to go through a student leader process.

- FCA leaders could be adults and students.
- Student leaders at Jackson-Reed may voluntarily sign a sexual purity statement.
- The sexual purity statement says that leaders will not engage in heterosexual, premarital sex or homosexual acts.

107.   DCPS again concluded that the school "allowed and supported a group on their campus that discriminated against the LGBTQ community by making people sign a purity pledge that prohibits homosexual acts" and that "the language in the sexual purity statement prohibiting homosexuality constitutes a violation of policy." This was so even though "only student and adult leaders are asked to sign the sexual purity statement and although signing the statement is voluntary."

108.   The decision again invited Jackson-Reed FCA to disaffiliate from FCA National and "create a new organization independent of FCA."

109.   The decision indicated that FCA could appeal within 10 days to the DCPS Chief Integrity Officer or to DC Superior Court.

110.   FCA timely appealed, submitting its appeal to Defendant DCPS Chief Integrity Officer Cinthia Ruiz on January 20, 2023. FCA again explained that DCPS's decision was based on the faulty premise that students were required to sign a "sexual purity statement." FCA also explained that it was denied due process because DCPS did not provide a copy of its November 22, 2022, decision; DCPS did not timely reply to FCA's December 15, 2022, appeal; and DCPS blatantly ignored the substance of FCA's appeal. Finally, FCA also explained that DCPS's exclusion of Jackson-Reed FCA violated a host of D.C., federal, and constitutional laws.

111.   Once again, DCPS denied the appeal.

112.   In a letter from Ms. Ruiz dated February 10, 2023, DCPS upheld its previous decisions, repeating its previous findings and conclusion that FCA violated the D.C. Human Rights Act.

113.   DCPS again repeated that it had "recommended Jackson-Reed students and staff

who were interested in joining FCA may [instead] create a new organization independent of the FCA."

114.    Failing that, DCPS then gave FCA and Jackson-Reed FCA an ultimatum: if FCA could prove that no sexual purity statement existed and that all students can serve as a club leader "regardless of religious affiliation and personal belief," and would submit all training materials and leadership to DCPS for review (a requirement imposed on no other student group), DCPS would "be in favor of reinstating" FCA. If not, then FCA would not be recognized or receive the benefits of official recognition.

115.    Of course, that was a false choice. Jackson-Reed FCA can't be forced to terminate its religious association with FCA as the price of equal access to public facilities and benefits. Nor can FCA allow any student to become a leader regardless of their beliefs; that would undermine the integrity, expression, and mission of the huddle.

116.    Indeed, DCPS's position—that FCA must "assure that any member of the school community can be a 'Leader,' regardless of ... religious affiliation, or personal belief"—was of sweeping breadth. Evidently the Fellowship of Christian Athletes can exist only if it contents itself with being represented on campus by students of non-Christian faiths or no faith at all—students who don't believe in the God their role as student leader charges them with praying to.

117.    And being denied equal access banned FCA from enjoying full membership in the Jackson-Reed (and DCPS) community, including the important benefits that come with being a recognized student club. Just taking meeting space as an example, given space restrictions in D.C. and the fact that students do not live on or near campus in many cases, organizing students to meet off campus is not sustainable and would frustrate the viability and unity of any potential FCA huddle. Nor is it safe.

118.    Ms. Ruiz's letter to FCA stated that it was the "final DCPS administrative decision in the matter."

### *The En Banc Ninth Circuit rules in favor of FCA*

119.    During FCA's back-and-forth with DCPS, a different FCA huddle was suing a California school district for similar violations of state and federal law.

120.    FCA and local huddle student leaders found themselves backed into a corner and forced to sue the San Jose Unified School District in April 2020 after the district kicked the huddles out of the district for asking student leaders to affirm FCA's religious beliefs. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, No. 5:20-cv-2798, ECF 1 (N.D. Cal. Apr. 22, 2020).

121.    Several years later, the en banc Ninth Circuit ruled for FCA, holding that the California school district must accommodate FCA clubs on its school campuses. *FCA-San Jose*, 82 F.4th 664.

122.    Specifically, the Ninth Circuit explained that it violated "bedrock" First Amendment law for the San Jose Unified School District to exclude FCA student clubs from its schools because of their religious beliefs. *Id.* at 686. Thus, the court ruled in favor of FCA after assessing its right to the free exercise of religion, *id.*, the freedom of speech, *id.* at 686 n.8; *see also id.* at 710-12 (Forrest, J., concurring), and its statutory rights under the Equal Access Act, *id.* at 693-94 n.12; *see also id.* at 710 (Forrest, J., concurring)

123.    After the decision issued in September 2023, FCA sent the decision to DCPS and asked it to reconsider its refusal to reinstate FCA on Jackson-Reed's campus. FCA's reconsideration request noted that DCPS cannot accommodate student clubs that restrict membership, leadership, or benefits on criteria included in DCPS's nondiscrimination policy while simultaneously excluding FCA based on its religious leadership requirements.

124.    Mr. Rich's letter requested a response from DCPS by November 6, 2023.

125.    DCPS never responded to Mr. Rich's letter.

### *DCPS and the District selectively enforce the D.C. Human Rights Act*

126.    DCPS schools like Jackson-Reed permit many noncurricular groups and activities

to organize around distinctive beliefs, visions, and identities—just not FCA.

127.    For example, Jackson-Reed permits the Jewish Student Union to organize around "Jewish traditions and culture," and—on information and belief—exclude from leadership students that do no share those traditions or culture. So too for the Wise Club, which Jackson-Reed recognizes even as it describes itself as a "separate space for young women." Same for Ruling Our eXperiences (ROX), which states that its "facilitat[ors]" must "identify as female." *See Are You Ready to Empower Girls?: FAQ,* ROX, https://perma.cc/68VC-UCHK. And several student groups at Jackson-Reed state *membership* requirements: an Asian Student Union purports to be "for students of Asian heritage," like the Disability Student Alliance is "for disabled students and their allies."

128.    This is true at other DCPS schools. EcoRise at Banneker, for example, is open only to "students interested in taking care of Mother Earth." *See About Clubs / Extracurricular Activities* (2022-2023), Benjamin Banneker Academic High School, https://perma.cc/D5SW-LYVD. The Muslim Student Association at Schools Without Walls exists to "strengthen the Muslim community at walls." *See Club Descriptions* (2022-2023), School Without Walls High School, https://perma.cc/ST9B-5YGQ . The Columbia Heights Educational Campus' Marching and Step team requires members to maintain a 2.0 GPA. *See* Columbia Heights Educational Campus, *Clubs and Activities*, https://perma.cc/J876-QD8H. And Young Men of Phelps is a "leadership trust" restricted to "young men" in high school. *See Young Men of Phelps*, Phelps A.C.E. High School, https://perma.cc/WLK2-U4RS.

129.    DCPS also allows its own programs and schools to discriminate on grounds forbidden by its nondiscrimination policy.

130.    For instance, DCPS schools have gender-specific sports, like basketball, football, volleyball, and others. *See Sports*, District of Columbia State Athletic Association, https://perma.cc/2PEA-MR3T. Upon information and belief, those teams are permitted to discriminate and do discriminate according to sex, height, weight, and disability.

131.    Similarly, the D.C. Human Rights Act makes certain special exceptions for

educational institutions to discriminate based on sex and age. D.C. Code § 2-1402.42. DCPS has used this exception, and gone beyond it to discriminate based on race or ethnicity as well.

132.    One DCPS school, Ronald Brown College Preparatory High School, is an all-male preparatory school for men of color. *See About RBHS*, Ronald Brown College Preparatory, https://perma.cc/M5YK-4RGG. The school was opened as part of the District's "Empowering Males of Color" initiative with the intent of helping raise on-time graduation rates among young African-American and Latino men in the District.

133.    The initiative involved $20 million in public funds spent to help young men and boys of color. *See Empowering Males of Color* at 3, DCPS, https://perma.cc/87ZC-VK2B. As the District put it, a "concentrated and targeted effort" toward a specific population, defined by race and sex, was necessary to meet DCPS's goals of increasing achievement rates, graduation rates, enrollment numbers, and student satisfaction. *Id.* at 2.

134.    The District also targets certain demographics for grants and public funding. The Mayor's Office on Lesbian, Gay, Bisexual, Transgender, & Questioning Affairs announced community development grants for fiscal year 2024 targeted at "LGBTQIA+ residents and/or business owners in the District of Columbia." *See Notice of Funding Availability*, Mayor's Office, compiled at https://perma.cc/SXM2-A8ZP (listing notices of funding issued from various offices within the Mayor's Office of Community Affairs). So too, for example, for the Mayor's Office on Asian and Pacific Islander Affairs, which provided grants in fiscal year 2024 for "Asian American and Pacific Islanders who reside in the District," and the Office of African American Affairs (FY24 African American Community Development Grant) and the Office on African Affairs (FY 2024 African Community Grant).

135.    Despite all these exceptions to the same policy that it is applying against FCA, DCPS does not permit Jackson-Reed FCA—a private religious student club—to choose its leaders based on their beliefs.

136.    As demonstrated by these examples and others, DCPS is selectively interpreting and enforcing D.C.'s nondiscrimination law in a manner that allows Jackson-Reed and the District

to discriminate according to supposedly prohibited categories on the face of applicable rules, in practice, or both.

137.    The District is aware of these violations of D.C.'s nondiscrimination law, but on information and belief, it has selectively enforced and interpreted its law in a way that discriminates against FCA.

138.    Defendants are aware of this discriminatory application of D.C. law, but twice affirmed their exclusion of FCA because of its student leadership requirements.

### DCPS has frustrated FCA's Mission

139.    DCPS has frustrated FCA's mission of reaching athletes and other students and promoting FCA's religious beliefs, speech, and values. DCPS's derecognition of Jackson-Reed FCA effectively stigmatizes FCA's religious beliefs, speech, and values. And by stigmatizing FCA's religious beliefs, speech, and values, Defendants impede FCA's religious mission to share its religious beliefs, speech, and values to athletes and other students. These actions further frustrate FCA's religious mission because students are less likely to start or maintain a student-led FCA huddle at their school.

140.    Because of DCPS's actions, Jackson-Reed FCA has not been able to hold a single meeting since its recognition in September 2022. By denying equal participation and benefits to Jackson-Reed FCA because of the content and viewpoint of their religious speech and message, DCPS unlawfully and unreasonably discourages students from attending meetings and events held by Jackson-Reed FCA.

141.    Additionally, DCPS's actions frustrate FCA's religious mission by denying the FCA huddles benefits on the basis of leadership criteria. This denial of benefits impedes the religious message of FCA, its student leaders, and Jackson-Reed FCA by forcing them to choose between foregoing generally available benefits or giving up their constitutional and statutory right to select leaders who agree with FCA's religious beliefs.

142.    As a result and as discussed above, DCPS has denied FCA equal benefits of official

recognition, which include access to faculty advisors, inclusion in the school activity fair, the ability to meet on campus and host school-sanctioned events, access to advertisement spaces, listing on the school website, permission to use the name "Jackson-Reed" in club social media handles, and access to funding for the club sponsor. Maintaining an active student organization without access to these benefits is difficult, if not downright impossible. Denial of access therefore severely burdens an FCA huddle's ability to exist.

143.    For example, on-campus meeting spaces are usually the only free, safe, consistent, and logistically feasible space for students to meet. This is why many student organizations hold their regular meetings on campus over the lunch hour. Denying this benefit to Jackson-Reed FCA has paralyzed its ability to gather and effectuate its mission.

144.    DCPS's actions have caused FCA to divert resources from its core religious mission to promote its Christian values and lead students into a growing relationship with Jesus Christ. For instance, Jolee Paden, FCA DC's Metro Director, has spent time that she would have otherwise used to provide ministry outreach and support to other FCA huddles in the DC area to instead ensure compliance with the DCPS investigation, respond to inquiries by FCA supporters concerned by the Jackson-Reed Beacon article, and support the Jackson-Reed faculty adviser who oversaw the huddle. So too for Mr. Rich. He was forced to spend time preparing for and attending an interview with DCPS's investigative team. Then, once DCPS derecognized Jackson-Reed FCA, Mr. Rich had to spend time corresponding with local counsel, gathering facts, submitting two appeals, and requesting reconsideration after the en banc Ninth Circuit's decision in another FCA case. Ms. Paden and Mr. Rich would have otherwise spent this time on other ministry advancing tasks like supporting other student huddles, training new staff, raising financial resources, developing relationships with coaches in the community, engaging in one-on-one personal religious ministry activities such as prayer and religious teaching, or preparing to support other FCA ministry objectives.

145.    FCA has also diverted resources by working with attorneys to help draft their appeals to DCPS and other correspondence to try to educate DCPS officials about students' rights;

namely, that students have the right to affiliate with FCA and to promote FCA's religious beliefs, speech, and values under the EAA and the First Amendment. This frustration of mission and diversion of time and other resources continue to harm FCA as DCPS continues to discriminate against FCA.

146.    Nor is this an isolated event. In addition to reflecting a final decision of DCPS under District-wide policy, just weeks ago, school officials shut down another FCA huddle at Banneker High School. When the Banneker FCA huddle requested official recognition in April 2024, after previously meeting with the administration's knowledge and approval, the Banneker administration ordered the huddle to immediately stop meeting because it needed to confer with DCPS. In submission to the school's authority, the Banneker huddle has suspending meeting.

**Students wish to restart Jackson-Reed's FCA huddle**

147.    In the upcoming academic year, FCA won't be able to participate on Jackson-Reed's campus or on many other DCPS campuses such as Banneker. The District refuses to let FCA have leadership requirements aimed at ensuring its leaders are aligned with its mission, and FCA cannot operate without student leaders who agree with its religious beliefs.

148.    This unlawful and unreasonable exclusion continues to harm FCA and DCPS students. Current Jackson-Reed students have started a local huddle and desire official recognition so they can have equal access to express their shared religious beliefs, message, and values on the Jackson-Reed campus. These students include individuals who have participated in FCA camps and FCA huddle training.

149.    One such student is a junior at Jackson-Reed. He has recently completed FCA DC's student leadership application, and his huddle has been officially affiliated with FCA. All he needs now is official recognition from Jackson-Reed.

150.    Unfortunately, because of DCPS's discriminatory actions, this student's FCA huddle cannot receive official recognition. Submitting an application for recognition would be futile because DCPS bans FCA's religious leadership requirements and his huddle fully adopts

those requirements. But for the ban, he would submit a recognition application like the previous successfully application in Fall 2022 and begin holding on-campus club meetings. And once DCPS's discriminatory ban on FCA is enjoined, he will submit an application for recognition and begin holding meetings on campus.

## CLAIMS

## <u>COUNT I</u>

### 42 U.S.C. § 2000bb-1
### Violation of the Religious Freedom Restoration Act

151.    Plaintiffs incorporate by reference all preceding paragraphs.

152.    RFRA states that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1; *Singh v. Berger*, 56 F.4th 88, 92 (D.C. Cir. 2022).

153.    RFRA's "compelling interest test" is a form of strict scrutiny that "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430-31 (2006).

154.    The District of Columbia, as an enclave of the federal government, is a "covered entity" under RFRA and must comply with the statute. 42 U.S.C. § 2000bb-2(2); *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 293 (D.D.C. 2020).

155.    To make the required "demonstrat[ion]" to justify a burden of religion, Defendants must satisfy both the evidentiary and persuasive burden. 42 U.S.C. § 2000bb-2(3).

156.    RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (citing 42 U.S.C. § 2000cc-5). In *Burwell v. Hobby Lobby Stores, Inc.*, the United

States Supreme Court stated that the exercise of religion involves "'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" 573 U.S. 682, 710 (2014) (citing *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)).

157.    Ensuring their huddles are led by student leaders that sincerely adhere to FCA's Christian faith is an essential component of Plaintiffs' exercise of religion. A discriminatory ban on equal access to DCPS schools is a substantial burden on that religious exercise, making it effectively impossible for Plaintiffs and their members to accomplish their religious mission.

158.    A compelling interest includes "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). And the least-restrictive-means standard is "exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector. *Id.*

159.    By denying Plaintiffs the ability to select the leaders that represent its values to the Jackson-Reed student body, Defendants violate RFRA.

160.    Defendants do not have a compelling interest in controlling which students in a religious group lead the religious observances of a group. Nor can it meet the least-restrictive-means test. Plaintiffs already permit all students to join their huddles, as Defendants' initial decision recognized, so there is no discrimination. The Jackson-Reed huddle, and other FCA member huddles, consider religion only in choosing student leaders. Imposing more-restrictive requirements would target only religious student groups, and is not the least restrictive means of achieving Defendants' purported goal of eliminating discrimination. This is particularly clear given that Defendants already allow other recognized student groups and its own programs to discriminate in violation of the same nondiscrimination policy that it applies to Plaintiffs. Defendants accordingly cannot justify the discriminatory burden they are placing on Plaintiffs' religious exercise.

161.    Plaintiffs seek on behalf of themselves and their members a declaration that Defendants' actions violate RFRA and injunctive relief prohibiting future acts in violation of RFRA. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

### COUNT II

**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise – Not Generally Applicable**

162.    Plaintiffs incorporate by reference all preceding paragraphs.

163.    "[L]aws burdening religious practice must be of general applicability." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) (en banc).

164.    A law fails general applicability if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

165.    The D.C. Human Rights Act prohibits discrimination on the basis of "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, political affiliation, source of income, disability, or homeless status." D.C. Code § 2-1402.41. The Act applies to all District programs and all DCPS programs.

166.    This requirement is not enforced equally against all student organizations, District programs, or DCPS programs.

167.    Many student organizations and activities on DCPS campuses, including Girls Who Code, the Asian Student Union, the Jewish Student Union, and Ruling Our eXperiences, have the ability to and in fact explicitly restrict membership and/or leadership on the basis of one or more of the categories identified in DCPS's non-discrimination policy and the D.C. Human Rights Act.

168.    Similarly, DCPS schools operate programs, like single-sex schools, that explicitly restrict access based on one or more of the categories identified in DCPS's non-discrimination policy and the D.C. Human Rights Act.

169.    And the District itself operates programs—like grants or other benefits targeted to individuals based on their sexual orientation, gender identity, ethnicity, or race—that discriminate based on one or more of the categories identified in the D.C. Human Rights Act.

170.    Defendants have thus selectively enforced DCPS's non-discrimination policy and the D.C. Human Rights Act.

171.    Plaintiffs do not restrict leadership based on any of the categories identified in these policies, other than religion.

172.    By stripping Plaintiffs' recognition because of their alleged noncompliance with DCPS's non-discrimination policy and the D.C. Human Rights Act, and by giving a pass to secular student clubs and District programs, Defendants are "treat[ing] ... comparable secular activity more favorably than [Plaintiffs'] religious exercise." *Tandon*, 593 U.S. at 62.

173.    Defendants' enforcement of DCPS's non-discrimination policy and the D.C. Human Rights Act thus fails to restrict nonreligious conduct that endangers the policy's principles in a similar or greater degree than does Plaintiffs' conduct.

174.    Further, Defendants' application of their policies is also not generally applicable because the policies reserve discretion to DCPS and its individual schools "to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021). For instance, Defendants leave it to individual DCPS schools to create the process by which student groups receive official recognition and the decision whether to grant prospective student clubs recognized status, including recognition to groups that violate the terms of the D.C. Human Rights Act. Similarly, Defendants reserves discretion to themselves to decide when to allow departures from the D.C. Human Rights Act for District or DCPS programs. The mere existence of such discretion "undermines the [State's] contention that its [regulations] can brook no departures." *Id.* at 542.

175.    Defendants do not have a compelling government interest pursued by the least restrictive means to justify this unequal application of its policies against Plaintiffs.

176.    Defendants' unequal application of their policies violates the Free Exercise Clause

of the First Amendment to the United States Constitution.

177.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

178.    Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Exercise Clause and injunctive relief prohibiting future acts in violation of the Free Exercise Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT III

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise – Religious Animus / Targeting

179.    Plaintiffs incorporate by reference all preceding paragraphs.

180.    "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 n.4 (2017) (quoting *Lukumi*, 508 U.S. at 533).

181.    The government has no authority to control the content of or the expression of religious beliefs within the context of private religious associations. *Braunfeld v. Brown*, 366 U.S. 599, 603 (1961) ("The freedom to hold religious beliefs and opinions is absolute.").

182.    Defendants claim that they derecognized Jackson-Reed FCA because Plaintiffs' leadership policies violate DCPS's non-discrimination policy and the D.C. Human Rights Act.

183.    Other student organizations at DCPS are permitted to select their leadership, and even membership, based on their values, purposes, and beliefs.

184.    By stripping Plaintiffs of recognition because of their religious leadership policies while ignoring or tacitly approving the leadership practices of other groups, Defendants are targeting and seeking to control Plaintiffs' religious beliefs as such, which violates the Free Exercise Clause of the First Amendment to the United States Constitution.

185.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

186.    Plaintiffs seek on behalf of themselves and their members a declaration that the

District's actions violate the Free Exercise Clause and injunctive relief prohibiting future acts in violation of the Free Exercise Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT IV

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise & Establishment Clauses – Internal Autonomy

187.    Plaintiffs incorporate by reference all preceding paragraphs.

188.    Under the Free Exercise and Establishment Clauses of the First Amendment, religious groups have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This includes the right to select their leaders without government interference. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012).

189.    FCA is a religious organization created to establish a community on campus in which students grow in love for God, God's Word, God's people of every ethnicity and culture, and God's purposes in the world. Jackson-Reed FCA is a part of FCA's religious community.

190.    FCA's Christian Community Statement sets forth its core religious beliefs that define its mission, guide its work, and help FCA select its leadership. Jackson-Reed FCA has chosen to adopt FCA's Christian Community Statement to reflect its own beliefs.

191.    Plaintiffs' leaders provide spiritual ministry by leading Bible study, prayer, and worship, and by selecting ways that FCA can serve in the community and with other religious ministries as a means of expressing and developing its faith. These leaders are the primary messenger through which FCA shares its religious beliefs with others and are responsible for determining how it will express its faith to others. For that reason, its leaders must and do embody its faith.

192.    Plaintiffs' leaders are selected based on their agreement with FCA's religious

33

beliefs, their training in spiritual leadership, and their ability to sincerely express FCA's beliefs effectively and credibly.

193.    Plaintiffs' religious autonomy, including the selection of its religious leaders, is protected by the First Amendment. *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 801-13 (E.D. Mich. 2021).

194.    By revoking Plaintiffs' status as a recognized student group, with the rights, benefits, and privileges that flow from that status, because of Plaintiffs' religious leadership requirements, and by banning Plaintiffs from affiliating with DCPS clubs that share its beliefs, Defendants infringe on Plaintiffs' First Amendment right to govern themselves according to religious principles and select their leaders free from government interference.

195.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

196.    Plaintiffs seek on behalf of themselves and their members a declaration that Defendants' actions violate the Religion Clauses and injunctive relief prohibiting future acts in violation of the Religion Clauses. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

### COUNT V
**20 U.S.C. § 4071**
**Violation of the Equal Access Act**

197.    Plaintiffs incorporate by reference all preceding paragraphs.

198.    The Equal Access Act, 20 U.S.C. §§ 4071-4074, makes it unlawful for "any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

199.    Jackson-Reed is a public secondary school that receives federal financial assistance and is within Defendants' jurisdiction and control.

200.    Jackson-Reed has allowed at least one noncurriculum-related student group to meet

on school premises during noninstructional time and thereby maintains a limited open forum as that term is defined within the EAA. Jackson-Reed continues to recognize noncurriculum-related student groups and grant them benefits not available to unrecognized student groups.

201.    Defendants have allowed its member schools to recognize at least one noncurriculum-related student group and permit that group to meet on school premises during noninstructional time. Defendants and its member schools thereby maintain a limited open forum as that term is defined within the EAA. Defendants continue to allow its member schools to recognize noncurriculum-related student groups and grant them benefits not available to unrecognized student groups.

202.    Jackson-Reed, acting pursuant to Defendants' policies, practices, and customs, has revoked and continues to deny official club recognition and the benefits associated with that recognition to Plaintiffs, thus "deny[ing] equal access or a fair opportunity to, or discriminat[ing] against," Plaintiffs and their student members on the basis of the religious content of their speech. 20 U.S.C. § 4071(a). This denial of recognition relegates Plaintiffs and their member students to second-class status and denies them access to other resources granted to student groups that are officially recognized.

203.    Defendants have denied equal access to, and discriminated against Plaintiffs' right to meet as a recognized student group because of the religious content of their speech.

204.    For instance, denying club recognition to and placing other restrictions on Plaintiffs' ability to require their leaders to affirm its religious beliefs illegally regulates the religious content of Plaintiffs' speech. *See Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 861 (2d Cir. 1996); *see also FCA-San Jose*, 82 F.4th at 709 (Forrest, J., concurring).

205.    Similarly, Defendants' application of DCPS policy and the D.C. Human Rights Act to Plaintiffs violates the EAA on its face because it is an expressly content-based regulation of Plaintiffs' speech. Plaintiffs are banned from selecting leaders who share certain religious beliefs, but not from selecting leaders on grounds not regulated by the D.C. Human Rights Act, such as ideological grounds. Thus, if Plaintiffs were a climate-change group or an animal welfare group,

they could require their leaders to affirm those views because those views do not make distinctions on grounds forbidden by the Act. But because the content of Plaintiffs' leadership requirements are religious and thus regulated by the Act, Plaintiffs' requirements are banned.

206.   Further, Defendants selectively enforce their policies, including its nondiscrimination policies, to deny recognition to student groups that wish to affiliate with Plaintiffs. Students at Jackson-Reed continue to seek and be denied official recognition while other student groups who similarly violate DCPS policy by discriminating on the basis of sex, race, or other regulated characteristics are granted full recognition and its benefits.

207.   Defendants recognize they are bound by the EAA's requirements but nonetheless withdrew recognition from Plaintiffs and subsequently refused to grant them official club recognition despite the EAA's requirements. The rights of religious and other noncurriculum-related student groups to meet and enjoy all the other benefits of recognition are clearly established in the law, including in *Board of Education v. Mergens,* 496 U.S. 226 (1990).

208.   Defendants' actions were taken pursuant to official policy, as evidenced by, among other things, Defendants' citation to DCPS's Notice of Non-Discrimination and the D.C. Human Rights Act and its enforcement of the Act against Plaintiffs.

209.   Defendants further refused to correct their actions and recognize Plaintiffs even after the illegality of its decisions was repeatedly and specifically pointed out in writing over a period of 1.5 years.

210.   Defendants' actions, taken under color of District of Columbia law, have denied and continue to deny Plaintiffs and their members' rights and privileges secured under the EAA.

211.   Defendants continue to deny official recognition and its benefits to student groups who wish to affiliate with Plaintiffs and promote their religious beliefs, speech, and values in violation of the rights of Plaintiffs and their members, who wish to promote and advance their shared religious beliefs, speech, and values at Jackson-Reed and other DCPS schools.

212.   Defendants' ongoing denial of recognition and its benefits to student groups affiliated with Plaintiffs frustrates Plaintiffs' mission by, among other things, stigmatizing

Plaintiffs and their religious beliefs and intimidating students who attend meetings or events held by student groups affiliated with Plaintiffs. FCA and FCA DC staff have diverted and continue to divert resources, including staff time and procuring legal advice and correspondence, in order to address and mitigate its injury caused by Defendants' illegal actions. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (organizational standing where government action injured the organization's interest and the organization used its resources to counteract that harm).

213.    Plaintiffs seek on behalf of themselves and their members a declaration that Defendants' actions violate the EAA and injunctive relief prohibiting future acts in violation of the EAA. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT VI
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Speech Clause – Viewpoint Discrimination

214.    Plaintiffs incorporate by reference all preceding paragraphs.

215.    Governmental efforts to regulate speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of impermissible speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

216.    Defendants are selectively enforcing DCPS's non-discrimination policy and the D.C. Human Rights Act in a discriminatory manner to penalize Plaintiffs because of their religious viewpoint. This is blatant viewpoint-based discrimination.

217.    Further, applying DCPS's non-discrimination policy and the D.C. Human Rights Act to Plaintiffs to force them to accept leaders who do not share their faith and allow those leaders to teach Bible studies, lead outreach activities, and carry the group's message is unconstitutional.

218.    This forced inclusion of leaders who may not share Plaintiffs' religious beliefs and

mission would communicate both to Plaintiffs' own members as well as to the community at large that its views are insincere and different than what Plaintiffs actually espouse.

219.    Defendants' actions would thus violate Plaintiffs' right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

220.    Neither discriminating against Plaintiffs' expressed religious viewpoints nor compelling Plaintiffs to convey messages that they disagree with is narrowly tailored to a compelling governmental interest.

221.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

222.    Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Speech Clause and injunctive relief prohibiting future acts in violation of the Free Speech Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT VII

### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Speech Clause – Expressive Association

223.    Plaintiffs incorporate by reference all preceding paragraphs.

224.    Defendants' application of DCPS's non-discrimination policy and the D.C. Human Rights Act to ban Plaintiffs' religious leadership standards compels Plaintiffs to either give up equal access to public benefits or to select leaders who do not share or live out their religious beliefs.

225.    Plaintiffs are associations of like-minded Christians who seek to express their Christian faith through word and deed.

226.    Plaintiffs engage in expression and expressive activities together and believe that their activities and organization are a witness of their members' faith and thus inherently expressive.

227.    Compelling Plaintiffs to accept leaders who do not share their religious beliefs

would force them to associate with and promote a message with which they disagree and which runs contrary to the expressive purposes for which they were created and operate.

228.    Defendants allow other recognized student groups and District and DCPS programs to associate with leaders and members who agree with their various missions or programmatic purposes. Thus, Defendants are discriminating against Plaintiffs.

229.    Compelling Plaintiffs to associate with and promote a message with which they disagree and which runs contrary to the expressive purposes for which they were created and operate is not narrowly tailored to a compelling governmental interest.

230.    Further, Defendants' actions expressly and unconstitutionally pressured Jackson-Reed FCA to ends its religious association with FCA National and start a new organization that was independent of FCA National and did not share the same religious beliefs.

231.    Defendants' actions thus violate the right of expressive association as secured to by the First Amendment of the United States Constitution to Plaintiffs and their members.

232.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

233.    Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Speech Clause and injunctive relief prohibiting future acts in violation of the Free Speech Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT VIII
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Assembly Clause

234.    Plaintiffs incorporate by reference all preceding paragraphs.

235.    By denying Jackson-Reed FCA recognized student group status because of its religious beliefs, Defendants infringe on Plaintiffs' First Amendment right "peaceably to assemble" to engage in otherwise lawful religious worship and speech activities with persons of their choosing. *Thomas v. Collins*, 323 U.S. 516, 530-40 (1945) (explaining right of assembly);

*see also InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 827 (E.D. Mich. 2021). Defendants commit the same injury to Plaintiffs by forbidding them from affiliating with student groups that affirm its religious beliefs and that would assemble on DCPS campuses as affiliates of Plaintiffs.

236.     Defendants allow other student groups with a wide variety of ideological tenets and a wide variety of restrictions on membership and leadership to access DCPS resources and to assemble on campus.

237.     Without recognized student group status, Plaintiffs and their members are denied important DCPS resources to meet, share their message, and grow their membership—resources that are available to all other student groups.

238.     Defendants are persons within the meaning of 42 U.S.C. § 1983.

239.     Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Free Speech Clause and injunctive relief prohibiting future acts in violation of the Free Speech Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT IX
### 42 U.S.C. § 1983
### Violation of the Fifth Amendment to the U.S. Constitution
### Due Process

240.     Plaintiffs incorporate by reference all preceding paragraphs.

241.     The District of Columbia "is a political entity created by the federal government, [so] it is subject to the restrictions of the Fifth Amendment." *Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991).

242.     By derecognizing Jackson-Reed FCA, Defendants have infringed on Plaintiffs' constitutional rights as laid out in the proceeding counts. *See Healy v. James,* 408 U.S. 169, 181 (1972) (explaining "that denial of official recognition, without justification, to college organizations burdens or abridges" constitutional protections).

243.    The Due Process Clause of the Fifth Amendment guarantees that individuals and groups shall not be deprived of constitutional protections without "due process of law." That protection extends to student groups. *See Healy*, 408 U.S. at 177 (describing how a university was required to provide a student group "a hearing and opportunity to introduce evidence" before excluding them from campus).

244.    At a minimum, "the due process clause requires ... that the government provide notice and some kind of hearing before final deprivation of a property [or liberty] interest." *Propert*, 948 F.2d at 1331.

245.    Defendants failed to provide Plaintiffs notice concerning the basis for the revocation of recognized status. Likewise, Plaintiffs were not provided with an opportunity to correct evidence that Defendants apparently used to make their decision(s), nor to confront any accusers. Even throughout the appeal process, Defendants did not meaningfully reconsider their factual findings or seek additional evidence from Plaintiffs. Defendants' conduct therefore falls short of even the most minimal protections of the Due Process Clause.

246.    As a result of Defendants' acts, Plaintiffs and their members have suffered harm including the loss of benefits identified above.

### COUNT X
**42 U.S.C. § 1983**
**Violation of the Fifth Amendment to the U.S. Constitution**
**Equal Protection**

247.    Plaintiffs incorporate by reference all preceding paragraphs.

248.    The Equal Protection Clause prohibits discrimination on the basis of religion.

249.    Defendants' interpretation and application of the D.C. Human Rights Act and the DCPS non-discrimination policy penalizes Plaintiffs because of their religious beliefs by denying Plaintiffs recognized status while allowing other religious and non-religious groups with leadership and membership qualifications to maintain recognized status.

250.    Other organizations that espouse religious beliefs are allowed to maintain

recognized status. For example, the Jewish Student Union is permitted to retain its recognized status, as is the Muslim Student Association. Likewise, nonreligious groups like Girls Who Code are permitted to maintain recognized status.

251.    Defendants' preference for one set of religious beliefs and against Plaintiffs' religious beliefs, and its preference for nonreligious groups against Plaintiffs, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

252.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

253.    Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Equal Protection Clause and injunctive relief prohibiting future acts in violation of the Equal Protection Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

## COUNT XI

### 42 U.S.C. §1983
### Violation of the First Amendment to the U.S. Constitution
### Establishment Clause
### Denominational Discrimination

254.    Plaintiffs incorporate by reference all preceding paragraphs.

255.    "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

256.    Defendants seek to apply DCPS's nondiscrimination policy and the D.C. Human Rights Act to penalize Plaintiffs because of their religious beliefs.

257.    Defendants have not penalized other religious groups on campus for their religious beliefs and leadership selection.

258.    Defendants' preference for some religious beliefs and leadership selection practices over FCA's religious beliefs and leadership selection practices violates the Establishment Clause of the First Amendment to the United States Constitution.

259.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

260.    Plaintiffs seek on behalf of themselves and their members a declaration that the District's actions violate the Establishment Clause and injunctive relief prohibiting future acts in violation of the Establishment Clause. Without such declaratory and injunctive relief, Plaintiffs and their members will continue to be irreparably harmed.

**COUNT XII**

**D.C. Code § 2-1402**
**Violation of the D.C. Human Rights Act**

261.    Plaintiffs incorporate by reference all preceding paragraphs.

262.    The District is the suable entity representing DCPS's member schools, which are "Educational institutions" within the meaning of D.C. Code 2-1401.02(8). An "educational institution" as "any public or private institution including an academy, college, elementary or secondary school." *Id*.

263.    The D.C. Human Rights Act prevents educational institutions from denying access to its facilities, services, and programs to any qualified person based upon the religion of the person. *Id*. § 2-1402.41.

264.    By singling out Plaintiffs and forcing Jackson-Reed to derecognize the Jackson-Reed FCA huddle as a student group, Defendants have "den[ied], restrict[ed], abridge[d] or condition[ed] the use of… facilities, services, programs, or benefits" based upon the religion of Plaintiffs. *Id*. § 2-1402.41(1).

265.    Specifically, Defendants have denied the benefits of official club recognition to Plaintiffs. These benefits include access to faculty advisors, student activities funding, on-campus meeting spaces, listing on the school website, the right to access student activities fairs, the ability to advertise on-campus for huddle events, and other benefits. Defendants denied these benefits because Plaintiffs wish to freely exercise their religion and choose student leaders that share Plaintiffs' Christian beliefs.

266.    As a result of Defendants' discriminatory acts, Plaintiffs and their members have suffered harm including the loss of benefits identified above.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

a.  Declare that the First and Fifth Amendments to the United States Constitution, the Equal Access Act, the Religious Freedom Restoration Act, and the D.C. Human Rights Act require Defendants to stop discriminating against Plaintiffs and to stop withholding recognized status on the basis of their beliefs and leadership selection policies;

b.  Declare that the First Amendment to the United States Constitution and DC law to protect Plaintiffs' right to select religious leaders who share their faith, without government interference;

c.  Declare that D.C. law may not be applied by Defendants to Plaintiffs in a manner that violates Plaintiffs' rights under the United States Constitution;

d.  Issue a preliminary and permanent injunction prohibiting enforcement of DCPS's anti-discrimination policies against Plaintiffs for requiring that student leaders agree with Plaintiffs' religious beliefs;

e.  Issue a preliminary and permanent injunction prohibiting enforcement of the D.C. Human Rights Act against Plaintiffs for requiring that student leaders agree with Plaintiffs' religious beliefs;

f.  Award Plaintiffs compensatory and nominal damages for the loss of their rights as protected by the United States Constitution and D.C. law;

g.  Award Plaintiffs the costs of this action and reasonable attorney's fees; and

h.  Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Respectfully submitted this 7th day of May, 2024.

/s/ Daniel H. Blomberg
Daniel H. Blomberg (D.C. Bar No. 1032624)
Joseph C. Davis (D.C. Bar No. 1047629)
Kelly J. Oeltjenbruns (D.C. Bar No. 1658786)
Richard C. Osborne (N.J. Bar No. 402232022)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
dblomberg@becketlaw.org

Counsel for Plaintiffs

*pro hac vice application forthcoming