**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FELLOWSHIP OF CHRISTIAN ATHLETES**, et al., | Civil Action No. 1:24-cv-01332 |
| Plaintiffs, | **STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **DISTRICT OF COLUMBIA**, et al., | (Oral Argument Requested) |
| Defendants. | |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARD ....................................................................................................... 10

ARGUMENT .................................................................................................................. 10

    I.  Plaintiffs are likely to succeed on the merits. ................................................ 10

        A.  The District's exclusion of FCA violates statutory and constitutional protections for religious exercise. ........................................................ 10

            1.  The District's exclusion of FCA violates the Religious Freedom Restoration Act. ...................................................................... 11

            2.  The District's exclusion of FCA violates the Free Exercise Clause. .................... 16

            3.  The District's exclusion of FCA violates the Religion Clauses' protection of religious autonomy. ........................................... 23

        B.  The District's exclusion of FCA violates statutory and constitutional protections for religious speech and assembly. ........................................... 25

            1.  The District's exclusion of FCA violates the Equal Access Act. ....................... 25

            2.  The District's exclusion of FCA violates its free-speech rights. ....................... 31

            3.  The District's exclusion of FCA violates its expressive-association rights .......... 34

            4.  The District's exclusion of FCA violates its right to assemble. ....................... 35

    II.  FCA easily satisfies the remaining preliminary-injunction factors. ................................... 36

        A.  FCA is irreparably harmed .......................................................................... 36

        B.  The public interest and balance of equities favor recognizing FCA ............................ 37

CONCLUSION ............................................................................................................... 39

CERTIFICATE OF SERVICE ........................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023).................................................................................................29, 31

*Axson-Flynn v. Johnson,*
   356 F.3d 1277 (10th Cir. 2004) ...........................................................................21

*Bible Club v. Placentia-Yorba Linda Sch. Dist.,*
   573 F. Supp. 2d 1291 (C.D. Cal. 2008) ................................................ 27, 30, 36-37

*Board of Educ. v. Mergens ex rel. Mergens,*
   496 U.S. 226 (1990)...............................................................................25, 26-27, 30

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000).........................................................................................34, 35

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014).........................................................................................11, 12

*Bus. Leaders in Christ v. Univ. of Iowa,*
   991 F.3d. 969 (8th Cir. 2021) ...........................................................................32, 34

*Bus. Leaders in Christ v. Univ. of Iowa,*
   No. 3:17-cv-80, 2018 WL 4701879 (S.D. Iowa Jan. 23, 2018)..............................37

*Butler v. St. Stanislaus Kostka Catholic Acad.,*
   609 F. Supp. 3d 184 (E.D.N.Y. 2022) ...................................................................24

*Cal. Democratic Party v. Jones,*
   530 U.S. 567 (2000).........................................................................................27

*Capitol Hill Baptist Church v. Bowser,*
   496 F. Supp. 3d 284 (D.D.C. 2020).................................................................11, 13, 15

*Christian Legal Soc'y v. Martinez,*
   561 U.S. 661 (2010)...........................................................................................27, 31, 32

*Christian Legal Soc'y v. Walker,*
   453 F.3d 853 (7th Cir. 2006) ...........................................................................34, 35

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993)...........................................................................................20, 22

*Colin ex rel. Colin v. Orange Unified Sch. Dist.*,
    83 F. Supp. 2d 1135 (C.D. Cal. 2000) ...................................................30

*Conlon v. InterVarsity Christian Fellowship*,
    777 F.3d 829 (6th Cir. 2015) ..............................................................24

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,
    483 U.S. 327 (1987)............................................................................12

*De Jonge v. Oregon*,
    299 U.S. 353 (1937)............................................................................35

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
    336 F.3d 211 (3d Cir. 2003)................................................................26

*Duquesne Univ. of the Holy Spirit v. NLRB*,
    947 F.3d 824 (D.C. Cir. 2020) ......................................................16, 23

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) ...................................................14, 15, 23

*Espinoza v. Mont. Dep't of Rev.*,
    591 U.S. 464 (2020)............................................................................15

*Eu v. San Francisco Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989)............................................................................34

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ........................................................ *passim*

*Frederick Douglass Found. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023)............................................... 29-30, 32

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)......................................................................20, 21

*Gonzales v. O Centro Espírita Beneficente União*
    *do Vegetal*, 546 U.S. 418 (2006)..................................................11, 15

*Gonzalez ex rel. Gonzalez v. School Bd. Of Okeechobee Cnty.*,
    571 F. Supp. 2d 1257 (S.D. Fla. 2008) ..............................................31

*Green v. Miss United States of Am.*,
    52 F.4th 773 (9th Cir. 2022) ..............................................................27

*Healy v. James*,
    408 U.S. 169 (1972)......................................................................13, 35

*Hosanna-Tabor v. EEOC,*
    565 U.S. 171 (2012)................................................................24, 27, 33

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist.,*
    85 F.3d 839 (2d Cir. 1996).............................................................28, 38

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.,*
    515 U.S. 557 (1995)......................................................................27, 34

*InterVarsity Christian Fellowship v. University of Iowa,*
    408 F. Supp. 3d 960 (S.D. Iowa 2019) ..........................................15

*InterVarsity Christian Fellowship/USA v. Board of Govs. Of Wayne State Univ.,*
    534 F. Supp. 3d 785 (E.D. Mich. 2021)......................................... *passim*

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa,*
    5 F.4th 855 (8th Cir. 2021) .............................................16, 32, 36

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ........................................................11

*Karem v. Trump,*
    960 F.3d 656 (D.C. Cir. 2020) ........................................................37

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
    344 U.S. 94 (1952)..........................................................................23

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ....................................................................21-22

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................................10, 36

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020)........................................................................14

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy,*
    594 U.S. 180 (2021)........................................................................34

*Mahoney v. Babbitt,*
    105 F.3d 1452 (D.C. Cir. 1997) ......................................................30

*Masterpiece Cakeshop, Ltd. V. Colorado C.R. Comm'n,*
    584 U.S. 617 (2018)....................................................................21, 22

*Matal v. Tam,*
    582 U.S. 218 (2017)........................................................................31

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...............................................................................36

*Nat'l Cap. Presbytery v. Mayorkas*,
    567 F. Supp. 3d 230 (D.D.C. 2021) .........................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009) ..................................................................................................37

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020) .........................................................................................24, 25

*PETA, Inc. v. Gittens*,
    215 F. Supp. 2d 120 (D.D.C. 2002) .........................................................................33

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) .......................................................................10, 36, 37

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .......................................................................37-38

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..............................................................................................28-29

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) .......................................................................................33, 34-35

*Roman Catholic Archbishop of Wash. v. Bowser*,
    531 F. Supp. 3d 22 (D.D.C. 2021) ...........................................................................11

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ...................................................................................................36

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................................31, 32

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ............................................................................................23-24

*Shurtleff v. City of Boston*,
    596 U.S. 243 (2022) .............................................................................................31-32

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ............................................................................ *passim*

*Singh v. Carter*,
    168 F. Supp. 3d 216 (D.D.C. 2016) .....................................................................13, 37

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
    41 F.4th 931 (7th Cir. 2022) ........................................................................24

*Straights & Gays for Equal. v. Osseo Area Schs.*,
    471 F.3d 908 (8th Cir. 2006) ..................................................................30, 36

*Tandon v. Newsom*,
    593 U.S. 61 (2021)........................................................................................17

*Thomas v. Collins*,
    323 U.S. 516 (1945)......................................................................................35

*Thomas v. Review Bd. Of Ind. Emp. Sec. Div.*,
    450 U.S. 707 (1981)......................................................................................12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)......................................................................................16

## Statutes

20 U.S.C. § 4071 ..............................................................................................25, 26

20 U.S.C. § 4072 ....................................................................................................26

42 U.S.C. § 2000bb ................................................................................................10

42 U.S.C. § 2000bb-1 ............................................................................................13

42 U.S.C. § 2000bb-2 ............................................................................................11

42 U.S.C. § 2000cc-5 ............................................................................................11

D.C. Code §§ 2-1371-1398.02 .............................................................................6-7

D.C. Code § 2-1401.03 ..........................................................................14, 19-20, 23

D.C. Code § 2-1402.12 ..........................................................................................20

D.C. Code § 2-1402.41 ............................................................................................6

D.C. Code § 2-1402.42 ..........................................................................................20

D.C. Code § 2-1402.73 ..........................................................................................19

## Other Authorities

*About Clubs/Extracurricular Activities*, Benjamin Banneker
    Academic High School ............................................................................32-33

*How DCPS is Funded as an Agency from the District*, DCPS ...................................................5, 26

*Clubs*, Jackson-Reed High School ................................................................................................5

John D. Inazu, *The First Amendment's Public Forum*,
    56 Wm. & Mary L. Rev. 1159 (2015) .....................................................................................35

## INTRODUCTION

This case is about a religious student group that wants equal access to a public high-school campus like every other student group. But because it asks its leaders to agree with its religious beliefs, the District of Columbia (via D.C. Public Schools) is excluding it. That violates not only common sense but settled law. Indeed, the en banc Ninth Circuit, applying "bedrock" Supreme Court precedent, recently held as much, in a case involving the same national student group being kicked off another high-school campus for maintaining the same religious leadership requirements.

Fellowship of Christian Athletes is a longstanding religious ministry with a mission to combine faith and sports and which affiliates with more than 7,000 student groups—"huddles"—on university, high-school, and middle-school campuses across the country (and many more around the world). But the District kicked FCA off Jackson-Reed High School's campus. The reason? FCA asks its student leaders to hold the same religious beliefs as the group itself. According to the District, "[t]he premise of what the organization stands for is discriminatory." And FCA can be allowed back only if it allows anyone to lead its prayers and religious teaching "regardless of religious affiliation, or personal belief."

The District's exclusion of FCA violates multiple overlapping statutory and constitutional protections for religious exercise and speech. *First*, it violates the Religious Freedom Restoration Act, which presumptively prohibits the District from conditioning government benefits—like student-group recognition—on abandoning religious exercise—like FCA's leadership requirements. The District can only do so if it can satisfy the strictest scrutiny, which it can't come close to doing.

*Second*, the District's actions violate the First Amendment's Free Exercise Clause, which prohibits the government from treating religion unequally unless the government satisfies strict scrutiny. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc) ("*FCA-San Jose*"). Like its San Jose school district counterpart, the District runs numerous programs—indeed even entire *schools*—in ways that turn on characteristics covered by the same nondiscrimination policies it invokes against FCA, and gives a pass to a

multitude of favored student groups that do the same. "[T]he Constitution prohibits such a double standard." *Id*. at 672.

*Third*, by penalizing FCA for its religious leadership policies, the District has violated the doctrine of religious autonomy. Whatever else they mean, the First Amendment's Religion Clauses at least prevent the government from the extraordinary intrusion of banning religious groups from having religious leaders.

*Fourth*, the District's actions violate the Equal Access Act, a statute passed by Congress specifically to guarantee campus access for religious student groups. Because the District recognizes myriad noncurricular student groups (from Dungeons & Dragons to Chess Club), it cannot, under the plain terms of the EAA, exclude FCA because of the religious content of its speech.

*Fifth*, and finally, the District's actions violate FCA's First Amendment rights to free speech, expressive association, and assembly. The District has stopped FCA from assembling on its campuses simply because it disagrees with FCA's religious views. And the District cannot force FCA to associate with leaders who don't share its religious beliefs.

*        *        *

Student groups provide an important means for students of diverse interests and backgrounds to foster connections and nurture their interests among like-minded peers. But groups can serve this role only if they are allowed to be who they are—only if their salt can retain its savor. Fortunately, the Constitution protects student groups' right to be distinct. And that's all the more so when, as here, the government allows a wide array of unique communities but selectively enforces its policy against a religious organization to which the First Amendment extends special solicitude.

Jackson-Reed FCA is ready and waiting to resume its ministry on Jackson-Reed's campus. This Court should enter a preliminary injunction allowing it to do so for the 2024-25 school year and during the pendency of this litigation. FCA thus respectfully requests a decision by **August 26, 2024**, the scheduled first day of the 2024-25 school year.

## FACTUAL BACKGROUND

*Fellowship of Christian Athletes.* Founded in 1954, Fellowship of Christian Athletes is a Christian ministry whose chapters embrace both its mission "to lead every coach and athlete into a growing relationship with Jesus Christ and His church" and its vision "to see the world transformed by Jesus Christ through the influence of coaches and athletes." Declaration of Ken Williams ¶ 4. Today, FCA has more than 20,000 ministry groups in 115 countries and over 7,000 student chapters, called "huddles," which meet on middle-school, high-school, and college campuses across the United States. *Id.* ¶ 6.

Throughout FCA's nearly 70-year existence, huddle ministry has been at the core of its religious mission. *Id.* ¶ 7. By supporting and affiliating with huddles on school campuses across the country, FCA has been able to share the Gospel of Jesus Christ with student-athletes and help them grow and mature as Christians. *Id.* Without this campus presence, FCA wouldn't be able to pursue its religious mission and reach student-athletes—whom FCA believes "are worth our deepest love" and "best sacrifice." *Id.*

Students are indispensable to FCA's religious mission. Indeed, FCA huddles are initiated and led by students who want to partner with FCA, and student leaders are "the primary embodiment of FCA's faith and Christian message to the campuses on which they serve." *Id.* ¶ 9. Most of what student leaders do for their huddle is pure religious ministry and leadership. *Id.* ¶ 11. For example, student leaders supervise and run their huddle's religious meetings, which often includes leading Bible study, prayer, and worship. *Id.* ¶ 9.

Because student leaders are critical to FCA's religious mission, it's essential that they agree with FCA's religious beliefs, which include its Christian Community Statement, its Statement of Faith, and its Student Leadership Statement. *Id.* ¶ 10. To allow otherwise would "undermine FCA's religious mission and message" because "student leaders' beliefs and conduct are crucial to the credibility and effectiveness of each FCA club's ministry." *Id.* ¶ 14. In practice, this means student leaders of affiliated huddles must "affirm[ ] their agreement with FCA's" Christian beliefs and "conduct themselves in a manner that affirms biblical standards of conduct in accordance with

3

FCA's Christian beliefs." Williams Decl. ¶ 10; *id.* Ex. B at 11, 16. FCA's community standards include (among other things) that "all prejudice, bias and racism is wrong and rooted in sin"; that leaders should abstain from "controlled substances, alcohol, tobacco and cannabis"; and that "sexual relations outside of marriage"—understood as being only between a man and a woman—"are inconsistent with God's call to holiness in our lives." Declaration of Jolee Paden ¶ 20; *id.* Ex. A.

Although student leaders must agree with FCA's religious beliefs, any student is welcome to join as a member or participate in huddle events, including in their religious discussions, service projects, prayer times, worship sessions, weekly meetings, and Bible studies. Paden Decl. ¶ 13. FCA huddles in Washington, DC, have members and participants from various religious and non-religious backgrounds. *Id.*

In addition to their religious ministry and outreach to student-athletes, FCA huddles serve and enrich the communities in which they operate. *Id.* ¶ 10. For example, D.C. FCA offers $30,000 in annual scholarships for local student-athletes to attend summer sports camps across the country. *Id.* At these camps, students can improve their athletic skills and build community with other student-athletes. FCA also partners with the D.C. Dream Center, a community center in Southeast D.C. dedicated to serving the community, to host various events including an "all-abilities" camp for student-athletes with disabilities. *Id.* And once a month, FCA offers a free community huddle, where students gather, eat pizza, talk about faith, and play sports. *Id.*

FCA huddles also play an important role in their local school community. In D.C. specifically, FCA huddles help local schools address chronic absenteeism—a well-known problem in D.C. *Id.* ¶ 34. As the D.C. Policy Center recently reported, 60% of all high school students in D.C. were "chronically absent" in the 2022-23 school year, which means those students missed more than 10% of all school days. Paden Decl. Ex. C at 32-33. The report further explained that chronic absenteeism presents "one of the greatest challenges for D.C.'s public schools, especially at high schools." *Id.* at 32.

FCA's huddle ministry helps meet this grave issue facing D.C. public schools. First, FCA huddles meet during the school day, giving students a reason to be on campus and attend class. Paden

Decl. ¶ 35. Second, FCA also provides free lunch to students—a meal that many students wouldn't otherwise have—which helps build community and friendship among students and further incentivizes students to attend school. *Id.*

FCA huddles are thus key contributors in meeting the local needs of school districts. That's why several Jackson-Reed High School administrators and employees in 2022 expressed interest in having FCA return to campus. *Id.* ¶ 29. These "administrators, teachers, and coaches all understood both the impact FCA huddles have on their campuses and the value of having a faith community among their student athletes." *Id.*

***The District's Student Groups.*** The District of Columbia Public School system ("DCPS," or together with all Defendants, "the District") receives federal financial assistance to fund its operations. *See How DCPS is Funded as an Agency from the District*, DCPS, https://perma.cc/2KMS-VXPV. The District allows students to create and organize their own student groups, which can meet during noninstructional time. *See, e.g.*, *Clubs*, Jackson-Reed High School, https://perma.cc/2ARW-JEGZ.

Because these groups don't need to serve an educational purpose, the District has recognized hundreds of them with many diverse purposes and viewpoints. Jackson-Reed's website claims that it alone recognizes over 200 clubs and activities, which have included the Cooking Club, the Gender Sexuality Alliance, the Awkward Black Girls Club, the National Society of Black Engineers, the Jewish Student Union, the Dungeons & Dragons Club, the Lego Builders Club, and the Ping Pong Club. Declaration of Joseph Davis, Ex. A.

Becoming an officially recognized student group at Jackson-Reed is easy. A student or faculty sponsor must submit an online form that identifies the club's faculty sponsor and provides the club's purpose, objectives, and activities. There are no additional steps in the approval process, and clubs can be recognized within hours of submission. Paden Decl. ¶ 27.

Official recognition for student groups is important. It signifies a group's full membership in the school community and comes with many additional benefits, like the ability to meet in school facilities, which provides a safe environment for students to gather; participate in the student

activities fair; appear on school websites and use the school's name in the club's social media handles; advertise club events on school bulletin boards; and access funding, including stipends for club sponsors. Paden Decl. ¶ 31. And because an unrecognized student group doesn't get any of these benefits, it would be "very difficult, and likely impossible, to run a successful, healthy student group" without official recognition. *Id.*

***DCPS's Application of the D.C. Human Rights Act.*** According to DCPS, all DCPS programs and activities, along with all student groups recognized by DCPS schools, must comply with the D.C. Human Rights Act. *See* DCPS Notice of Non-Discrimination, Davis Decl. Ex. B. The Act prohibits, among other things, discrimination based on certain characteristics, including "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, political affiliation, source of income, disability, or homeless status." D.C. Code § 2-1402.41(1).

Nonetheless, the District, through its member schools, has approved numerous student groups that take into account one or more of the criteria listed in the D.C. Human Rights Act. *See* Paden Decl. ¶ 42. Many clubs—like the Gender Sexuality Alliance, Girls Up in the District, Girls Who Code, the National Society of Black Engineers, Young Men of Phelps, and Women in STEM — appear to select members and leaders based on race, sex, and sexual orientation. Davis Decl. Ex. A at 8, 39-42; *id.* Ex. F at 9; *id.* Ex. I at 3.

Further, beyond just student groups, many of DCPS's own programs discriminate in violation of the applicable nondiscrimination policies. For instance, some DCPS schools discriminate based on race and sex in their admissions: Ron Brown College Preparatory High School is a school holding itself out as for boys of color, and Excel Academy is an all-girls school. Davis Decl. Exs. G, H. And although the D.C. government as a whole is subject to the Human Rights Act, it has multiple Executive Offices dedicated to promoting the interests of various race-, ethnicity-, and sex-based groups, including by administering government benefits. These include the "Office on African Affairs," the "Office of African American Affairs," the "Office on Latino Affairs," the "Office on Asian & Pacific Islander Affairs," and the "Office on Gay, Lesbian, Bisexual, and

Transgender Affairs." D.C. Code §§ 2-1371-1398.02; *see also Mayor Bowser Awards Over $2.2 Million in Grants to Community Organizations Supporting DC Values*, Executive Office of the Mayor of D.C., Davis Decl. Ex. D, at 1-2. Moreover, DCPS's "Anti-Discrimination Policy" applies the D.C. Human Rights Act within DCPS and reserves discretion to school officials to provide preferential treatment to protected groups based on officials' determination of "where the greatest disparities have persisted." DCPS Anti-Discrimination Policy, Davis Decl. Ex. C at 1.

**DCPS Revokes FCA's Recognition.** FCA has been active in D.C. schools for decades, Paden Decl. ¶ 2, and it had an intermittent presence on Jackson-Reed's campus for years before the COVID-19 pandemic. *Id*. ¶ 28. At the beginning of the 2022 school year, several Jackson-Reed administrators expressed interest in FCA returning to campus. *Id.* ¶ 29. Accordingly, in September 2022, FCA submitted a request for official recognition as a student group, which Jackson-Reed approved. *Id.* ¶ 30; Rich Decl. Ex. A. This recognition permitted students to initiate FCA huddle activities, and the group joined the school's official list of recognized student groups and received a dedicated student-group webpage. Rich Decl. Ex. A; Paden Decl. ¶ 30. Soon after, FCA participated in Jackson-Reed's activities fair, where several students signed up to attend the group's inaugural huddle meeting in October. Paden Decl. ¶ 30.

Two weeks after Jackson-Reed granted FCA official recognition as a student group, however, a part-time assistant coach, Paul Legere, objected to FCA's presence on campus because he disagreed with FCA's religious beliefs. Rich Decl. ¶ 9. As he explained in a social media message to FCA, "[t]here is no place for a group like FCA in a public school." *Id.* Ex. B.

Acting on that view the next day, Legere filed a grievance with the District's Comprehensive Alternative Resolution and Equity Team (CARE)—the body who oversees claims of discrimination, sexual harassment, bullying, or other unfair treatment of students, parents, and visitors of DCPS schools. In his complaint, Legere alleged that Jackson-Reed was violating the D.C. Human Rights Act by "allowing the Fellowship of Christian Athletes (FCA), who discriminates against the Lesbian, Gay, Bisexual, Transgender & Queer (LGBTQ) community, to sponsor a club on their campus." *Id.* Ex. H. More specifically, Legere wrongly believed that FCA "openly discriminate[d]

7

against the LGBTQ community" by "ma[king] … participants sign a sexual purity statement which prohibits homosexual acts." *Id.*

Because of Legere's allegations, the District suspended FCA's official recognition, removed it from the list of recognized student clubs, deleted its club webpage, and launched a formal investigation into the student group. Paden Decl. ¶¶ 30-31; Rich Decl. Exs. C, D. As part of this investigation, CARE interviewed Chris Rich, Vice-President of Field Ministry for FCA's Mid-Atlantic Region, and Grant Franke, Jackson-Reed FCA's faculty advisor. Both explained that FCA doesn't require anyone—leaders, members, or participants—to sign a "sexual purity" statement. Rich Decl. ¶ 11. Further, FCA doesn't discriminate based on sexual orientation or on any basis other than religion—all students are eligible for leadership if they sincerely agree with and follow FCA's faith. Paden Decl. ¶ 23. And while FCA does require that its student leaders agree with its religious beliefs, anyone "is welcome to be a member of or participate in FCA huddles." Paden Decl. ¶ 14.

Despite the information presented to CARE, it concluded that Legere's grievance was "substantiated." Rich Decl. Ex. H. As it explained in its decision, Jackson-Reed had "allowed and supported a group on their campus that discriminated against the LGBTQ community by making people sign a purity pledge that prohibits homosexual acts." *Id.* The District therefore ordered Jackson-Reed to "disassociate" from FCA and encouraged Jackson-Reed FCA to disassociate from FCA National. *Id.*

FCA first learned about the decision through a report in the student newspaper—which was published the same day as CARE's decision. And that report already included an interview with Legere, who praised the decision and explained that while he was "not sure if this ruling w[ould] withstand a challenge by the FCA," it would "at least ensure that kids/families involved at Jackson-Reed are fully aware of what they are taking part in." Rich Decl. Ex. F. By contrast, CARE refused to share its decision with FCA for weeks. Rich Decl. ¶ 16. It was only after repeated requests that a copy was even given to FCA's faculty advisor—and he was instructed not to share it with FCA. *Id.* ¶¶ 16-17. FCA didn't receive a copy until December 22, a week after it filed its appeal. *Id.* ¶ 17.

*FCA Appeals Its Exclusion.* On December 15, 2022, FCA timely appealed CARE's decision through the District's grievance appeal process. Rich Decl. ¶ 17. In its appeal letter, FCA asked to be reinstated for two primary reasons. First, CARE's original conclusion was based on facts it knew to be false, such as that FCA required its participants to sign a sexual purity statement. *Id.* ¶ 19; Rich Decl. Ex. I at 3. And second, regardless of any sexual purity statement, excluding FCA for asking its leaders to agree with its faith violated federal civil rights laws and the First Amendment. Rich Decl. ¶ 17; Rich Decl. Ex. I at 3-4.

On January 11, DCPS denied FCA's appeal in a decision virtually identical to its first one. *See* Rich Decl. ¶ 21; Rich Decl. Ex. L. The District's denial gave FCA 10 days to appeal the decision to Cinthia Ruiz—the District's Chief Integrity Officer and highest DCPS authority on grievance appeals. Rich Decl. ¶ 23. FCA timely filed its appeal, reiterating how the District's decision rested on a factual error and violated federal law. Rich Decl. Ex. M at 3-4.

Yet again, the District refused to reinstate FCA because of FCA's religious beliefs. Rich Decl. Ex. N. The District concluded that it would consider "reinstating" FCA only if FCA could "prove and assure that any member of the school community can be a 'Leader,' regardless of … religious affiliation, or personal belief." *Id.* at 2. The District's ruling stated that it was its "final DCPS administrative decision in the matter."

Several months later, the en banc Ninth Circuit ruled that a California school could not, under the First Amendment, exclude an FCA huddle for asking its leaders to agree with its religious beliefs. Rich Decl. ¶ 26. Because that decision rejected a rationale similar to DCPS's, FCA requested that the District reconsider its exclusion of FCA by November 10, 2023. Rich Decl. Ex. O. The District never responded. Rich Decl. ¶ 27. Instead, in early April 2024, DCPS officials ordered an unrecognized FCA huddle at another DCPS high school, Banneker, to stop holding meetings. Paden Decl. ¶ 37.

*The 2024-25 School Year.* In the upcoming academic year, FCA won't have equal access to Jackson-Reed's campus. Further, FCA has also been ordered to stop meeting at another DCPS school. *See* Paden Decl. ¶ 37. In the meantime, a current Jackson-Reed student has restarted the

local FCA huddle and affiliated with FCA. The huddle wants to obtain official recognition at Jackson-Reed. Declaration of John Doe ¶¶ 7-8.[1] Without judicial intervention, students in the huddle cannot enjoy their constitutional and statutory rights. "As soon as" the District's unlawful derecognition "is rejected in this lawsuit," however, Jackson-Reed FCA "intend[s] to apply for club recognition." John Doe Decl. ¶ 10.

## LEGAL STANDARD

A party moving for a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will likely suffer irreparable harm absent preliminary relief; (3) the balance of harms favors an injunction; and (4) the injunction will be in the public interest. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "In First Amendment cases, the likelihood of success [on the merits] 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## ARGUMENT

**I.  Plaintiffs are likely to succeed on the merits.**

**A.  The District's exclusion of FCA violates statutory and constitutional protections for religious exercise.**

The District's actions violate multiple statutory and constitutional protections for religious freedom—in particular, the Religious Freedom Restoration Act, which prohibits governments like the District from substantially burdening religious exercise absent compelling reason, 42 U.S.C. § 2000bb *et seq.*; the First Amendment's Free Exercise Clause, which protects religious observers from unequal treatment; and the First Amendment's Religion Clauses, which together protect religious organizations from government intrusion into leadership criteria.

---

[1]    John Doe, a minor, has expressed a reasonable fear of retaliation or other harm if his identity is disclosed, given his school's demonstrated hostility to his religious beliefs. John Doe Decl. ¶ 10. He therefore has submitted his declaration under a pseudonym. His father, also a declarant, has likewise submitted his declaration pseudonymously to protect his son's identity. Declaration of James Doe ¶ 9.

**1.   The District's exclusion of FCA violates the Religious Freedom Restoration Act.**

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014); *see Singh v. Berger*, 56 F.4th 88, 92-93 (D.C. Cir. 2022). RFRA by its terms applies to the District, 42 U.S.C. § 2000bb-2(2)—so "the District of Columbia and its officials must comply with" it. *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 293 (D.D.C. 2020).

RFRA was enacted in response to the Supreme Court's decision in *Employment Division v. Smith*, which held that under the Free Exercise Clause heightened review applies only to burdens on religion imposed by laws that aren't "neutral" and "generally applicable." *See Hobby Lobby*, 573 U.S. at 694-95. RFRA, meanwhile, stops the government from burdening religious exercise *even if* its rule is "neutral" or "of general applicability." 42 U.S.C. §§ 2000bb(a)(2), 2000bb-1(a).

RFRA's analysis is thus straightforward: if the plaintiff shows a substantial burden on its religious exercise, "the onus then shift[s] to the government" to satisfy strict scrutiny. *Capitol Hill Baptist*, 496 F. Supp. 3d at 293. Strict scrutiny means the government must "show that the law or regulation at issue is the least restrictive means to further a compelling interest." *Id.*; *see also Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb-1(b)).

**a.   The District substantially burdens FCA's religious exercise.**

The District's actions substantially burden FCA's religious exercise. RFRA defines "religious exercise" broadly to include *any* exercise of religion, even if it is "not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7). Courts therefore "focus not on the centrality of the particular activity to the adherent's religion but rather on whether the adherent's sincere religious exercise is substantially burdened." *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008). This "'substantial burden' exists when government action rises above *de minimis* inconveniences and puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Roman Catholic Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 35 (D.D.C. 2021) (quoting *Kaemmerling*, 553 F.3d at 678).

*Religious Exercise*. Here, FCA and its local huddles sincerely exercise their religion by gathering together on campus, praying, reading the Bible, worshipping, and discipling one another. FCA's exercise includes asking students who lead its huddles to share and abide by its religious beliefs, Paden Decl. ¶¶ 14-18 and 21-23, which courts around the country have recognized as protected religious exercise for religious student groups. *FCA-San Jose*, 82 F.4th 664, 672 (9th Cir. 2023) (en banc) (protecting FCA's practice of "requir[ing] its student leaders to affirm certain core religious beliefs identified in [its] Statement of Faith"); *see also, e.g.*, *InterVarsity Christian Fellowship/USA v. Board of Govs. of Wayne State Univ.*, 534 F. Supp. 3d 785, 796 (E.D. Mich. 2021) (protecting another Christian student group's requirement "that its faith leaders profess to be faithful"). And that's unsurprising, since a religious organization' "[d]etermin[ation]" that "only those committed to [its] mission should conduct" certain activities is a crucial "means by which a religious community defines itself." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring); *see also, e.g.*, *Nat'l Cap. Presbytery v. Mayorkas*, 567 F. Supp. 3d 230, 242 (D.D.C. 2021) (RFRA protects church's decision of who to employ as minister).

*Substantial Burden*. The government imposes a substantial burden when it either penalizes a religious adherent because of his religious exercise, *see Hobby Lobby*, 573 U.S. at 719-20, or "conditions receipt of an important benefit upon" his abandonment of it, *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981); *see also Nat'l Cap. Presbytery*, 567 F. Supp. 3d at 242. Here, the District has done both: it has penalized FCA for asking that its leaders agree with its faith—derecognizing Jackson-Reed FCA, stripping it from the school website, and ordering it to immediately cease operations, Rich Decl. Exs. C, D—and it has conditioned FCA's student-group status going forward on FCA's ceasing its religious exercise, Rich Decl. Ex. N. Indeed, the District couldn't have been more explicit: "DCPS would be in favor of reinstating" FCA, the District's final decision said, only if FCA dropped its religious leadership requirement and allowed "any member of the school community" to "be a 'Leader,' regardless of ... personal belief." *Id.*

And the benefits of recognition are important. Indeed, "it would be very difficult, and likely impossible, to run a successful, healthy student group" without them. Paden Decl. ¶ 31. Recognized student groups "enjoy important recruiting tools," *FCA-San Jose*, 82 F.4th at 673, such as appearance on the school website and the ability to participate in club rush. Paden Decl. ¶ 31. They can also obtain a faculty sponsor, use the school's name in social media handles, apply for certain funding, and access school meeting space. *Id.*; *see FCA-San Jose*, 82 F.4th at 673 (listing similar benefits). Being able to safely meet in school space especially key given that the surrounding "environment of many DCPS schools" can be unsafe. Paden Decl. ¶ 32 (recounting shooting just outside Jackson-Reed days after the District derecognized FCA). In short, as the Supreme Court has already explained in another student-group case, "impediments" on "official recognition" "cannot be viewed as insubstantial." *Healy v. James*, 408 U.S. 169, 181-82 (1972) (benefits of recognition needed "[i]f an organization is to remain a viable entity"); *infra* p.37 (collecting cases finding that denial of recognition to a student group constitutes irreparable harm).

Further, the "unfair and discriminatory" "singling out for special scrutiny" of a claimant's religious exercise itself constitutes a substantial burden. *Singh v. Carter*, 168 F. Supp. 3d 216, 230 (D.D.C. 2016). As explained more fully below, the District targeted FCA for special disapproval based on its nondiscrimination laws, even as it permits student clubs and runs government programs that themselves take into account characteristics covered by those same nondiscrimination laws. "Even if not intended" as discrimination, this conduct itself "amounts to a 'substantial burden.'" *Id.*

### b.  The District fails strict scrutiny.

Because the District's actions substantially burden FCA's religious exercise, its actions will be lawful only if they serve a compelling interest and are the least restrictive means of doing so. 42 U.S.C. § 2000bb-1(b). "In facing this strict scrutiny, the burden remains on the District, even as [FCA] moves for a preliminary injunction." *Capitol Hill Baptist*, 496 F. Supp. 3d at 296.

"Strict scrutiny is an 'exceptionally demanding' test." *Singh*, 56 F.4th at 93. In *Singh*, for example, the D.C. Circuit affirmed a preliminary injunction under RFRA against the Marine Corps,

holding that not even the Corps' interest in "forging unit cohesion and a uniform mindset during boot camp" could justify its refusal to permit religious beards and turbans. *Id.* at 97-106. Here too, the District can't show either of strict scrutiny's prongs.

**Compelling interest.** First, the District has no interest at all—much less a compelling interest— in forcing FCA to accept any leader regardless of "religious affiliation, or personal belief." Rich Decl. Ex. N. Such an interest would be nonsensical; no student joins the Fellowship of *Christian* Athletes expecting that it might be run by an atheist or pagan; just as there'd be no point in having (as a District high school does) a High School Democrats of America chapter if it might be run entirely by Republicans. *See* Davis Decl. Ex. F at 4.

Tellingly, the law supposedly providing the basis for the District's actions here—the D.C. Human Rights Act—does not even prohibit discrimination based on "personal belief." *See* Rich Decl. Ex. N, at 2. And the Act explicitly *permits* religious organizations to "limit[ ] … admission" or "giv[e] preference to persons of the same religion ... as is calculated by the organization to promote the religious ... principles for which it is established or maintained"—exactly what FCA seeks to do here. D.C. Code § 2-1401.03(b). This is not how the District would treat a "paramount interest" of the kind sufficient under strict scrutiny. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 696-97 (2020) (Alito, J., concurring) (quoting *Sherbert v. Verner*, 374 U.S. 398, 406 (1963)).

Nor even would the District's narrower claimed interest in eliminating sexual-orientation discrimination be enough to override FCA's religious exercise—as the D.C. Circuit has already held in an analogous context. *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467-70 (D.C. Cir. 1996) ("*CUA*"). In *CUA*, the D.C. Circuit held that RFRA barred a sex-discrimination claim by a teacher who was denied tenure at a Catholic university, holding that "the Government's interest in eliminating employment discrimination is insufficient to overcome a religious institution's interest in being able to employ the ministers of its choice." *Id.* at 467-68. If that's true even for Title VII— which the D.C. Circuit acknowledged generally serves "interests of the highest order," *id.* at 460—

it's certainly true of an application of the D.C. Human Rights Act to a voluntary religious student group's ability to select religious leadership.

In any event, government action can't be deemed to advance a compelling interest "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. 464, 486 (2020); *see also O Centro*, 546 U.S. at 433. And here, the District's view of the Human Rights Act appears to be honored only in the breach. As explained *infra* pp.17-20, myriad other student groups are permitted to organize around shared interests and characteristics, including characteristics otherwise covered by the Human Rights Act. And the District even runs programs—indeed, *entire schools*—that do likewise. The District's toleration of these groups and programs "undermines [any] contention that it has a compelling interest" in barring FCA for asking its leaders to agree with its faith. *Capitol Hill Baptist*, 496 F. Supp. 3d at 298-99.

Further, even if the District's interest were compelling in the abstract, RFRA requires the District to "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened.'" *O Centro*, 546 U.S. at 430-31. In other words, the District "must demonstrate the specific harm that 'would'—not could—result from 'granting [a] specific exemption[ ] to'" FCA. *Singh*, 56 F.4th at 97. Here, however, there is no evidence that any DCPS student ever sought to be a leader of an FCA huddle even while rejecting FCA's beliefs; the fight the District instigated here is purely speculative. Accordingly the District will "fail[ ] to establish the 'direct causal link between the restriction imposed and the [compelling-interest] injury to be prevented'"; it will therefore fail "RFRA's strict scrutiny test." *Id.* at 100.

**Least restrictive means.** Even assuming the District could claim a compelling interest in eliminating discrimination in DCPS schools, it would fail on least restrictive means. That is because it used a hatchet without considering a scalpel. Far from taking time to "meaningfully consider less-restrictive alternatives," the District "took an extreme step—complete deregistration of [FCA]"—in a rush to exclude FCA's religious views from campus. *InterVarsity Christian Fellowship v. University of Iowa*, 408 F. Supp. 3d 960, 984-85 (S.D. Iowa 2019).

Further, the District paradoxically "served [its allegedly] compelling interest" of eliminating discrimination "by picking and choosing what kind of discrimination was okay." *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 865 (8th Cir. 2021) ("*InterVarsity-Iowa*"); *see also id.* ("some RSOs at the University of Iowa may discriminate in selecting their leaders and members, but others, mostly religious, may not."). If the District truly wishes to eliminate discrimination of the type it claims FCA commits—requiring its leaders to share its faith—it "could have adopted an 'all-comers' policy." *Id.*[2] Or, since it is making an exception for gender-based groups and programs, it could have made a similar one for religious groups—like the already-existent religious exemption in the D.C. Human Rights Act.

It didn't. And now, FCA is barred from campus unless it deserts all leadership requirements and lets anyone (sincere believer or no) lead its students in prayer, worship, and other religious activities. That cannot possibly be the least restrictive way for the District to eliminate invidious discrimination in DCPS schools.

### 2. The District's exclusion of FCA violates the Free Exercise Clause.

RFRA aside, the District's actions also violate the Free Exercise Clause. "The Free Exercise Clause safeguards the freedom to practice religion, whether as an individual or as part of a group." *Duquesne Univ. of the Holy Spirit v. NLRB*, 947 F.3d 824, 827 (D.C. Cir. 2020). And it "'protect[s] religious observers against unequal treatment,'" subjecting "to the strictest scrutiny laws" disfavoring religion. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)).

Per the *en banc* Ninth Circuit, "Supreme Court authority sets forth three bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny." *FCA-San Jose*, 82 F.4th at 686. First, "the government may not 'treat ... comparable secular activity more favorably than religious exercise.'" *Id.* (quoting *Tandon v. Newsom*, 593

---

[2]    And the District's concern that FCA discriminates based on sexual orientation is simply false. A student who sincerely affirms FCA's beliefs is eligible for leadership regardless of orientation. Paden Dec. ¶ 23.

U.S. 61, 62 (2021)). Second, "a purportedly neutral 'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *Id.* (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). Third, "the government may not act in a manner 'hostile to ... religious beliefs' or inconsistent with the Free Exercise Clause's bar on even 'subtle departures from neutrality.'" *Id.* (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018)). Here, as in *FCA-San Jose*, "the District's implementation of its non-discrimination policies fails all three." *Id.*

### a. Comparable exceptions.

Strict scrutiny is triggered under the Free Exercise Clause whenever the government treats "*any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. In *FCA-San Jose*, the school district's policy failed this general-applicability test. While the school district derecognized FCA for its allegedly discriminatory leadership requirements, the district granted "exemptions for its own programs and student programs alike" and allowed them to discriminate "on otherwise protected grounds" like "race and gender." 82 F.4th at 687-90.

So too here. The District is requiring FCA to accept "any" student as a "'Leader,'" even if the student openly rejects FCA's mission. Rich Decl. Ex. N. But at Jackson-Reed alone, numerous other clubs are permitted to limit even *membership* on the basis of alignment with the club's mission and vision: for example, the Disability Student Alliance is for "disabled students and their allies"; Girls Who Code is "for girls interested in coding"; and the "Gender Sexuality Alliance" is for "LGBTQIA+ students" and their "allies." Davis Decl. Ex. A at 2-4.

Of course, the District purported to justify its actions by claiming FCA's leadership requirements "discriminate[d]" based on characteristics protected by the D.C. Human Rights Act. Rich Decl. Ex. N. But the District authorizes numerous clubs, programs, and activities to discriminate based on even those specific, Act-covered characteristics.

Beginning with the obvious: many recognized student clubs at District schools are organized around "individual preferences based on certain characteristics and criteria," *FCA-San Jose*, 82 F.4th at 689, including characteristics and criteria covered by the Act. Jackson-Reed alone

recognizes clubs like the Asian Student Union ("for students of Asian heritage"); the Black Student Union; the Disability Student Alliance; the Ethiopian Eritrean Organization; Girls Up in the District; Girls Who Code; the National Society of Black Engineers (featuring "[m]onthly guest speakers[ ] from community members of color in the STEM field"); and the Wise Club (which "offers a separate space for young women to meet to explore" various issues). Davis Decl. Ex. A at 1-8. Each of these clubs at least "facially discriminate[s] on the basis of" characteristics covered by the Human Rights Act (sex, ethnicity, disability)—yet each of them (unlike FCA) is allowed to do so. *FCA-San Jose*, 82 F.4th at 688.

Further, while FCA was derecognized for requiring it its leaders to share its traditional Christian beliefs about issues of sex and gender, Jackson-Reed permits other groups to organize around shared religious beliefs (the Jewish Student Union), and still others to organize around *progressive* views on sex and gender (the Gender Sexuality Alliance ("dedicated to providing a safe space for LGBTQIA+ students within Jackson-Reed"); The Birds & The Bees Sexual Health Club ("mission ... to combat the stigma" and "explore taboo topics," including via "condom packing")). Davis Decl. Ex. A at 39, 62, 82. Other schools within DCPS likewise recognize groups facially organized based on sex, ethnicity, or religion, like Young Men of Phelps ("a leadership trust for young men"); Commercial Real Estate Women (for "registered Female students"); and the Muslim Student Association ("goal ... to strengthen the Muslim community"). Davis Decl. Ex. F at 6; *id.* Ex. I at 3-4. And other schools permit student clubs to organize around still other Human Rights Act-protected categories—*e.g.*, the High School Democrats of America enjoy recognition at a DCPS campus, Davis Decl. Ex. F at 4, despite the Human Rights Act's prohibition on discrimination based on "political affiliation." And these are just a few examples. *See* Davis Decl. Exs. A, F, I.

Other DCPS school programs likewise turn on protected characteristics. *See FCA-San Jose*, 82 F.4th at 689. All District sports are segregated by "gender"; some are exclusively available to boys or to girls. *See Sports*, District of Columbia State Athletic Association, Davis Decl. Ex. J. And just this year, Jackson-Reed became "home" to Ruling Our eXperiences (ROX), a school-run

"sisterhood of young women" whose "facilitat[ors]" must "identify as female." Davis Decl. Ex. K; *Are You Ready to Empower Girls: FAQ*, ROX, Davis Decl. Ex. L.

But it isn't just school *programs*; rather, DCPS runs *entire schools* that facially discriminate based on characteristics covered by the Human Rights Act. DCPS includes two "single sex" schools—one for boys (Ron Brown College Preparatory High School) and one for girls (Excel Academy). Davis Decl. Ex. G, H. Moreover, Ron Brown states that it is a "Black Biosphere" existing specifically to "educate young men of color"—indicating that it discriminates in admission based not only on sex but also on race. *Id.* Ex. G; *see also id.* (Ron Brown demographic information; 0% white). If the Nation's capital operates a public high school admitting only students of a particular race and sex, it's difficult to see why a voluntary religious student club cannot ask its leaders to be of a particular faith.

Moreover, while the Human Rights Act expressly applies to the "District government" (not just its schools), D.C. Code § 2-1402.73, the District itself routinely offers programs that take into account characteristics allegedly off-limits under that Act. DCPS's "Empowering Males of Color" initiative aimed to distribute "$20 million" worth of grants in furtherance of race-conscious goals; Ron Brown High School was a recipient. Davis Decl. Ex. E. And the District has multiple Executive Offices explicitly dedicated to promoting the interests of various race-, ethnicity-, and sex-based groups, including the "Office on African Affairs," the "Office on African American Affairs," the "Office on Latino Affairs," the "Office on Asian and Pacific Islander Affairs," and the "Office of Gay, Lesbian, Bisexual, and Transgender Affairs." D.C. Law 16-89, Sec. 3; *see also, e.g.*, *Mayor Bowser Awards Over $2.2 Million in Grants to Community Organizations Supporting DC Values*, Executive Office of the D.C. Mayor, Davis Decl. Ex. D (millions of dollars in race, sex-, and sexual-orientation-targeted grants distributed by these offices).

Finally, even setting aside this multitude of on-the-ground exceptions, the D.C. Human Rights Act itself is riddled with express, textual "Exceptions"—making it the antithesis of a generally applicable law. *Lukumi*, 508 U.S. at 542 ("categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice"). For example, under the Act, the

District can discriminate based on age in hiring police officers and firefighters; employers can discriminate on any basis for reasons of "business necessity"; and private schools can discriminate based on sex in admissions. D.C. Code §§ 2-1401.03(a); 2-1402.12(b); 2-1402.42(a). Indeed, the Act allows "religious organization[s]" to "limit[ ] employment," "admission[s]" or "giv[e] preference to persons of the same religion ... as is calculated by the organization to promote the religious ... principles for which it is established or maintained"—an exception covering the exact type of conduct FCA seeks to engage in here. *Id.* § 2-1401.03(b); *see also id.* (similar for "political organization[s]").

\* \* \*

"Simply put, there is no meaningful constitutionally acceptable distinction between the types of exclusions at play here." *FCA-San Jose*, 82 F.4th at 689. The District is free to conclude that certain activities are sufficiently important to warrant exemptions from otherwise-applicable prohibitions in the Human Rights Act. But its refusal to similarly accommodate FCA's religious exercise "of necessity devalues" that exercise relative to analogous secular conduct—triggering strict scrutiny. *Lukumi*, 508 U.S. at 537-38; *see FCA-San Jose*, 82 F.4th at 689-90 ("Under *Tandon*, the District's acceptance of comparable selective secular organizations renders its decision to revoke and refuse recognition to FCA subject to strict scrutiny.").

### b. Individualized discretion.

*Tandon* aside, strict scrutiny is also triggered under *Fulton* because the District "retains (and exercises) significant discretion in applying exceptions to its own programs, as well as to student programs." *FCA-San Jose*, 82 F.4th at 687 (citing *Fulton*, 593 U.S. at 536-37). Policies allowing governmental discretion to award such exceptions trigger strict scrutiny even where, as in *Fulton*, the discretion is never used because it still "invites the government to consider the particular reasons for a person's conduct"—thus opening the door for disfavoring religion. *Fulton*, 593 U.S. at 523, 537. Such discretion can be "formal," *id.* at 537; but it can also be shown by repeatedly granting "ad hoc" discretionary exceptions, *FCA-San Jose*, 82 F.4th at 687; *accord Axson-Flynn v.*

*Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004) ("pattern of ad hoc discretionary" exceptions triggers scrutiny).

Both are true here. First, as in *Fulton*, the District has "creat[ed] ... a formal mechanism for granting exceptions," rendering its "policy not generally applicable." 593 U.S. at 537. In particular, although the D.C. Human Rights Act does not distinguish between the various protected characteristics (prohibiting all discrimination equally), the District has promulgated its own Anti-Discrimination Policy, which states that in implementing the Act the District will "offer[ ] the most support where the greatest disparities have persisted." Davis Decl. Ex. C at 1. This is just like *FCA-San Jose*, where the school district had likewise adopted a "separate" "equity policy," under which it could "evaluate which 'groups of students' qualify for the equity policy's objectives" based on various characteristics. 82 F.4th at 687.

Second, this case, like *FCA-San Jose*, "steps beyond the mere existence" of discretion to its "exercise[ ]." *Id.* at 688. As already explained, the District has "allow[ed]" numerous "student groups to discriminate" based on characteristics covered by the Human Rights Act, including "sex or ethnic identity," *id.*, and indeed has engaged in such discrimination itself. *Supra* pp.17-20. Under *Fulton*, even discretion that has "never" been exercised suffices to trigger strict scrutiny, 593 U.S. at 537; the fact that the District here has so routinely put its discretion into practice makes this an easy case.

In short, the District has ample discretion to depart from the Human Rights Act when it finds certain "reasons for not complying with [it] are worthy of solicitude." *Fulton*, 593 U.S. at 537. Under the Free Exercise Clause, the District "may not refuse to extend" the same favorable treatment to FCA "without compelling reason." *Id.* at 534; *see also FCA-San Jose*, 82 F.4th at 687-88.

### c. Hostility.

Independent of general applicability, the Free Exercise Clause's neutrality requirement forbids government actions that "stem from animosity to religion or distrust of its practices." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 584 U.S. 617, 638-39 (2018). Where this prohibition applies, courts "'set aside'" the government's actions "without further inquiry." *Kennedy v.*

*Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022). This rule forbids even "subtle departures from neutrality" and "covert suppression of particular religious beliefs," *Lukumi*, 508 U.S. at 534, which is "inconsistent with what the Free Exercise Clause requires," *Masterpiece*, 584 U.S. at 639. Here, the District's hostility was far from "subtle" or "covert," particularly "when bearing in mind" that its actions were "directed not at adult professionals, but at teenage students." *FCA-San Jose*, 82 F.4th at 692.

The hostility begins at the beginning. As in *FCA-San Jose*, the District's investigation began with a faculty member seeking to exclude FCA because of its *beliefs* about sexuality. *See* 82 F.4th at 673-75. Here, a Jackson-Reed baseball coach responded to an invitation to attend a free coaches' breakfast by sending FCA staff a social-media message stating "[t]here is no place for a group like FCA in a public school," Rich Decl. Ex. B, and filing a grievance with the District seeking to have FCA kicked off campus because of its faith, Rich Decl. Ex. H.

The hostility then continued in the District's investigation and initial grievance decision. First, before even reaching a decision on the grievance, the District ordered that Jackson-Reed FCA "immediately cease operations" and that its kick-off meeting—then less than a week away—"be postponed until further notice." Rich Decl. Ex. C. Its reason: "[t]he premise of what the organization stands for is discriminatory." Rich Decl. Ex. E at 1. Statements like this—characterizing religion as synonymous with "discrimination"—are precisely the kind the Supreme Court held improperly "disparag[ing]" in *Masterpiece*, 584 U.S. at 634-35.

Then, Jackson-Reed FCA was denied recognition because of its "sexual purity statement," which allegedly violated the District's non-discrimination policies. Rich Decl. Ex. H at 3. The problem is that this factual premise was incorrect: Although all FCA huddle leaders must agree with FCA's religious beliefs, including on sexuality, Jackson-Reed FCA had never required its participants to sign a "sexual purity statement." Rich Decl. ¶ 11. No matter—the District's grievance decision simply ignored this and determined that "the language in the sexual purity statement … constitutes a violation of policy." Rich Decl. Ex. H at 3. In response, Legere lauded the

District's decision even as he admitted to being "not sure if [it would] withstand a challenge by the FCA." Rich Decl. Ex. F at 2.

The hostility continued throughout the appeals process. For one thing, the District jeopardized FCA's ability even to appeal at all by refusing to send FCA a copy of the grievance decision (despite repeated requests and even as the school newspaper received one immediately). Rich Decl. ¶¶ 16-17. Then, after being told repeatedly on appeal that its original rationale for derecognizing FCA was factually inaccurate, the District simply supplied a broader rationale—determining that FCA must be willing to allow *anyone* to "be a 'Leader,' regardless of ... personal belief," or else remain off-campus forever. Rich Decl. Ex. N at 2. Notably, this rationale was entirely unmoored from the Human Rights Act (the law purportedly justifying the District's decision)—which doesn't prohibit "personal belief" discrimination and explicitly *permits* religious organizations to prefer "persons of the same religion." D.C. Code § 2-1401.03(b).

In other words, the District had a conclusion—FCA must go—in search of a rationale. Such efforts to "'use[ ]' government policy to exclude" a religious group have repeatedly been found to show "'significant hostility.'" *FCA-San Jose*, 82 F.4th at 692 (quoting *Lukumi*, 508 U.S. at 541). The District's actions violate the Free Exercise Clause.

### 3. The District's exclusion of FCA violates the Religion Clauses' protection of religious autonomy.

Finally, the District's actions also violate the First Amendment's protections for religious autonomy. It has long been established that the "First Amendment 'gives special solicitude to the rights of religious organizations,' guaranteeing them 'independence from secular control or manipulation.'" *Duquesne Univ.*, 947 F.3d at 828. This doctrine of autonomy for religious groups safeguards the groups' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *see also CUA*, 83 F.3d at 462-63.

This doctrine ensures that governments don't become "entangled in essentially religious controversies," like disputes over "the standard of morals" or decisions regarding who may properly

lead religious worship or prayer. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709, 713-14 (1976). Yet that's exactly what the District has done here—overriding FCA's determination that its leaders abide by its community standards, and insisting that *any* student at Jackson-Reed (of whatever "religious affiliation" or "personal belief") must be able to lead Bible studies and prayer at FCA meetings. Rich Decl. Ex. N at 2; *see* Paden Decl. ¶ 15.

Moreover, the Supreme Court has recognized that an important "component of [religious] autonomy" is a religious organization's "selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). Under the "ministerial exception," for example, governments are barred from "penal[izing]" a religious organization "for terminating an unwanted minister," *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 194 (2012), whether or not the decision was "made for a religious reason," *id.* at 194-95, and even if the decision would otherwise constitute (for example) sexual-orientation discrimination prohibited by other law, *see, e.g.*, *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 938 (7th Cir. 2022) (barring sexual-orientation-discrimination claims of Catholic school employee let go for engaging in same-sex relationship); *Butler v. St. Stanislaus Kostka Catholic Acad.*, 609 F. Supp. 3d 184, 188-89 (E.D.N.Y. 2022) (same, teacher).

This rationale applies all the more here. *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835-36 (6th Cir. 2015) ("[T]he historical practice has always been that the government cannot dictate to a religious organization who its spiritual leaders would be."). Indeed, if under the ministerial exception religious organizations are protected with respect to *each* ministerial position, and allowed to make hiring and firing decisions for any reason (or no reason at all), it follows *a fortiori* that a government entity can't categorically override a religious organization's selection of *all* its leaders, telling the organization that it can't even take the plainly religious step of ensuring that they are of the same faith.

And in fact, the court in *Wayne State* already so held. There, a university derecognized a Christian student group, reasoning that (as the District does here) the group violated antidiscrimination policies because its "leadership positions were limited to those who agree with [its] statement of

faith." 534 F. Supp. 3d at 797-98. But the court held that this violated the First Amendment, under which "[n]o religious group can constitutionally be made an outsider, excluded from equal access to public or university life, simply because it insists on religious leaders who believe in its cause." *Id.* at 812.

So too here. The District's action—derecognizing FCA clubs "because they do not allow non-believers, *who may be hostile to Plaintiffs' religious tenets*, to hold important spiritual offices"— "violate[s] the Religion Clauses of the First Amendment." *Wayne State*, 534 F. Supp. 3d at 811-13. The religious-autonomy doctrine bars "any attempt by government to … influence such matters." *Our Lady*, 140 S. Ct. at 2060.

### B. The District's exclusion of FCA violates statutory and constitutional protections for religious speech and assembly.

On top of these free-exercise protections, the District's actions also violate statutory and constitutional protections for FCA's religious speech and assembly. Congress enacted the Equal Access Act, 20 U.S.C. § 4071 *et seq.*, precisely to protect the rights of religious student groups (like FCA) to access campuses (like the District's). And the First Amendment's Free Speech Clause, expressive-association doctrine, and Assembly Clause likewise converge to condemn the District's actions and show FCA's likelihood of success.

### 1. The District's exclusion of FCA violates the Equal Access Act.

Under the Equal Access Act, any public high school that "receives Federal financial assistance" and "has a limited open forum" is barred from "deny[ing] equal access" to student clubs "on the basis of the religious … content of [their] speech." 20 U.S.C. § 4071(a). Congress enacted the EAA with a "broad legislative purpose" to address "widespread discrimination against religious speech in public schools," and the Supreme Court has instructed that the statute must be given a similarly "broad reading." *Board of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226, 239 (1990).

The statute is more protective than the "limited public forum" framework applicable in certain First Amendment cases, which presumptively prohibits only *viewpoint* discrimination and allows

a strict-scrutiny defense. *Id.* at 242. Under the EAA, by contrast, Congress determined that a school creates a "limited open forum" whenever it allows "one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b). And in a limited open forum, equal access must be restored whenever there is any *content*-based regulation—with no strict-scrutiny balancing exception allowed. *Mergens*, 496 U.S. at 236.

Here, the District accepts federal funds, allows numerous student groups with no relationship to its curriculum to meet during noninstructional time, and has excluded FCA based on the content of FCA's religious speech. Thus, the EAA dictates the District must remove its ban on equal access for FCA clubs.

### a. The District is subject to the EAA and has a limited open forum.

The EAA applies to "any public secondary school which receives Federal financial assistance" and which has established a "limited open forum" by allowing at least one "noncurriculum" group to meet at school during noninstructional time. 20 U.S.C. § 4071(a); *Mergens*, 496 U.S. at 235-36. Those criteria are met here.

Jackson-Reed is a public secondary school that receives federal funds. DCPS, *How DCPS is Funded as an Agency from the District*, https://perma.cc/2KMS-VXPV. It allows recognized clubs to meet during "noninstructional time"—which is before or after "actual classroom instruction" time. 20 U.S.C. § 4072(4); Davis Decl. Ex. A (listing several clubs meeting "after school"); *see also Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 221 (3d Cir. 2003). And it hosts many dozens of clubs on campus, including the Arab Student Union, Asian Student Union, Black Student Union, Chess Club, Cooking Club, Dungeons & Dragons Club, K-Pop Dance Club, Gender & Sexuality Alliance, National Honor Society, Jewish Student Union, LEGO Builders Club, and The Birds & The Bees Sexual Health Club. Davis Decl. Ex. A. Many of these kinds of clubs have specifically been identified by other courts as noncurricular. *See Mergens*, 496 U.S. at 238-40, 243 (listing "National Honor Society" among examples; also explaining "noncurriculum related" requires "more than just a tangential or attenuated relationship to courses offered by the school," and must be "more direct" than a "religious or political club" or "a chess club, a

26

stamp collecting club, or a community service club"); *accord Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1293 (C.D. Cal. 2008).

     **b.  The District's content-based exclusion of FCA violates the EAA.**

    The District is violating the EAA by regulating the content of FCA's speech in three different ways. First, the District inherently regulates the content of FCA's speech by not permitting FCA to select religious leadership. Second, the District's policy is expressly regulating the religious content of FCA's speech. And third, the District is selectively enforcing its policy in a content-based manner to favor other clubs' speech over FCA's.

    ***Excluding FCA for its leadership standards is content-based exclusion.*** The District cannot restrict FCA's religious leadership requirements without regulating the content of FCA's speech. That's because the leadership of an expressive association inherently influences the expression of the group. Put another way, "[w]ho speaks on [a club's] behalf … colors *what* concept is conveyed." *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 680 (2010). Thus, an expressive organization's "choice of a candidate is the most effective way in which that [organization] can communicate." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 570 (1995) (determining who marches in a parade is an expressive act protected by the Free Speech Clause); *Green v. Miss United States of Am.*, 52 F.4th 773, 788 (9th Cir. 2022) (expressive group "expresses its message in part through whom it chooses as its contestants").

    This "principle applies with special force with respect to religious groups," since they are the "archetype of associations formed for expressive purposes." *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring). Simply put, "the *content* … of a religion's *message* depend[s] vitally on the character" of its leaders. *Id.* (emphasis added). Because "there can be no doubt that the messenger matters" when it comes to the "expression" of religious belief, *id.*, banning a religious group from selecting leaders who sincerely agree with the group's faith inescapably regulates the content of its religious message.

That's why the leading EAA case on this issue—that is, whether a school district may ban a religious club from having religious leadership under the school's nondiscrimination policy—concluded the district's action was impermissibly content based. *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist.,* 85 F.3d 839 (2d Cir. 1996). As *Hsu* explained, leadership is "essential to the expressive content of the [club's] meetings," and thus a rule against faithful religious leadership "will affect the 'religious … content of the speech at [a club's] meetings,' within the meaning of the [EAA]." *Id.* at 848, 858.

And a Ninth Circuit judge recently agreed with *Hsu* in another case that protected FCA's religious leadership standards. There, Judge Forrest explained that banning an expressive group "from requiring its leaders to espouse the group's ideology is a content-based regulation because it undermines the group's ability to control its identity and messaging, i.e., its speech." *FCA-San Jose*, 82 F.4th at 710 (Forrest, J., concurring). Thus, like *Hsu*, she concluded that a school district's regulation of FCA's religious leadership standards violated the EAA. *Id.*

So too here. Jackson-Reed FCA's student leaders not only express FCA's beliefs in religious teaching, worship, and prayer, but also exemplify its beliefs with their lives. Williams Decl. ¶¶ 10, 14. Indeed, "FCA's student leaders are the primary embodiment of FCA's faith and Christian message to the campuses where they serve," and "[t]heir ministry also determines the content of the FCA student groups' message." Paden Decl. ¶ 15. And the "core function" of FCA's student leaders "is to express, message, and model FCA's faith." Williams Decl. ¶ 11. It would thus "undermine the mission and message" of an FCA huddle if its "leaders rejected its religious beliefs, or if they intentionally and unrepentantly acted contrary to them." Paden Decl. ¶ 22. Accordingly, the District's ban on FCA selecting leaders who embrace its faith is a content-based regulation of FCA's speech violating the EAA.

***Excluding FCA for its religious speech is content-based exclusion***. The District also violates the EAA because its regulation is expressly based on the religious content of FCA's speech. A regulation is "content-based" if it facially "draws distinctions based on the message a speaker

conveys" or, where it is facially content neutral, cannot be "justified without reference to the content of the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

Here, there is no doubt that the District's derecognition of FCA was content based. Indeed, the District said as much, ordering that FCA immediately be shut down because of what its "pledge says"—"that you must turn away from an impure lifestyle of which they list as homosexual activities." Rich Decl. Ex. E.

In short, the District's regulation of FCA is based on the content of FCA's religious leadership selection. It is not a general ban on all leadership requirements of any kind; rather, it is expressly justified by the religious nature and content of FCA's leadership standards. *See, e.g., FCA-San Jose*, 82 F.4th at 709 (Forrest, J., concurring) (comparing all-comers policy to a content-based nondiscrimination rule). An example illustrates the point. If FCA limited its leadership based on a category not regulated by the District's policies—such as ideological commitments to the ethical treatment of animals or protecting the environment—then FCA would still be recognized today. But because FCA instead imposes leadership requirements based on the specific religious content of its beliefs, the District has banned FCA. That is content-based regulation and violates the EAA.

What's more, the content discrimination here is particularly clear because the "very purpose" of the District's ban is to "excis[e] certain ideas or viewpoints" from Jackson-Reed's campus. *303 Creative LLC v. Elenis*, 600 U.S. 570, 588 (2023). The complaining school coach stated that he saw "no place for a group like FCA in a public school" because of FCA's religious beliefs on sexuality. Rich Decl. Ex. B. And the District agreed, kicking out FCA solely for those beliefs. Rich Decl. Ex. H. Even if the District's actions were facially content neutral (they weren't), their only justification turns on the content of FCA's speech—which itself is content discrimination. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).

***Selective enforcement is content-based exclusion***. Finally, the District violates the EAA because it selectively enforces its policies against FCA. Selectively enforcing a law to disfavor certain views is viewpoint-based regulation, which is an "especially invidious" form of content discrimination—and indeed is "antithetical to a free society." *Frederick Douglass Found. v. District*

*of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023). "It is fundamental to our free speech rights that the government cannot pick and choose between speakers … when enforcing the laws." *Id.*; *accord Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997) ("government has no authority to license one side to fight freestyle, while forbidding the other to fight at all").

Here, the District selectively enforces its nondiscrimination policies against FCA while allowing favored student groups to openly violate them with impunity. For instance, the District allows the Wise Club to "offer[ ] a separate space for young women to meet" as part of "creat[ing] a healthy understanding of womanhood," Davis Decl. Ex. A at 89, and the Asian Student Union to create a place "for students of Asian heritage," *id.* at 12. That selective enforcement is viewpoint discrimination, and is therefore impermissible content regulation under the EAA. *See FCA-San Jose*, 82 F.4th at 688 (allowing "Senior Women Club" and "South Asian Heritage Club" to exclude based on sex and ethnicity showed viewpoint discrimination); *id.* at 694 n.12 ("selective enforcement" violates the EAA), *id.* at 711 n.8 (Forrest, J., concurring) (citing *Frederick Douglass* to support conclusion that selective enforcement is "quintessential viewpoint discrimination"); *Bible Club*, 573 F. Supp. 2d at 1300 (selective enforcement violated EAA).

In sum, by targeting the religious message conveyed by FCA's speech, District officials have discriminated based on the content of FCA's speech. That violates the EAA, and so FCA is entitled to an injunction ordering the District to restore FCA's equal access to campus.

\* \* \* \*

Although originally passed with religious student groups in mind, the EAA has provided important protections to *all* student groups. "[O]ne of the consequences of the statute, as [the Supreme Court has] interpret[ed] it, is that clubs of a most controversial character might have access to the student life of high schools that in the past have given official recognition only to clubs of a more conventional kind." *Mergens*, 496 U.S. at 259 (Kennedy, J., concurring). Thus, the EAA has repeatedly been applied to protect the right of LGBT students to form recognized student groups. *See, e.g.*, *Colin ex rel. Colin v. Orange Unified Sch. Dist.*, 83 F. Supp. 2d 1135, 1148-49 (C.D. Cal. 2000); *Straights & Gays for Equal. v. Osseo Area Schs.*, 471 F.3d 908, 909-10 (8th Cir. 2006);

*Gonzalez ex rel. Gonzalez v. School Bd. of Okeechobee Cnty.*, 571 F. Supp. 2d 1257, 1269-70 (S.D. Fla. 2008). And it likewise protects FCA here.

### 2.  The District's exclusion of FCA violates its free-speech rights.

By excluding FCA from a limited public forum because of its religious speech, the District has also violated the Free Speech Clause. When a public school creates a limited public forum, "some content- and speaker-based restrictions may be allowed." *Matal v. Tam*, 582 U.S. 218, 243 (2017). But public schools cannot "discriminate against speech on the basis of its viewpoint" or otherwise "exclude speech where [doing so] is not 'reasonable in light of the purpose served by the forum.'" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Here, the District created a limited public forum for purposes of the First Amendment when it allowed student groups to receive official recognition and special benefits. *See Martinez*, 561 U.S. at 679. And excluding FCA from that limited public forum is both viewpoint discriminatory and unreasonable given the purpose of the forum. Thus, the District has doubly violated FCA's free speech rights.

***The District's Actions are Viewpoint-Based.*** First, the District's exclusion of FCA discriminates against FCA because of its religious viewpoint. A public school discriminates based on viewpoint when its actions stem from the "ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829.

Here, as discussed above, the District excluded FCA because it disliked FCA's religious viewpoint. Indeed, the District said as much in its decision denying FCA's second appeal, derecognizing FCA because of its religious views about "homosexuality." Rich Decl. Ex. N at 2-3. And the District's conditions for reinstatement echoed its disagreement with FCA's religious viewpoint, as the District would allow FCA back on campus only if it renounced those religious views and could "prove and assure" that student leaders need not hold certain religious beliefs about sexuality. *Id*. at 2. This proves that the "elimination of dissenting ideas about marriage" and sexuality was the District's "very purpose in seeking to apply" the D.C. Human Rights Act against FCA. *303 Creative*, 600 U.S. at 588 (cleaned up); *see also Shurtleff v. City of Boston*, 596 U.S. 243, 258 (2022)

31

(government can never "exclude speech based on 'religious viewpoint'") (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001)).

But even if the District's application of D.C. law and policies was facially neutral, its selective enforcement of them is clearly viewpoint-based. Last year, the D.C. Circuit held that the government's "prosecutorial choice[ ]" to permit chalked messages of "Black Lives Matter" but not "Black Pre-Born Lives Matter" obviously "turn[ed] on the ... viewpoint of speech," condemning an otherwise neutral policy. *Frederick Douglass*, 82 F.4th at 1141-42. The District's selective enforcement here is just as obvious. While it allows certain schools, programs, activities and student groups to limit participation based on protected categories, including race, sex, and sexual orientation, it excludes FCA for limiting its leadership based on religion. Courts have been "hard-pressed to find a clearer example of viewpoint discrimination." *InterVarsity-Iowa*, 5 F.4th at 864; s*ee also Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d. 969, 985 (8th Cir. 2021) ("*BLinC*") ("[A] nondiscrimination policy neutral on its face violates a student group's rights to free speech and expressive association if not applied in a viewpoint-neutral manner.").

***The District's Actions are Unreasonable.*** Second, the District's exclusion of FCA is also unreasonable because it undermines the District's entire purpose for allowing student groups. A content-based restriction is reasonable only if, after "taking into account the forum's function and all the surrounding circumstances," *Martinez*, 561 U.S. at 685 (cleaned up), that restriction "preserves the purposes of that limited forum" and "respects the lawful boundaries [the government] has itself set," *Rosenberger*, 515 U.S. at 829-30 (cleaned up).

Student groups exist to enable students to find a "source of connection and community" through exploring and developing their interests. *Wayne State*, 534 F. Supp. 3d at 817; *see also About Clubs/Extracurricular Activities*, Benjamin Banneker Academic High School, https://perma.cc/9839-4RZY; *FCA-San Jose*, 82 F.4th at 673 (student group program's purpose is "to give students practice in self-governance, [to] provide social and recreational activities, to honor outstanding student achievement, [and] to enhance school spirit and student sense of belonging") (alterations in original).

With this purpose in view, the District's exclusion of FCA is unreasonable. Part of exploring and developing interests involves gathering with likeminded students who share those interests. *See FCA-San Jose*, 82 F.4th at 689 ("Individual preferences based on certain characteristics and criteria serve important purposes for these groups"). But students cannot freely or fairly gather with likeminded peers if certain groups are required to hide their interests or beliefs. And it is "hardly a leap of logic" that student groups formed around certain interests and beliefs—especially religious or political ones—cannot survive without leaders who agree with and promote those interests and beliefs. *Id.*; *cf. Hosanna-Tabor*, 565 U.S. at 201 (Alito J., joined by Kagan, J., concurring) ("A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses."). The District has therefore imposed on FCA a limitation not reasonably related to the forum's purpose. *See Wayne State*, 534 F. Supp. 3d at 817-18.

What's more, whether or not the District's exclusion of FCA is inconsistent with the forum's purpose, the District's selective enforcement of its policies makes its exclusion of FCA "inherently unreasonable." *See PETA, Inc. v. Gittens*, 215 F. Supp. 2d 120, 134 (D.D.C. 2002) ("inconsistent treatment of messages which are similarly noncompliant with the stated themes and objectives of the limited public forum is inherently unreasonable and unacceptable discrimination under the First Amendment, regardless of whether [the government] believes it is not viewpoint related"). The District cannot—on the one hand—allow other schools, activities, and groups to discriminate in ways that violate the D.C. Human Rights Act and then—on the other—exclude only FCA for allegedly violating that same law. The District's actions violate the First Amendment.

### 3. The District's exclusion of FCA violates its expressive-association rights.

The First Amendment's protection for expressive association has "long" safeguarded the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). This doctrine forbids the government from "interfer[ing] with the internal organization or affairs of [a] group," *id.* at 623, including by punishing groups for selecting leaders that further their expression, *see*

*Hurley*, 515 U.S. at 570; *BLinC*, 991 F.3d at 985 (university cannot exclude religious groups for requiring leaders to share their beliefs about marriage). "This right is crucial in preventing the majority from imposing its views on groups that would rather express other, perhaps unpopular, ideas." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000); *see id.* at 653 (Boy Scouts can decline to associate with "gay rights activist" scoutmaster); *cf. Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021) (school's protection of student expression "must include the protection of unpopular ideas, for popular ideas have less need for protection").

The District's actions have violated FCA's rights of expressive association in two ways.

***First***, by banning FCA from selecting religious leadership. In a case analogous to this one, the Seventh Circuit has already held that schools cannot use antidiscrimination policies to force religious groups to accept student leaders who disagree with the group's religious beliefs (including the belief that "sexual activity outside of a traditional (one man, one woman) marriage is forbidden"). *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 858, 862-63 (7th Cir. 2006). As the court explained, the "enforcement of [an] antidiscrimination policy upon penalty of derecognition can only be understood as intended to induce" a religious group to change its leadership standards. *Id.* at 863. And that violates the expressive-association doctrine, because it "would be difficult for" a religious group "to sincerely and effectively convey a message of disapproval of certain types of conduct if, at the same time, [they] must accept [leaders] who engage in that conduct." *Id.*; *accord Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989) (freedom of expressive association "encompasses a political party's decisions about the identity of, and the process for electing, its leaders").

Here, FCA qualifies as an expressive association because it promotes a core set of religious beliefs. *See Roberts*, 468 U.S. at 618; *Walker*, 453 F.3d at 862. And being forced to accept as leaders students who reject FCA's religious beliefs would compel FCA "to propound a point of view contrary to its beliefs." *Dale*, 530 U.S. at 654; *id.* at 653 (courts must "give deference to an association's view of what would impair its expression"). Because this is a clear "example of an intrusion into the internal structure or affairs of an association," the District's actions trigger strict

scrutiny. *Roberts*, 468 U.S. at 623; *Walker*, 453 F.3d at 861 (same); *see also Dale*, 530 U.S. at 648 (the freedom to associate "plainly presupposes a freedom not to associate").

**Second**, by repeatedly pushing Jackson-Reed FCA to disaffiliate with FCA National, the District has engaged in an unusually egregious form of "interference with the internal organization or affairs of [a] group." *Roberts*, 468 U.S. at 622-23. Pressuring religious bodies to dissolve their religious ties is anathema to the First Amendment. Hence courts have "consistently disapproved government action … denying rights and privileges solely because of a citizen's association with an unpopular organization." *Healy*, 408 U.S. at 185-86. And here, the District's pressure went outside the bounds of the limited public forum, and sought to terminate Jackson-Reed FCA's religious association with FCA more broadly. That is unconstitutional.

### 4. The District's exclusion of FCA violates its right to assemble.

Excluding FCA also violates its right to assemble. This "right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. Oregon*, 299 U.S. 353, 364-65 (1937) (reversing conviction for speaker at communist party meeting because "the defendant still enjoyed his personal right … to take part in a peaceable assembly having a lawful purpose"); *Wayne State*, 534 F. Supp. 3d at 827 (derecognizing student group for leadership restrictions violated group's assembly rights). Distinct from FCA's free speech rights, its assembly right allows its members to meet *together* and "foster ideas and identities in the … 'pre-expressive' moments of group formation." John D. Inazu, *The First Amendment's Public Forum*, 56 Wm. & Mary L. Rev. 1159, 1169 (2015) (distinguishing free speech, which one can exercise alone, with free assembly, which is inherently relational and requires nothing "expressive" to receive protection); *see also Thomas v. Collins*, 323 U.S. 516, 532 (1945) ("[t]he right thus to discuss, and inform people concerning [unions] is protected not only as part of free speech, but as part of free assembly").

Here too, the District gets a red card. It opened a limited public forum for student organizations to develop and explore interests and then dispelled FCA—a club for students to combine their interest in sports with their Christian faith—even though FCA's "assembly was entirely peaceable"

and well within the forum's purpose. *Thomas*, 323 U.S. at 536; *see* Rich Decl. Ex. C (FCA meetings "postponed until further notice"). This violates FCA's "ability to assemble as a campus ministry," *Wayne State*, 534 F. Supp. 3d at 827, violating the First Amendment.

## II. FCA easily satisfies the remaining preliminary-injunction factors.

FCA satisfies the remaining preliminary-injunction factors. It is likely to suffer irreparable harm in the absence of preliminary relief, the equities tip in its favor, and enjoining the District here is in the public interest. *League of Women Voters*, 838 F.3d at 6.

### A. FCA is irreparably harmed.

FCA is suffering and will continue to suffer irreparable harm without injunctive relief. As both the Supreme Court and the D.C. Circuit have recognized, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *see Pursuing America's Greatness*, 831 F.3d at 512 (same). Here, as explained above, the District is violating FCA's First Amendment freedoms of speech, association, assembly, and religious exercise. And because "[i]t is apparent that [FCA's] constitutional rights are violated," FCA "ha[s] sufficiently demonstrated irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). The same is true for FCA's statutory rights under the EAA and RFRA. *See Singh*, 56 F.4th at 109 ("comparably irreparable injury applies to violations of RFRA"); *Straights & Gays*, 471 F.3d at 913 ("presumption of irreparable harm" for EAA claims because the EAA "protects free speech rights and expressive liberties").

And in student access cases specifically, courts have long agreed that First Amendment violations inflict irreparable harm on students. *See FCA-San Jose*, 82 F.4th at 694-95 (high school FCA chapters' First Amendment rights); *InterVarsity-Iowa*, 5 F.4th at 862 (deregistration caused student group to "struggle[ ] with recruiting members, organizing activities" and caused the group to lose "a significant number of members"); *Walker*, 453 F.3d at 867 (denial of recognition "constitute[d] irreparable injur[y]"); *Bible Club*, 573 F. Supp. 2d at 1300 (denial of a Christian club risked

irreparable harm when it could affect recruitment efforts and delayed "preparations for club activities for the upcoming school year").

The loss of FCA's First Amendment rights is sufficient for injunctive relief. But FCA is also suffering other harms because of the District's unlawful actions. As it stands, Jackson-Reed FCA cannot access campus space, cannot receive funding, cannot have a faculty sponsor, cannot appear on the school's website or use the school's name in its social media, and cannot participate in the student activity fair. *See Bus. Leaders in Christ v. Univ. of Iowa*, No. 3:17-cv-80, 2018 WL 4701879, at *14 (S.D. Iowa Jan. 23, 2018) (irreparable harm shown through loss of student group's ability to access the benefits of registered groups, like loss of funding and "exposure at the student activity fairs and through the University's website"). These are no small potatoes. The impracticability and dangers of meeting off-campus and during non-school hours means that religious students cannot meet with each other at their school. Nor can students advertise and inform peers about the huddle. And stigmatizing FCA and its religious beliefs by publicly announcing that FCA members are not equal to their peers is religious discrimination—which is "by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d at 233. In short, no school recognition means no club, and no club means Plaintiffs are irreparably deprived of the opportunity to exercise their First Amendment rights on District campuses.

**B. The public interest and balance of equities favor recognizing FCA.**

Courts in this Circuit regularly grant preliminary injunctions when a party has shown that its First Amendment rights are likely being violated—because the Constitution strikes the remaining balance. The remaining factors—public interest and balance of equities—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And in a First Amendment case like this one, they point in Plaintiffs' favor as a matter of law: the public interest "always" favors the protection of constitutional rights. *Pursuing America's Greatness*, 831 F.3d at 511; *see also, e.g.*, *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("enforcement of an unconstitutional law is always contrary to the public interest"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191

(D.D.C. 2015) ("The Government cannot suffer harm from an injunction that merely ends an un-lawful practice.").

And the facts agree: without relief, Jackson-Reed FCA will not exist, and students who wish to assemble, speak, and exercise their religion together cannot do so. Before the District kicked FCA off campus, there were several interested students, and as it stands, at least one student has started a new huddle. John Doe Decl. ¶ 7. Absent preliminary relief, Doe could very well graduate without ever experiencing a time when his high school wasn't discriminating against his club.

The contrast in "harm" to the District is stark. That's because, quite frankly, there is none. Before the District shut FCA down, FCA was a welcome member of Jackson-Reed's campus. Administrators, teachers, coaches, and much of the school community recognized that FCA's abil-ity to gather students, build a healthy community, and encourage virtue in students was not only helpful but vital to the District's student body. The only complaint that triggered the District's investigation was based on a single individual's personal belief that "there [wa]s no place for a group like FCA in a public school." *See* Rich Decl. Ex. B. There have been no complaints against any other FCA huddle, and administrators and staff at Jackson-Reed see immense value in having FCA in a public school system crippled with absenteeism and lack of engagement. And the activ-ities FCA engages in are far from harmful: they eat pizza, discuss the Bible, and perform commu-nity service projects.

To be sure, FCA requires that its student leaders agree with its religious beliefs. But "[w]hile the District's asserted interest in inclusiveness may be important, the Constitution prohibits the District from furthering that interest by discriminating against religious views." *FCA-San Jose*, 82 F.4th at 695. And "high school students are subjected to discrimination and selection all the time" within the District without incident—it's a fact of daily life. *Hsu*, 85 F.3d at 871 (citing "girls and boys [sports] teams," limiting honor roll membership, and the exclusion of "students who do not maintain a certain grade point average" from extracurriculars as examples of "discrimination" common "in a high school setting"). If sports teams, District programs, multiple District schools, and nearly every other student group can exclude students based on criteria such as race, sex, or

gender identity—like Jackson-Reed's ROX program or the District's Ron Brown High School—the District suffers no harm by including FCA.

## CONCLUSION

Plaintiffs respectfully request that this Court grant the injunction requested.

Respectfully submitted,

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg (D.C. Bar No. 1032624)
Joseph C. Davis* (D.C. Bar No. 1047629)
Kelly R. Oeltjenbruns* (D.C. Bar No. 1658786)
Richard C. Osborne* (N.J. Bar No. 402232022)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
dblomberg@becketlaw.org

*Counsel for Plaintiffs*

*\*pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 7, 2024, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record. A copy of the foregoing was also served on the D.C. Attorney General's Office at the email addresses provided for service of process.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

*Counsel for Plaintiffs*