# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FELLOWSHIP OF CHRISTIAN ATHLETES**, et al., | Civil Action No. 1:24-cv-01332-DLF |
| Plaintiffs, | **REPLY IN SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **DISTRICT OF COLUMBIA**, et al., | |
| Defendants. | |

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.   Plaintiffs are overwhelmingly likely to succeed on the merits. ................................. 2

   A.  Plaintiffs' religion claims are likely to succeed. .................................................. 2

      1.  The District is violating RFRA. .................................................................... 2

      2.  The District is violating the Free Exercise Clause. ...................................... 8

      3.  The District is violating the Religion Clauses. ........................................... 12

   B.  Plaintiffs' speech and assembly claims are likely to succeed. ........................... 14

      1.  The District is violating the Equal Access Act. ......................................... 14

      2.  The District is violating the Free Speech Clause. ...................................... 16

      3.  The District is violating the right of expressive association. ..................... 18

      4.  The District is violating the Assembly Clause. .......................................... 19

II.  The other preliminary-injunction factors are plainly satisfied. ............................... 19

   A.  Plaintiffs face irreparable harm from the District's discrimination. ................. 20

   B.  The equities and public interest favor recognizing FCA. .................................. 21

CONCLUSION .................................................................................................................. 21

CERTIFICATE OF SERVICE .......................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021).................................................................................................19

*Board of Educ. v. Mergens ex rel. Mergens,*
  496 U.S. 226 (1990).................................................................................................15

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000)............................................................................................18, 19

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)...................................................................................................5

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014)...................................................................................................4

*Bus. Leaders in Christ v. Univ. of Iowa,*
  No. 17-cv-80, 2018 WL 4701879 (S.D. Iowa Jan. 23, 2018)...............................17

*Bus. Leaders in Christ v. Univ. of Iowa,*
  991 F.3d. 969 (8th Cir. 2021) ................................................................................17

*Cal. Democratic Party v. Jones,*
  530 U.S. 567 (2000)...................................................................................................3

*Calvary Chapel Dayton Valley v. Sisolak,*
  140 S. Ct. 2603 (2020)..............................................................................................8

*Capitol Hill Baptist Church v. Bowser,*
  496 F. Supp. 3d 284 (D.D.C. 2020) .......................................................................20

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ..................................................................................21

*Christian Legal Soc'y v. Martinez,*
  561 U.S. 661 (2010).....................................................................................1, 5, 7, 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993)......................................................................................... 9, 10-11

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
  483 U.S. 327 (1987)...................................................................................................4

*De Jonge v. Oregon,*
  299 U.S. 353 (1937).................................................................................................19

ii

*Espinoza v. Montana Dep't of Revenue*,
    591 U.S. 464 (2020)................................................................................................6

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    46 F.4th 1075 (9th Cir. 2022) ............................................................................6

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ....................................................................... *passim*

*Frederick Douglass Found. v. District of Columbia*,
    82 F.4th 1122 (D.C. Cir. 2023)..........................................................................17

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)...................................................................................5, 11-12

*Holt v. Hobbs*,
    574 U.S. 352 (2015)................................................................................................3

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012)................................................................................. 14, 17-18

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
    85 F.3d 839 (2d Cir. 1996)...........................................................................4, 15, 21

*InterVarsity Christian Fellowship/USA v. Board of Govs. of Wayne State Univ.*,
    534 F. Supp. 3d 785 (E.D. Mich. 2021)............................................... 13, 18, 20-21

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
    408 F. Supp. 3d 960 (S.D. Iowa 2019) ............................................................15

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018)..............................................................................................12

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*,
    984 F.3d 477 (6th Cir. 2020) ...............................................................................9

*Obergefell v. Hodges*,
    576 U.S. 644 (2015)..............................................................................................12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020).........................................................................................12-13

*Priests for Life v. HHS*,
    808 F.3d 1 (D.C. Cir. 2015)...................................................................................4

*Ramirez v. Collier*,
    595 U.S. 411 (2022)................................................................................................5

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ...................................................................................15

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) .....................................................................................20

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................................16

*Singh v. Berger*,
    56 F.4th 88 (D.C. Cir. 2022) ....................................................................5, 6

*Singh v. Carter*,
    168 F. Supp. 3d 216 (D.D.C. 2016) ...........................................................20

*Slattery v. Hochul*,
    61 F.4th 278 (2d Cir. 2023) .......................................................................18

*Starkey v. Roman Catholic Archdiocese of Indianapolis*,
    41 F.4th 931 (7th Cir. 2022) ......................................................................14

*Students for Fair Admissions v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ...................................................................................11

*Tandon v. Newsom*,
    593 U.S. 61 (2021) .......................................................................................8

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ...................................................................................13

*Truth v. Kent Sch. Dist.*,
    542 F.3d 634 (9th Cir. 2008) .....................................................................16

**Statutes**

5 U.S.C. § 3331 ....................................................................................................3

42 U.S.C. § 2000bb ..............................................................................................5

42 U.S.C. § 2000bb-1 ........................................................................................2, 5

42 U.S.C. § 2000bb-2 ..........................................................................................3

42 U.S.C. § 2000cc-5 ...........................................................................................3

D.C. Code § 2-1401.03 ........................................................................................7

D.C. Code § 2-1402.41 ........................................................................................7

**Other Authorities**

D.C. Att'y Gen. Op. (Mar. 30, 2015)............................................................................10

Michael W. McConnell, *Freedom by Association*, First Things (Aug. 2012)..............................19

U.S. Const. art. II ............................................................................................................3

U.S. Const. art. VI............................................................................................................3

## INTRODUCTION

The District doesn't dispute that it kicked the Fellowship of Christian Athletes off campus for asking its leaders to share its Christian beliefs. To the contrary, the District embraces that fact, claiming FCA "cannot" "prohibit students from running for leadership positions based on the students' religious beliefs," but instead must be open to being run by "students who are Muslim," "pagans," and "atheists." At the same time, the District recognizes that many other student groups limit membership to their "allies," and it doesn't dispute that numerous student clubs at other DCPS schools hold themselves out as taking into account protected characteristics, that the District itself runs entire schools and government programs doing the same, or that the statute it purported to apply against FCA is riddled with exceptions.

That violates the law many times over, as Plaintiffs' motion explains and Defendants' opposition confirms. Indeed, Defendants' opposition only makes its situation worse. For example, the District claims there is no "burden at all" on FCA's religious exercise. Yet it concedes it has conditioned the benefits of official recognition on FCA's abandoning part of its religious exercise, and decades of caselaw squarely recognizes that those benefits are critical to running a viable student club on a public-school campus.

Likewise, the District acknowledges that "any exemption" to the Anti-Discrimination Policy would "undermine" its interests. Yet in addition to the exemptions Plaintiffs already identified, the District itself articulates a new, gaping one: "students are free to choose whomever they please" as club leaders, "for whatever reasons they want"; the District "leaves that decision to the sound discretion of the students." In other words, while FCA is barred from limiting *eligibility* for leadership based on religious beliefs, students are free to *select* leaders based on religious beliefs—or, apparently, any other characteristic covered by the Policy. That isn't even a coherent policy, much less one that is narrowly tailored to accomplish compelling governmental interests.

In the end, the District's position comes down to one case, which it cites again and again: *Christian Legal Society v. Martinez*, 561 U.S. 661 (2010). But *Martinez* upheld an "all-comers" policy that it found neutral and generally applicable, while the District seeks to defend a no-

discrimination-based-on-protected-characteristics policy that is shot through with exceptions. Moreover, the District entirely overlooks that some of Plaintiffs' claims—like RFRA and the EAA—would override even a true all-comers policy, a possibility *Martinez* itself acknowledged. In short, this case, like its counterpart before the Ninth Circuit, is not governed by *Martinez*. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 694 (9th Cir. 2023) (en banc) (while "the District relies heavily on *Martinez* in an attempt to justify its position," "[f]airly read, *Martinez* affirms that the" District's policy "as applied is neither neutral nor generally applicable, and thus is subject to strict scrutiny"). Plaintiffs' requested injunction is warranted.

## ARGUMENT

### I. Plaintiffs are overwhelmingly likely to succeed on the merits.

#### A. Plaintiffs' religion claims are likely to succeed.

Plaintiffs bring three religion-specific claims: RFRA, the Free Exercise Clause, and religious autonomy. Each is overwhelmingly likely to succeed.

##### 1. The District is violating RFRA.

The District's derecognition of FCA because of FCA's religious exercise substantially burdens that exercise and isn't the least restrictive means of achieving any compelling governmental interest. 42 U.S.C. § 2000bb-1(a)-(b). The District's contrary arguments are meritless.

***Substantial burden on religious exercise.*** A substantial burden exists when the government either (a) penalizes an adherent for her religious exercise or (b) conditions an important government benefit on the abandonment of that exercise. Mot. 12. Here, the District doesn't seriously dispute that FCA's religious exercise at issue is requesting that its leaders agree with its faith—an exercise long and repeatedly protected by courts. *FCA-San Jose*, 82 F.4th at 672; Mot. 12 (collecting cases). Nor does the District dispute that it penalized FCA for limiting leadership eligibility to those who agree with FCA's faith. And it doesn't dispute it has conditioned the critical benefits of student-group recognition going forward on FCA's ceasing to do so. *Cf.* Opp. 15 (conceding "benefits of school recognition"). That is a substantial burden.

Instead, the District says that even if FCA can't maintain religious leadership criteria, its members can at least pray and read the Bible. Opp. 12. But RFRA protects "*any* exercise of religion," 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7) (emphasis added), including FCA's religious exercise of asking its leaders to share its beliefs. Indeed, the Supreme Court has squarely rejected attempts to distract from a claimant's inability to engage in *one* religious exercise by noting his continued ability to engage in *others*: the "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise," "not whether the [RFRA] claimant is able to engage in other forms of religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 361-62 (2015); *id.* at 357-58 (RFRA and RLUIPA impose "same standard"). So too here.

The District next makes the puzzling claim that FCA's asking huddle leaders "to share and abide by its religious beliefs" "is not precluded by the District's actions." Opp. 12-13. But its own final grievance decision couldn't be clearer: DCPS would consider "reinstating" FCA only if "FCA can prove and assure that any member of the school community can be a 'Leader,' regardless of … personal belief." Dkt. 3-21 at 2.

What the District really means is that while FCA can't set agreement with its beliefs as a condition for leadership *eligibility*, student members "can, and likely will, choose" leadership based on that criterion on a case-by-case basis. Opp. 12-13. But here again, the District is attempting to swap in a different religious exercise rather than addressing the one actually at issue. Setting aside the accuracy of the District's self-serving and evidence-free predictions of students' voting decisions, FCA seeks to *ensure* that its leaders agree with its faith. And reasonably so. The District's view is like saying that government officials shouldn't be required prior to entering office to swear or affirm to support the Constitution and faithfully discharge their duties, since voters "can, and likely will choose" only those already inclined to do so. *But see* U.S. Const. art. II, § 1, art. VI; 5 U.S.C. § 3331. In that case as in this one, the importance of fundamental alignment explains the requirement. *See Cal. Democratic Party v. Jones*, 530 U.S. 567, 570, 575-77 (2000) (upholding right of political parties to restrict primaries to party members who vote only on candidates affiliated with the party).

More to the point, courts have recognized time and again that religious leadership requirements can be crucial to ensuring mission integrity, *see, e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 335-36 (1987); *FCA-San Jose*, 82 F.4th at 689, and thus have squarely rejected the notion that a Christian club suffers no "tangible harm" from being required to "rely on elections to assure that its leaders are Christians," *Hsu ex rel. Hsu v. Roslyn Union Free School District No. 3*, 85 F.3d 839, 861-62 (2d Cir. 1996). The school district in *FCA-San Jose* tried the same argument, and not a single member of the en banc Ninth Circuit found it persuasive. *Compare* Answering Br. at 37, *FCA-San Jose*, 82 F.4th 664 (9th Cir. July 18, 2022) (No. 22-15827), 2022 WL 2898933 (making argument), *with FCA-San Jose*, 82 F.4th 664 (no takers). Notwithstanding the District's view that it hasn't placed "any burden at all" on FCA's "religious practices," Opp. 1, FCA simply isn't required to roll the dice with the coherence of its faith. And in fact, the District's argument that it's fine for students to "discriminate" in *electing* leaders as long as groups don't do so in filtering candidates not only doesn't help it on substantial burden—it *defeats* it on strict scrutiny, as explained below. *See infra* pp. 5-6.

Third, the District suggests that perhaps FCA doesn't really need to ask its leaders to share its beliefs, since at another school (Eastern) the FCA huddle operates without having any "elected student leaders." Opp. 14. But even if Eastern FCA didn't have any leaders at all, this argument wouldn't work; the government can't "dodge[ ] the question that RFRA presents" by "in effect tell[ing] the plaintiffs that their beliefs are flawed." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014); *see also, e.g.*, *Priests for Life v. HHS*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing en banc) ("That is not our call to make under the first prong of RFRA."), *panel opinion vacated*, 578 U.S. 403 (2016). In any event, the fact is that FCA DC's Area Director has long understood that an FCA DC board member personally ensured each student leading Eastern FCA's prayer, scripture reading, and religious teaching was aligned with FCA's faith. Suppl. Decl. of Jolee Paden ¶ 7. And starting next semester, those leaders will confirm their alignment using the same Student Leader Application submitted by Jackson-Reed FCA's student leader in this case. *Id.* at ¶ 8; Dkt. 3-6.

Finally, the District seeks refuge (here as everywhere else) in *Martinez*, where the Court rejected certain First Amendment claims brought by a derecognized student group because the challenged policy was "of general application," applying equally to "all other student organizations." 561 U.S. at 669, 697 n.27. But even if the same were true of the District's policy here (it isn't, *see infra* pp. 8-10), RFRA provides "greater protection for religious exercise than is available under the First Amendment," *Ramirez v. Collier*, 595 U.S. 411, 424 (2022), requiring exemptions *even if* the challenged law is "neutral" and "of general applicability," 42 U.S.C. §§ 2000bb(a)(2), 2000bb-1(a). *Martinez*, of course, didn't involve RFRA at all. And indeed, *Martinez* expressly left open the possibility that other laws "could, consistent with the Constitution," "provide religious groups dispensation" even from an all-comers policy, 561 U.S. at 694 n.24—which is exactly what RFRA (and the EAA, *see infra* pp. 14-16) does.

**Strict scrutiny.** So strict scrutiny is triggered, and the District hasn't come close to meeting that "'exceptionally demanding' test." *Singh v. Berger*, 56 F.4th 88, 93 (D.C. Cir. 2022). To the contrary, the District's opposition resolves strict scrutiny *in FCA's favor*. First, the District dismisses as "hypothetical" and "remote" the chances that those disagreeing with FCA's beliefs might seek leadership positions. Opp. 13-15. But if so, the District can't possibly have a compelling interest in kicking FCA off campus based on what DCPS thinks is the "remote" possibility that such students would want to run for FCA leadership. Strict scrutiny requires "an 'actual problem' in need of solving," and burdening fundamental rights "must be actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). "[S]peculation" about hypothetical future harms "is insufficient." *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021); *see also id.* at 530 ("No same-sex couple has ever sought" to work with religious foster agency).

Second, the District insists that in electing leaders, "students are free to choose whomever they please, for whatever reasons they want," including rejecting candidates who disagree with FCA's beliefs. Opp. 12-13. But surreptitious application of religious leadership criteria undermines the District's claimed interests just as much as FCA's effort to apply them forthrightly—either way, "students who are Muslim," atheist, or pagan will not be leading FCA. *Cf.* Opp. 16-17. Indeed, as

another school district recently admitted when trying the same argument, the District's argument means that it must allow members of a "White nationalist group" to intentionally choose leaders based on race and yet retain recognition provided the group was (on paper) open to everyone. *FCA-San Jose*, 46 F.4th 1075, 1095 n.7 (9th Cir. 2022), *vacated on grant of rehearing en banc*, 82 F.4th 684 (reaching same result). There, as here, that kind of "formalistic litmus test fall[s] far short" of surviving strict scrutiny. *Id.*

The District also "leaves appreciable damage to [its] supposedly vital interest unprohibited" in other ways, *Espinoza v. Montana Department of Revenue*, 591 U.S. 464, 486 (2020)—for example, by allowing numerous other clubs and activities to consider characteristics covered by its nondiscrimination policies, Mot. 15, 17-19. Scrambling, the District has tried to address this problem by having Jackson-Reed's principal send emails to "four student organizations" at Jackson-Reed with obviously discriminatory "descriptions." Opp. 19 n.4. But it hasn't tried to do anything about the other Jackson-Reed student groups Plaintiffs cited—so (*e.g.*) the Gender Sexuality Alliance can continue to be for "LGBTQIA+ students" and their "allies," and the National Society of Black Engineers can continue to select its speakers "from community members of color in the STEM field." Dkt. 3-29 at 3-4, 8. And it hasn't tried to do anything at all about groups at other DCPS schools—so (*e.g.*) Young Men of Phelps can continue to be "a leadership trust for young men," and Commercial Real Estate Women can continue to be for "registered Female students." Dkt. 3-37 at 3-4.

Nor has it adequately accounted for the fact that DCPS itself operates *entire schools*—Excel Academy (for girls) and Ron Brown (for "young men of color")—that discriminate on the bases of race and sex. Mot. 19. Or that the District has entire Executive Offices devoted to promoting the interests of groups defined based on protected characteristics including race ("Office on Latino Affairs") and sexual orientation ("Office of Gay, Lesbian, Bisexual, and Transgender Affairs"). *Id.* This multitude of "exceptions" from the same Human Rights Act it enforced against FCA "seriously 'undermine[s]'" any "contention that [the District] 'can brook no departures' for Plaintiffs." *Singh*, 56 F.4th at 99.

6

The District also fails on least restrictive means. Mot. 15-16. Indeed, even assuming the District's interests were compelling in the abstract, a less restrictive means appears on the face of the Human Rights Act. The Act generally prohibits religious and sexual-orientation discrimination, but makes an express exception for "religious … organization[s]" to "limit[ ] employment," "admission[s]," or "giv[e] preferences to persons of the same religion," D.C. Code § 2-1401.03(b)—exactly what FCA seeks to do here.

Addressing this element, the District says it "has adopted" an "all-comers policy" like in *Martinez*, Opp. 17, but it misunderstands what that is. The *Martinez* parties stipulated that under the policy there, "all groups must accept all comers as voting members even if those individuals disagree with the mission of the group." 561 U.S. at 674-75. By contrast, the policy here forbids discrimination on *certain enumerated bases*, such as race, sex, national origin, and the like, but says nothing remotely suggesting that every group is required to accept every student. D.C. Code § 2-1402.41(1); *see also* Dkts. 3-30 (DCPS Notice of Non-Discrimination), 3-31 at 3 (DCPS Anti-Discrimination Policy). Indeed, the District itself elsewhere characterizes the relevant policy as requiring "all student clubs [to] refrain from discrimination on the basis of [certain] protected characteristics," Opp. 20—not as requiring all clubs to accept all members. And it concedes that some recognized student groups limit membership to those with certain characteristics "and their allies"—meaning they aren't open to everyone (like non-allies). Opp. 19-20.

So the District doesn't have an all-comers policy. And its evident approval of the "allies" limitations only highlights the problem: The District is barring FCA from limiting even *leadership* to *its* allies. Instead, as the District itself puts it, FCA must be open to having its prayers and religious teaching led by students "who hold religious convictions different from" it. Opp. 29. That is unlawful.[1]

---

[1]    The District blatantly substitutes its governmental "common sense" for FCA's religious beliefs, claiming it's "clear" that "a gay student" couldn't lead FCA. Opp. 23 n.6. Governments make bad theologians. As Ms. Paden has testified, "a student who feels attracted to members of the same sex yet who also sincerely agreed with and followed FCA's Christian Community Statement would

### 2. The District is violating the Free Exercise Clause.

The District's ban on FCA also isn't neutral and generally applicable, triggering strict scrutiny under the Free Exercise Clause. That's so for at least three reasons: the District (1) permits numerous exceptions for secular conduct (*Tandon*); (2) at minimum has discretion to grant such exceptions (*Fulton*); and (3) has acted with hostility toward FCA's religious exercise (*Masterpiece*). Mot. 16-23. Its counterarguments fail.

**Comparable exceptions.** Under *Tandon*, treating "*any* comparable secular activity more favorably than religious exercise" triggers strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). This is a "most-favored nation" rule: when the government favors or exempts some organizations, "it must place religious organizations in the favored or exempt category." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2611-13 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief); *see also Tandon*, 593 U.S. at 62.

But the District treats nearly every nation more favorably than FCA. As explained in the motion, the District (1) allows other student groups to organize around particular ideas and protected characteristics, including race, sex, and political affiliation; (2) runs sports programs segregated by sex; (3) operates entire schools segregated by race and sex; and (4) has government offices wholly devoted to serving people of particular races, national origins, and sexual orientations. Mot. 17-19. Moreover (and (5)), the D.C. Human Rights Act applied to FCA here is riddled with textual exceptions allowing others to discriminate in employment, admissions, and more. *Id.* at 19-20.

In response, the District ignores (3), (4), and (5) entirely and devotes only a scant footnote to (2). It instead aims virtually all its fire at (1), citing *FCA-San Jose* for the proposition that the only "appropriate comparisons" are "other student organization [sic]." Opp. 20-21.

---

be eligible for leadership." Dkt. 3-2 ¶ 23; *see also, e.g.*, Br. for Same-Sex Attracted Men and Their Wives as Amici Curiae Supporting Respondents at 3-4, *Obergefell v. Hodges*, 576 U.S. 644 (2015) (Nos. 14-556, 14-562, 14-571, & 14-574), 2015 WL 1608211 (amici's "attractions do not dictate their relationships").

But the District gets *FCA-San Jose* exactly wrong. In fact, *FCA-San Jose* explicitly *rejected* this argument, refusing "the District['s] attempts to draw a distinction between school-operated and student-operated programs," instead looking to the District's "own programs and student programs alike." 82 F.4th at 687, 689. And for good reason: the relevant question isn't whether the "religious and secular conduct involve similar forms of activity" but whether they "endanger[ ]" the government's "*interests*" in a similar way. *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020). Thus, the Supreme Court "routinely identifies as comparable" for purposes of the general-applicability inquiry "activities that are in other ways very different," *id.* at 481—far more so than those Plaintiffs have identified here, *see, e.g.*, *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 544-45 (1993) (animal sacrifice and "improper disposal of garbage by restaurants"; both undermined "public health").

So the District tries another way of reducing the scope of comparators, claiming the "more appropriate starting point" for analysis is DCPS's "Anti-Discrimination Policy" (applying only to DCPS activities) rather than the Human Rights Act (applying more generally to and throughout the District). Opp. 18 n.3. But this convenient new nuance appears to have been lost on the enforcing DCPS officials themselves: In its three grievance decisions kicking FCA off campus, DCPS relied *exclusively* on the Human Rights Act (and the "Notice of Non-Discrimination" incorporating it), *not once* citing the Anti-Discrimination Policy. Dkts. 3-15, 3-19, 3-21.

In any event, what matters is, again, the asserted government interest, which the District never disputes is the same for each policy. *See* Opp. 18 n.3. The Free Exercise Clause "guarantee transcends the bounds between particular ordinances, statutes, and decrees," looking not "only [to] the secular actors … regulated by [any] specific provision" but to *all* exceptions to any provision implicating the same interests. *Monclova*, 984 F.3d at 481-82. "At bottom," pursuant to a long line of precedent including *Tandon* and *Lukumi*, "the government may not create 'religious gerrymanders.'" *FCA-San Jose*, 82 F.4th at 689.

9

The District's lack of any substantive response on non-student-group comparators alone dooms it to strict scrutiny under *Tandon*.[2] But even if the Court were to accept the District's invitation to focus only on student groups, its actions *still* wouldn't be generally applicable, for two reasons.

First, although the District has now had Principal Brown send an email to four groups even it must concede hold themselves out as being facially discriminatory, Opp. 6-7, 19 n.4, it hasn't said anything to the many *other* Jackson-Reed groups who do the same, or to *any* groups at *other* DCPS schools who do likewise. That includes (non-exhaustively) the Gender Sexuality Alliance (for "LGBTQIA+ students" and their "allies"), the Arab Student Union ("for Arab students and their allies"), the National Society of Black Engineers, Girls Up In the District, Young Men of Phelps ("a leadership trust for young men"), High School Democrats of America, Commercial Real Estate Women (for "registered Female students"), the Muslim Student Association, and Women in STEM (for "girls"). Mot. 17-18; Dkts. 3-29 at 1, 3-34 at 10.

Second, the District's newly articulated approval of *student* discrimination in selecting leaders further confirms that its actions aren't generally applicable. According to the District, the reason it must kick FCA off campus is to "promot[e] an equitable environment free of discrimination." Opp. 16. At the same time, however, the District says students in any group can choose as leaders "whomever they please, for whatever reasons they want"—including, apparently, intentional discrimination based on protected characteristics. Opp. 13. It's difficult to imagine a policy more

---

[2]    The District does say "[a]ll programming, meetings, benefits, and events offered within the" "Empowering Males of Color" initiative "are open to all students." Dkt. 23-1 ¶ 10. But *schools* (*i.e.,* Ron Brown) are conspicuously absent from the list. And indeed, the District's Office of the Attorney General has issued a formal legal opinion approving Ron Brown even while recognizing it is "a single-sex school for only one gender" and "target[s]" students of color. *See* D.C. Att'y Gen. Op. at 6-7 (Mar. 30, 2015), https://perma.cc/58MM-KRVD. The same opinion noted that "the EMOC initiative will supplement … the already existing single-sex public school programs in the District that benefit girls," such as "Excel Academy," a "girls-only public charter school." *Id.* at 2; *accord* Dkt. 3-36 (Excel Academy information).

"underinclusive for [its] ends," *Lukumi*, 508 U.S. at 543—and such a yawning chasm between means and ends undoubtedly triggers strict scrutiny.[3]

   ***Individualized discretion.*** All this aside, the District at minimum has "discretion" to grant exceptions, independently requiring strict scrutiny. *Fulton*, 593 U.S. at 536-37. This is demonstrated not only by the *actual* exemptions described above, but also by the terms of the Anti-Discrimination Policy, which says that rather than enforcing its requirements equally the District will "offer[ ] the most support where the greatest disparities have persisted." Dkt. 3-31 at 1.

   In response, the District says "[t]here is no process for seeking or granting exemptions and there are no DCPS employees empowered to waive the requirements of the Anti-Discrimination Policy." Opp. 18-19. But the point is that the Anti-Discrimination Policy *itself* "invites the government to consider the particular reasons for" allegedly discriminatory conduct, *Fulton*, 593 U.S. at 523—allowing it to drop the hammer on disfavored groups while retaining flexibility to look the other way where discrimination is aimed at remedying "disparities." *But see Students for Fair Admissions v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("Eliminating racial discrimination means eliminating all of it."). This flexibility "to decide which reasons for not

---

[3]    Even the four groups getting the emails have been treated more favorably than FCA. DCPS responded immediately to the grievance against FCA by having FCA scrubbed from Jackson-Reed's website, its initial meeting canceled, and all its activities put on indefinite hold—all before the investigation was even concluded. Dkts. 3-10, 3-11; *accord* Opp. 8 (admitting FCA was required to "immediately cease operations … while the complaint was pending"). Principal Brown responded to concerns about these other groups by sending an email asking them to "update[ ]" their "club description." Opp. 6-7.

   Nor is it clear why Principal Brown merely emailed the Ruling Our eXperiences (ROX) group, since the group is "run and co-founded" by two female *Jackson-Reed employees* under his authority, both of whom were quoted in the school newspaper as saying their club is "composed of a group of freshman girls" and has "created a sisterhood of young women," and that they "plan on expanding the club … to create a wider cohort consisting of 15 girls," and to host a "self-defense class for girls at JR." Dkt. 3-39 at 2. The District notably did not submit declarations from either employee. And it does not explain why it had "no reason to believe" that ROX was "in fact" only open to girls, Opp. 19 n.4, when that's what was stated by their employees to the entire Jackson-Reed community just three months ago, Dkt. 3-39 at 2.

complying with the policy are worthy of solicitude" warrants strict scrutiny for the lack of solicitude to FCA. *Fulton*, 593 U.S. at 537.

*Hostility.* The District has also triggered strict scrutiny by conducting itself in a manner "hostile to [FCA's] religious beliefs." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018); *see* Mot. 21-23. Resisting, the District attempts to throw its own employee under the bus for complaining about FCA, saying his statements were simply "on his private social media account," and didn't purport to speak for the District's "CARE Team." Opp. 22. But then they put in even more hostile statements by the employee, attaching the email in which he implored Principal Brown to take action against FCA because "[t]he group operates around guiding principles based on a number of bible teachings" and seeks "to influence young people's views relative to their faith." Dkt. 23-2 at 9-10. Specifically, the employee requested that the District not "allow them to hold meetings or events in school space," and end "their association with Jackson Reed." *Id.* Far from "disavow[ing]" the employee's complaint and demands, *Masterpiece*, 584 U.S. at 639, DCPS ratified them when, less than a week later, Principal Brown and the CARE Team gave the employee exactly what he wanted. They ordered that FCA must "immediately cease operations" on campus, including canceling FCA's scheduled "kick-off meeting," Dkt. 23-2 at 13; Dkt. 3-11, with CARE ultimately ordering Jackson-Reed to "disassociate" from FCA, Dkt. 3-15 at 3.

The District also says the "statements in the CARE Teams communications and decisions" "simply explain CARE's reasoning." Opp. 22-23. That's exactly the problem—that reasoning treats Plaintiffs' "decent and honorable" religious beliefs, *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015), as tantamount to discrimination.

***

For these reasons, the District's actions trigger strict scrutiny, which it fails for the same reasons as under RFRA. *See Fulton*, 593 U.S. at 541 (relying on RFRA precedent).

### 3. The District is violating the Religion Clauses.

Religious autonomy protects a religious organization's "internal management decisions," which includes (but is not limited to) the "selection of the individuals who play certain key roles."

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). That doctrine bars the government from banning a religious student group from having religious leadership criteria, as an on-all-fours decision from another court has held. *InterVarsity Christian Fellowship/USA v. Board of Govs. of Wayne State Univ.*, 534 F. Supp. 3d 785, 802-13 (E.D. Mich. 2021).

In response, the District says Plaintiffs don't offer enough "facts" on leaders' "responsibilities." Opp. 24-25. But that misses the point. The problem isn't what specifically FCA leaders do, it's that the District has imposed a categorical ban on requiring those leaders to affirm FCA's beliefs. Whatever else religious autonomy protects about "internal management decisions that are essential to the institution's central mission," *Our Lady*, 591 U.S. at 746, it protects the right to even *have* religious leaders.

The District is also wrong on the facts. Plaintiffs have explained exactly what huddle leaders do—they "lead and participate in prayer, worship, and religious teaching; help decide the religious content of meetings," "minister to their peers individually," and "determine what kind of outreach and service activities to engage in to advance the group's religious mission." Dkt. 3-2 ¶ 15 (Paden Decl.); Dkt. 3-23 ¶¶ 9-10 (Williams Decl.). So this case is about the District telling FCA it must be willing to be led by students who don't believe in the God they're charged with praying to and teaching about. "[T]he ability of religious groups to select leaders who in fact agree with the[ir] religion is exactly what the First Amendment protects." *Wayne State*, 534 F. Supp. 3d at 811.

Next, the District says the Religion Clauses are "not applicable here," since this case is about "how a school-sanctioned student club may treat students on a public school campus." Opp. 24. But religious autonomy protects against "any attempt by government … even to influence" a religious group's choice of leaders. *Our Lady*, 591 U.S. at 746. Conditioning the benefits of student-group recognition on abandonment of leadership criteria is certainly one way to exercise such influence. *Wayne State*, 534 F. Supp. 3d at 812-13. "The 'imposition of such a condition upon even a gratuitous benefit inevitably deters or discourages the exercise of First Amendment rights.'" *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 463 (2017) (cleaned up).

Finally, the District says there's no harm to religious-leadership selection because "the District does *not* tell student organizations who they have to elect to represent them," merely that they can't make eligibility determinations "on the basis of protected characteristics." Opp. 25. But that would mean religious groups could never insist on *religious* leadership criteria. And indeed, virtually every case protecting a religious group's leadership selection involves not the government telling religious organizations precisely who to hire, but rather telling them they can't make decisions based on protected characteristics—like age (*Our Lady*), disability (*Hosanna-Tabor*), or sexual orientation (*Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931 (7th Cir. 2022)). The District's uniformly rejected argument here would gut the doctrine entirely. *See, e.g.*, *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 190 (2012) ("valid and neutral law of general applicability" can't justify government interference in religious leadership decisions).

### B. Plaintiffs' speech and assembly claims are likely to succeed.

Plaintiffs are also likely to succeed on their speech and assembly claims—*i.e.*, their claims arising under (1) the Equal Access Act; (2) the Free Speech Clause; (3) expressive association; and (4) the Assembly Clause.

#### 1. The District is violating the Equal Access Act.

The District is violating the Equal Access Act because Jackson-Reed is a public high school that "receives Federal financial assistance," "has a limited open forum," and has "den[ied] equal access" to FCA "on the basis of the religious … content of [FCA's] speech." Mot. 25-26 (citing 20 U.S.C. § 4071(a)). The District leaves uncontested all elements of the EAA violation save one: it claims its exclusion of FCA isn't content-based. Opp. 36. But it's wrong for the three reasons laid out in FCA's motion: banning FCA from having religious leaders *is* a content-based exclusion, the District's exclusion here was expressly based on the content of FCA's religious speech, and the District's selective enforcement is also content-based. Mot. 27-29.

On the first point, the District claims that "the selection of leaders" is irrelevant to the content of an "organization's messages," and cites *Martinez* for support. Opp. 36-37. But as FCA explained, a long line of cases (*Martinez* included) says the exact opposite: "[w]ho speaks on [a

club's] behalf … colors *what* concept is conveyed." Mot. 27 (quoting *Martinez,* 561 U.S. at 680). Indeed, this "principle applies with special force with respect to religious groups" because "the *content* … of a religion's *message* depend[s] vitally on the character" of its leaders." Mot. 27 (quoting *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring).

Two opinions have directly addressed this leadership principle under the EAA: the Second Circuit's decision in *Hsu*, 85 F.3d 839, and Judge Forrest's recent concurring opinion in *FCA-San Jose*, 82 F.4th at 697. Both directly rejected arguments exactly like the District's. Yet the District entirely ignores Judge Forrest. And they ask this Court to split with *Hsu* as "not binding." Opp. 38. But they neglect to mention that they favorably cited *Hsu* to another judge of this Court in an EAA case just last month. Memo. in Opp. to Prelim. Inj. at 22-23, *Arab Student Union v. District of Columbia*, No. 24-cv-1195 (D.D.C. May 6, 2024), Dkt. 15.

Turning to *Hsu*'s reasoning, the District argues this Court should reject *Hsu*'s recognition that leadership selection is "essential to the expressive content of [a club's] meetings," 85 F.3d at 848, because the Supreme Court hasn't said the EAA requires broad protection for speech, Opp. 38-39. But the Court *has* said that. Indeed, it said Congress enacted the EAA with a "broad legislative purpose" and that the EAA must be given a "broad reading" to effectuate that purpose. *Board of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226, 239 (1990). Nor is any stretching required here. As the District agrees, Opp. 37, a regulation flunks content neutrality if it cannot be "justified without reference to the content of the regulated speech," *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015). Here, FCA clubs "speak about religion … through their leadership criteria," *Inter-Varsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 980 (S.D. Iowa 2019) (cleaned up), and the District regulates the content of that speech by forbidding speech on "protected characteristics" in its nondiscrimination policy, Opp. 37. The District, for instance, allows clubs complete freedom to select leaders on ideological grounds, but bans selection made on religious grounds. Mot. 29-30. That is content-based regulation since it can only be justified by reference to the religious content of FCA's speech.

15

But, the District claims, "*other* Circuits have found non-discrimination policies content-neu-tral" to permit a ban on religious leadership. Opp. 39 (emphasis added). It cites only one case from one circuit, though. *Id.* (citing *Truth v. Kent Sch. Dist.*, 542 F.3d 634 (9th Cir. 2008)). And that case expressly noted it did not reach the only question at issue here—leadership selection—*and* expressly declined to conflict with *Hsu*'s holding that banning religious leadership selection is content regulation. *Truth*, 542 F.3d at 647. Nor could this legal point help the District anyway, since—as *Truth* confirms—even a truly facially neutral policy violates the EAA where it is "se-lectively enforce[d]." *FCA-San Jose*, 82 F.4th at 694 n.12; *Truth*, 542 F.3d at 650-51. And that is how the District has enforced its (content-based) policy.

The District then again resorts to *Martinez* to claim that an all-comers policy is content neutral. Perhaps. But as FCA has shown, that's not the kind of policy the District has here. And, as if to prove it, the District wraps up by once more trotting out its exception for students to exercise complete discretion to select leaders on whatever grounds they want. Opp. 40. While that exception doesn't help the District for all the reasons already explained, it once again confirms that the Dis-trict does require clubs to accept all comers.

### 2. The District is violating the Free Speech Clause.

The District's exclusion of FCA also violates the Free Speech Clause because its actions (1) discriminate based on viewpoint, and (2) are unreasonable given the purpose of the forum.

*Viewpoint.* A public school commits viewpoint discrimination—an "egregious" violation of the Free Speech Clause—when it tries to regulate speech based on the "specific motivating ideol-ogy or the opinion or perspective of the speaker." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-30 (1995). Just so here: the District excluded FCA from Jackson-Reed's campus because it disliked FCA's religious viewpoint. Mot. 31-32.

The District responds that its policies don't discriminate based on viewpoint because they re-quire only that FCA's "leadership positions [be] open to all students within the school's commu-nity." Opp. 29-30. But the District's final grievance decision cited the District's belief that FCA's leadership "training may include statements denouncing homosexuality and/or homosexual acts,"

Dkt. 3-21 at 1; *accord* Opp. 29—thus explicitly targeting speech ("statements") based on viewpoint ("denouncing"). That is viewpoint discrimination.

Moreover, the District's prohibition on FCA's leadership criteria is also viewpoint-based. The District quotes *Martinez* for the idea that it's "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." Opp. 30. The problem is that the District doesn't have such a policy. And it has failed to apply the "nondiscrimination policy" that it does have "in a viewpoint-neutral manner" by preventing FCA "from expressing its viewpoints on protected characteristics while other student groups 'espousing another viewpoint [were] permitted to do so.'" *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 985 (8th Cir. 2021).

In response, the District calls it "pure speculation" that groups the District favors have exclusionary membership policies. Opp. 30. But it beggars belief to suggest that, for example, "High School Democrats of America" could be led by Republicans; "Young Men of Phelps" could be led by young women; or a group dedicated to "providing a safe space for LGBTQIA+ students" could be led by students who believe sex is immutable and same-sex sexual conduct is wrong. The District doesn't seem to believe it either, as it acknowledges that the Gender Sexuality Alliance is open only to LGBT students and their "*allies*." Opp. 19-20 (emphasis added). That alone suffices to issue relief at this stage, *Bus. Leaders in Christ v. Univ. of Iowa*, No. 17-cv-80, 2018 WL 4701879, at *14 (S.D. Iowa Jan. 23, 2018) (granting preliminary injunction based on single comparator student group)—but to reiterate, these are hardly the only examples, *supra* p. 10; *see also Frederick Douglass Found. v. District of Columbia*, 82 F.4th 1122 (D.C. Cir. 2023) ("selective enforcement" based on viewpoint is viewpoint discrimination).

***Reasonableness.*** The District's exclusion of FCA also fails because it's inconsistent with the District's purpose for the student-group forum. Mot. 32-33. The District agrees that the forum's purpose is to let students "develop interests and talents outside the classroom," find "connection and community," and gather with other likeminded students without being pressured to "hide their shared interests or beliefs," Opp. 33; *see also* Mot. 33. But associations formed around certain interests and beliefs—especially religious ones, where messenger and message are so tightly

intertwined, *Hosanna-Tabor*, 565 U.S. at 200-01 (Alito, J., joined by Kagan, J., concurring)—cannot survive without leaders who agree with those interests and beliefs. Thus, the District's limitation on FCA deprives students of the opportunity to "develop[ ] interests" and find "community," and flouts the forum's purpose. Mot. 32; *see also FCA-San Jose*, 82 F.4th at 689; *Wayne State*, 534 F. Supp. 3d at 817-18.

Relying on *Martinez*, the District tries to defend its reasonableness by noting that FCA can "host huddles safely at their own homes, a library, or other venue." Opp. 35. But post-graduate law students are different from high schoolers on inner-city campuses in Washington, D.C. Dkt. 3-2 ¶ 32 (Paden Decl.). And here, the unrebutted specifics of Jackson-Reed's environment show the District's proposed alternatives are inadequate, *id.* at ¶¶ 31-32, and would "undoubtedly hamper" FCA's "ability to engage in its core objective," *FCA-San Jose*, 82 F.4th at 683.

Finally, even if the District *did* have an all-comers policy—and evenhandedly enforced it—its actions would still violate the Free Speech Clause because "permitting a religious group to restrict membership to persons who share the group's faith" does not "undermine" any of the goals offered in support of such a policy. *Martinez*, 561 U.S. at 729-35 (Alito, J., dissenting).[4]

### 3. The District is violating the right of expressive association.

The District's exclusion of FCA for declining to associate with leaders who reject its faith also violates the First Amendment right of expressive association. Mot. 33-35. That is because (1) FCA is an expressive association; (2) requiring it to accept such leaders would "significantly affect [its] ability to advocate" its viewpoints; and (3) the District can't survive strict scrutiny. *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 641 (2000); *see also, e.g.*, *Slattery v. Hochul*, 61 F.4th 278, 287 (2d Cir. 2023).

The District offers no independent response on expressive association, instead noting that *Martinez* held the all-comers policy there survived both Speech Clause and expressive-association claims because it was reasonable and viewpoint-neutral. Opp. 26-27. But the District doesn't have

---

[4]   Plaintiffs recognize that this last point is barred by *Martinez*, and here preserve it and *Martinez*'s viewpoint analysis for appeal.

an all-comers policy, and its actions are unreasonable and viewpoint-based. *See supra* pp. 7, 16-18.

The District also claims that "Plaintiffs confuse" an organization's "message" with "who may join or" lead that organization. Opp. 31. That is wrong by any metric, as already explained. *See supra* pp. 14-15. But it's *especially* wrong in the context of expressive association, which requires courts to "give deference to an association's view of what would impair its expression," and indeed whose foundational premise is that "[f]orcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express." *Dale*, 530 U.S. at 648, 653. The District's argument rejects the doctrine itself.

### 4. The District is violating the Assembly Clause.

The District likewise entirely collapses FCA's Assembly Clause claims with its speech claims. Opp. 25-26. But the Assembly Clause is a distinct constitutional provision that is distinctly offended by FCA's derecognition. *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937); *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 619-20 (2021) (Thomas, J., concurring) (discussing "text and history of the Assembly Clause"). That Clause was understood at the Founding "to protect not only the assembly itself but also the right to organize assemblies through more or less continual associations and for those associations to select their own members by their own criteria." Michael W. McConnell, *Freedom by Association*, First Things (Aug. 2012), https://perma.cc/YA3D-Z37E. The District has violated that protection here.

## II. The other preliminary-injunction factors are plainly satisfied.

The District acknowledges that if FCA shows a likelihood of success as to any First Amendment claims (or comparable statutory claims), it satisfies the remaining preliminary-injunction factors. Opp. 41, 44. The District thus seems to admit that if FCA satisfies the first factor, it should get a preliminary injunction. And because FCA has, the inquiry ends there, and this Court should restore the status quo prior to the start of the District's unlawful actions. *FCA-San Jose*, 82 F.4th at 685 (derecognition "alter[ed] the status quo of providing FCA clubs [official] recognition"). The District's admission renders its remaining arguments irrelevant. FCA will address them anyway.

**A.  Plaintiffs face irreparable harm from the District's discrimination.**

The District claims FCA hasn't been irreparably harmed because the Jackson-Reed huddle may continue in "the ways the group exercises its religion" without official club recognition. Opp. 42. But (again) one way it seeks to exercise religion is through religious leadership standards, and unless it gives those up it will continue to face the harms of derecognition—like the inability to secure funding and advertise at the student activities fair, the lack of a consistent on-campus meeting place during the school day, and the stigma of getting kicked off-campus. Courts in cases like this one have repeatedly found harms like these irreparable. *See* Mot. 36 (listing cases).

The District also promises the Jackson-Reed huddle could obtain official status if it "simply … remove[d] one prerequisite"—Christian faith—"for running for a student leadership position." Opp. 42. Restated, the District says that if FCA gives up its speech and religious rights to student leaders that reflect its faith, it won't be irreparably harmed. But that *is* the irreparable harm: "The loss of First Amendment freedoms … unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). So is "being subjected to discrimination," which is "by itself an irreparable harm." *Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016); Dkt. 3-2 ¶ 41 (Paden Decl.).

Finally, *contra* the District's claims, there was no "substantial delay." Opp. 43. FCA spent months in the DCPS appeal process, despite repeated decisions by DCPS based on known false information, hoping the District would reinstate FCA. The District did not. FCA then sent the Ninth Circuit's ruling in a mirror-image case to the District in October 2023, hoping the District would respond by changing its decision. But the District didn't respond at all—until April 2024, when it implicitly responded by doubling down, ordering the FCA huddle at Banneker to stop meeting. Dkt. 3-2 ¶ 37. FCA filed this case mere weeks later. In short, when FCA saw that its ministry could not continue without a lawsuit, it filed one. It shouldn't "now be punished for seeking an amicable resolution before rushing to the courthouse." *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 302 (D.D.C. 2020) (six months between administrative decision and lawsuit did not defeat showing of irreparable harm); *see also Wayne State*, 534 F. Supp. 3d at 798,

800 (six months from derecognition to motion for relief); *FCA-San Jose*, 82 F.4th at 677 (over two years between initial derecognition and preliminary-injunction motion).

### B. The equities and public interest favor recognizing FCA.

The District does not dispute that the equities and public-interest factors—which merge with government defendants—"always favor[ ] the protection of constitutional rights." Opp. 43-44. So if Plaintiffs show a likelihood of success on their First Amendment and related statutory claims, the public interest favors protecting their rights.

Yet the District complains it will face hardship if it must recognize the Jackson-Reed huddle as an official student organization. Opp. 44-45. It will not. Recognizing the huddle will not "undermine[ ] the DCPS and JRHS values that promote a safe and inclusive environment"; it will affirmatively create a "safe and inclusive environment" because kids who share FCA's Christian beliefs will be able to participate in student life like everyone else. Opp. 44. Accommodating a club that's long been part of District campuses will obviously not "strip the District … of *any* ability to enforce the Anti-Discrimination Policy"; it will be party-specific relief required by federal law. *Id.* (emphasis added). And amidst its handwringing, the District nowhere addresses *Hsu's* clear-eyed observation that "high school students are subjected to discrimination and selection all the time." 85 F.3d at 871. The District—with its sex-specific schools and sports teams—is certainly no exception to that rule. In any event, since the District is enforcing its policy "in a manner that violates [FCA's] First Amendment rights," the District's "claimed harm is no harm at all." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006).

### CONCLUSION

Plaintiffs respectfully request that this Court grant the injunction requested.


Respectfully submitted,

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg (D.C. Bar No. 1032624)
Joseph C. Davis (D.C. Bar No. 1047629)
Kelly R. Oeltjenbruns (D.C. Bar No. 1658786)

Richard C. Osborne (D.C. Bar No. 90024046)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
dblomberg@becketlaw.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 18, 2024, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Daniel H. Blomberg*
Daniel H. Blomberg

*Counsel for Plaintiffs*