**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| FELLOWSHIP OF CHRISTIAN ATHLETES, *et al.*, <br><br>       *Plaintiffs*, <br><br>    v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br>       *Defendants*. | No. 24-cv-1332 (DLF) |

**MEMORANDUM OPINION**

The Fellowship of Christian Athletes ("FCA"), an international ministry dedicated to engaging student-athletes in their Christian faith, brings this suit against the District of Columbia. FCA claims that the District violated the Religious Freedom Restoration Act, the Equal Access Act, and the First Amendment by suspending and later removing FCA as an official student group at Jackson-Reed High School in Washington, D.C.  Before the Court is FCA's Application for Preliminary Injunction, Dkt. 3, seeking a District-wide injunction to ensure its reinstatement before the 2024–2025 school year begins.  For the reasons that follow, the Court will grant in part and deny in part FCA's motion.

## I.      BACKGROUND

FCA is an international Christian ministry that envisions "the world transformed by Jesus Christ through the influence of coaches and athletes."  Decl. of Ken Williams Ex. A, at 2, Dkt. 3-24.  Its mission is "[t]o lead every coach and athlete into a growing relationship with Jesus Christ and His church."  *Id.*  To that end, FCA operates over 7,000 student chapters—called "huddles"—that meet on middle-school, high-school, and college campuses across the nation.  *See* Decl. of

Ken Williams ¶ 6, Dkt. 3-23.   Huddles "are initiated and led by student-athletes, and student leaders determine the content of the FCA huddle's message" and lead religious meetings, prayer, and Bible study.   *Id.* ¶ 9.   FCA "invites everyone to participate in [its] ministry programs, such as Huddle meetings, camps, Bible studies, and other events, regardless of their personal beliefs." Decl. of Ken Williams Ex. B, at 12, Dkt. 3-25.   Each student leader, however, is considered the "primary embodiment of FCA's message," Decl. of Ken Williams ¶ 10, and must accordingly "affirm his or her agreement with FCA's Statement of Faith," Decl. of Ken Williams Ex. B, at 11. As relevant here, the Statement of Faith posits that marriage is "a lifelong covenant relationship between a man and a woman" and proscribes "sexual relations outside of marriage (whether involving individuals of the same or opposite sex)" and "any sexually immoral act . . . including homosexuality." *Id.* at 14.

Jackson-Reed High School is the largest high school in the District of Columbia Public Schools system.   *See* Decl. of Sah Brown ¶¶ 1–2, Dkt. 23-2.   It is also home to "approximately 60 recognized student organizations."   *Id.* ¶ 5.   To become a recognized club, students must meet with a Club and Activities Coordinator and secure a faculty, staff, or approved-adult sponsor.   *See id.* ¶ 6.   The "adult club sponsor" then must complete a "registration form to receive final approval by either the Director for Strategy and Logistics or the Principal."   *Id.*   Recognized student groups "are permitted to participate in the annual student club and organization fair to attract new members, submit requests to use facilities for tabling or other events, . . . seek approval for flyers," and post a description on the Jackson-Reed website.   *Id.* ¶¶ 8–9.   Recognized groups are also eligible for school funding.   *See* Decl. of Jolee Paden ¶ 31, Dkt. 3-2.   Approval for new clubs is "a simple process," and new "[c]lubs can be recognized within hours of submission."   *Id.* ¶ 27.

"[F]or years before . . . the COVID-19 pandemic," FCA "had an intermittent presence on Jackson-Reed's campus." *Id.* ¶ 28.  The huddle stopped meeting, however, during the pandemic. *See id.* ¶ 29.  In the 2022 school year, "several Jackson-Reed administrators and employees expressed interest in FCA returning to campus," and a teacher applied for official recognition.  *Id.* ¶¶ 29–30.  Jackson-Reed approved the application.  *See id.* ¶ 30.  Soon after its approval, FCA "invited Jackson-Reed coaches to attend a coaches breakfast."  Decl. of Chris Rich ¶ 9, Dkt. 3-7. In response to one such invitation on Instagram, on September 28, 2022, an assistant coach at Jackson-Reed messaged an FCA staff member that "[t]here is no place for a group like FCA in a public school."  Decl. of Chris Rich Ex. B, at 1, Dkt. 3-9.  On October 3, 2022, the assistant coach filed a grievance with the District's Comprehensive Alternative Resolution and Equity Team ("CARE") alleging that FCA "openly discriminates against the LGBTQ community" and "makes [its] participants sign a sexual purity statement which prohibits homosexual acts."  Decl. of Chris Rich ¶ 10; *see* Decl. of Chris Rich Ex. H, at 1, Dkt. 3-15 (noting the date of the grievance).

Four days later, on October 7, 2022, CARE finished its "initial review of the complaint." Decl. of Chris Rich Ex. C, at 1, Dkt. 3-10.  Upon consideration of "the allegations raised . . . and the content of certain information distributed by" FCA, CARE "request[ed] that Jackson Reed immediately cease operations" of FCA "while the complaint is pending."  *Id.*  That day, Principal Sah Brown adopted CARE's recommendation, launched a formal CARE investigation, removed FCA's website listing, and suspended FCA pending investigation.  *See* Decl. of Chris Rich Ex. D, at 1, Dkt. 3-11.  On the day of the suspension, FCA's faculty advisor Grant Franke asked CARE Implementation Specialist Donica Adesokan for clarification on what FCA "content" was found objectionable.  *See* Decl. of Chris Rich Ex. E, at 1, Dkt. 3-12.  Adesokan responded that "[t]he

premise of what the organization stands for is discriminatory in that the pledge says that you must turn away from an impure lifestyle of which they list as homosexual activities." *Id.*

CARE issued its decision on November 22, 2022. *See* Decl. of Chris Rich Ex. H, at 1. As part of its investigation, it interviewed Chris Rich, the Vice President of Field Ministry for FCA's Mid-Atlantic Region, and Grant Franke, FCA's faculty sponsor at Jackson-Reed. *See* Decl. of Chris Rich ¶ 12. CARE found the grievance "substantiated" under section 2-1402.41 of the D.C. Human Rights Act and the District's Anti-Discrimination Policy.[1] Decl. of Chris Rich Ex. H, at 2–3. It interpreted FCA's "sexual purity statement" as asking "leaders [to] turn away from impure lifestyles, which include homosexual acts." *Id.* at 3. In CARE's view, that "language . . . prohibiting homosexuality constitutes a violation of policy." *Id.* It thus ordered that Jackson-Reed "disassociate from the national Fellowship for Christian Athletes . . . organization" but left open the possibility that the Jackson-Reed huddle could "create a new organization independent" of the national organization. *Id.* Rich represents that "CARE did not initially provide its decision" to FCA, which only "learned about" it "through a report in the student newspaper." Decl. of Chris Rich ¶ 16. FCA's faculty advisor was "instructed not to provide" the group a copy of the decision. *Id.* ¶ 17.

---

[1] At various points, the parties discuss the D.C. Human Rights Act, the District's Notice of Non-Discrimination, and the District's Anti-Discrimination Policy. *See, e.g.*, Mot. for Prelim. Inj. at 6; Opp'n at 2–5. It is not clear to the Court whether these authorities are interchangeable, but it appears that CARE and the District applied either the Non-Discrimination Notice or the Anti-Discrimination Policy to the Fellowship. *See* Decl. of Chris Rich Ex. H, at 2, Dkt. 3-15 (CARE referring to "DCPS Notice of Non-Discrimination"); Opp'n at 2–3 (explaining the application and purposes of the Anti-Discrimination Policy). These policies contain substantively identical nondiscrimination requirements. *Compare* Decl. of Joseph Davis Ex. B, at 1, Dkt. 3-30 (Notice of Non-Discrimination), *with* Decl. of Paige Hoffman Ex. A, at 3, Dkt. 23-1 (Anti-Discrimination Policy). For simplicity's sake, the Court will refer herein to the Anti-Discrimination Policy.

On December 15, 2022, FCA appealed.  *See* Decl. of Chris Rich Ex. I, Dkt. 3-16.  It warned that "[i]f DCPS does not reverse course," it stood to violate "federal civil rights law and the First Amendment"—specifically, "the Equal Access Act, the Religious Freedom Restoration Act, the Free Exercise Clause, and the Free Speech Clause."  *Id.* at 1.  FCA also noted that CARE's decision relied on "a faulty premise" that student leaders are required to sign a "sexual purity statement."  *Id.* at 3.  FCA "do[es] not use" such a "document," according to the appeal letter.  *Id.*  On January 11, 2023, the District affirmed, employing nearly verbatim language as in the initial CARE denial.  *See, e.g.*, Decl. of Chris Rich Ex. L, at 1–2, Dkt. 3-19.

On January 20, 2023, FCA filed a second appeal with D.C. Public Schools Chief Integrity Officer Cinthia Ruiz.  *See* Decl. of Chris Rich Ex. M, Dkt. 3-20.  The Appeals Panel upheld the initial appeal decision on February 10, 2023.  *See* Decl. of Chris Rich Ex. N, at 2, Dkt. 3-21.  It found, among other things, that FCA "may require club leaders to sign/acknowledge a 'sexual purity' clause or similar clause requiring the school community to denounce homosexuality and/or homosexual acts."  *Id.* at 1.  The Panel also noted that the District "would be in favor of reinstating" FCA "if the following conditions are met": FCA (1) "can prove and assure that no document or form requiring student and staff volunteers to acknowledge sexual purity and denounce homosexuality or homosexual acts is required . . . to join" FCA "at Jackson-Reed"; (2) "can prove and assure that any member of the school community can be a 'Leader,' regardless of sexual orientation, religious affiliation, or personal belief"; and (3) "will provide any other training materials or documents required to participate or be a 'Leader.'"  *Id.* at 2.

In "a last-ditch effort to avoid litigation," FCA submitted a request for reconsideration eight months later.  Decl. of Chris Rich ¶ 25.  In its letter, FCA noted the Ninth Circuit's recent en banc decision in *Fellowship of Christian Athletes v. San Jose Unified School District Board of*

*Education*.  Decl. of Chris Rich Ex. O, at 1, Dkt. 3-22.  In that case, the en banc Ninth Circuit reversed a district court's denial of a preliminary injunction against the San Jose Unified School District based on its decision to exclude FCA from campus.  82 F.4th 664, 696 (9th Cir. 2023) (en banc).  The Ninth Circuit held in relevant part that FCA was likely to succeed on its claim that the school district violated the Free Exercise Clause because it failed to treat FCA "like comparable secular student groups whose membership was limited based on criteria including sex, race, ethnicity, and gender identity."  *Id.* at 672.  In its words, "the Constitution prohibits such a double standard."  *Id.*  FCA's letter urged "that identical legal analysis applies to DCPS's actions here, in part because Jackson-Reed High School grants official recognition to student clubs that restrict membership, leadership, or benefits on criteria included in DCPS's nondiscrimination policy."  Decl. of Chris Rich Ex. O, at 2.  The District never responded.  *See* Decl. of Chris Rich ¶ 27.

In April 2024, a student[2] restarted the huddle at Jackson-Reed.  *See* Decl. of John Doe ¶ 7, Dkt. 3-26.  He is "planning to help lead the club in meetings for the 2024–25 school year" and "will immediately seek to have [his] club recognized" if "the school district reverses its decision" denying FCA official status.  *Id.*¶¶ 7–8.  On May 7, 2024, the Jackson-Reed huddle and the national chapter of FCA brought this action, Dkt. 1, and simultaneously filed an Application for a Preliminary Injunction, Dkt. 3.  Among other things, they seek to enjoin the District's application of the Anti-Discrimination Policy to the Jackson-Reed huddle and to restore "official club recognition" before the start of the next school year on August 26, 2024.  *See* Proposed Order

---

[2] "John Doe," a minor, filed his declaration pseudonymously "to protect [his] privacy and safety."  Decl. of John Doe ¶ 1, Dkt. 3-26.  He represents that he has "encountered hostility in the school environment toward [his] Christian beliefs," and "if [his] true name were a part of this lawsuit," he would face "negative consequences."  *Id.* ¶ 10.  Consistent with Rule 5.2(a) of the Federal Rules of Civil Procedure and without objection from the District, the Court will allow the minor student to proceed as "John Doe".

Granting Pls.' Appl. for Prelim. Inj. at 2, Dkt. 3-41.  On June 26, 2024, the Court heard argument on FCA's motion.

## II.  LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted).  The plaintiff "bear[s] the burdens of production and persuasion."  *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  The last two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.  ANALYSIS

### A.  Success on the Merits

FCA alleges twelve bases for relief in its complaint, *see* Compl. at 28–43, Dkt.1, but it only raises seven in its Application for Preliminary Injunction—*i.e.*, Religious Freedom Restoration Act, Free Exercise Clause, Religious Autonomy, Equal Access Act, Free Speech Clause, Free Assembly Clause, and Free Association, *see* Mot. for Prelim. Inj. at 10–36, Dkt. 3-1.  That said, FCA "need only establish a likelihood of succeeding on the merits of any one of those claims in order to satisfy this part of the preliminary injunction standard for obtaining the injunctive relief they seek." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 250 (D.D.C. 2003) (citing *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 319 (D.C. Cir. 1987)).  Because FCA has

shown that it is likely to succeed on its Religious Freedom Restoration Act and Free Exercise Clause claims, the Court will not address the remaining claims at this early stage, without the benefit of a full record. Moreover, there is no need to do so in order to "preserve the relative positions of the parties until a trial on the merits can be held." *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998).

       1.     *Religious Freedom Restoration Act*

In *Employment Division, Department of Human Resources Oregon v. Smith*, the Supreme Court held that the Free Exercise Clause of the First Amendment permits a neutral, generally applicable law to burden or prohibit religious acts even if the law fails strict scrutiny. 494 U.S. 872, 885–90 (1990). Several years after *Smith*, Congress enacted the Religious Freedom Restoration Act ("RFRA") "to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA thus offers "greater protection . . . than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). To state a claim under RFRA, a plaintiff bears the initial burden of proving that the government has "substantially burden[ed] [his] exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a); *see Holt*, 574 U.S. at 360 (noting that under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), the plaintiff bears the "initial burden" of proving substantial burden); *id.* at 358 (noting that RLUIPA and RFRA are subject to "the same standard"). If the plaintiff meets this burden, the burden shifts to the government to show that its "application of the burden to the person (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000bb-1(b); *cf. Holt*, 574 U.S. at 362.

i.    Substantial Burden

FCA is likely to carry its burden of proving the District "substantially burden[ed] [its] exercise of religion."  42 U.S.C. § 2000bb-1.  "[R]eligious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  *Id.* § 2000cc-5(7)(A); *see id.* § 2000bb-2(4) ("[T]he term 'exercise of religion' means religious exercise, as defined in section 2000cc-5 of this title.").  "Congress mandated that this concept" of "exercise of religion" "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by" law.  *Hobby Lobby*, 573 U.S. at 696 (quoting 42 U.S.C. § 2000cc-3(g)).  RFRA does not define "substantial burden," but the D.C. Circuit has held that a "substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Rev. Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)).

To start, FCA's requirement that student leaders affirm its Statement of Faith constitutes the "exercise of religion."  In enacting RFRA, Congress "mandated" a broad conception of "exercise of religion," *Hobby Lobby*, 573 U.S. at 696, that undoubtedly covers a religious group's selection of its leaders.  *See Kedroff v. Saint Nicholas Cathedral of Russ. Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (noting that religious entities are guaranteed "independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.").  "Religious autonomy means that religious authorities must be free to determine who is qualified to serve in positions of substantial religious importance," including "those who serve in positions of leadership."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, *J.*, joined by Kagan, *J.*, concurring).  FCA's Statement of Faith ensures that student

leaders, who lead Bible study and prayer (among other activities), can properly "embod[y] . . . FCA's faith and Christian message to the campuses where they serve." Decl. of Jolee Paden ¶ 15. The Court thus has no trouble finding that a religious group's requirement that its leaders "live up to . . . religious precepts that he or she [must] espouse[]" is a core facet of religious exercise covered under RFRA. *Hosanna-Tabor*, 565 U.S. at 201 (Alito, *J.*, joined by Kagan*, J.*, concurring). In short, control over the selection of ministerial leadership is a core feature of religious practice.

FCA also has shown that it is likely to succeed in proving the District "substantially burdened" that religious exercise. A substantial burden under RFRA can be a carrot or a stick. On one hand, "a substantial burden exists where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith." *Sample v. Lappin*, 424 F. Supp. 2d 187, 193 (D.D.C. 2006) (cleaned up). For example, in *Hobby Lobby*, the Affordable Care Act required employers to adopt healthcare coverage for "methods of birth control that . . . may result in the destruction of an embryo" or else suffer "substantial economic consequences." 573 U.S. at 720. The Supreme Court held that this requirement was a substantial burden as it "put family-run businesses to the choice of violating their sincerely held religious beliefs or making all of their employees lose their existing healthcare plans." *Id.* at 723. On the other hand, a substantial burden may also arise when the government denies a benefit outright "because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Sample*, 424 F. Supp. 2d at 193 (cleaned up).

Whether construed as a carrot or stick, the District's conduct was plainly a substantial burden. In its initial letter, CARE determined that FCA committed "a violation of policy" because its "sexual purity statement"—*i.e.*, the Statement of Faith—"prohibit[s] homosexuality." Decl. of

Chris Rich Ex. H, at 3.  Based on this policy violation, the District forced Jackson-Reed to "disassociate from the national Fellowship for Christian Athletes" and withdraw FCA's recognition as an official student group.  *Id.*  Due to its views on sexual relations, FCA lost the numerous benefits of official recognition.  Such benefits include the ability to "meet in school facilities," "participate in the student activities fair," "appear on school websites," "advertise club events on school bulletin boards," access funding, and include "Jackson-Reed's name as part of [an] Instagram account."  Decl. of Jolee Paden ¶ 31.  Official recognition also ensures that groups "can access campus during the school day."  *Id.* ¶ 33.  As such, official recognition guarantees students the ability to meet safely, recruit, and join their classmates on equal footing in the school's civil society.  *See id.* ¶¶ 31–32.

Given the importance of these benefits, their denial likely pressured FCA to conform its views on sexual relations contrary to its principles.  As the Supreme Court has noted (albeit in the free-association context), the denial of campus resources, like "bulletin boards and the school newspaper," undermines a group's ability to "remain a viable entity in a campus community in which new students enter on a regular basis."  *Healy v. James*, 408 U.S. 169, 181–82 (1972).  "Such impediments cannot be viewed as insubstantial."  *Id.* at 182.  So too under RFRA: it is a substantial burden to make students choose between their principles and a place on campus.

Further, the District did not merely pressure FCA to scrap its Statement of Faith; rather, it expressly conditioned FCA's reinstatement on such abandonment.  In its second appeal decision, the District represented that it was open to reinstating FCA as long as it could "prove and assure that no document or form requir[ed] student and staff volunteers to acknowledge sexual purity and denounce homosexuality or homosexual acts."  Decl. of Chris Rich Ex. N, at 2.  The District also demanded FCA "prove and assure that any member of the school community can be a 'Leader,'

regardless of . . . personal belief." *Id.* The Statement of Faith reflects FCA's beliefs and promotion of "a higher standard of biblical lifestyle." Decl. of Ken Williams ¶ 10. Conditioning "important benefit[s]" on disavowal—or at least nonenforcement—of those beliefs is certainly a substantial burden on FCA's exercise of religion. *Sample*, 424 F. Supp. 2d at 193.

The District's arguments to the contrary are unavailing. First, it contends that "[n]othing in the Anti-Discrimination Policy or CARE's decision precludes FCA from engaging in" meetings or prayer on Jackson-Reed's campus. Opp'n at 12, Dkt. 23. In other words, FCA can engage in religious practice on campus as long as it foregoes eligibility criteria for its leaders.[3] But as FCA rightly points out, RFRA proscribes substantial burdens on "*any* exercise of religion," including the selection of leaders. *See* Reply Br. at 3, Dkt. 24 (quoting 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)). And the Supreme Court has expressly rejected the suggestion that the government may burden some religious practice as long as it allows other practices to proceed. *See Holt*, 574 U.S. at 357–58 ("RLUIPA thus allows prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA." (cleaned up)). For example, in *Holt v. Hobbs*, a prison required a devout Muslim to shave his beard despite his "wish[] to grow a ½-inch beard in accordance with his religious beliefs." *Id.* at 355–56. The Supreme Court held that this violated RLUIPA, and in relevant part, it rejected the prison's argument that "the grooming policy did not substantially burden [the prisoner's] religious exercise because" it provided him "a prayer rug and a list of distributors of Islamic material," among other faith accommodations. *Id.* at 361 (cleaned up). Although the "availability of alternative means of practicing religion is a relevant consideration" under the First Amendment, RLUIPA (and RFRA by extension) "provide[] greater protection"

---

[3] To the extent the District is arguing that FCA could continue operating unencumbered without the benefit of official recognition, this argument fails for the reasons stated *supra*. Namely, official recognition confers important benefits that pressure the FCA to abandon its beliefs.

that cannot be overcome by showing a "claimant is able to engage in *other forms* of religious exercise." *Id.* at 361–62 (emphasis added).  The same is true here.  Permitting FCA to continue worshipping and praying on campus does not make up for the inability to control the selection of its leaders.

Second, the District argues that if FCA agrees to the conditions of reinstatement, its members "would choose their leaders through student-run elections."  Opp'n at 13.  Huddle members would be "free to choose whomever they please, for whatever reasons they want," including for faith-based reasons.  *Id.*  In support of this proposition, the District directs the Court to *Christian Legal Society Chapter of the University of California v. Martinez*, in which the Supreme Court noted that "[s]tudents tend to self-sort and presumably will not endeavor en masse to join—let alone seek leadership positions in—groups pursuing missions wholly at odds with their personal beliefs."  561 U.S. 661, 692–93 (2010).

As an initial matter, *Martinez* was decided under the First Amendment's Free Speech Clause, not RFRA.  *Martinez* also expressly left open the possibility that a public school "*could*, consistent with the Constitution, provide religious groups dispensation from [an] all-comers policy." *Id.* at 694 n.24.  Since *Martinez*, the Supreme Court has reaffirmed that RFRA offers such "greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier*, 595 U.S. 411, 424 (2022).  And as discussed *supra*, RFRA does not permit the government to enforce practice substitution—*i.e.*, requiring FCA to accept the impairment of its leadership selection as the price for engaging in other practices at Jackson-Reed.

In any event, the Court is unpersuaded that the District's burden on FCA's leadership selection would be *de minimis*.  In truth, the District offers little more than its own assurances that student-run elections would be a "*de minimis* inconvenience[]." *Capitol Hill Baptist Church v.*

*Bowser*, 496 F. Supp. 3d 284, 294 (D.D.C. 2020).  And as the Court has explained *supra*, a group's *ability* to select its own leaders on its own terms is a key part of its religious exercise.  Stripping FCA of control of that right is far from minimally invasive—even if in all likelihood student-run elections would yield the same or similar results in leadership.

Nor is the Court inclined to take the District at its word that Jackson-Reed high schoolers possess the maturity to self-select without incident.  True, *Martinez* reasoned that students were unlikely to be "saboteurs" seeking to "infiltrate groups to subvert their mission and message."  561 U.S. at 692.  But *Martinez* concerned adults enrolled at Hastings Law School, not high schoolers.  The Court is skeptical that the Supreme Court's assurances of student maturity carry the same force in the high-school context.  *Cf. Roemer v. Bd. of Pub. Works of Md.*, 426 U.S. 736, 750 (1976) (noting "several general differences between college and precollege education," including courses "entail[ing] an internal discipline that inherently limits the opportunities for sectarian influence").  Indeed, the Court need look no further than FCA's experience in the Ninth Circuit where classmates formed a "Satanic Temple Club" as a form of mockery and "verbally abus[ed]" and bullied FCA members during meetings.  *Fellowship of Christian Athletes*, 82 F.4th at 676–77.

Finally, the District suggests FCA has failed to show "that a lack of student leaders significantly burdens a huddle's ability to gather[] together on campus, pray[], read[] the Bible, worship[], and discipl[e] one another."  Opp'n at 14 (cleaned up).  As proof, it cites a Fellowship huddle at another D.C. public school, Eastern Senior High School, that lacks leaders.  *See* Decl. of Steven Miller ¶ 3, Dkt. 23-3.  But FCA submitted a supplemental declaration casting doubt on the District's representation.  FCA Area Director Jolee Paden represents that "an FCA DC board member" has "personally met each of the students leading Eastern FCA[]" and "ensured their religious beliefs are aligned with FCA's beliefs such that they can sincerely lead prayers, teaching,

and other FCA religious functions with integrity."  Supp. Decl. of Jolee Paden ¶ 7, Dkt. 24-1.  In light of this supplemental declaration, all that is left of the District's argument is its suggestion that FCA could, in the abstract, continue worshipping without a student leader.  The District does not, however, challenge the sincerity of FCA's belief that it needs student leaders to operate a huddle. It is not the role of the Court to arbitrate the accuracy of this "scriptural interpretation."  *Thomas*, 450 U.S. at 716; *see also Priests for Life v. DHS*, 808 F.3d 1, 10 (D.C. Cir. 2015) (en banc) (Brown, *J.*, joined by Henderson, *J.*, dissenting from the denial of rehearing en banc) ("RFRA's concern is with the *sincerity* of religious beliefs and not their *accuracy*.").

For these reasons, the Fellowship has carried its burden of showing that the District's application of its Anti-Discrimination Policy substantially burdened its exercise of religion.

ii.      Strict Scrutiny

Because FCA has met its burden, the burden shifts to the District to show that its conduct was (1) "in furtherance of a compelling governmental interest" and (2) "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b); *see Holt*, 574 U.S. at 362 (noting the defendant bears the burden).  In short, the District must satisfy "strict scrutiny." *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006).  This is a "focused inquiry" "loo[king] beyond broadly formulated interests . . . to scrutinize the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing" the government's policy.  *Hobby Lobby*, 573 U.S. at 726–27 (cleaned up).

The District asserts "a compelling interest in protecting the safety and well-being of its students by promoting an equitable environment free of discrimination."  Opp'n at 16.  It couches its Anti-Discrimination Policy as an "all-comers policy" and argues "[a]ny exemptions . . . would

undermine the District's goal of ensuring that *every* student feels safe and included in the student clubs." *Id.* at 16–17.  The District further contends that it "used the least restrictive means" because "FCA [can] remain on campus" and the "students [can] continue electing whomever they believe would best lead the group." *Id.* at 17.  In its view, FCA "identified no narrower means the District could have employed to enforce its Anti-Discrimination Policy." *Id.*

As a preliminary matter, the Supreme Court's recent affirmative-action decision casts doubt on the compelling nature of the District's claimed interest. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023).  In that case, the Supreme Court considered constitutional challenges to Harvard College's and the University of North Carolina's admissions systems, both of which took race into account. *Id.* at 2154–57.  Per the Supreme Court's earlier affirmative-action decisions, universities must "operate their race-based admissions programs in a manner that is 'sufficiently measurable to permit judicial [review]' under the rubric of strict scrutiny." *Id.* at 2166 (quoting *Fischer v. Univ. of Tex. at Austin*, 579 U.S. 365, 381 (2016)).  In an effort to overcome strict scrutiny, Harvard and the University of North Carolina claimed compelling interests similar to those claimed by the District here.  Specifically, both universities sought to "enhanc[e] appreciation, respect, and empathy, cross-racial understanding, and break[] down stereotypes." *Students for Fair Admissions*, 143 S. Ct. at 2166.  The Supreme Court found this insufficient.  Although the schools' alleged interest was "commendable," the Court found it "standardless" and "not sufficiently coherent for purposes of strict scrutiny." *Id.* at 2166–67.  That too is true for the District's claimed interest in maintaining an "equitable environment free of discrimination."  Opp'n at 16.  "Unlike discerning whether a prisoner will be injured or whether an employee should receive backpay," the Court has no way to "measure" the equity of the school environment. *Students for Fair Admissions*, 143 S. Ct. at 2166–67.

The District points the Court to two authorities suggesting that "foster[ing] an environment of inclusivity, acceptance, and tolerance" and "diversity" are compelling.  Opp'n at 16 (first quoting *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018); and then quoting *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003)).  But neither case helps the District.  To start, *Grutter* did not survive *Students for Fair Admissions*, based on the Court's best reading.  Although the majority opinion did not expressly overrule *Grutter*, its reasoning, especially with respect to strict scrutiny, seems incompatible with that of *Grutter*.  *Compare Students for Fair Admissions*, 143 S. Ct. at 2167 ("It is far from evident, though, how assigning students to these racial categories and making admissions decisions based on them furthers the educational benefits that the universities claim to pursue."), *with Grutter*, 539 U.S. at 328 ("The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer.").  In addition, Justice Thomas noted in a concurring opinion that "[t]he Court's opinion rightly makes clear that *Grutter* is, for all intents and purposes, overruled."  *Students for Fair Admissions*, 143 S. Ct. at 2207 (Thomas, *J.*, concurring).

And *Doe* is not on point.  In that case, the Third Circuit considered a school district's policy "allowing transgender students to use bathrooms and locker rooms that are consistent with [their] gender identities as opposed to the sex they were determined to have at birth."  897 F.3d at 521.  The Third Circuit found a "compelling state interest in not discriminating against transgender students" because such discrimination posed "life threatening" "risk to [transgender students'] wellbeing."  *Id.* at 528–29 (cleaned up).  But the District does not allege that any student's physical well-being is in any danger; rather, it relies on the goal of maintaining an "equitable" school environment.  As *Students for Fair Admissions* teaches, such an amorphous and standardless goal is unlikely to be compelling.  *See* 143 S. Ct. at 2166–67.

But even assuming *Students for Fair Admission* has no bearing here, the District has failed to show that its claimed interest is compelling. Strict scrutiny "is a demanding standard." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). The government "must specifically identify an actual problem in need of solving," and the curtailment of rights "must be actually necessary to the solution." *Id.* (cleaned up). Take *Fulton v. City of Philadelphia*, for example. 141 S. Ct. 1868 (2021). There, the City of Philadelphia stopped referring foster children to Catholic Social Services due to its refusal to "certify same-sex couples to be foster parents due to its religious beliefs about marriage." *Id.* at 1874 (2021). To justify its exclusion of Catholic Social Services, Philadelphia asserted several compelling interests, including "protecting the City from liability." *Id.* at 1881. The Supreme Court found this purported interest insufficient, however, because Philadelphia failed to "show that granting . . . an exception" to Catholic Social Services would actually "put those goals at risk." *Id.* at 1881–82. Specifically, "the City offer[ed] only speculation that it might be sued over [Catholic Social Service's] certification practices," and "[s]uch speculation is insufficient to satisfy strict scrutiny." *Id.* at 1882.

By the same token, the District's interest is unjustifiably speculative. It seeks to "protect[] the safety and well-being of its students by promoting an equitable environment free of discrimination." Opp'n at 16. At the same time, however, it suggests a "hypothetical" and "at most[] remote" probability that "pagans and atheists" would actually "assum[e] leadership positions in" FCA. *Id.* at 14–15. In other words, the District readily admits that a student in noncompliance with FCA's Statement of Faith—whether an atheist, Jewish, gay, or lesbian student—is unlikely to seek a leadership position in the Jackson-Reed huddle. The District can thus offer "only speculation" that FCA's reinstatement would pose an actual threat of

discrimination against any Jackson-Reed student based on a protected characteristic. *Fulton*, 141 S. Ct. at 1882. Such a speculative goal does not pass muster under strict scrutiny.

Moreover, the District's exclusion of FCA as a means of eliminating discrimination is "fatally underinclusive." *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2261 (2020). That is because the District has not pursued this "proffered objective[] . . . with respect to analogous nonreligious conduct." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). As explained in Section III.A.2, *infra*, the District permits student groups besides FCA to continue operating at Jackson-Reed even though they restrict membership on the basis of protected characteristics and/or ideological alignment. Such restrictions also appear to be in tension with the District's Anti-Discrimination Policy. The District's exclusion of FCA can hardly be said to advance "an interest of the highest order" in eliminating discrimination "when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up). The District's "interest" in nondiscrimination "cannot justify" a nondiscrimination policy "that requires only religious" groups to "bear [its] weight." *Espinoza*, 140 S. Ct. at 2261 (cleaned up).

Further, even assuming the District could assert a compelling interest, it is unlikely to show it used "the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000bb-1(b). "The least-restrictive-means standard is exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. The government must show "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Id.* Here, the District claims it adopted an "all-comers policy," Opp'n at 17, akin to that in *Martinez*, under which "all [student] groups must accept all comers as voting members even if those individuals disagree with the mission of the group," *Martinez*, 561 U.S. at 674. According to the District, there are "no narrower means" it could "have employed to enforce its Anti-Discrimination Policy." Opp'n at 17.

19

Even assuming an all-comers policy is the least restrictive means, the Court disagrees that is what the District has adopted here.  At the June 26, 2024 hearing, the District asserted that "[t]he policy in *Martinez* is very much the policy here" because, like the District here, Hastings Law School adopted an all-comers policy based on an "interpretation of [its] antidiscrimination policy." But *Martinez* is distinguishable.  Although it is true that Hastings Law School, like the District, had a Nondiscrimination Policy that prohibited discrimination on the basis of enumerated characteristics, *see Martinez*, 561 U.S. at 670, the parties expressly "stipulate[d] that Hastings impose[d] an open membership rule on all student groups," *id.* at 674.  *See also Fellowship of Christian Athletes*, 82 F.4th at 686 (noting the "stipulated facts in *Martinez*").  Before the Supreme Court, the Christian Legal Society attempted to shift gears and argue that Hastings's "Nondiscrimination Policy" is not actually "a requirement that all [student groups] accept all comers" because it "prohibit[s] discrimination on several enumerated bases." *Martinez*, 561 U.S. at 675.  The Supreme Court declined to reach the merits of the Society's argument, however, because it ran "headlong into the stipulation of facts it jointly submitted with Hastings at the summary-judgment stage." *Id.*  Instead, the Court rejected the "unseemly attempt to escape from the stipulation" and considered only whether the stipulated all-comers policy violated the Free Speech Clause of the First Amendment. *Id.* at 675–78.

Without the benefit of a similar stipulation, the District cannot claim the mantle of an all-comers policy.  The District's Anti-Discrimination Policy applies to "all students, staff, and visitors in any DCPS building or program" and prohibits discrimination on enumerated grounds:

> on the basis of actual or perceived race, color, religion, national origin, sex (including pregnancy), age, marital status, personal appearance, sexual orientation, gender identity or expression, family status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intrafamily offense, or place of residence or business.

Decl. of Paige Hoffman Ex. A, at 3, Dkt. 23-1.  As Justice Alito noted in his *Martinez* dissent (joined by three other Justices), such a policy "proscrib[ing] discrimination on a limited number of specified grounds" is "simply not the same" as an "all-comers policy outlaw[ing] all selectivity." *Martinez*, 561 U.S. at 712 (Alito, *J.*, joined by Roberts, *C.J.*, and Scalia & Thomas, *JJ.*, dissenting). The en banc Ninth Circuit impliedly endorsed Justice Alito's view and characterized *Martinez* as approving only a truly "*exceptionless* policy." *Fellowship of Christian Athletes*, 82 F.4th at 686. This Court agrees too: namely, policies like the District's leave room for groups to limit membership on any criterion not expressly prohibited—far from leaving all groups open to all comers.  Moreover, as discussed at greater length in Section III.A.2, *infra*, the District's application of the Anti-Discrimination Policy is "replete with exemptions that treat comparable secular groups more favorably by allowing them to limit membership based on a variety of discriminatory secular criteria"—falling well outside the narrow confines of *Martinez*. *Fellowship of Christian Athletes*, 82 F.4th at 694.  The District thus, at best, has an "accept-*some*-comers policy."  *Martinez*, 561 U.S. at 714 (Alito, *J.*, joined by Roberts, *C.J.*, and Scalia & Thomas, *JJ.*, dissenting).

At bottom, the evidence before the Court shows that the District has not in fact adopted an all-comers policy.  Rather, it has applied its Anti-Discrimination Policy selectively, punishing a religious organization while exempting secular student groups for arguably similar conduct.  The District's treatment of FCA is thus far from the least restrictive means of achieving its antidiscrimination goals.  At this preliminary juncture, FCA has thus shown a likelihood of success on the merits of its RFRA claim.

### 2.    *Free-Exercise Clause*

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  In *Smith*, the Supreme Court held that "laws

incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable," *Fulton*, 141 S. Ct. at 1876.  The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Id.* at 1877.  "A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'" or by "prohibit[ing] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* (quoting *Smith*, 494 U.S. at 884).  Failing either prong triggers strict scrutiny.

Although FCA "points to evidence in the record that it believes demonstrates" that the District "transgressed th[e] neutrality standard," the Court finds "it more straightforward to resolve this case under the rubric of general applicability." *Fulton*, 141 S. Ct. at 1877.

On this front, the principal dispute is whether the District has "prohibit[ed] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*  Two examples of underinclusion are particularly illustrative.  In *Lukumi*, the City of Hialeah passed an ordinance proscribing animal sacrifice, a Santeria religious rite. *See* 508 U.S. at 524–28.  The City "claimed that the ordinances were necessary in part to protect public health" from "the disposal of animal carcasses in open public places." *Fulton*, 141 S. Ct. at 1877 (quoting *Lukumi*, 508 U.S. at 544).  But, at the same time, the City did not regulate "hunters' disposal of their kills or improper garbage disposal by restaurants"—*i.e.*, secular activities "pos[ing] a similar hazard" to that of Santeria animal sacrifice. *Id.*

So too in *Tandon v. Newsom*.  That case concerned California's response to the COVID-19 pandemic, including its prohibition on in-home gatherings of more than three different households. *See Tandon v. Newsom*, 992 F.3d 916, 933 (9th Cir. 2021) (Bumatay, *J.*, dissenting

in part and concurring in part).  California residents seeking to conduct in-home Bible studies and "communal worship services" with more than three households challenged this policy on Free Exercise grounds.  *See id.*  The Supreme Court found the challenge likely to succeed because California's regulation was not generally applicable: namely, "California treat[ed] some comparable secular activities more favorably than at-home religious exercise, permitting hair salons, retail stores, personal care services, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring together more than three households at a time."  *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021).

To decide "whether two activities are comparable for purposes of the Free Exercise Clause," the Court must determine "the asserted government interest that justifies the regulation at issue."  *Id.* at 1296.  As discussed in Section III.A.1.ii, *supra*, under its Anti-Discrimination Policy, the District seeks to "protect[] the safety and well-being of its students by promoting an equitable environment free of discrimination," Opp'n at 16.  The evidence before the Court, however, shows that the District punished FCA "while permitting secular conduct that undermines the [District's] asserted interests in a similar way."  *Fulton*, 141 S. Ct. at 1877.

FCA first points to Jackson-Reed student groups that, based on their website descriptions, appear to limit membership on the basis of characteristics protected under the Anti-Discrimination Policy.  *See* Mot. for Prelim. Inj. at 17–19.  For example, the Wise Club is "a separate space for young women to meet to explore key learning areas of development," Decl. of Joseph Davis Ex. A, at 8, Dkt. 3-29; Girls Who Code "provide[s] a space for girls interested in coding," *id.* at 4; the Asian Student Union "is for students of Asian heritage," *id.* at 1; and Ruling Our eXperiences ("ROX") is a "sisterhood of young women," Decl. of Joseph Davis Ex. K, at 2, Dkt. 3-39, whose "facilitat[ors]" must "identify as female," Decl. of Joseph Davis Ex. L, at 4, Dkt. 3-40.

On the face of these descriptions, "each of these clubs" appears to "to discriminate expressly—even on otherwise protected grounds." *Fellowship of Christian Athletes*, 82 F.4th at 689.  That the District permits "such discrimination for secular groups significantly undercuts its goal" of eliminating discrimination as applied to FCA.  *Id.*  In *Fellowship of Christian Athletes*, the en banc Ninth Circuit found nearly identical facts to run afoul of general applicability.  There, the school district "allowed the Girls' Circle to admit only female-identifying students," "the Big Sister/Little Sister club to similarly exclude members of the opposite gender," and the Senior Women Club to exclude students who "do[] not identify as female."  *Id.*  That the school district punished FCA based on its Statement of Faith suggested "selective enforcement" inconsistent with general applicability.  *Id.*

The District contends FCA's "entire argument is based solely on their reading—or misreading—of the descriptions of the organizations on the [Jackson-Reed] website."  Opp'n at 19.  As proof, it presents an affidavit from Principal Sah Brown.  *See* Decl. of Sah Brown.  Principal Brown represents that during his "tenure as Principal, none of the [four] JRHS student groups . . . have been authorized by the school to exclude members or leaders based on gender identity, race, ethnicity, national origin, or any other protected characteristic."  *Id.* ¶ 21.  And to "the best of [his] knowledge, none of these groups have in fact excluded members or leaders in this way, with or without authorization."  *Id.*  But "[o]ut of an abundance of caution," he "emailed" the four organizations on June 5, 2024 "to reiterate that the Anti-Discrimination Policy applies to all student groups, and . . . that means that they cannot exclude anyone from membership, leadership, or participation due to a protected characteristic, including gender, race, national origin, or ethnicity."  *Id.* ¶ 22; *see* Decl. of Sah Brown Ex. C, at 1–4, Dkt. 23-2.  At the June 26, 2024 hearing, counsel for the District informed the Court that the four groups updated their website

listings accordingly.  Counsel also represented that she "confirmed" that ROX permits men to join.

In context, however, counsel's "confirmation" appears to be a reference to Principal Brown's email

and ROX's subsequent amendment to its Jackson-Reed website description.

The Brown Declaration carries some weight, but it is not the knock-down argument the

District assumes.  This "belated remedial effort[] suggest[s], if anything, that" the District "had no

accept-all-comers policy until this litigation was well under way."  *Martinez*, 561 U.S. at 713

(Alito, *J.*, joined by Roberts, *C.J.*, and Scalia & Thomas, *JJ.*, dissenting).  Principal Brown testifies

that he never "authorized" any exemptions from the Anti-Discrimination Policy, and "to the best

of [his] knowledge, none of the[] [four] groups have in fact" violated the Policy.  Decl. of Sah

Brown ¶ 21.  But neither his declaration nor emails to the groups reflect any effort to interrogate

whether the four groups had in fact violated the policy as their website listings may have suggested.

The four groups received an email simply reminding them of the Anti-Discrimination Policy and

expressing "trust that the club[s] will continue to allow all students to enjoy the[ir] benefits"

without any apparent need for an investigation.  Decl. of Sah Brown Ex. C, at 1.  This treatment is

in stark contrast to that received by FCA: specifically, a suspension within four days of a grievance

filing and "initial review."  Decl. of Chris Rich Ex. C, at 1.  In the Court's view, this disparity

tenders further proof of "selective enforcement favoring comparable secular activities."

*Fellowship of Christian Athletes*, 82 F.4th at 689.

Jackson-Reed is also home to other groups limited to students with a protected

characteristic and their "allies."  For example, the Gender Sexuality Alliance is "a safe space for

LGBTQIA+ students" and "for allies to show support and build community," and the Disability

Student Alliance is for "disabled students and their allies."  Decl. of Joseph Davis Ex. A, at 26, 39.

As the District defines them, "allies" are "students who want to support the club's goals but are

not themselves" members of the protected class.  Opp'n at 19.  In other words, "allies" are ideologically aligned with the club's goals.  As the en banc Ninth Circuit observed, "[i]ndividual preferences based on certain characteristics and criteria serve important purposes for these groups."  *Fellowship of Christian Athletes*, 82 F.4th at 689.  Allies of the Gender Sexuality Alliance, for example, help LGBTQIA+ students feel more comfortable and welcomed at Jackson-Reed.  *See* Decl. of Paige Hoffman ¶ 8, Dkt. 23-1.

But "it makes equal sense that a religious group," like FCA, "be allowed to require that its leaders agree with the group's most fundamental beliefs" too.  *Fellowship of Christian Athletes*, 82 F.4th at 689  Instead, the District permits secular groups to limit their *membership* to ideologically aligned students while denying the same right to FCA with respect to its *leadership*. The Court can find "no meaningful constitutionally acceptable distinction between the types of exclusions at play here."  *Id.*; *see Tandon*, 141 S. Ct. at 1296.  Indeed, the secular groups enforce ideological alignment of *all* of their members, and that arguably poses more of risk to the District's purported goal of "promoting an equitable environment free of discrimination," Opp'n at 16, than FCA's requirement that applies only to its leaders.

The parties dispute other issues, such as (1) the comparability of gender-segregated sports, gender-segregated schools, and student groups at other high schools; and (2) whether the Anti-Discrimination Policy empowers the District to make individualized exemptions.  *See, e.g.*, Reply Br. at 8, 10 & n.2, 11.  Given the foregoing analysis, however, the Court need not resolve those issues because FCA has supplied sufficient evidence to conclude that the District did not apply its Anti-Discrimination Policy in a generally applicable manner.  As such, strict scrutiny is triggered, *see Fulton*, 141 S. Ct. at 1876, and, as explained in Section III.A.1.ii, *supra*, the District cannot

satisfy this demanding standard.  FCA is thus likely to succeed on the merits of its Free Exercise Clause claim.

### B.        Remaining Injunction Factors

The remaining factors favor a preliminary injunction.

#### 1.        *Irreparable Harm*

As to irreparable harm, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." (cleaned up)).  So too for RFRA claims.  *See Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) ("At least when, as here, the Government has not argued that there is any relevant daylight between the RFRA and First Amendment analyses, then a comparably irreparable injury applies to violations of RFRA.").  For the reasons stated above, FCA has shown a likelihood of succeeding on its claims that the District's application of the Anti-Discrimination Policy violated (and will continue to violate) the Free Exercise Clause and Religious Freedom Restoration Act.

FCA's "asserted harm will certainly accrue 'in the absence of preliminary relief.'"  *Id.* (quoting *Winter*, 555 U.S. at 20).  Without reinstatement before the next school year, FCA will continue to lack official recognition and be burdened in its ability to meet, receive funding, and recruit on campus.  *See* Decl. of John Doe ¶ 8.  The deprivation of such benefits thus constitutes a continuing harm that hampers FCA's continued operations at Jackson-Reed.  *See Fellowship of Christian Athletes*, 82 F.4th at 695 ("[T]he deprivation of ASB recognition has and will continue

to hamper FCA's ability to recruit students, constituting an enduring harm that will irreparably risk the club's continued existence.").

The District offers several responses, but none are persuasive.  First, it reiterates that even without official recognition, FCA can still gather on campus.  *See* Opp'n at 41–42.  But to do so, FCA would have to sacrifice school funding, security in meeting places, and the ability to recruit through official channels like the activities fair.  Such limitations easily constitute harms from which FCA may not recover.  *See, e.g.*, *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1300 (C.D. Cal. 2008) ("Because school at EHS is scheduled to start in a matter of days, keeping the group off campus at this important time might further sabotage its efforts to recruit students when they are most available, permanently stunting the size of the group's membership.").  That is also not to mention the indignity and possible stigma of operating at Jackson-Reed as an "unregistered" student group due its religious beliefs.

Second, the District suggests FCA could simply forego its leadership requirements and receive official recognition.  *See* Opp'n at 42.  But as the Court explained in Section III.A.1.i, *supra*, asking FCA to abandon its leadership requirement is itself a burden on its exercise of religion under RFRA.  And such a burden constitutes irreparable harm.  *See Singh*, 56 F.4th at 109.

Finally, the District blames FCA for the "substantial delay between Plaintiffs being informed of the Final CARE Appeal decision [on February 10, 2023] and their seeking injunctive relief."  Opp'n at 43.  But this delay stemmed from FCA's various prelitigation settlement efforts, including an October 10, 2023 letter seeking reconsideration based on the en banc Ninth Circuit decision in favor of FCA's huddle in San Jose.  *See* Reply Br. at 20; Decl. of Chris Rich ¶ 25.  The District never responded to this letter.  This suit also came closely on the heels of the District's

April 2024 suspension of the FCA huddle at Banneker High School and was filed in anticipation of the next school year.[4]  *See* Decl. of Jolee Paden ¶ 37.  FCA has thus shown irreparable harm.

### 2. *Balance of the Equities and Public Interest*

The remaining two factors—balance of the equities and the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors also favor a preliminary injunction.  As the D.C. Circuit has noted, the "enforcement of an unconstitutional law is always contrary to the public interest," *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), and FCA raises a likely meritorious First Amendment claim that tips the balance of equities in its favor.  That is sufficient to satisfy the final two factors.

Resisting this conclusion, the District argues that a preliminary injunction would impose a substantial burden on it because the District would have to give "special treatment" to FCA and would be "strip[ped] . . . of any ability to enforce the Anti-Discrimination Policy."  *See* Opp'n at 44.  But as explained in Section III.C, *infra*, the scope of injunctive relief is limited to FCA's huddle at Jackson-Reed, not any other group.  Also, the District already permits student groups besides FCA to impose membership requirements in tension with the Anti-Discrimination Policy.  *See supra* Section III.A.2.  It is thus not credible that the District would be required to give FCA any "special treatment" under the Court's injunction.  Rather, the District will merely have to permit FCA to stand on equal footing with its secular counterparts.

### C. Scope of Injunctive Relief

The final issue to consider is the proper scope of the preliminary injunction.  Issuance of a preliminary injunction is an exercise of the Court's equitable power.  *See Grupo Mexicano de*

---

[4] Notably, the delay in this case was less than the two-year delay in the en banc Ninth Circuit case between the Fellowship's derecognition and preliminary-injunction motion.  *See Fellowship of Christian Athletes*, 82 F.4th at 674–77.

*Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).  But equitable remedies should not be "more burdensome to the defendant than necessary to" redress a plaintiff's injury. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  This "authority to provide equitable relief" must be "meaningfully constrained," *Trump v. Hawaii*, 138 S. Ct. 2392, 2426 (2018) (Thomas, *J.*, concurring), and the Court must take care to "limit[]" any equitable remedy to the injuries "the plaintiff has established," *Gill v. Whitford*, 585 U.S. 48, 68 (2018) (cleaned up).

At the June 26, 2024 hearing, FCA clarified that it seeks a District-wide injunction, reaching beyond Jackson-Reed High School.  In the Court's view, such an injunction is broader than necessary.  Although the District of Columbia operates other D.C. public high schools where Fellowship huddles exist, the complaint and application for preliminary injunction raise allegations almost exclusively about Jackson-Reed High School, and on this record, the Court cannot determine whether FCA's huddles have faced identical treatment at other D.C. high schools.  *See, e.g.*, Decl. of Jolee Paden ¶ 37.  Indeed, at the hearing, the District suggested that the circumstances at Banneker High School are distinguishable, and FCA presented no argument to the contrary.

The Court will thus issue a "decision[] attuned to the facts, parties, and claims at hand." *Labrador v. Poe*, 144 S. Ct. 921, 927–28 (2024) (Gorsuch, *J.*, joined by Thomas & Alito, *JJ.*, concurring).  As such, it will narrow the scope of requested relief and order a preliminary injunction against the District of Columbia requiring the reinstatement of the Fellowship of Christian Athletes at Jackson-Reed High School for the 2024–2025 school year pending proceedings in this case.  The Court's views on the District's conduct may "advantage[] nonparties" at other D.C. public high schools, but any such "benefit [is] merely incidental." *Trump*, 138 S. Ct. at 2427 (Thomas, *J.*, concurring).

**CONCLUSION**

Antidiscrimination laws "have done much to secure the civil rights of all Americans." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2307 (2023).  But antidiscrimination laws, like all other laws, must be applied evenhandedly and not in violation of the Constitution.  *See id.* Unfortunately, it appears that this command was not followed at Jackson-Reed High School.

The Fellowship of Christian Athletes requires its student leaders, but not its members, to affirm their commitment to the group's beliefs.  Among those beliefs is a prohibition on sexual relations outside of marriage between a man and a woman.  For this, FCA lost its official status at Jackson-Reed.  As a condition for reinstatement, the District forced FCA to choose between official school recognition and its religious principles.  Such treatment is at odds with that received by secular groups at Jackson-Reed that appear to limit membership on the basis of other protected characteristics and/or ideological alignment.

At this stage, FCA has shown that the District's application of its Anti-Discrimination Policy is likely to run afoul of, at the very least, the Religious Freedom Restoration Act and the Free Exercise Clause.  The Court will, however, narrow the scope of the requested injunction.  The Court thus grants in part and denies in part FCA's Application for Preliminary Injunction.  A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

July 11, 2024

31