## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FELLOWSHIP OF CHRISTIAN ATHLETES**, et al., | Civil Action No. 1:24-cv-01332-DLF |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS** |
| v. | |
| **DISTRICT OF COLUMBIA**, et al., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

I.   FCA's religious ministry and leadership requirements ............................................... 2

II.  The District's discriminatory exclusion of FCA ......................................................... 4

III. The District's intentional selective enforcement of its non-discrimination policies ................ 5

IV. Defendants' extensive notice that their actions violated federal law ............................. 7

V.  This litigation and the Court's preliminary injunction in FCA's favor ....................... 9

VI. The District's post-preliminary-injunction maneuvering ........................................... 10

LEGAL STANDARDS ...................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.   FCA's forward-looking claims are not moot. ............................................................ 12

   A.  The Court should decline the District's invitation to create a special
       mootness standard for government defendants. ..................................................... 12

   B.  The District has failed to carry its mootness burden. ........................................... 14

II.  The individual defendants are not entitled to qualified immunity at the pleading stage. ......... 19

   A.  Defendants violated the law. ................................................................................ 20

   B.  The law was clearly established. .......................................................................... 22

      1.  Both the rules and their application to protect religious leadership
          standards for religious student groups were clearly established at
          the time of Defendants' actions. ...................................................................... 23

      2.  Courts have repeatedly rejected qualified immunity for identical conduct. ............. 26

   C.  Defendants' qualified-immunity arguments are meritless. .................................... 27

III. Plaintiffs have adequately pled their Due Process Clause claim. ............................... 31

IV. Plaintiffs have adequately pled claims against Chancellor Ferebee in his individual capacity...................................................................................................33

V.  Plaintiffs do not object to dismissal of their official-capacity claims against the individual Defendants. ..........................................................................................34

CONCLUSION...................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

*303 Creative LLC v. Elenis,*
   600 U.S. 570 (2023) ....................................................................................................23

*Akiachak Native Cmty. v. U.S. Dep't of Interior,*
   827 F.3d 100 (D.C. Cir. 2016) ....................................................................................18

*Already, LLC v. Nike, Inc.,*
   568 U.S. 85 (2013) ......................................................................................................12

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   934 F.3d 649 (D.C. Cir. 2019) ....................................................................................17

*Am. Bar Ass'n v. FTC,*
   636 F.3d 641 (D.C. Cir. 2011) ....................................................................................18

*Am. Freedom Def. Initiative v. WMATA,*
   901 F.3d 356 (D.C. Cir. 2018) ........................................................................... 15, 18-19

*Am. Nat'l Ins. Co. v. FDIC,*
   642 F.3d 1137 (D.C. Cir. 2011) ..................................................................................11

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ....................................................................................................22

*Aref v. Lynch,*
   833 F.3d 242 (D.C. Cir. 2016) ..............................................................................13, 14

*Armstrong v. Manzo,*
   380 U.S. 545 (1965) ....................................................................................................32

*Ashbourne v. Hansberry,*
   245 F. Supp. 3d 99 (D.D.C. 2017) ..............................................................................34

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011) ....................................................................................................22

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..............................................................................................11, 33

*Bame v. Dillard,*
   637 F.3d 380 (D.C. Cir. 2011) ....................................................................................29

*Barham v. Ramsey,*
   434 F.3d 565 (D.C. Cir. 2006) ....................................................................................19

*Bd. of Educ. v. Mergens ex rel. Mergens,*
    496 U.S. 226 (1990)................................................................................22

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000)...........................................................................21, 25

*In re Bright Ideas Co.,*
    284 A.3d 1037 (D.C. 2022) ..................................................................13

*Brosseau v. Haugen,*
    543 U.S. 194 (2004)................................................................................23

*Bus. Leaders in Christ v. Univ. of Iowa,*
    360 F. Supp. 3d 885 (S.D. Iowa 2019) ...................................................25

*Bus. Leaders in Christ v. Univ. of Iowa,*
    991 F.3d 969 (8th Cir. 2021) ....................................................... 26, 28-29

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) .................................................................25

*Christian Legal Soc'y v. Martinez,*
    561 U.S. 661 (2010).....................................................................20, 27, 28

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)...........................................................................21, 23

*City of Mesquite v. Aladdin's Castle, Inc.,*
    455 U.S. 283 (1982)...................................................................12, 14, 19

*Daugherty v. Sheer,*
    891 F.3d 386 (D.C. Cir. 2018) ..............................................................29

*Doe v. Harris,*
    696 F.2d 109 (D.C. Cir. 1982) ......................................................... 17-18

*FBI v. Fikre,*
    601 U.S. 234 (2024)...........................................................................13, 14

*Fellowship of Christian Athletes v. District of Columbia,*
    743 F. Supp. 3d 73 (D.D.C. 2024) .................................................. *passim*

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
    82 F.4th 664 (9th Cir. 2023) ............................................................ *passim*

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.,*
    46 F.4th 1075 (9th Cir. 2022) ....................................................7, 24, 29

*Franciscan All., Inc. v. Becerra,*
   47 F.4th 368 (5th Cir. 2022) ..............................................................................17

*Frederick Douglass Found., Inc. v. District of Columbia,*
   82 F.4th 1122 (D.C. Cir. 2023) ...........................................................................21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*
   528 U.S. 167 (2000) .............................................................................................12

*Fulton v. City of Philadelphia,*
   593 U.S. 522 (2021)........................................................................................21, 23

*Global Tel*Link v. FCC,*
   866 F.3d 397 (D.C. Cir. 2017) ............................................................................15

*Haase v. Sessions,*
   835 F.2d 902 (D.C. Cir. 1987) ............................................................................11

*Hall v. District of Columbia,*
   867 F.3d 138 (D.C. Cir. 2017) ............................................................................19

*Hardaway v. D.C. Hous. Auth.,*
   843 F.3d 973 (D.C. Cir. 2016) ............................................................................13

*Haynesworth v. Miller,*
   820 F.2d 1245 (D.C. Cir. 1987) ..........................................................................33

*Healy v. James,*
   408 U.S. 169 (1972)........................................................................................23, 31

*Herbert v. Nat'l Acad. of Scis.,*
   974 F.2d 192 (D.C. Cir. 1992) ............................................................................11

*Heritage Action for Am. v. FEC,*
   682 F. Supp. 3d 62 (D.D.C. 2023) ......................................................................16

*Hoggard v. Rhodes,*
   141 S. Ct. 2421 (2021)........................................................................................30

*Hope v. Pelzer,*
   536 U.S. 730 (2002)............................................................................................22

*Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist.,*
   85 F.3d 839 (2d Cir. 1996)..................................................................................25

*InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State Univ.,*
   534 F. Supp. 3d 785 (E.D. Mich. 2021)............................................................ *passim*

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
    5 F.4th 855 (8th Cir. 2021) ...................................................................... *passim*

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
    408 F. Supp. 3d 960 (S.D. Iowa 2019) .................................................... 25

*Jerome Stevens Pharms., Inc. v. FDA.*,
    402 F.3d 1249 (D.C. Cir. 2005) ............................................................... 11

*Johnson v. District of Columbia*,
    528 F.3d 969 (D.C. Cir. 2008) ................................................................. 23

*JSC Transmashholding v. Miller*,
    70 F. Supp. 3d 516 (D.D.C. 2014) ........................................................... 11

*Kennedy v. Berkel & Co. Contractors, Inc.*,
    319 F. Supp. 3d 236 (D.D.C. 2018) .......................................................... 17

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) ................................................................... 30

*Knapp Med. Ctr. v. Burwell*,
    192 F. Supp. 3d 129 (D.D.C. 2016) .......................................................... 34

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
    567 U.S. 298 (2012) ................................................................................ 18

*Montgomery v. McDonough*,
    682 F. Supp. 3d 1 (D.D.C. 2023) ............................................................. 34

*N. Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ............................................................... 31

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ................................................................................ 15

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ........................................................................... 22, 23

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ........................................................................... 12, 14

*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991) .......................................................... 32, 33

*Rahimi v. Weinstein*,
    271 F. Supp. 3d 98 (D.D.C. 2017) ....................................................... 34-35

*Roe v. San Jose Unified Sch. Dist. Bd.*,
   No. 4:20-cv-2798, 2021 WL 292035 (N.D. Cal. Jan. 28, 2021)......................................27, 28

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995).........................................................................................................23

*Saucier v. Katz*,
   533 U.S. 194 (2001).........................................................................................................30

*Sause v. Bauer*,
   585 U.S. 957 (2018).........................................................................................................19

*Shaw v. District of Columbia*,
   944 F. Supp. 2d 43 (D.D.C. 2013)..................................................................................33

*Tandon v. Newsom*,
   593 U.S. 61 (2021).....................................................................................................12, 14

*Taylor v. Riojas*,
   592 U.S. 7 (2020)........................................................................................................22-23

*Temple Univ. Hosp., Inc. v. Nat'l Labor Rels. Bd.*,
   929 F.3d 729 (D.C. Cir. 2019)........................................................................................34

*Tri County Indus., Inc. v. District of Columbia*,
   104 F.3d 455 (D.C. Cir. 1997)........................................................................................31

*Tucker v. Gaddis*,
   40 F.4th 289 (5th Cir. 2022) ..........................................................................................14

*Watson v. Jones*,
   80 U.S. (13 Wall.) 679 (1872) .......................................................................................23

*Weise v. Jenkins*,
   796 F. Supp. 2d 188 (D.D.C. 2011) ...............................................................................33

*West Virginia v. EPA*,
   597 U.S. 697 (2022).........................................................................................................12

*Widmar v. Vincent*,
   454 U.S. 263 (1981).........................................................................................................23

**Statutes**

20 U.S.C. § 4071...................................................................................................................22

20 U.S.C. § 4072...................................................................................................................22

20 U.S.C. § 4073...................................................................................................................22

20 U.S.C. § 4074 ................................................................................................................22

42 U.S.C. § 2000bb-1 .........................................................................................................20

D.C. Code § 2-1401.03 ................................................................................................4, 15-16

D.C. Code § 2-1402.41 ..........................................................................................................4

D.C. Code § 38-174 .............................................................................................................34

D.C. Municipal Regulations title 5, § 5-B2405.1 ...................................................................4

**Other Authorities**

*Anti-Discrimination Policy: Students*, District of Columbia Public Schools ..................................4

Clark Neily, *Heart of Mootness:* FBI v. Fikre, 2024 Cato Sup. Ct. Rev. 267 ...........................13

Joseph C. Davis & Nicholas R. Reaves, *The Point* Isn't *Moot: How Lower
    Courts Have Blessed Government Abuse of the Voluntary-Cessation Doctrine*,
    129 Yale L.J.F. 325 (2019) ...........................................................................................13, 14

*Notice of Non-Discrimination*, District of Columbia Public Schools..............................................4

*Student Organizations and Clubs Guidance*, District of Columbia Public Schools.....................10

## INTRODUCTION

The District of Columbia selectively enforced its policies to kick a religious student group off a public-school campus solely because the group requires its leaders to share its faith. Like every other court to consider similar misconduct, this Court has already held that the District's discrimination likely violates constitutional and statutory protections for religious freedom, entering a preliminary injunction requiring the District to reinstate Fellowship of Christian Athletes of Jackson-Reed High School for the pendency of this case. *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73 (D.D.C. 2024) ("*FCA-DC*"), Dkt. 26. But the District is now trying to shirk the consequences of its unlawful actions. It argues that Plaintiffs' claims for injunctive and declaratory relief have been mooted by *post hoc* tweaks to its student-group policies. And it asserts that Plaintiffs can't seek relief against the individual officials responsible for their derecognition because those officials—although repeatedly and explicitly warned in writing for over a year about the illegality of their actions and the squarely-on-point caselaw establishing it—nonetheless weren't sufficiently on notice that their actions were illegal.

The District's arguments fail. The District's post-injunction maneuvering doesn't moot Plaintiffs' claims because the District has failed to make it "absolutely clear" that the new policy solves the problem. Nor could the District carry that burden, since the new policy is essentially identical to the old policy that didn't stop Defendants last time around. And the individual Defendants' plea for qualified immunity founders on the fact that cases presenting (in this Court's words) "nearly identical facts" have repeatedly and unanimously held that actions just like Defendants' violated the First Amendment and federal civil-rights laws. *FCA-DC*, 743 F. Supp. 3d at 91 (citing *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc) ("*FCA-San Jose*")); *see also infra* Part II.B (collecting cases). Indeed, this case is one of the worst imaginable candidates for qualified immunity, given that Defendants made their deliberate choice to strip FCA of recognition—and then to affirm and reaffirm that choice through multiple appeals and a request for reconsideration—having not only *constructive* but *actual* notice

of the relevant precedent. And that precedent not only explains the unlawfulness of Defendants' conduct but also rejects claims of qualified immunity by the school officials who engaged in it.

In short, the rule at the heart of this case—that "antidiscrimination laws … must be applied evenhandedly" and not based on religious exercise, association, or viewpoint—is as clearly established as they come. *FCA-DC*, 743 F. Supp. 3d at 95. The religious exercise at issue—FCA's "control over the selection of ministerial leadership"—"is a core feature of religious practice." *Id.* at 83. And the obvious illegality of the District's actions is even plainer at this stage, since on this motion to dismiss the Court must take as true Plaintiffs' allegations that the District's nondiscrimination policies were indeed selectively enforced to permit other student groups to engage in "arguably similar conduct"—*i.e.*, "restrict[ing] membership on the basis of protected characteristics and/or ideological alignment." *Id.* at 88-90. If this Court were to immunize Defendants' actions on allegations like these, it would be the first to do so. Qualified immunity must be denied.

As for Defendants' other dismissal theories, Plaintiffs adequately alleged their Due Process Clause claims and their claims against Defendant Ferebee in his individual capacity. Plaintiffs do not object, however, to dismissal of their official-capacity claims against the individual Defendants given the District's representation that Plaintiffs can obtain all the relief sought from those Defendants in that capacity from the District itself.

## BACKGROUND

The facts of this case are well set out in this Court's preliminary-injunction order. *FCA-DC*, 743 F. Supp. 3d at 78-82. Plaintiffs briefly recount the pertinent background here, focusing for purposes of Defendants' Rule 12(b)(6) motion on the facts as alleged in the complaint. Plaintiffs also note relevant developments post-dating this Court's order.

### I.     FCA's religious ministry and leadership requirements

FCA is a religious ministry for student-athletes and coaches that is active on thousands of middle-school, high-school, and college campuses across the country. Dkt. 1 ¶¶ 2, 30-31. It exists to lead every coach and athlete into a growing relationship with Jesus Christ and His Church, which it accomplishes through local on-campus groups called "huddles." *Id.* ¶¶ 7, 31.

FCA huddles are open to students of all faiths or none. *Id.* ¶¶ 45-46. But "[t]o retain its identity and to carry out its religious mission," FCA requires its student *leaders* to agree with FCA's core Christian beliefs. *Id.* ¶¶ 47, 65. Student leaders are the primary embodiment of FCA's faith and Christian message. *Id.* Among other things, student leaders:

- lead the groups' religious meetings and Bible studies;

- lead and participate in prayer, worship, and religious teaching;

- plan the religious content of meetings;

- select guest speakers and identify religious topics to cover during events;

- personally minister to their peers on an individual basis;

- plan and schedule ministry events on campus that are distinct from regular meetings;

- communicate FCA's message to staff, faculty, and students at their schools; and

- plan outreach and student activities to advance the huddle's religious mission.

*Id.* ¶ 48. Accordingly, "FCA must have leaders who themselves embrace and follow FCA's religious beliefs and organizational mission. Otherwise, FCA's entire mission—its Bible studies, its prayers, its worship—would be hollow, inauthentic, and unlikely to endure." *Id.* ¶ 65.

In particular, FCA student leaders must affirm its Christian Community Statement. *Id.* ¶ 64. That Statement includes FCA's views on several core religious issues, including the divinity of Christ, belief in the Trinity, and the biblical imperative to reject racism and bias. *Id.* ¶ 44. It also sets forth FCA's beliefs and standards regarding the Bible's teachings on sexual morality, including that sexual relations outside of marriage (biblically understood) are inconsistent with God's call to holiness in His followers' lives. *Id.* ¶ 92.

FCA operates cooperatively with schools, and its huddles seek official recognition so they can function and effectively reach students as full members of the school community. *Id.* ¶ 17. Within District of Columbia Public Schools ("DCPS"), for example, official student-group recognition is necessary to, *inter alia*, gain access to faculty advisors, access to advertising spaces, listing on the school website, inclusion in school activity fairs, the ability to meet on campus and host school-sanctioned events, permission to use the school name in social media handles, and access to

funding for the club sponsor. *Id.* ¶ 142. As the complaint alleges, "[m]aintaining an active student organization without access to these benefits is difficult, if not downright impossible." *Id.*

## II.    The District's discriminatory exclusion of FCA

In September 2022, an FCA huddle at Jackson-Reed High School in D.C. received official recognition as a student group. *Id.* ¶ 71. Two weeks later, a Jackson-Reed employee objected to the huddle because of FCA's religious beliefs. *Id.* ¶ 76. The employee filed a grievance with DCPS, alleging that FCA "discriminates against the Lesbian, Gay, Bisexual, Transgender & Queer (LGBTQ) community" because FCA adheres to its understanding of the Bible's teaching on sexuality and asks its leaders to abide by those beliefs. *Id.* ¶¶ 77, 80. In support, the employee invoked D.C. Municipal Regulations title 5, § 5-B2405.1(e), which allows complaining parties to file grievances with DCPS for alleged violations of the D.C. Human Rights Act. *Id.* ¶ 77.

The D.C. Human Rights Act makes it unlawful "for an educational institution" to restrict access to "any of its facilities, services, programs, or benefits … for a discriminatory reason, based upon race, color, religion, national origin, sex, age, … sexual orientation, gender identity or expression, … [or] political affiliation." *Id.* ¶¶ 78, 165; *see* D.C. Code § 2-1402.41. Similarly, DCPS's Notice of Non-Discrimination states that "[i]n accordance with" the Human Rights Act, "DCPS does not discriminate" on these bases. *Id.* ¶ 79; *see Notice of Non-Discrimination*, District of Columbia Public Schools, https://perma.cc/N5PG-8SAC. And in 2021, Defendant DCPS Chancellor Lewis D. Ferebee promulgated an "Anti-Discrimination Policy" applying the Human Rights Act within DCPS and stating that "DCPS does not discriminate or tolerate discrimination" on these bases. DCPS, Anti-Discrimination Policy, *Anti-Discrimination Policy: Students*, District of Columbia Public Schools, https://perma.cc/QPY6-UF9H.

The D.C. Human Rights Act includes a religious exemption, stating that "[n]othing in this chapter shall be construed to bar" religious organizations from "giving preference to persons of the same religion … as is calculated by the organization to promote the religious … principles for which it is established or maintained." D.C. Code § 2-1401.03(b).

Nonetheless, immediately after the grievance, DCPS's investigative team ordered Jackson-Reed to "cease operations of the Jackson-Reed FCA while the complaint is pending." Dkt. 1 ¶ 82. Jackson-Reed complied. *Id.* DCPS then issued a formal decision finding the grievance "substantiated" and confirming FCA Jackson-Reed's derecognition. *Id.* ¶ 90. DCPS concluded that "the language in [FCA's alleged] sexual purity statement prohibiting homosexuality constitutes a violation of policy," citing the D.C. Human Rights Act and DCPS's Notice of Non-Discrimination. *Id.* ¶ 107; *see* Dkt. 3-15. Following this decision, the DCPS employee who filed the grievance acknowledged that he was "not sure if this ruling w[ould] withstand a challenge by the FCA," though he nonetheless lauded it. Dkt. 1 ¶ 98.

### III.    The District's intentional selective enforcement of its non-discrimination policies

At the same time as it stripped FCA's recognition for requiring its leaders to share its beliefs, DCPS broadly and knowingly permitted "many noncurricular groups and activities"—and even "its own programs and schools"—"to organize around distinctive beliefs, visions, and identities," even when those characteristics are otherwise protected by the District's nondiscrimination policies. Dkt. 1 ¶¶ 126, 129. The complaint alleges this selective enforcement in detail, *id.* ¶¶ 10, 55, 126-138, and this Court's preliminary-injunction order found this selective enforcement based on extensive "evidence before the Court." *FCA-DC*, 743 F. Supp. 3d at 90.

At Jackson-Reed alone, for example, the complaint identifies numerous clubs that by their own avowal take into account characteristics otherwise prohibited by the D.C. Human Rights Act, including:

- disability (the Disabled Student Alliance: "for disabled students and their allies");
- race or national origin (*e.g.*, the Asian Student Union: "for students of Asian heritage"; the National Society of Black Engineers: "dedicated to increasing the number of culturally responsible Black engineers"; the Arab Student Union: a "safe space for Arab students and their allies");

- sex (*e.g.*, Girls Who Code: "for girls interested in coding"; the Wise Club: a "separate space for young women"; "Ruling Our eXperiences": "facilitat[ors]"—who are school employees—must "identify as female");

- sexual orientation and gender identity (Gender Sexuality Alliance: a "safe space for LGBTQIA+ students within Jackson-Reed HS" and their "allies"), and

- religion (the Jewish Student Union).

*See* Dkt. 1 ¶¶ 10, 55.

Similarly, at the same time that it excluded FCA, the District also knowingly approved student groups on its other campuses that, for instance, were for "Latinx" students (the Latinx Student Club); served "young men" (Young Men of Phelps) or young women (Women in STEM); were for students of a particular political affiliation (High School Democrats of America); or were dedicated to "strengthen[ing] the Muslim community" (the Muslim Student Association). *Id.* ¶¶ 56, 128; *see* Dkt. 3-34, 3-37.

The District's own programs also discriminated based on criteria forbidden in the same policies it applied against FCA. For example, DCPS operates one school dedicated to students of a particular race and sex—Ron Brown College Preparatory High School, "an all-male preparatory school for men of color"—and another for students of the other sex—Excel Academy, a "single-sex" charter school "for girls." Dkt. 1 ¶ 132; Dkt. 3-36. And the District has entire government offices expressly dedicated to promoting the interest of groups defined based on protected characteristics, like race ("the Office of African American Affairs") and sexual orientation (the "Office on Lesbian, Gay, Bisexual, Transgender, & Questioning Affairs"). *Id.* ¶ 134; *see also id.* ¶ 130 (District sports are gender-specific). And the District expressly reserves broad discretion for its officials to provide preferential treatment in the future based on the officials' determination of where "great[ ] disparities have persisted." Dkt. 3-31 at 2.

Nor was all this selective enforcement accidental oversight. The District knowingly and intentionally approved each individual student group and school program, and posted confirmation of their exclusionary criteria on District websites. Dkt. 1 ¶¶ 137-38; *see* Dkts. 3-29, 3-34, 3-37.

Indeed, the District ran articles in school newspapers celebrating the exclusionary criteria, had school employees support and participate in exclusionary groups or programs, and drafted legal memos justifying the criteria. Dkt. 3-39; Dkt. 24 at 16 n.2.

As this Court put it, it is of course easy to see why "[i]ndividual preferences based on certain characteristics and criteria" would "serve important purposes for these groups"—for example, by making those who share them "feel more comfortable and welcomed." *FCA-DC*, 743 F. Supp. 3d at 92 (quoting *FCA-San Jose*, 82 F.4th at 689). "But 'it makes equal sense that a religious group,' like FCA, 'be allowed to require that its leaders agree with the group's most fundamental beliefs' too." *Id.* Yet FCA was subjected to a double standard by the District.

## IV.    Defendants' extensive notice that their actions violated federal law

On December 15, 2022, FCA appealed DCPS's grievance decision in accordance with District procedures, explaining that excluding FCA for asking its leaders to agree with its faith violated D.C. federal law. Dkt. 1 ¶¶ 101-02. In support, FCA cited the D.C. Human Rights Act's religious exemption, explaining that this provision "specifically protects the right of religious organizations to 'giv[e] preference to persons of the same religion … as is calculated by the organization to promote the religious … principles for which it is established or maintained.'" Dkt. 3-16 at 4. FCA recounted in detail how denying FCA recognition violated the Equal Access Act (EAA) and the Religious Freedom Restoration Act (RFRA), walking through the key provisions of each statute and citing RFRA caselaw. And FCA invoked the Constitution, explaining that "[c]ourts have repeatedly held that similar acts by other public high schools and colleges violate the Free Speech and Free Exercise rights of the First Amendment, among other protections," specifically citing cases such as the Ninth Circuit's panel decision in *Fellowship of Christian Athletes v. San Jose Unified School District*, 46 F.4th 1075 (9th Cir. 2022); the Eighth Circuit's decision in *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855 (8th Cir. 2021) ("*IVCF-Iowa*"); and the Eastern District of Michigan's decision in *InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785 (E.D. Mich. 2021) ("*IVCF-Wayne State*"). Dkt. 3-16 at 5. Further, FCA explained, courts have repeatedly held "that school officials who violate

7

these rights" do not enjoy qualified immunity and can "be held financially liable for their actions." *Id.*

On January 11, 2023, DCPS denied FCA's appeal. Dkt. 1 ¶ 104. The appeal decision did not respond to FCA's legal arguments, make any mention of the D.C. Human Rights Act's religious exemption or the court decisions in FCA's favor, or cite any countervailing federal law. Dkt. 3-19. To the contrary, it was a virtually identical copy-and-paste of DCPS's initial grievance decision. Dkt. 1 ¶ 106.

FCA therefore appealed again, this time to DCPS's Chief Integrity Officer (and Defendant here) Cynthia Ruiz. Dkt. 1 ¶ 110. FCA again explained that DCPS's exclusion of the Jackson-Reed huddle was inconsistent with the D.C. Human Rights Act's religious exemption and that it violated numerous federal laws, and again cited the caselaw supporting that claim. *Id.*; *see* Dkt. 3-20 at 4.

In a February 10, 2023, response, Ruiz denied the appeal, telling FCA that it could either change its policy such that all students can serve as a club leader "regardless of religious affiliation and personal belief" or cease its activities within DCPS. Dkt. 1 ¶¶ 111-16. As with the initial appeal decision, Ruiz made no mention of the D.C. Human Rights Act's religious exemption and offered no response to the federal law and precedent FCA had invoked. Dkt. 3-21 at 2. Nor did she cite any federal law or precedent supporting her decision. *See id.*

Early the next semester, the en banc Ninth Circuit issued its decision in *FCA-San Jose*. As FCA had told DCPS in its initial appeal letter, the *FCA-San Jose* panel had already ruled for FCA, holding that, by derecognizing FCA because of its religious leadership criteria, the school district there likely violated the First Amendment. 82 F.4th at 679. On en banc review, the Ninth Circuit ruled for FCA again, determining that the school district's actions had violated not only "bedrock" Free Exercise Clause law but also the Free Speech Clause and the Equal Access Act. *Id.* at 686, 694 n.12, 696 n.13. Precisely paralleling this case, the Ninth Circuit emphasized that while the San Jose school district purported to apply its nondiscrimination policies strictly to exclude FCA, it made "exceptions [for] its own programs" to openly discriminate, and it continued to recognize

other student groups—like "the Senior Women Club and the South Asian Heritage Club"—"which facially discriminate on the basis of sex and ethnicity." *Id.* at 687-88. On October 10, 2023, FCA sent the decision to Ruiz, along with a letter asking the District to reinstate FCA and "remedy this ongoing violation of federal law." Dkt. 3-22; *see* Dkt. 1 ¶ 123.

FCA requested a response to its reconsideration letter by November 6. Dkt. 1 ¶ 124. Neither Ruiz nor anyone else at DCPS ever responded. *Id.* ¶ 125.

## V.     This litigation and the Court's preliminary injunction in FCA's favor

Six months later, faced with the prospect of being excluded from Jackson-Reed for yet another school year and after another FCA club faced discrimination and derecognition by a District school, FCA filed its complaint and moved for a preliminary injunction on May 7, 2024. Dkts. 1, 3. FCA explained that the derecognition had violated its RFRA, EAA, and First Amendment rights and that the fact that the District "gives a pass to a multitude of favored student groups" that organize around protected characteristics made this an easy case. Dkt. 3-1 at 9-10.

In response, Defendants vigorously defended their actions, insisting that "Plaintiffs' religious rights [had not been] violated," asserting that FCA was seeking "special favored treatment" and a "right to discriminate" that "goes too far," and claiming that kicking FCA off DCPS campuses was essential to achieving a "compelling interest in protecting the safety and well-being of [DCPS] students." Dkt. 23 at 1, 16, 44-45. And when this Court asked the District why it couldn't "have a religious exemption," particularly since, "[a]fter all, the [D.C. Human Rights Act] does," the District answered that that would "undermine the District's goal," which is that "every student has equal opportunity to enjoy the benefits of student organizations." Dkt. 38 at 64:13-65:2. Elaborating, the District asserted its position that FCA couldn't be recognized if it persisted in, for example, "closing the door" to having an "atheist" run its prayer meetings. *Id.* at 40:21-41:2.

After briefing and argument, this Court granted in part FCA's motion for preliminary injunction. The Court determined that "at the very least" FCA had demonstrated a likelihood of success on the merits of its RFRA and Free Exercise Clause claims. *FCA-DC*, 743 F. Supp. 3d at 96. The Court explained that "a religious group's requirement that its leaders 'live up to … religious

precepts that he or she [must] espouse[ ]' is a core facet of religious exercise." *Id.* at 83. The District had substantially burdened this exercise by "mak[ing] students choose between their principles and a place on campus." *Id.* at 84. And the District had imposed the burden in a "'fatally underinclusive'" and not "generally applicable manner," applying "its Anti-Discrimination Policy selectively" to "punish[ ] a religious organization while exempting secular student groups for arguably similar conduct." *Id.* at 88, 90; *see also id.* at 92 (recounting the District's "belated remedial effort[ ]" of "reminding" other groups "of the Anti-Discrimination Policy" and explaining how it only "tender[ed] further proof" of the District's "selective enforcement"). The Court thus ordered the District to (1) "restore official recognition and all of the benefits, rights, and privileges of such status" to FCA Jackson-Reed for the duration of this litigation; and (2) "not enforce their Anti-Discrimination Policy to exclude [FCA Jackson-Reed] because of its leadership-selection practices." Dkt. 25.

## VI.    The District's post-preliminary-injunction maneuvering

Following this Court's preliminary injunction, the District repeatedly sought extensions to the deadline for their response to Plaintiffs' complaint, stating the extensions would allow the parties to pursue settlement negotiations. Dkt. 30; *see also* Dkts. 28, 33, 35. In the meantime, the District posted on DCPS's website a guidance document entitled "Student Organizations and Club Guidance." Dkt. 39-3; *see Student Organizations and Clubs Guidance*, District of Columbia Public Schools, https://perma.cc/L8TP-A4CA. That document provides that "Student Organizations may have membership eligibility requirements to join and serve in leadership positions in alignment with their mission statement," but "[a]ny eligibility requirements cannot be based on" certain "protected classes," including "[r]ace, color, religion, national origin, sex (including pregnancy), … sexual orientation, gender identity or expression, … [and] political affiliation." *Id.* at 2. The document then states that "[n]othing in this guidance permits a DCPS school to bar any religious organization … from limiting admission to or giving preference to persons of the same religion as is calculated by the organization to promote the religious principles of the organization." *Id.*

Defendants say they "circulated" this guidance "on November 22, 2024." Dkt. 39-2 ¶ 6. On February 6, 2025, the District filed a partial motion to dismiss, claiming this new guidance requires that Plaintiffs' claims for injunctive and declaratory relief be dismissed as moot. Dkt. 39. The District's motion also seeks dismissal on qualified-immunity grounds of Plaintiffs' individual-capacity claims against Defendants Ferebee and Ruiz; argues that Plaintiffs' claims against Ferebee and their Due Process Clause claims are inadequately pled; and asserts that Plaintiffs' official-capacity claims against Ferebee and Ruiz should be dismissed as "redundant of the claims against the District." *Id.* Besides the Due Process Clause claim, Defendants' motion does not seek dismissal of any of Plaintiffs' claims against the District itself to the extent Plaintiffs seek actual and nominal damages. *See* Dkt. 39-1 (Mot.) at 2 n.1.

## LEGAL STANDARDS

A Rule 12(b)(6) motion to dismiss tests whether a plaintiff's complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 520 (D.D.C. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff's complaint receives the "benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

Similarly, when a court considers a 12(b)(1) motion to dismiss for lack of jurisdiction, it must "accept all of the factual allegations in [the] complaint as true." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1254 (D.C. Cir. 2005) (alteration in original). Additionally, the court may make "appropriate inquiry" beyond the pleadings to "satisfy itself on authority to entertain the case." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Ruling on a Rule 12(b)(1) motion "may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992).

# ARGUMENT

## I.  FCA's forward-looking claims are not moot.

The District's mootness argument turns on its post-injunction "guidance" document, which it says "created an exception to the Anti-Discrimination Policy for religious groups" that moots Plaintiffs' injunctive- and declaratory-relief claims. Mot. at 3, 5-10. Not so. Such belated efforts at evading a lawsuit by "moving the goalposts" are commonplace and typically don't moot the need for forward-looking relief. *Tandon v. Newsom*, 593 U.S. 61, 64 (2021). Rather, it's "well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). The only exception is if the defendant can show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (quoting *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007)).

This is a "heavy" burden, *id.* at 719, which the District comes nowhere close to meeting. *See also, e.g.*, *Laidlaw*, 528 U.S. at 189 ("the standard … is stringent"); *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) ("formidable burden"). Indeed, here, the "exception" Defendants say should give Plaintiffs and the Court comfort that the wrongful conduct won't recur is identical to an exception that *already existed* at the time the wrongful conduct occurred in the first place. And the District's effort to load the dice in its favor by asserting a more favorable mootness standard in cases involving government defendants should be rejected out of hand.

### A.  The Court should decline the District's invitation to create a special mootness standard for government defendants.

First, the standard. Unwilling (and unable) to shoulder the heavy burden imposed on it by ordinary voluntary-cessation law, the District asks for special treatment, claiming that because it is a "government actor" rather than a "private citizen," there should be a "rebuttable presumption" that its voluntary cessation suffices to create mootness. Mot. 8-9. But the District cites no binding

precedent for this proposition, and it conflicts with blackletter law: "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with *the party asserting mootness*," whether that party is a private defendant or the government. *See Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 979-80 (D.C. Cir. 2016) (emphasis added) (government-defendant case, quoting *Laidlaw*, a private-defendant case); *see also, e.g.*, *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) ("The government bears the 'heavy' burden of showing it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" (emphasis in original)).

And indeed, the Supreme Court just rejected the District's precise argument last year in *FBI v. Fikre*, 601 U.S. 234 (2024). There, the Solicitor General argued that given the "presumption of regularity that attaches to governmental actions," the government's voluntary cessation should presumptively moot cases "absent some strong showing of bad faith." Br. for Pet'rs at 17-19, *Fikre*, 601 U.S. 234 (No. 22-1178). But the Supreme Court rejected this proposal 9-0. The Court reiterated that, even after the challenged conduct has ceased, "[t]o show that a case is truly moot, a defendant must prove 'no reasonable expectation remains' that it will 'return to [its] old ways.'" *Fikre*, 601 U.S. at 241 (alteration in original). And then it held that this same "formidable burden" "holds for governmental defendants no less than for private ones." *Id.* at 241-42; *see also* Clark Neily, *Heart of Mootness:* FBI v. Fikre, 2024 Cato Sup. Ct. Rev. 267, 280 (lower-court judges would "do well … to heed the Justices' unanimous rejection of the government's attempt to rejigger the voluntary-cessation rubric in *Fikre*").

Nor did *Fikre* break new ground. Indeed, as the District has been informed before, although the Supreme Court has repeatedly addressed voluntary cessation in government-defendant cases, the Court has never "recognized such a presumption" in such defendants' favor. *In re Bright Ideas Co.*, 284 A.3d 1037, 1045 (D.C. 2022). And even setting precedent aside, there are "forceful" reasons to reject the District's proposal. *See id.* (citing Joseph C. Davis & Nicholas R. Reaves, *The Point* Isn't *Moot: How Lower Courts Have Blessed Government Abuse of the Voluntary-Cessation Doctrine*, 129 Yale L.J.F. 325, 328 (2019)). The voluntary-cessation doctrine is meant to prevent

defendants from strategically "manipulat[ing]" the courts, "suspend[ing] … challenged conduct after being sued" only to remain free to "pick [it] up" again at "some more propitious moment" or in some more favorable venue. *Fikre*, 601 U.S. at 241, 243. Yet compared with private defendants, government defendants have far "*stronger* incentives" to engage in this sort of "strategic mooting," given their "status as repeat litigants," their "powerful interest in curating precedent," and their frequently asserted immunity from damages claims. Davis & Reaves, 129 Yale L.J.F. at 328, 335-42. So the District's request for a special, more government-friendly rule in this context is not only barred by *Fikre*—it would "defy common sense." *Tucker v. Gaddis*, 40 F.4th 289, 295 (5th Cir. 2022) (Ho, J., concurring).

**B. The District has failed to carry its mootness burden.**

The question, then, is whether, absent any presumption in its favor, the District has carried the "'heavy' burden of showing it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Aref*, 833 F.3d at 251. The answer is no. For one thing, although the District has now "revis[ed]" its policy, that does not "preclude it from reenacting" the old policy if it succeeded in dismissing Plaintiffs' request for forward-looking relief. *Aladdin's Castle*, 455 U.S. at 288-89. The District plainly "retain[s] authority to reinstate" an exceptionless policy at any time. *Tandon*, 593 U.S. at 64. And the District never concedes that a religious exemption is required; to the contrary, it has "vigorously defend[ed]" the legality of its previous denial of an exemption to FCA at every step of this case. *Parents Involved*, 551 U.S. at 719; *see supra* p. 9. Indeed, when this Court expressly asked the District at the hearing why it couldn't "have a religious exemption," it insisted that "that would undermine the District's goal" of "ensur[ing] that every student has equal opportunity to enjoy the benefits of student organizations." Dkt. 38 at 64:18-65:2. The District does not say whether it has now changed its mind.

More importantly, the new "guidance" doesn't fix the problem here. The document merely says that *the guidance itself* doesn't "permit[ ]" DCPS schools or staff to punish religious groups for having religious leadership. Dkt. 39-3 at 2. That's a far cry from saying that DCPS schools and staff are forbidden from engaging in such action. And the guidance doesn't change the authorities

14

that the District used to punish FCA in the first place. *See supra* pp. 5, 8 (grievance and appeal decisions citing D.C. Human Rights Act and DCPS Notice of Non-Discrimination); Dkt. 23 at 2-3 (briefing emphasizing the Anti-Discrimination Policy). Thus, the new guidance is facially inadequate to constrain future bad conduct.

And that's precisely the point: the allegedly wrongful behavior here isn't merely a particular *policy*; it's the District's *conduct* of derecognizing FCA because of its religious leadership criteria. And the District could well engage in that conduct again even without re-revising its policy. In fact, at the time it initially kicked FCA off campus, the District was *already bound* by a virtually identical religious exemption as the one it now claims moots Plaintiffs' claims—and yet it kicked Plaintiffs off its campuses anyway. And if the new policy is "fundamentally similar" to the old one, then its issuance can't possibly moot this case. *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 362 (D.C. Cir. 2018) ("*AFDI*") (citing *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)); *see also Global Tel*Link v. FCC*, 866 F.3d 397, 413-14 (D.C. Cir. 2017) ("Although the FCC purported to change its position in the *Reconsideration Order*, that order does not moot [Plaintiffs'] challenge here," citing *City of Jacksonville*).

Here is the religious exemption in the District's new student-groups guidance:

> Nothing in this guidance permits a DCPS school to bar any religious organization, or any organization operated for educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion as is calculated by the organization to promote the religious principles of the organization.

Dkt. 39-3 at 2. That language is materially identical to the religious exemption in the D.C. Human Rights Act, which provides that:

> Nothing in this chapter shall be construed to bar any religious or political organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious or political organization, from limiting employment, or admission to or giving preference to persons of the same religion or political persuasion as is calculated by the organization to promote the religious or political principles for which it is established or maintained.

D.C. Code § 2-1401.03(b). The D.C. Human Rights Act's religious exemption was in effect at the time of the 2022 grievance against FCA Jackson-Reed, and both of FCA's appeal letters cited it prominently. *See* Dkt. 3-16 at 3; Dkt. 3-20 at 4. Yet the District determined that the exemption did not protect FCA. Instead it ignored FCA's invocation of the religious exemption and agreed with the grievance that FCA's religious leadership criteria violated the very law in which this religious exemption was contained—"the D.C. Human Rights Act." Dkt. 3-15 at 1.

It's difficult to see how the same language in 2022 could offer FCA no protection from being kicked off campus while today mooting Plaintiffs' claims. At minimum, "it is certainly not '*absolutely clear*'" how simply re-articulating an already-applicable religious exception fixes the problem—and that alone forecloses mootness. *Heritage Action for Am. v. FEC*, 682 F. Supp. 3d 62, 71 (D.D.C. 2023) (emphasis added).

Nor does the District even try to explain how the "new" exception changes the pre-derecognition status quo. For their part, Plaintiffs would of course say that the District's 2022 grievance decision was simply wrong and that FCA's religious leadership criteria have been protected all along. But the District has made no such concession.

Far from it: the District has vigorously defended its grievance decision through two internal appeals, a post-appeal letter seeking reconsideration in light of squarely-on-point caselaw, and extensive preliminary-injunction proceedings before this Court. *Supra* pp. 5, 7-9. Just months ago, the District told this Court that not only were Plaintiffs' religious leadership criteria not protected by the First Amendment or statutory civil-rights law but also that it had a "compelling interest" in excluding FCA in order to "protect[ ] the safety and well-being of its students by promoting an equitable environment free of discrimination." Dkt. 23 at 16. Even now, having landed on the receiving end of a preliminary injunction, the District maintains that it wasn't "clearly established" that its officials' actions were unlawful. Mot. 13-16. And strikingly, while the District now says it "has no intention to *change the guidance*" again, Dkt. 39-2 ¶ 7 (emphasis added), it "has never stated that it" will not *derecognize FCA* again because of its religious leadership criteria; "indeed, it insists that [doing so] is … lawful." *Heritage Action*, 682 F. Supp. 3d at 71.

All this indicates that the District has a narrower understanding of the D.C. Human Rights Act exemption language now incorporated into the guidance's religious exemption than do Plaintiffs. And that is exactly what the District's prior positions suggest. The Court need look no further than page one of the District's brief opposing a preliminary injunction, where the District insisted that by describing their religious leadership criteria in this lawsuit, FCA was "admitting openly that they discriminate on the basis of religion *and sexual orientation*." Dkt. 23 at 1 (emphasis added); *see also id.* at 17 ("The only thing FCA had to do was remove prerequisites for running for FCA student leadership that excluded students based on religious beliefs *and sexual orientation*.") (emphasis added); *id.* at 29 (if religious training "include[s] statements denouncing homosexuality and/or homosexual acts," "[t]his is discriminatory"). This characterization suggests a reading of the exemption under which it would merely allow religious student groups to decline to admit as leaders persons who identify as being members of other religions (*e.g.*, a Christian group could decline to have Muslims or Jews as leaders), rather than allowing them to decline to admit as leaders persons whose *conduct* demonstrates that they do not share the same understanding of the relevant religion (*e.g.*, a Christian student group with traditional beliefs on sexuality could not decline to have as leaders persons who reject those beliefs and engage in same-sex sexual conduct). That reading makes the exception here entirely nonresponsive to the dispute at the heart of this case and thus plainly insufficient to moot Plaintiffs' claims. *But see Kennedy v. Berkel & Co. Contractors, Inc.*, 319 F. Supp. 3d 236, 244, 246 (D.D.C. 2018) (Friedrich, J.) (suggesting that Title VII's definition of "religion" to include "all aspects of religious observance and practice, as well as belief" applies under the D.C. Human Rights Act).

At minimum, the mere fact that there is ambiguity in the District's position on the meaning of the exemption makes the mootness question straightforward. The guidance—on its face and in the context of this case and Defendants' uniform practices—gives "'no certainty' that" the District won't again derecognize FCA because of its religious practices. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 661-62 (D.C. Cir. 2019); *see also, e.g., Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022) ("vague" religious exemption language leaving "the

scope of liability" unknown insufficient to moot case). And where, as here, "the legality of [the challenged] conduct is vigorously asserted by the officers in question, the complainant may justifiably project repetition." *Doe v. Harris*, 696 F.2d 109, 113 (D.C. Cir. 1982); *see also, e.g.*, *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("[S]ince the union continues to defend the legality of the [challenged] fee, it is not clear why the union would necessarily refrain from collecting similar fees in the future."). Indeed, given that the District just months ago professed to believe that derecognizing FCA was not only lawful but essential to protecting students' safety and well-being, its rule change and subsequent mootness argument looks like exactly the sort of strategic "maneuver[ ]" that this Court must "view[ ] with a critical eye." *Id.*

None of the District's cases are to the contrary. The District cites *American Bar Association v. FTC* for the proposition that "new legislation addressing" the disputed matter means "a case must be dismissed as moot." Mot. 6 (quoting 636 F.3d 641, 647-48 (D.C. Cir. 2011)). But it neglects to mention that the critical point there was that the new legislation was enacted by an independent party not before the Court—Congress, rather than the defendant FTC. *Am. Bar Ass'n*, 636 F.3d at 648 ("[t]he FTC's abandonment of the Extended Enforcement Policy was not voluntary" and so was "not within the compass of the voluntary cessation exception to mootness"). Another of the District's cites says it is "uncontroversial" that "when an agency has rescinded and replaced a challenged regulation, litigation over the legality of the original regulation becomes moot." Mot. 6 (quoting *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016)). But here the District hasn't rescinded anything. The D.C. Human Rights Act, Notice of Non-Discrimination, and Anti-Discrimination Policy all remain in place, and its "new" religious exemption is identical to the ineffective old one. That's a far cry from *Akiachak*. 827 F.3d at 104-05 (plaintiff challenged "Alaska exception"; Alaska exception repealed; no new Alaska exception promulgated).

Elsewhere, the District (correctly) acknowledges that an intervening policy change "may be insufficient to moot a claim," characterizing the question as whether the policy change has "'completely or irrevocably eradicated the effects of the alleged violation' by providing the relief

requested by Plaintiffs." Mot. 8 (quoting *AFDI*, 901 F.3d at 362). But that is exactly the problem for the District here. Injunctive relief in Plaintiffs' favor would prevent the District from ever again excluding FCA from campus because of its religious leadership criteria. *See, e.g.*, Dkt. 3-41. Meanwhile, the District's rule change on its face does nothing more than reassert the pre-litigation status quo, and without renouncing the express pre- (and post-) litigation positions against FCA's leadership standards. In these circumstances, and in light of the District's repeated refusal to follow the law and its ensuing "belated" litigation maneuvering, *FCA-DC*, 743 F. Supp. 3d at 92, Plaintiffs' injunctive- and declaratory-relief claims are not moot—and any question about whether the Court *should* grant those remedies "is a matter relating to the exercise rather than the existence of judicial power." *Aladdin's Castle*, 455 U.S. at 289.

## II. The individual defendants are not entitled to qualified immunity at the pleading stage.

The District seeks dismissal of Plaintiffs' individual-capacity claims against Defendants Ferebee and Ruiz on grounds of qualified immunity. Mot. 13-16. But qualified immunity applies only if the defendant officials' conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006). And in applying this standard at the motion-to-dismiss stage, the Court must "treat[ ] the plaintiff's allegations as true and read[ ] them in the light most favorable to the plaintiff," asking whether, based on those allegations, the defendant officials violated clearly established law. *Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017); *see also, e.g.*, *Sause v. Bauer*, 585 U.S. 957, 959-60 (2018) (reversing pleading-stage grant of qualified immunity on free-exercise claim).

Here, that means the Court must take as true not only that FCA was kicked off of DCPS campuses because of its religious leadership criteria but *also* that the District was "selectively interpreting and enforcing D.C.'s nondiscrimination law," allowing other student groups and programs "to organize around distinctive beliefs, visions, and identities," and even allowing its "own programs and schools to discriminate on grounds forbidden by its nondiscrimination policy," at the same time as it invoked those same nondiscrimination policies to shut down FCA. Dkt. 1 ¶¶ 126-

38. That makes this an easy case. Well before this lawsuit, courts around the country had considered cases in which school officials "selectively enforce[d]" nondiscrimination policies to "revoke and refuse recognition" to religious student groups because of their religious leadership criteria. *FCA-San Jose*, 82 F.4th at 689-90, 693-94. In doing so, courts repeatedly held not only that that conduct was unlawful, but that its unlawfulness was "clearly established"—and thus repeatedly denied qualified immunity to the responsible officials. *IVCF-Iowa*, 5 F.4th at 866. And while Defendants claim *Martinez* gets them off the hook, this Court already held that "the District cannot claim the mantle of" that decision, explaining that the nondiscrimination policy the District applied against FCA was "'simply not the same' as an 'all-comers policy outlaw[ing] all selectivity.'" *FCA-DC*, 743 F. Supp. 3d at 89-90 (quoting *Christian Legal Society v. Martinez*, 561 U.S. 661, 712 (2010) (Alito, J., dissenting)). Qualified immunity should be denied.

**A.  Defendants violated the law.**

First, taking the allegations of the complaint as true, Defendants plainly violated the law by selectively applying their nondiscrimination policies to derecognize FCA based on its religious leadership criteria. Indeed—looking to evidence and not only allegations—this Court already held that the District's actions were "likely to run afoul of, at the very least," RFRA and the Free Exercise Clause. *FCA-DC*, 743 F. Supp. 3d at 96. And Defendants here never actually contest that their alleged actions, if true, violated the law. Mot. 13-16.

Nor could they. RFRA, for example, prohibits the government from "substantially burden[ing] a person's exercise of religion" unless it can satisfy strict scrutiny. 42 U.S.C. § 2000bb-1. Here, as this Court already explained, FCA's practice of requiring its leaders to share its beliefs "is a core facet of religious exercise covered under RFRA"; "the District's conduct was plainly a substantial burden"; and the District's allegedly compelling interests were both "unjustifiably speculative" and pursued in a "fatally underinclusive" way, given that "the District permits student groups besides FCA to continue operating at Jackson-Reed even though they restrict membership on the basis of protected characteristics and/or ideological alignment." *FCA-DC*, 743 F. Supp. 3d at 82-90.

Likewise, under the Free Exercise Clause, government may not burden a religious organization's "religious exercise … through policies that do not meet the requirement of being neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993)). But here, as this Court explained, the District at minimum fails "the rubric of general applicability" by "punish[ing] FCA" for its religious leadership criteria while appearing to permit other groups "to limit membership on the basis of characteristics protected under the Anti-Discrimination Policy." *FCA-DC*, 743 F. Supp. 3d at 90-93. Further, the District expressly retains discretion to enforce its nondiscrimination policies differently in order to remedy perceived "disparities." Dkt. 3-31 at 1; *see Fulton*, 593 U.S. at 534-35, 537-38 (mechanism for "discretionary 'exception[s]'" renders policy not generally applicable). And as under RFRA, the District "cannot satisfy" the "demanding standard" of strict scrutiny. *Id.* at 93.

Too, under the Free Speech Clause, the government's enforcement even of a facially neutral policy violates the First Amendment if the policy is "selectively enforced … on the basis of viewpoint." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136, 1141 (D.C. Cir. 2023). Yet that is exactly what Plaintiffs allege here—that even if the District's nondiscrimination policies were facially neutral, the District committed viewpoint discrimination by selectively enforcing those policies against FCA while turning a blind eye to the numerous other groups that held themselves out as engaging in analogous conduct. Dkt. 1 ¶¶ 126-38, 214-22

Separately, under the First Amendment's protections for freedom of association, the Supreme Court has held that the government cannot apply nondiscrimination laws to force an expressive association to accept "members it does not desire" if such acceptance "affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647-48 (2000). As *Dale* instructs, that includes when the law would require an organization that teaches traditional views on sexuality to accept a "leader" who rejects and "avowed[ly]" lives contrary to those views. *Id.* at 651-56. This is (again) exactly what Plaintiffs are alleging that the District attempted to require of FCA. Dkt. 1 ¶¶ 92-93, 223-33.

In addition, under the First Amendment's protections for religious autonomy, government cannot attempt "to dictate or even to influence" a religious organization's choice of its leaders—much less ban the organization from having *any* religious leadership requirement at all. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746-47 (2020). Yet as this Court explained, FCA's policies here are an effort to retain "control over the selection of ministerial leadership." *FCA-DC*, 743 F. Supp. 3d at 83. And the District has indisputably attempted to "influence" that choice by conditioning the important benefits of student-group recognition on FCA's abandoning the religious criteria currently used to make it. *See id.* at 84 (District's "denial likely pressured FCA to conform its views on sexual relations contrary to its principles"); *see also* Dkt. 1 ¶¶ 114-17.

Finally, under the plain terms of the EAA, 20 U.S.C. §§ 4071-4074, it's unlawful for the District "to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious … content of the speech at such meetings." 20 U.S.C. § 4071(a). That language, the Supreme Court has instructed, must be given "[a] broad reading." *Bd. of Educ. v. Mergens ex rel. Mergens*, 496 U.S. 226, 239 (1990). And "[t]he EAA directly applies" when a school district derecognizes a student group for requiring its leaders to share its views. *FCA-San Jose*, 82 F.4th at 696 (Forrest, J., concurring).

### B.  The law was clearly established.

Rather than disputing legality directly, Defendants insist that their actions' illegality at least wasn't "clearly established" at the time they derecognized FCA. Mot. 14. But even this more modest claim plainly fails. A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). As Defendants concede, Mot. 15, there need not be "a case directly on point" when "existing precedent … have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). That is, even "a general constitutional rule" may defeat qualified immunity if it "appl[ies] with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002); *accord, e.g.*, *Taylor v. Riojas*, 592

U.S. 7, 8-9 (2020). The problem for Defendants here is that not only are there obviously applicable general constitutional rules but *also* cases directly on point—many of them from jurisdictions across the country, all of which Defendants had more than "fair notice" at the time they engaged in the challenged conduct here. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

> 1. **Both the rules and their application to protect religious leadership standards for religious student groups were clearly established at the time of Defendants' actions.**

As an initial matter, the applicable "rule[s]" governing the District's alleged conduct were undoubtedly "clearly established" at the time of its actions. *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008). RFRA and the EAA were enacted in 1993 and 1984 respectively. That strict scrutiny applies to religious burdens that are not neutral and generally applicable has likewise been the law for decades. *See Fulton*, 593 U.S. at 533 (citing *Lukumi*, 508 U.S. at 531-32 (1993)). Under the Free Speech Clause, the Supreme Court held over fifty years ago that public schools can't "den[y] … official recognition" to student groups based on the supposed "repugnan[ce]" of their "views." *Healy v. James*, 408 U.S. 169, 181, 187-88 (1972); *see also, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829-37 (1995) (public schools must maintain "viewpoint neutrality" in "provision of … benefits"); *Widmar v. Vincent*, 454 U.S. 263, 269-73 (1981) (striking down "discriminat[ion] against student groups" based on religious content and viewpoint). *Dale* was decided a quarter-century ago, and its rule reflects "foundational principles." *303 Creative LLC v. Elenis*, 600 U.S. 570, 585-86 (2023). And the Supreme Court has traced the caselaw prohibiting government interference in religious leadership selection back to the 19th century. *See Our Lady*, 591 U.S. at 746-47 (citing *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872)).

More importantly, however, these clearly established rules have repeatedly been applied to hold unlawful conduct *identical* to that Plaintiffs allege Defendants engaged in here—that is, actions by public schools to deny recognition to religious groups who require their leaders to share their religious views, including on marriage and sexuality, particularly when the school permits other groups to organize around protected characteristics.

Indeed, as this Court is well aware, the en banc Ninth Circuit has confronted "nearly identical facts" in another case involving FCA, and emphatically ruled that the defendant school district's conduct was unlawful. *FCA-DC*, 743 F. Supp. 3d at 91 (citing *FCA-San Jose*, 82 F.4th 664, 689 (9th Cir. 2023) (en banc)). In *FCA-San Jose*, as here, a school district refused to recognize an FCA huddle because FCA required "students serving in a leadership capacity to affirm a Statement of Faith" that included traditional beliefs about marriage and sexuality. 82 F.4th at 671. Yet in *FCA-San Jose*, as alleged here, the school district selectively applied its nondiscrimination policy to allow numerous other groups to maintain "[i]ndividual preferences based on certain characteristics and criteria," including by "discriminat[ing] … on otherwise protected grounds." *Id.* at 689-90. Moreover, in *FCA-San Jose*, as alleged here, the school district "retain[ed] discretion to grant individualized exemptions for its own programs and student programs alike." *Id.* at 687. Sitting en banc, the Ninth Circuit held that particularly given this "pattern of selective enforcement favoring comparable secular activities," the district's derecognition of FCA violated the "bedrock requirements of the Free Exercise Clause," with an injunction likewise justified under the Free Speech Clause and EAA. *Id.* at 686, 689, 694 n.12, 696 n.13; *see also* 46 F.4th 1075 (2022) (earlier panel opinion likewise ruling for FCA).

And *FCA-San Jose* is hardly alone. Two years before, the court in *InterVarsity Christian Fellowship/USA v. Board of Governors of Wayne State University* had addressed a similar case in which a public university derecognized a Christian student group for "requiring that its faith leaders profess to be faithful," even as "other groups violated" the school's "non-discrimination policy but retained" their recognized status. 534 F. Supp. 3d at 796, 801-29. The court issued an exhaustive opinion surveying the law of many of the same claims Plaintiffs press here—including religious autonomy, the Free Speech Clause, and the Free Exercise Clause—and held on summary judgment that the school's actions had violated each of these. *See id.* at 828-29 (school's "exception-ridden" conduct was "the antithesis of a neutral and generally applicable policy," a conclusion "confirmed by the court's free speech analysis").

Likewise, in *Business Leaders in Christ v. University of Iowa*, the court held that a public university violated the Free Speech Clause, the Free Exercise Clause, and the freedom of association by denying recognition to a Christian student group that required its leaders to share its traditional religious beliefs on marriage and sexuality, even as other groups were allowed "to limit leadership" based on "religion, homosexuality, and other protected traits." 360 F. Supp. 3d 885, 892, 895-905 (S.D. Iowa 2019); *see also id.* at 899 ("That is viewpoint discrimination."). In *Inter-Varsity Christian Fellowship/USA v. University of Iowa*, the court reached the same result on the same grounds where a different Christian student group was barred from requiring its leaders "to subscribe to its faith" while other groups were "free to limit membership and leadership based on the Human Rights Policy's protected characteristics." 408 F. Supp. 3d 960, 978-85 (S.D. Iowa 2019). And in *Christian Legal Society v. Walker*, the Seventh Circuit held that a public university's denial of recognition to a Christian student group who required even its *members* to abide by its traditional beliefs on sexuality likely violated the expressive-association doctrine and the Free Speech Clause. 453 F.3d 853, 859-67 (7th Cir. 2006). Indeed, the Seventh Circuit explained that "[t]here can be no clearer example" of a violation of the freedom of association than "a regulation that forces the group to accept members it does not desire." *Id.* (quoting *Dale*, 530 U.S. at 648).

Even longer ago, the Second Circuit applied the EAA statute to a case in which a high-school Bible club that was denied recognition for requiring its leaders to be Christians. *Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist.*, 85 F.3d 839, 853-62 (2d Cir. 1996). The court explained that "requiring that their leaders show a firm commitment to the club's cause" is "one of the principal ways in which many extracurricular clubs typically define themselves." *Id.* at 860. Thus, since the EAA requires "[e]qual treatment," the court explained that "just as a secular club may protect its character by restricting eligibility for leadership to those who show themselves committed to the cause, the Hsus may protect their ability to hold Christian Bible meetings by" enforcing their religious leadership requirements. *Id.* at 860-61. No case from this Circuit or any other has disagreed. *See FCA-San Jose*, 82 F.4th at 701, 703, 708, 710 (Forrest, J., concurring) (relying extensively on *Hsu*).

### 2. Courts have repeatedly rejected qualified immunity for identical conduct.

But it isn't just that courts have repeatedly held that school officials violate the law when they deny recognition to religious student groups under the facts alleged here—though that alone would be enough for this Court to deny qualified immunity. Rather, courts addressing these issues have also repeatedly considered *the same qualified-immunity defense Defendants offer here*—and have repeatedly denied qualified immunity to the relevant school officials, finding that the illegality of their actions was clearly established.

The Eighth Circuit, for example, has twice denied qualified immunity to school officials in cases just like this one, explaining that where an official deregisters a religious student group for requiring its leaders to share its religious beliefs, while at the same time "permitting other student organizations to base membership and leadership on specific traits or affirmations," the official commits "viewpoint discrimination and a violation of the First Amendment that was clearly established." *IVCF-Iowa*, 5 F.4th at 866-67 (citing *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 986 (8th Cir. 2021)). The Eighth Circuit determined that the appropriate "level of generality" for the qualified-immunity inquiry was to ask whether the student group had a clearly established "right not to be subject to viewpoint discrimination when speaking in a university's limited public forum." *Bus. Leaders in Christ*, 991 F.3d at 985. It held that the answer to that question was yes, finding the right clearly established by the Supreme Court's precedents in *Rosenberger*, *Widmar*, and *Healy*, and the Seventh Circuit's decision in *Walker*. *Id.*

Likewise, in *IVCF-Wayne State*, the court (as explained above) held that school officials' selective enforcement of their nondiscrimination policies to derecognize a religious student group violated the First Amendment in multiple respects—including religious autonomy, free speech, freedom of association, and free exercise. 534 F. Supp. 3d at 801-29. It then denied qualified immunity, explaining that "[i]t is well established" that the government "cannot discriminate on the basis of viewpoint" in a "limited public forum" (like student-group recognition); that "government actions are not neutral and generally applicable for purposes of the Free Exercise Clause when they treat religious activities more harshly than similar secular activities"; and "[e]xtensive

historical support and the First Amendment's original understanding clearly establish that the government … violate[s] the Constitution when it interferes with a religious organization's choice in ministers." *Id.* at 832-34.

And in *FCA-San Jose*, in a separate decision from the one ultimately resulting in the en banc disposition, the district court denied a motion to dismiss based on qualified immunity filed by the school-district officials who derecognized FCA because of its religious leadership criteria. *Roe v. San Jose Unified Sch. Dist. Bd.*, No. 4:20-cv-2798, 2021 WL 292035, at *16-18 (N.D. Cal. Jan. 28, 2021). The court explained that even if the nondiscrimination policies under which the school district had derecognized FCA were "facially valid," FCA had adequately alleged that those policies were selectively enforced, because the district continued to recognize numerous other student groups that maintained sex- and religion-based leadership requirements. *Id.* at *15-16. And taking those allegations as true, the court declined to dismiss FCA's claims based on qualified immunity, finding it "clearly established that viewpoint-discriminatory application of a valid nondiscrimination policy violates the First Amendment, Fourteenth Amendment, and the EAA." *Id.* at *17.

*   *   *

In short, no court has ever allowed government officials to selectively enforce their club recognition policies to discriminate against religious student groups. To the contrary, every court to ever address this issue has squarely recognized that such conduct is unlawful, under the same legal theories that Plaintiffs press here. And no case to address a qualified-immunity defense in this context has ever concluded that the student group's rights were anything less than clearly established. If this Court were to accept Defendants' qualified-immunity arguments, particularly at the pleading stage where all facts must be presumed true, it would be the first court ever to do so.

**C. Defendants' qualified-immunity arguments are meritless.**

Defendants make no effort to show a lack of clearly established law on any claim-by-claim basis. *See* Mot. 13-16. Rather, Defendants' main offering is the broad theory that qualified immunity applies because DCPS's anti-discrimination policy was "model[ed]" after "that upheld by the Supreme Court in" *Martinez*, 561 U.S. 661. Mot. 14. But this Court has already rejected exactly

this argument: "the District claims it adopted an 'all-comers policy' akin to that in *Martinez*" but "the Court disagrees that is what the District has adopted here"; "*Martinez* is distinguishable." *FCA-DC*, 743 F. Supp. 3d at 89 (internal citations omitted). As the Court explained, in *Martinez*, the parties stipulated that the "all comers" policy there meant exactly that—that "all groups" had to be "open to all comers." *Id.* at 89-90. Meanwhile, the policy here on its face only "'proscrib[es] discrimination on a limited number of specified grounds'"—which is "'simply not the same' as an 'all-comers policy outlaw[ing] all selectivity.'" *Id.*

Moreover, this Court explained that in practice, "the District's application of the Anti-Discrimination Policy is 'replete with exemptions that treat comparable secular groups more favorably by allowing them to limit membership based on a variety of discriminatory secular criteria.'" *Id.* at 90. So even if the policy were facially an all-comers policy (and it isn't), "an all-comers policy" that is selectively applied "fall[s] well outside the narrow confines of *Martinez*." *Id.* (quoting *FCA-San Jose*, 82 F.4th at 694). If the Court found that the District's selective application here fell "well outside the narrow confines of *Martinez*" based on "the evidence before the Court" at the preliminary-injunction stage, *id.*, then that conclusion must follow *a fortiori* at the motion-to-dismiss stage, where the Court must take Plaintiffs' selective-enforcement allegations as true. And indeed, in every one of the student-group cases going Plaintiffs' way on qualified-immunity cited above, the courts expressly rejected efforts by the defendants to wrap themselves in *Martinez*. *See IVCF-Iowa*, 5 F.4th at 865; *Bus. Leaders in Christ*, 991 F.3d at 973; *IVCF-Wayne State*, 534 F. Supp. 3d at 821-22; *Roe*, 2021 WL 292035, at *13.

In fact, given this selective enforcement, *Martinez* supports *Plaintiffs* on qualified immunity. *Martinez* expressly *affirms* that any "barrier" to student-group recognition "must be reasonable and viewpoint neutral," agreeing that public schools violate the Constitution when they "singl[e] out" student groups for disfavored treatment "because of their points of view." *Martinez*, 561 U.S. at 679, 685; *see id.* at 683-84 ("a public educational institution exceeds constitutional bounds … when it restricts speech or association simply because it finds the views expressed by a group to be abhorrent" (cleaned up)). So *Martinez* "support[s]" the notion "that a school's selective

enforcement of a nondiscrimination policy violates the student group's free speech." *Bus. Leaders in Christ*, 991 F.3d at 985; *accord IVCF-Wayne State*, 534 F. Supp. 3d at 833. Such selective enforcement is exactly what Plaintiffs allege here.

Next, Defendants suggest that a "handful of district court" opinions couldn't have put them on notice that their conduct was clearly unconstitutional, while *FCA-San Jose*—which the District concedes is "the most on-point case"—was decided "too late." Mot. 14-15. But this dramatically understates the situation pre-*FCA-San Jose*, where there weren't just "district court" opinions but also *Martinez* and squarely-on-point decisions from the Second, Seventh and Eighth Circuits telling the District that its conduct was unlawful—and *no* cases going the other way. The D.C. Circuit has repeatedly confirmed that law can be "clearly established" not only by Supreme Court and D.C. Circuit caselaw but also by "cases from other courts exhibiting a consensus view." *See, e.g.*, *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011); *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018). And the District was well aware of this consensus, since FCA cited several cases supporting it in both of its appeal letters. Dkt. 3-16 at 4; Dkt. 3-20 at 4. The District simply chose to defy these cases rather than abide by or distinguish them. Dkt. 3-19; Dkt. 3-21.

This aside, however, the District's timeliness objection to *FCA-San Jose* is effectively a concession that at least *that* case would suffice to put Defendants on notice of FCA's clearly established rights. And the notion that *FCA-San Jose* came "too late" is risible. For one thing, at the time the District initially kicked FCA off campus in 2022, a Ninth Circuit panel decision had *already held* that the San Jose school district's derecognition of FCA because of its religious leadership criteria likely violated the Free Exercise Clause. *FCA-San Jose*, 46 F.4th at 1093-98. The District was well aware of this, as FCA's initial grievance appeal cited this decision. Dkt. 3-16 at 4. The later en banc opinion Defendants refer to didn't change what a reasonable government official would think about the lawfulness of their conduct—it *reaffirmed* the result already reached by the panel.

In any event, even if the en banc opinion were somehow the only one that counts, Defendants learned of that opinion in ample time to correct their behavior. Within weeks of the *FCA-San Jose*

en banc decision, FCA sent the decision to Defendant Ruiz along with a letter asking her to "rem-edy [the District's] ongoing violation of federal law" by reinstating FCA Jackson-Reed. Dkt. 3-22. But Ruiz ignored the letter, continuing FCA's exclusion from DCPS campuses for the remain-der of the 2023-24 school year and forcing Plaintiffs to file this suit in May 2024 to prevent FCA from being excluded for yet *another* school year. Dkt. 1; *see also* Dkt. 3-7 ¶¶ 25-27. In other words, Defendants had *six months* to conform their position to Plaintiffs' by-then-indisputably clearly established rights. Yet Defendants declined, instead choosing to defend their actions on the merits in hotly contested preliminary-injunction proceedings before this Court. Qualified immunity is intended to protect officers making a close call over the "hazy border" between "acceptable" and unlawful conduct, *Saucier v. Katz*, 533 U.S. 194, 206 (2001)—not the kind of deliberate refusal to follow clearly established law here. *See, e.g.*, *Kinney v. Weaver*, 367 F.3d 337, 355 (5th Cir. 2004) (officials potentially liable for failing to "cease" unlawful conduct "in the wake of" decision clearly establishing illegality).

Indeed, as the Eighth Circuit suggested in *InterVarsity Christian Fellowship*, echoing Justice Thomas, it is strange to think that "university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies," should "receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting." *IVCF-Iowa*, 5 F.4th at 867 (quoting *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement regarding denial of certiorari)). The point applies with all the more force here, where the Defendant officials had years to carefully evaluate their decisions, receive advice of counsel, and review caselaw delivered directly to their inbox identifying the plain legal deficiencies of their position. Given these circumstances, the individual Defendants either "turned a blind eye to decades of First Amendment jurisprudence or they proceeded full speed ahead knowing they were violating the law. Either way, qualified immunity provides no safe haven." *Id*.[1]

---

[1]    For clarity, Plaintiffs note their position is that, at minimum, the law supporting their claims in Counts I-VII of the complaint was clearly established. As noted above, Defendants' sweeping qualified-immunity arguments do not distinguish between any of Plaintiffs' claims.

### III.   Plaintiffs have adequately pled their Due Process Clause claim.

Defendants next seek to dismiss Plaintiffs' Fifth Amendment Due Process claim, arguing that "Plaintiffs' own allegations" demonstrate that FCA received all the process that was due. Mot. 10-13. Defendants are mistaken. Plaintiffs undisputedly have a liberty interest in their student group not being "deni[ed] official recognition" on unlawful grounds. *Healy*, 408 U.S. at 181; *see* Mot. 10 n.2. So the question is whether Plaintiffs adequately allege that they were denied "appropriate procedural protections—protections that include, at minimum, the basic requirements of notice and an opportunity to be heard"—before the deprivation. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1266 (D.C. Cir. 2020). The answer is yes.

As for notice, the complaint alleges that the District failed to give FCA any notice at all of its grievance decision until after FCA filed its appeal, with FCA learning about the decision only because of a report in the Jackson-Reed student newspaper. Dkt. 1 ¶¶ 96-97, 100-01. And as for opportunity to be heard, the complaint alleges that FCA was given no opportunity whatsoever to defend itself before DCPS ordered Jackson-Reed to "immediately cease operations of the Jackson-Reed FCA while the complaint is pending." *Id.* ¶ 82. On the latter point, the District notes this "pause[ ]" was "temporar[y]." Mot. 13. But even an "'interim suspension'" can violate due process where the liberty interest is "substantial," the "risk of erroneous deprivation is high," and "the government interest in swift action was negligible." *Tri County Indus., Inc. v. District of Columbia*, 104 F.3d 455, 460-62 (D.C. Cir. 1997). That is this case—the "temporary" pause caused the fledgling FCA to fail to launch, stripping the group from Jackson-Reed's website and forcing the cancellation of its already-scheduled kick-off meeting, Dkt. 1 ¶¶ 82-83; the risk of error in proceeding into such constitutionally fraught territory based solely on "an assertion by another government official" and without "formal evidence" was "high," *Tri County*, 104 F.3d at 460-62; and the District had no interest in swift action, given that the dispute was purely hypothetical—the District made no finding that any actual student who disagrees with FCA's religious beliefs had sought to become a leader of that organization.

31

Switching gears, the District notes that "[t]he fact is, Plaintiffs submitted multiple CARE appeals and received decisions" before the derecognition became final. Mot. 12. But even setting aside that (as just explained) the temporary suspension alone could support Plaintiffs' due-process claim, "the opportunity to be heard must be given 'at a meaningful time and in a meaningful manner.'" *Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And the complaint more than adequately alleges that the appeals process here fell far short of that requirement.

As the complaint explains, the District's initial grievance decision turned on the notion that FCA "makes the participants sign a sexual purity statement which prohibits homosexual acts." Dkt. 1 ¶ 89. But "both FCA witnesses" interviewed in advance of the grievance decision had explained to the District that "the huddle at Jackson-Reed had never required its leaders to sign a standalone 'sexual purity statement.'" *Id.* ¶¶ 91, 102. And FCA's appeals repeated the point. *Id.* ¶ 102. Neither of the District's appeal decisions identified any reason to conclude otherwise. *Id.* ¶¶ 107, 114. Yet the District upheld the grievance decision anyway, demonstrating that derecognizing FCA was a result in search of a rationale.

Likewise, both of FCA's appeals explained that the First Amendment, federal civil rights laws, and D.C. law protected FCA's freedom to require its leaders to agree with its faith. *Id.* ¶¶ 102, 110. Yet neither appeal decision addressed these points at all, instead merely "repeating [DCPS's] previous findings and conclusion that FCA violated the D.C. Human Rights Act." *Id.* ¶¶ 106, 112. And indeed, the District entirely failed to respond to FCA's request that it reconsider its decision in light of a newly issued, squarely-on-point decision involving the *same* organization from an en banc federal court of appeals. Dkt. 1 ¶¶ 119-25.

Nor is it any surprise that Defendants failed entirely to consider the substance of FCA's appeals, given the cursory fashion in which those appeals were decided. Under DCPS's grievance policies, for example, a decision on the first appeal was due within 10 school days. *Id.* ¶ 103. When, days after DCPS's response deadline, FCA asked for an update on the response, the District

32

answered that the appeal was "still being reviewed by [its] legal team." *Id.* ¶ 104. Just over an hour after that, the largely copy-and-pasted appeal decision suddenly appeared in FCA's inbox. *Id.*

Drawing all reasonable inferences in Plaintiffs' favor, the District's appeals process plainly wasn't "a *meaningful* opportunity" for Plaintiffs to raise their constitutional and civil-rights defenses or correct the initial grievance decision's factual findings. *Proper*, 948 F.2d at 1333. Perhaps Defendants might attempt to show that in fact their factual and legal objections were adequately considered and *sub silentio* rejected. But neither their decisions nor the complaint reflects anything of the sort. Plaintiffs' claim is adequately pled.

## IV.    Plaintiffs have adequately pled claims against Chancellor Ferebee in his individual capacity.

Defendants next seek to hive off Plaintiffs' claims against Chancellor Ferebee in his individual capacity, saying that a government officials can't be held personally liable "for the unconstitutional conduct of their subordinates." Mot. 16-17 (quoting *Ashcroft*, 556 U.S. at 676). But Ferebee's liability here arises from his *own* unlawful conduct—his promulgation of the Anti-Discrimination Policy under which the District purports to have illegally derecognized FCA.

"The absence of vicarious liability does not mean … that an individual who does not directly participate in the constitutional violation can never be personally liable. Rather, in addition to 'direct participation' in a constitutional violation, a government official may be held liable in damages for constitutional wrongs resulting from the 'establishment of unconstitutional policies.'" *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 60-61 (D.D.C. 2013) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1259, 1263 (D.C. Cir. 1987), *rev'd on other grounds*, *Hartman v. Moore*, 547 U.S. 250 (2006)). To succeed on such a theory, the plaintiff must demonstrate (1) "that the official against whom liability is asserted has the power … to formulate policy"; (2) that he "has exercised that policymaking authority to generate improper practices"; and (3) that there is "a causal connection between the policy established and the wrong committed." *Haynesworth*, 820 F.3d at 1264; *see also, e.g.*, *Weise v. Jenkins*, 796 F. Supp. 2d 188, 197 (D.D.C. 2011).

Here, all three elements are met for purposes of the motion to dismiss. One, under District law, Chancellor Ferebee has the authority to "[p]romulgate and implement rules and regulations." D.C. Code § 38-174(c)(5); Dkt. 1 at ¶ 22.[2] Two, he used that authority here to promulgate the DCPS Anti-Discrimination Policy, which according to Defendants prohibits religious student groups from "restrict[ing] membership, leadership, or participation based on protected characteristics," even if the criteria are rooted in the group's religious exercise. Dkt. 23 at 3; *see also* Dkt. 23-1 at 6 (Anti-Discrimination Policy, reflecting promulgation by Ferebee). And three, there is a causal connection between Chancellor Ferebee's promulgation of the Anti-Discrimination Policy and the District's exclusion of FCA, since the Anti-Discrimination Policy is the core policy under which Defendants have sought to justify their exclusion of FCA. *See*, *e.g.*, Dkt. 23 at 1-2, 18 n.3 (Defendants asserting that "the Anti-Discrimination Policy" is the "more appropriate starting point" for understanding why they kicked FCA off campus). Plaintiffs' claims against Ferebee are adequately pled.

## V.    Plaintiffs do not object to dismissal of their official-capacity claims against the individual Defendants.

Finally, the District seeks dismissal of Plaintiffs' claims against Ferebee and Ruiz in their official capacities as "redundant," saying that Plaintiffs can obtain all the relief they seek from the District itself. Mot. 17-18. Based on that representation, and on the understanding that the District will later be estopped from claiming otherwise, *see Temple Univ. Hosp., Inc. v. Nat'l Labor Rels. Bd.,* 929 F.3d 729, 733 (D.C. Cir. 2019) (judicial estoppel), *Rahimi v. Weinstein*, 271 F. Supp. 3d

---

[2]    To the extent these precise points aren't sufficiently alleged in the complaint itself, a court considering a motion to dismiss "may also consider documents in the public record of which the court may take judicial notice." *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017) (collecting cases). That includes the Anti-Discrimination Policy and provisions of District law. *See, e.g.*, *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 10 (D.D.C. 2023) (judicial notice is proper for "information available on government websites"); *Knapp Med. Ctr. v. Burwell*, 192 F. Supp. 3d 129, 131 n.1 (D.D.C. 2016) (taking judicial notice on the contents of a government website). Alternatively, Plaintiffs request that any dismissal of Plaintiffs' claims against Chancellor Ferebee be without prejudice, permitting Plaintiffs to amend their complaint for the limited purpose of making these allegations expressly.

98, 103 (D.D.C. 2017) (equitable estoppel), Plaintiffs do not object to dismissal of their official-capacity claims against Ferebee and Ruiz.

### CONCLUSION

The Court should deny Defendants' motion, except that based on Defendants' representations Plaintiffs have no objection to dismissal of their claims against Defendants Ferebee and Ruiz in their official capacities.

Dated: March 24, 2025                    Respectfully submitted,

*/s/ Joseph C. Davis*
Daniel H. Blomberg (D.C. Bar No. 1032624)
Joseph C. Davis (D.C. Bar No. 1047629)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC, 20006
(202) 955-0095 PHONE
(202) 955-0090 FAX
jdavis@becketfund.org

*Counsel for Plaintiffs*

35

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 24, 2024, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Joseph C. Davis*
Joseph C. Davis

*Counsel for Plaintiffs*