# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FELLOWSHIP OF CHRISTIAN ATHLETES**, et al.,

        *Plaintiffs*,

v.

**DISTRICT OF COLUMBIA**, et al.,

        *Defendants.*

Case No. 1:24-cv-01332-DLF

**BRIEF *AMICI CURIAE* OF CHRISTIAN LEGAL SOCIETY, INTERVARSITY CHRISTIAN FELLOWSHIP/USA, NAVIGATORS, REJOYCE IN JESUS MINISTRIES, AND YOUNG LIFE SUPPORTING PLAINTIFFS AND OPPOSING DEFENDANTS' PARTIAL MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES .................................................................................................. iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ...................................................... 1

SUMMARY OF ARGUMENT ............................................................................................ 3

ARGUMENT .......................................................................................................................... 6

I.   Mootness Is Inapplicable to Plaintiffs' Injunctive Claim Because the
     District's Policy Change Constitutes Voluntary Cessation and Is
     Easily Reversible. .......................................................................................................... 6

II.  Qualified Immunity Is Inapplicable Because the Defendants' Actions
     Violated Clearly Established Law Prohibiting Discrimination Against
     Student Religious Groups for Their Leadership Criteria. .................................... 10

     A.   A "consensus of persuasive authority" shows that Defendants
          violated clearly established constitutional and statutory
          rights of FCA. ..................................................................................................... 12

     B.   Defendants' actions violated clearly established law under
          four of FCA's causes of action. ...................................................................... 16

          1. *The Free Exercise Clause.* .......................................................................... 16

          2. *The Religious Freedom Restoration Act.* ............................................... 17

          3. *The Equal Access Act.* ................................................................................ 19

          4. *Expressive association.* ............................................................................... 20

     C.   Damages awards are necessary, in appropriate cases, to deter
          officials from violating the rights of student groups. ................................. 22

CONCLUSION ..................................................................................................................... 24

CERTIFICATE OF SERVICE ........................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Delta Chi-Delta Chapter v. Reed,*
    648 F.3d 790 (9th Cir. 2011) ........................................................................13, 16

*Anderson v. Creighton,*
    483 U.S. 635 (1987)...........................................................................................11

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000)...........................................................................................21

*Bd. of Educ. v. Mergens,*
    496 U.S. 226 (1990)...........................................................................................19

*Business Leaders in Christ v. Univ. of Iowa,*
    991 F.3d 969 (8th Cir. 2018) ................................................................12, 14, 21

*Business Leaders in Christ v. Univ. of Iowa,*
    360 F. Supp.3d 885 (S.D. Iowa 2019) ...............................................................8, 13

*Child Evangelism Fellowship of Maryland, Inc. v.*
    *Montgomery Cnty. Public Sch.,*
    457 F.3d 376 (4th Cir. 2006) ............................................................................9, 10

*Child Evangelism Fellowship of Maryland, Inc. v.*
    *Montgomery Cnty. Public Sch.,*
    373 F.3d 589 (4th Cir. 2004) ............................................................................10

*Christian Legal Soc'y Chapter of the*
    *Univ. of California v. Martinez,*
    561 U.S. 661 (2010)...........................................................................................2, 14

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ............................................................................21

*Church of Lukumi Babalu Aye v. City of Hialeah,*
    508 U.S. 520 (1993)...........................................................................................17

*District of Columbia v. Wesby,*
    583 U.S. 48 (2018).............................................................................................10

*Fellowship of Christian Athletes v. District of Columbia,*
    43 F. Supp. 3d 73 (D.D.C. 2024)......................................................... 4, 11, 15, 16-18

*Fellowship of Christian Athletes v. San Jose*
  *Unified Sch. Dist. Bd. of Educ.*,
  82 F.4th 664 (9th Cir. 2023) (en banc) ................................................ 9, 13-16, 19

*Fellowship of Christian Athletes v. San Jose*
  *Unified Sch. Dist. Bd. of Educ.*,
  46 F. 4th 1075 (9th Cir. 2022), *vacated, reh'g en banc granted*,
  59 F.4th 997 (2023) ................................................................ 13-15, 20

*Fellowship of Christian Athletes v. San Jose*
  *Unified Sch. Dist. Bd. of Educ.*,
  59 F.4th 997 (9th Cir. 2023) .................................................................15

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989) ..............................................................................17

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................................6

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021) ..........................................................................16, 17

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
  5 F.4th 855 (8th Cir. 2021) ...............................................5, 11, 12, 14, 22, 24

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa*,
  408 F. Supp.3d 960 (S.D. Iowa 2019),
  *aff'd*, 5 F.4th 855 (8th Cir. 2021) ..................................................... 5, 7-9, 13

*InterVarsity Christian Fellowship/USA v. Bd. of Governors*
  *of Wayne State Univ.*,
  534 F. Supp. 3d 785 (E.D. Mich. 2021) ...............................................13

*Haggard v. Rhodes*,
  141 S. Ct. 2421 (2021) ..........................................................................24

*Hsu v. Roslyn Union Free Sch. Dist. No. 3*,
  85 F.3d 839 (2d Cir. 1996) ..................................................................20

*Lackey v. Stinnie*,
  145 S. Ct. 659 (2025) ..........................................................................6, 8

*Owen v. City of Independence, Mo.*,
  445 U.S. 622 (1980) ..............................................................................22

*Sample v. Lappin*,
    424 F. Supp. 2d 187 (D.D.C. 2006) ...................................................................18

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ............................................................................................16

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981) ..........................................................................................18

*Wilson v. Layne*,
    526 U.S. 603 (1999) .................................................................................... 11-15

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ............................................................................................2

**Statutes and Regulations**

20 U.S.C. §§ 4071-4074 .............................................................................1, 19, 20

42 U.S.C. § 1983 ...............................................................................................22

42 U.S.C. § 2000bb-1(a) ....................................................................................17

42 U.S.C. § 2000bb-1(b) ....................................................................................17

42 U.S.C. § 2000bb-2(2) ....................................................................................17

D.C. Code § 2-1401.03 .......................................................................................7

Iowa Code § 261H.3(3) .......................................................................................7

**Other Authorities**

128 Cong. Rec. 11784-85 (1982)..........................................................................1

Benjamin A. Fleshman, *How Do You Solve a Problem Like Martinez?*,
    29 TEX. REV. L. & POL. (forthcoming 2025),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5176047.......................22, 23

Hearing on First Amendment Protections on Public College and
    University Campuses Before the Subcomm. on the Const. &
    Civil Justice of the H. Comm. on the Judiciary,
    114th Cong. (2015), available at https://bit.ly/39Dg1EL .....................................23

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Amici are religious organizations whose mission is to equip students at universities, law schools, and secondary schools around the nation to follow and proclaim Jesus Christ. Amici have served such student groups on an ongoing basis and have also represented such groups, in negotiation or litigation, when school administrators restrict their constitutional rights to express their faith and associate together consistently with the principles of the faith. Amici, therefore, have extensive experience with the legal and practical concerns raised by Defendants' effort to claim mootness and qualified immunity so as to dismiss parts of FCA's complaint.

**Christian Legal Society ("CLS")**, founded in 1961, is an association of Christian attorneys, law students, and law professors with law student chapters at approximately 135 law school campuses nationwide, including in the District of Columbia. CLS believes that pluralism, essential to a free society, prospers only when the First Amendment rights of all Americans are protected regardless of the current popularity of their speech. CLS was instrumental in passage of the Equal Access Act of 1984, 20 U.S.C. §§ 4071-4074 ("EAA"), which protects the right of all students to meet for "religious, political, philosophical or other" speech on public secondary school campuses. 128 Cong. Rec. 11784–85 (1982) (Sen. Hatfield statement).

In 1975, CLS established its Center for Law & Religious Freedom ("Center") to protect the First Amendment right of religious student organizations to meet on public campuses. The Center was founded in response to a new trend of religious student organizations being excluded

---

[1] No party or party's counsel authored this brief in whole or in part, and no person—other than amici curiae, their members, or their counsel—contributed money that was intended to fund preparing or submitting this brief.

1

from campus by administrators who feared that providing equal access to religious student groups somehow violated the Establishment Clause of the First Amendment. In 1981, the U.S. Supreme Court held that universities did not violate the Establishment Clause when they gave equal access to religious student groups. Instead, equal access for religious student groups was required by the First Amendment's protection of students' free speech and expressive association. *Widmar v. Vincent*, 454 U.S. 263 (1981). Because religious student groups continue to experience difficulties in obtaining equal access to public university campuses, the Center has worked for 50 years to secure their access to campuses nationwide. CLS's interest, perspective, and experience in this area reflects that its own chapters have been denied recognition by public education institutions, including in *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010), and that the Center has been counsel or co-counsel for other groups seeking to exercise rights of religious speech and exercise in such institutions.

**InterVarsity Christian Fellowship/USA ("IVCF")** is a Christian campus ministry serving over 1,200 chapters on over 750 universities and colleges, including groups in all 50 states and in the District of Columbia. As a religious organization, it requires the leaders of its campus chapters to affirm the ministry's religious beliefs so that the group embodies and communicates the ministry's beliefs with integrity. In more than 25 states, IVCF chapters have been derecognized by campus administrators who selectively target IVCF for its requirements while ignoring similar leadership requirements in other student organizations.

The **Navigators**, as a religious nonprofit organization, conducts afterschool Bible clubs at elementary, middle, and high schools and has affiliated religious student groups at college campuses across the United States. The Navigators has a vested interest in ensuring its staff and

students who are involved with Navigator campus groups have the constitutional right to express and practice their sincerely held religious beliefs in accordance with the tenets of their faith.

**ReJOYce in Jesus Ministries ("ReJOYce")** has ReJOYce in Jesus Campus Fellowship chapters on college campuses in multiple states. As a campus religious organization with leadership standards, ReJOYce chapters have been denied campus access. ReJOYce believes that basic constitutional religious freedom and common sense require that a religious organization be permitted to maintain leadership requirements in agreement with its religious message and mission.

**Young Life** is a Christian youth ministry organization, active in all 50 states and the District of Columbia. Young Life has more than 60,000 volunteers engaged in outreach and discipleship ministry with middle school, high school, and college students in over 110 countries around the globe.

## SUMMARY OF ARGUMENT

This case involves a pattern of facts with which amici religious organizations are familiar: public educators have enforced their nondiscrimination policy in a way that clearly discriminates against student religious groups. Defendants, the District of Columbia Public Schools ("DCPS") and DCPS officials, terminated the status of the Fellowship of Christian Athletes (FCA) as a recognized student club at Jackson-Reed High School. Defendants' asserted ground for derecognizing FCA was that the group had violated DCPS's Anti-Discrimination Policy by requiring that its student leaders adhere to standards limiting sexual conduct to marriage between a man and woman. According to Defendants, FCA thereby discriminated against gay and lesbian students. FCA sued, alleging that the derecognition violated its constitutional and statutory rights.

3

This Court, in a 31-page memorandum opinion, found that Defendants had selectively enforced the nondiscrimination policy, derecognizing FCA while allowing other groups that "appear to limit membership on the basis of characteristics protected under the Anti-Discrimination Policy." *Fellowship of Christian Athletes v. District of Columbia*, 743 F. Supp. 3d 73, 91 (D.D.C. 2024) ("*FCA v. DC*"). This Court then granted a preliminary injunction requiring FCA's reinstatement. *Id.* at 96.

Defendants now move to dismiss FCA's claims for injunctive relief on the ground of mootness—undoing the injunction—and to dismiss claims for damages against two individual defendants on the ground of qualified immunity. Defendants' Mem. in Support of Partial Motion to Dismiss, Dkt. 39-1 ("Defs.' Mem."). But Defendants' arguments for dismissal are meritless. This brief demonstrates their errors by, among other things, drawing on amici's experiences in very similar cases of school district or university discrimination against student religious groups.

**I.** As to mootness, Defendants argue that they have now recognized FCA as an official group and also adopted a policy allowing student religious groups to prefer persons "of the same religion" in leadership and membership. But a defendant's voluntary cessation of challenged conduct does not moot a case unless the defendant shows it is clear that the allegedly wrongful behavior could not reasonably be expected to recur. No such clear assurance exists here. DCPS has a recent history of discriminatory enforcement, selectively targeting religious expression. The new policy adopted during litigation is untested, is devoid of binding legal commitments, and does not preclude DCPS from interpreting and enforcing it in a way that again targets disfavored viewpoints. Amici, as organizations that support and represent student religious groups, have extensive experience with school officials who use various tactics to continue discriminating against student religious groups. Indeed, in amicus IVCF's similar, lengthy

litigation with the University of Iowa, university officials claimed that the case was moot because they would follow a new state law protecting religious groups—in much the same way that Defendants here claim they will follow their new policy. But the district court there rejected the mootness claim because officials "ha[d] not given the Court any reason to trust the University will implement the new law in a manner that protects its students' civil liberties." *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 989 (S.D. Iowa 2019) ("*IVCF I*"), *aff'd*, 5 F.4th 855 (8th Cir. 2021) ("*IVCF II*"). Defendants here have given this Court no more reason to trust their non-binding assurances.

**II.**   Qualified immunity is inapplicable here because Defendants violated "clearly established" law when they derecognized FCA based on a selective, discriminatory enforcement of the nondiscrimination policy. This Court, in its thorough opinion, documented that selectivity and also documented the strong case law clearly establishing that selective derecognition of a student religious group violates the Free Exercise Clause and the Religious Freedom Restoration Act. The relevant law can be clearly established by a consensus of persuasive authority from other circuits, district courts, and the principles in U.S. Supreme Court decisions. Such a consensus exists here based on decisions of multiple courts of appeals, as well as district courts, and on bedrock principles from the U.S. Supreme Court. For similar reasons, Defendants' selective enforcement violates the Equal Access Act and FCA's right of expressive association.

Qualified immunity protects individual officials from overly burdensome liability; but conversely, damages awards play a vital role in deterring officials from violating clearly established constitutional and statutory rights. Deterrence through damages awards is particularly necessary to protect student religious organizations from facing overwhelming burdens associated with litigation. Amici are directly familiar with these burdens, which have been

documented in scholarship and legislative hearings. The student groups in question have severely limited resources. When it is expensive and time-consuming for students to pursue judicial relief, they are seriously discouraged from doing so. Damages awards are vital to ensure that government officials stop before trampling on clear constitutional rights of student religious groups. Defendants here utterly failed to heed such clear rights.

## ARGUMENT

### I.  Mootness Is Inapplicable to Plaintiffs' Injunctive Claim Because the District's Policy Change Constitutes Voluntary Cessation and Is Easily Reversible.

Defendants argue that Plaintiffs' claim for injunctive relief is moot. They rely on the fact that the FCA group at Jackson-Reed now appears as a recognized student group and that DCPS has adopted a policy that allows student religious organizations to "'limit admission or give preference to persons with the same religious belief.'" Defs.' Mem. at 8 (quoting Ex. B, Student Organizations and Club Guidance, at 2). But Defendants' claim of mootness is untenable. This Court should reject their effort to undo the preliminary injunctive relief that this Court properly granted.

The U.S. Supreme Court has long held that a defendant's voluntary cessation of challenged conduct does not moot a case unless the defendant meets a "formidable burden" of showing it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189–90 (2000); accord *Lackey v. Stinnie*, 145 S. Ct. 659, 669 (2025). *See* Plaintiffs' Opposition to Defendants' Partial Motion to Dismiss ("FCA Opp."), Dkt. 44, at 12–14 (citing authorities).

FCA groups may have recognized status at Jackson-Reed and other schools for now, but there is no clear assurance that DCPS will adhere to that in the future. Its new policy states that schools should not bar religious student groups "'from limiting admission to or giving preference

to persons of the same religion as is calculated by the organization to promote the religious principles of the organization.'" Defendants claim that they will read this language to allow FCA and other religious groups to require religious commitments of their leaders, including commitments that the leaders adhere to standards of sexual conduct grounded in the group's biblical beliefs. But there is no reason to be confident that DCPS will continue to allow religious groups that right. The emptiness of Defendants' assurance is shown by the fact that their policy merely adopts verbatim the exemption for religious organizations in the District of Columbia's Human Rights Law, D.C. Code § 2-1401.03. That exemption was in force in 2022, when DCPS terminated FCA's recognition—denying FCA the right to require religiously based standards of sexual conduct from its leaders. Because DCPS disregarded or narrowly interpreted the exemption language before, there is no reason whatsoever to be confident that it will interpret the very same language to protect religious student groups in the future. *See* FCA Opp., Dkt. 44, at 15.

Amicus IVCF knows this issue well. On a strikingly similar set of facts, another federal court found that IVCF's injunctive claim against the University of Iowa was not moot. *IVCF I*, 408 F. Supp. 3d 960. There the university defendants similarly discriminated against IVCF for requiring religious commitments from its leaders and then argued that any claim for injunctive relief was moot because of a new provision protecting such groups—in that case a newly enacted state statute. *Id*. at 988. The statute, similar to DCPS's policy, allowed student religious organizations to require that their leaders "agree to and support the student organization's beliefs, as those beliefs are interpreted and applied by the organization." *Id.* (quoting Iowa Code § 261H.3(3) (court's emphasis removed)). The court rejected that argument, reasoning that notwithstanding the statute's language, university officials might figure out grounds "on which

leadership criteria could be challenged in the future." *Id.* at 989. The court added that precisely because the university defendants had previously discriminated against IVCF and other religious groups, they "have not given the Court any reason to trust the University will implement the new law in a manner that protects its students' civil liberties." *Id.*

The same reasoning applies here. DCPS has a recent history of discriminatory enforcement, selectively targeting religious expression after ample notice that such actions were illegal. The DCPS policy adopted during litigation is new and untested, is devoid of binding legal commitments, and does not preclude administrators from interpreting and enforcing it in a way that again targets disfavored viewpoints. As a voluntary policy, it does not even have the binding power of the state law in *IVCF I* (which the court there found could still be evaded). Accordingly, there is no reason to believe that DCPS's past conduct will not "recur" once an injunction is lifted. *Lackey*, 145 S. Ct. at 669.

Amici can testify that school districts and universities have adopted various measures to continue discriminating against student religious groups. In the University of Iowa episode, for example, university officials first derecognized another Christian student group, Business Leaders in Christ ("BLinC"), and the district court entered a preliminary injunction on the ground that the university's selective enforcement of its nondiscrimination policy violated free speech rights of viewpoint neutrality. *IVCF I*, 408 F. Supp. 3d at 971 (citation omitted).[2] Despite the preliminary injunction, the university then proceeded to review all student organizations' constitutions for compliance with its policy—but it "review[ed] religious student groups first,

---

[2] Ultimately the court there granted BLinC summary judgment and a permanent injunction based on rights of expressive association and free exercise as well as viewpoint neutrality. *Business Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885, 903, 906 (S.D. Iowa 2019).

and those groups were reviewed twice." *Id.* at 972. Finally, the university deregistered IVCF—likewise on selective, discriminatory grounds, the district court in IVCF's case found—and the court explained that, given this history, it did not have "any reason to trust" that the university would implement rules "in a manner that protects its students' civil liberties." *Id.* at 989 ("The Court would never have expected the University to respond to [the earlier BLinC] order by homing in on religious groups' compliance with the policy while at the same time carving out explicit exemptions for other groups. But here we are.").

Likewise, in the litigation between FCA and the San Jose School District, where amicus CLS served as FCA's co-counsel, teachers and other school officials began by derecognizing and excluding FCA while allowing other student groups with criteria that violated the district's nondiscrimination policies; they continued with a campaign of hostile comments against FCA. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 692 (9th Cir. 2023) (en banc) ("*San Jose II*") (noting that, among other things, teachers on the committee that recommended FCA's derecognition called the group "charlatans" and its views "bullshit"). Then the district tried to eliminate claims for prospective relief by adopting a supposed "All-comers" policy that, the *en banc* Ninth Circuit found, was "little more than a rebranded version of [its] previous [selective] non-discrimination policies"—a "post hoc justification that is incompatible with the protections of the First Amendment." *Id.* at 693 (noting an administrator's admission that under the new policy, she would still approve an "application for the Girls Who Code club even if it expressly limited its membership to students identifying as female").

Likewise, CLS served as counsel for a religious organization in *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cnty. Public Sch.* ("*CEF II*"), 457 F.3d 376 (4th Cir. 2006), where the school district made several attempts to exclude a religious club's

communications from "take-home flyers" sent to parents. After the court of appeals earlier ruled that the district had discriminated against the club because of its viewpoint (*Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cnty. Public Sch.*, 373 F.3d 589, 594 (4th Cir. 2004)), the district adopted a new policy claiming discretion to determine the material permitted in flyers because they were a "nonpublic forum." *CEF II*, 457 F.3d at 379–80. It asserted that the new policy mooted the case. But the Fourth Circuit held that the "unbridled discretion" in the new policy allowed the district to engage in viewpoint discrimination, and that the claim was not moot. *Id.* at 388.

Amici's experience in such cases indicates that schools and universities have various means, and too often the inclination, to persist in discrimination against student religious groups. DCPS too has failed to provide any binding commitment ensuring that it will not return to its previous selective, discriminatory conduct. DCPS has its own history here of hostile teacher comments toward FCA. *See* Compl., Dkt. 1, ¶¶ 75–76 (complaining teacher's statement that "'there is no place for a group like FCA in a public school'"). DCPS's voluntary policy change cannot moot this case.

## II. Qualified Immunity Is Inapplicable Because the Defendants' Actions Violated Clearly Established Law Prohibiting Discrimination Against Student Religious Groups for Their Leadership Criteria.

Qualified immunity protects government officials from civil liability when performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right that a reasonable official should have known at the time. This analysis involves two key inquiries: (1) whether a constitutional or statutory right was violated, and (2) whether that right was clearly established at the time of the alleged violation. *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018). A right is "clearly established" when its contours

are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A prior case need not be directly on point to clearly establish the law; it is enough if "existing precedent [has] placed the statutory or constitutional question beyond debate." *IVCF II*, 5 F.4th at 866 (quotation omitted). The law can be clearly established based on "cases of controlling authority in [the relevant jurisdiction] at the time of the incident," but also by "a consensus of cases of persuasive authority such that a reasonable [official] could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *see also IVCF II*, 5 F.4th at 866 (relying on "[o]ut-of-circuit decisions" to show clearly established law).

This Court found that the Defendants here terminated FCA's official recognition based on DCPS's nondiscrimination policy while at the same time permitting other student organizations to impose leadership and membership criteria based on characteristics covered by the policy. In entering the preliminary injunction, this Court found that DCPS allowed groups such as the Asian Student Union, Girls Who Code, the Wise Club, the Gender Sexuality Alliance, the Disability Student Alliance, and Ruling Our eXperiences ("ROX") to limit leadership or membership based on sex, race, gender identity, sexual orientation, or beliefs. *See FCA v. DC*, 743 F. Supp. 3d at 91. Specifically, this Court found that the groups, as described on the school's website, "appeared to limit membership on the basis of such [protected] characteristics" and that, even assuming school officials told these other groups not to discriminate, the officials did not "interrogate" whether the groups had complied and did not take the vigorous action against them that they took against FCA. *Id.* at 91–92. *See* FCA Opp. at 5–7 (describing these and other groups as favored compared to FCA).

Thus, Defendants selectively enforced the DCPS policy, discriminating against FCA. As such, they violated clearly established constitutional and statutory law under FCA's four key causes of action (discussed individually *infra* section II-B).

### A. A "consensus of persuasive authority" shows that Defendants violated clearly established constitutional and statutory rights of FCA.

In this case, a "consensus of persuasive authority" (*Wilson*, 526 U.S. at 617) shows that Defendants violated clearly established law in derecognizing FCA. By the time of derecognition, in November 2022, multiple courts had already ruled that public educational institutions violate clearly established constitutional and statutory rights when they exclude a religious student group for violating a nondiscrimination policy through its leadership criteria but allow other student groups to apply criteria forbidden by the policy. These decisions involve public high schools. as well as universities, and come from multiple circuits and from courts of appeals, as well as district courts.

In *Business Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969 (8th Cir. 2021), university officials enforced a nondiscrimination policy against a Christian student group while allowing several organizations "'that explicitly restrict or control access to leadership or membership based on race, national origin, sex, sexual orientation, gender identity, status as a U.S. veteran, and/or military service.'" 991 F.3d at 978 (quotation omitted). The Eighth Circuit held that this selective enforcement violated clearly established law on free speech and expressive association, making qualified immunity inapplicable. *Id.* at 980–86. And in *IVCF II* (decided July 16, 2021), the Eighth Circuit found that "[t]he University and individual defendants' selective application of the Human Rights Policy against InterVarsity was [unconstitutional] viewpoint discrimination" and—again—violated clearly established law. 5 F.4th at 865, 866–67.

Two other court of appeals decisions invalidating selective enforcement against religious groups were also in place in November 2022. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 46 F. 4th 1075 (9th Cir. 2022) ("*San Jose I*"), *vacated, reh'g en banc granted*, 59 F.4th 997 (2023) (holding that a public high school's selective enforcement of its nondiscriminatory policy against FCA violated the Free Exercise Clause and the Equal Access Act); and *Alpha Delta Chi-Delta Chapter v. Reed*, 648 F.3d 790, 803 (9th Cir. 2011) (reversing summary judgment against student group and holding that a "nondiscrimination policy that is viewpoint neutral on its face may still be unconstitutional if not applied uniformly"), *overruled in part on other grounds*, *San Jose II*, 82 F.4th 664.[3]

District courts have likewise consistently ruled that excluding faith-based groups for requiring leaders to affirm shared beliefs constitutes unlawful discrimination. See *InterVarsity Christian Fellowship/USA v. Bd. of Governors of Wayne State Univ.*, 534 F. Supp. 3d 785, 810 (E.D. Mich. 2021); *IVCF I*, 408 F. Supp. 3d at 978–85; *BLinC*, 360 F. Supp. 3d at 895–903.

In the face of this line of rulings, Defendants try to argue that the relevant law was not clearly established in November 2022. But all of their arguments fail. They describe the case law as only "a handful of district court opinions" (Defs.' Mem. at 14), but obviously the case law includes several court of appeals decisions (which Defendants themselves cite, *id.*). Defendants also object that "there was no controlling case law in the D.C. Circuit that would have put [the officials] on notice." *Id.* at 15. But case law need not be directly "controlling" or binding to establish the law clearly; a "consensus of cases of persuasive authority" is sufficient. *Wilson*, 526

---

[3] *San Jose II* overruled *Alpha Delta Chi* in part not to narrow free exercise rights, but to *expand* them—recognizing that intervening U.S. Supreme Court decisions have found that government can unconstitutionally discriminate against religion even without targeting it or singling it out. *San Jose II*, 82 F.4th at 686.

U.S. at 617. (Indeed, Defendants admit that point elsewhere in their brief. Defs.' Mem. at 14.) Courts have looked to "'state courts, other circuits and district courts,' for what is clearly established." *IVCF II*, 5 F.4th at 866 (quotation omitted). Here, a series of decisions across multiple courts, settings, and legal claims gave Defendants ample notice that selectively penalizing student religious groups for their leadership standards violated First Amendment and/or statutory rights. Qualified immunity does not protect government officials who disregard such settled principles.

These decisions make clear that the holding of *Christian Legal Soc'y v. Martinez*, 561 U.S. 661 (2010), on which Defendants rely, is irrelevant in situations where school officials selectively enforce their policy to discriminate against a student religious group. *Martinez* upheld a neutral "all-comers" policy on the ground that it applied to all groups; but it too made clear that discrimination against religious groups would be impermissible. *See id.* at 679 ("any access barrier must be . . . viewpoint neutral"); *id.* at 695 (distinguishing *Martinez* from cases in which schools "singled out organizations for disfavored treatment because of their points of view"). Thus the Court in *Martinez* remanded for lower courts to address the "argument that Hastings selectively enforces its all-comers policy." 561 U.S. at 697–98. The post-*Martinez* cases invalidating selective enforcement of policies distinguish *Martinez* on this ground. *San Jose II*, 82 F.4th at 694; *BLinC*, 991 F.3d at 984.

Finally, Defendants try unsuccessfully to escape the force of the Ninth Circuit's ruling for FCA in its litigation against the San Jose public school district. *See, e.g.*, *San Jose II*, 82 F.4th 664 (en banc). Defendants admit that *FCA v. San Jose* is "on point" (Defs.' Mem. at 15)—i.e., it is factually very similar to this case. But they argue that *San Jose* is irrelevant because the Ninth Circuit's *en banc* decision did not issue until 2023, after DCPS terminated FCA's recognition on

November 21, 2022. *Id.* (citing *San Jose II*, 82 F.4th 664). Defendants' argument fails for two reasons.

First, at the time DCPS denied FCA's recognition, the Ninth Circuit panel hearing the case had already ruled in FCA's favor. *See San Jose I*, 46 F.4th 1075 (decided Aug. 29, 2022). The panel decision reached the same conclusion that the *en banc* decision later did: the school district violated both the Free Exercise Clause and the EAA by applying its nondiscrimination policy "selectively to deprive FCA of ASB recognition at the same time that secular clubs that discriminate on protected grounds have maintained ASB recognition." *Id.* at 1097, 1098 n.10. The panel decision was in effect in November 2022; it remained so until January 18, 2023, when the Ninth Circuit granted *en banc* rehearing. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 59 F.4th 997 (9th Cir. 2023).

Second, even though the *San Jose en banc* decision came after Defendants here derecognized FCA, Defendants had an obligation to reconsider their refusal once the *en banc* decision issued on September 13, 2023. As explained in this Court's opinion and FCA's opposition brief, FCA wrote DCPS on October 10, 2023, calling attention to the *San Jose en banc* decision and requesting that DCPS reconsider its withdrawal of recognition. *See FCA v. DC*, 743 F. Supp. 3d at 81 (quoting Decl. of Chris Rich, Ex. O, at 2, Dkt. 3-22); FCA Opp. at 30. FCA thereby gave Defendants fair notice of the *en banc* decision, making it entirely appropriate to include it among the decisions showing a "consensus of persuasive authority" (*Wilson*, 526 U.S. at 617). Despite this clear notice, "[t]he District never responded." *FCA v. DC*, 743 Supp. 3d at 81. Thus, *San Jose* further undermines any defense of qualified immunity.

**B. Defendants' actions violated clearly established law under four of FCA's causes of action.**

Having discussed the general caselaw that clearly established the invalidity of discriminatory policies, amici now briefly summarize how Defendants violated clearly established law under each of FCA's four key causes of action.

### 1. The Free Exercise Clause

This Court held, based on multiple decisions, that Defendants' actions in derecognizing FCA violated the Free Exercise Clause (*FCA v. DC*, 743 F. Supp. 3d at 90–93). Those multiple authorities also show that Defendants' actions violated clearly established law. The decisions have directly held that selective enforcement of a nondiscrimination policy against student religious organizations violates free exercise. They have held that selective enforcement renders an institution's policy non-neutral toward religion and/or non-generally applicable, thereby triggering strict constitutional scrutiny. *See San Jose II*, 82 F.4th at 686 (holding that selective enforcement triggered strict scrutiny under U.S. Supreme Court precedent because it created a "mechanism for individualized exemptions" and "treat[ed] comparable activity more favorably than religious exercise"); *see also Alpha Delta Chi*, 648 F.3d at 804–05 (holding that groups have a free exercise claim against derecognition if "they have been treated differently because of their religious status"). These courts also have found, as this Court found in its preliminary injunction opinion, that strict scrutiny follows clearly and directly from the principles in U.S. Supreme Court decisions. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (holding that strict scrutiny is triggered by a "mechanism for individual exemptions"); *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (holding that laws trigger strict scrutiny "whenever they treat *any* comparable secular activity more favorably than religious exercise") (emphasis added). *See FCA v. DC*, 743 F. Supp. 3d at 90–91.

16

Defendants' selective enforcement also means its actions fail strict scrutiny; the selectivity undermines DCPS's claim of a compelling interest. "It is established in [the Court's] strict scrutiny jurisprudence that "a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) (quoting *Florida Star v. B.J.F.,* 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring in part and concurring in judgment)). "The creation of a system of exceptions . . . undermines the [government's] contention that its non-discrimination policies can brook no departures." *Fulton*, 593 U.S. at 542. In short, discrimination against student religious groups is clearly unconstitutional as shown both by circuit decisions that are factually on point and by "established" U. S. Supreme Court principles (*Lukumi*, 508 U.S. at 547).

### 2. The Religious Freedom Restoration Act

This Court also ruled that FCA was likely to succeed in showing that Defendants had violated the Religious Freedom Restoration Act ("RFRA"). *FCA v. DC*, 743 F. Supp. 3d at 82–90. RFRA governs the actions of the District of Columbia government. *See* 42 U.S.C. § 2000bb-2(2) (defining the District as a "covered entity" under RFRA). The statute provides that "[g]overnment shall not substantially burden the exercise of religion" unless it demonstrates that "application of the burden to the person" furthers "a compelling governmental interest" and does so "by the least restrictive means." *See* 42 U.S.C. § 2000bb-1(a), (b).

This Court's conclusions in its preliminary injunction opinion demonstrate that Defendants violated clearly established law under RFRA. To begin with, as this Court found, "Defendants' conduct was *plainly* a substantial burden"—that is, clearly a substantial burden—on FCA's religious exercise. *FCA v. DC*, 743 F. Supp. 3d at 83 (emphasis added). As this Court

summarized, government imposes a substantial burden when it "'conditions receipt of an important benefit upon conduct proscribed by a religious faith'"—or put differently, when it denies such a benefit "'because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.* (quoting *Sample v. Lappin*, 424 F. Supp. 2d 187, 193 (D.D.C. 2006)) (cleaned up). This standard perfectly tracks the U.S. Supreme Court's controlling standard in *Thomas v. Review Bd.*, 450 U.S. 707, 717–18 (1981).

DCPS's denial of official recognition clearly imposed significant barriers to FCA's ability to function as a student group. The key facts are undisputed. Without recognition, FCA could not "'meet in school facilities,' 'participate in the student activities fair,' 'appear on school websites,' 'advertise club events on school bulletin boards,' access funding, [or] include 'Jackson-Reed's name as part of [an] Instagram account.'" *FCA v. DC*, 743 F. Supp. 3d at 84 (quotation source omitted). The students thus lost "the ability to meet safely, recruit, and join their classmates on equal footing in the school's civil society." *Id.* As this Court found, "[g]iven the importance of these benefits, their denial likely pressured FCA to conform its views on sexual relations contrary to its principles." *Id.* (For further discussion of harms from derecognition, see *infra* Part II-C.)

And this substantial burden clearly cannot be justified under strict scrutiny. Defendants' selectivity in applying their nondiscrimination policy to religious groups and not others undercuts their assertion of a compelling interest under RFRA, just as it undercuts their assertion of a compelling interest under the Free Exercise Clause. See *supra* pp. 16-17.

### 3. The Equal Access Act

Defendants' actions also violated clearly established law under the Equal Access Act, 20 U.S.C. § 4071 *et seq.* (the "EAA"). Under the EAA, a public secondary school that receives federal funds and has a "limited open forum"—permitting one or more noncurricular student groups to meet—"may not deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." *Id.* § 4071(a). In *Bd. of Educ. v. Mergens*, 496 U.S. 226, 239 (1990), the Supreme Court emphasized that the EAA was enacted to prevent "perceived widespread discrimination against religious speech in public schools." 496 U.S. at 247 (confirming that the EAA prohibits schools from discriminating against student groups "on the basis of the religious content of the speech at such meetings").

Defendants here were on notice, when they took their actions against FCA, that two federal courts of appeals had held that a public school violates the EAA when it denies religious student groups the right to choose leaders that other groups enjoy. In FCA's litigation with the San Jose School District, the *en banc* Ninth Circuit ruled that the district had likely violated the EAA by allowing other groups to choose leaders on grounds forbidden by its nondiscrimination policy. The court there explained the EAA violation:

> Even if a law is facially "content-neutral," the government still impermissibly regulates based on content if it selectively enforces its laws. . . . Because Plaintiffs are also likely to succeed on the merits of their Free Exercise claim, in part due to the selective enforcement and discrimination based on religious viewpoint, they are also likely to prevail on their EAA claim.

*San Jose II*, 82 F.4th at 694 n.12. As discussed above, Defendants had clear notice of the Ninth Circuit ruling when they refused, in October 2023, to reconsider their decision terminating FCA's recognition. *Supra* pp. 13-15. And the Ninth Circuit panel opinion in *San Jose I*—which

was in force when DCPS first withdrew recognition in November 2022 (see *supra* pp. 13, 15)—had held, identically, that plaintiffs were "likely to prevail on their EAA claim" because "the School District has selectively enforced its non-discrimination policies against FCA" and thus "the policies as applied are content-based." *San Jose I*, 46 F.4th at 1098 n.10.

Likewise, the Second Circuit had held that the EAA protects student religious groups' ability to impose religious qualifications for leadership when other groups can choose leaders based on their clubs' mission. *Hsu v. Roslyn Union Free Sch. Dist. No.* 3, 85 F.3d 839, 872–73 (2d Cir. 1996). The court there explained clearly how the group fit within the EAA's text:

> [W]hen an after-school religious club excludes people of other religions from conducting its meetings, and when that choice is made to protect the expressive content of the meetings, a school's decision to deny recognition to the club because of the exclusion is a decision based on "the content of the speech at [the] meetings."

*Id.* at 859 (quoting 20 U.S.C. § 4071). The court further explained that just as a chess club can require that its student leaders be committed to chess, a religious club should be able to require that its leaders be committed to its religious beliefs: "Equal treatment should mean that the [religious] Club enjoys the same latitude that other clubs may have in determining who is qualified to lead the Club." *Id.* at 860–61.

The same clearly holds for FCA here. Excluding it while allowing other groups that discriminate on prohibited grounds denies FCA "equal access" based on "the content of the speech at [its] meetings." 20 U.S.C. § 4071(a). The text, its application, and the precedents are clear, so FCA's right is clearly established.

### 4. Expressive association

Finally, Defendants violated clearly established law under the right of expressive association. Again, the relevant law is clearly established here on the basis both of lower court

decisions directly involving student religious groups and U.S. Supreme Court decisions announcing clearly applicable principles.

As to lower court decisions, the Eighth Circuit held that the University of Iowa violated expressive association rights when it derecognized Business Leaders in Christ for applying its leadership criteria while allowing other groups to apply such criteria. *BLinC*, 991 F.3d at 986. The court held that "a nondiscrimination policy neutral on its face violates a student group's rights to free speech and expressive association if not applied in a viewpoint-neutral manner." *Id.* at 985. And the Seventh Circuit held that derecognizing CLS as a student group because it required faith-based standards of sexual conduct from its leaders violated its right to associate for expressive purposes. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006). This principle is essential to the autonomy of religious organizations, as it allows them to define their message and maintain their identity. Of course, the same reasoning clearly applies here to the selective enforcement that the Defendants imposed on FCA.

Again, these decisions follow clearly from controlling U.S. Supreme Court principles. Most notably, in *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000), the Court held that the forced inclusion of a leader who did not adhere to the organization's beliefs violated the First Amendment. The Court explained that "[f]orcing a group to accept certain members may impair the ability of the group to express those views, and only those views, that it intends to express. Thus, '[f]reedom of association . . . plainly presupposes a freedom not to associate.'" *Id.* (quotation omitted; bracket and ellipsis in original). *Dale* held that strict scrutiny applied to forced inclusion of leaders, *id.*; and for reasons already discussed, the selective enforcement of a nondiscrimination policy cannot serve a compelling interest.

21

**C. Damages awards are necessary, in appropriate cases, to deter officials from violating the rights of student groups.**

Qualified immunity protects individual officials from overly burdensome liability; but conversely, damages awards play a vital role in deterring officials from violating clearly established constitutional and statutory rights. The civil rights cause of action under which FCA sued, 42 U.S.C. § 1983, "was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." *Owen v. City of Independence, Mo.*, 445 U.S. 622, 651 (1980) (citations omitted).

Deterrence through damages awards is particularly necessary to protect student religious organizations from facing overwhelming burdens associated with litigation. Amici are directly familiar with these burdens. The student groups in question have severely limited resources. Negotiating with district or university administrators for equal rights to meet can consume a full academic year; litigation can take years. During its lengthy conflict with the University of Iowa, amicus IVCF "struggled with recruiting members, [and] organizing activities, and spent money and other resources in fighting its deregistration." *IVCF II*, 5 F. 4th at 862. Deregistration—whether at the high school or college level, and whether threatened or carried out—distracts student leaders and members from their academic pursuits and causes them to fear harm to their grades or their college, graduate school, or job references. When it is expensive and time-consuming for students to pursue judicial relief, they are seriously discouraged from doing so, particularly when they are unlikely to see the fruits of litigation during their limited time at the school. *See, e.g.*, Benjamin A. Fleshman, *How Do You Solve a Problem Like* Martinez*?*, 29 TEX. REV. L. & POL. (forthcoming 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5176047 (noting that "many" religious groups have been unable to challenge their exclusion from schools "because they lacked the necessary connections and resources").

The Fleshman article, *supra*, documents at length the harmful effect of derecognition decisions on student religious groups, including chapters of the amici on this brief. See *id.* at 20–34. Testimony concerning such effects on students and groups also appears in *Hearing on First Amendment Protections on Public College and University Campuses Before the Subcomm. on the Const. & Civil Justice of the H. Comm. on the Judiciary*, 114th Cong. (2015), available at https://bit.ly/39Dg1EL. To take a few examples: For a student religious group at one institution, derecognition meant the group had to pay $200 a week to rent an on-campus meeting room, forcing it to move off campus and lose "critical avenues" for reaching new students. *Id.* at 49 (statement of Cinnamon McCellen). A chapter of amicus ReJOYce that lost recognition was forced off campus because it would have had to pay "up to $7,600 a year to continue to operate on campus." *Id.* at 59 (statement of Dr. Ra'sheeda Richardson). At another institution, while the religious club "was under review [by administrators], the time of the few students that were still involved with the club was consumed in dealing with this issue, rather than fulfilling the purpose of the club." *Id.* at 70 (statement of Justin Ranger). Elsewhere, the "president of a long-standing service-oriented [student] group," instead of focusing on that service, "was forced to spend dozens of hours trying to get us treated fairly again" by her institution. *Id.* at 50 (statement of Bianca Travis). And a final student reported that because of his role as a CLS chapter president during a dispute over its leadership criteria, he was "often the subject of name-calling, gossip, and rumor-mongering" and "was warned by upperclassmen not to take courses by certain professors who were not likely to give me fair evaluations." *Id.* at 63 (statement of Michael Berry).

Awarding damages is important to ensure that future government officials stop to think before trampling the constitutional rights of student religious groups. As the Eighth Circuit said

in ruling for IVCF against the University of Iowa, school officials "'have time to make calculated choices about enforcing unconstitutional policies,'" but nevertheless they sometimes have "turned a blind eye to decades of First Amendment jurisprudence or [have] proceeded full speed ahead knowing they were violating the law." *IVCF II*, 5 F.4th at 867 (quoting *Haggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (Thomas, J., statement respecting denial of certiorari)). The Defendants here turned a blind eye to clearly established law: to numerous decisions finding constitutional and statutory violations based on selective enforcement in very similar fact situations. Qualified immunity is inapplicable.

## CONCLUSION

This Court should deny Defendants' Motion to Dismiss insofar as it rests on asserted mootness and qualified immunity.

Respectfully submitted.

March 31, 2025

/s/ Kimberlee W. Colby
Kimberlee W. Colby (D.C. Bar No. 358024)
Steven T. McFarland (D.C. Bar No. 452450)
Laura D. Nammo (D.C. Bar No. 471867)
Christian Legal Society
8001 Braddock Road, Suite 302
Springfield, VA 22151
(703) 919-8556
kcolby@clsnet.org

Thomas C. Berg
Religious Liberty Appellate Clinic
St. Thomas University School of Law
MSL 400, 1000 LaSalle Ave.
Minneapolis, MN 55403

*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 31, 2025, a true and correct copy of the foregoing was electronically filed using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Kimberlee W. Colby
Kimberlee W. Colby