UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FELLOWSHIP OF CHRISTIAN ATHLETES**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **DISTRICT OF COLUMBIA**, *et al.*, <br><br> **Defendants.** | No. 1:24-cv-01332-DLF |

**DEFENDANTS' REPLY IN SUPPORT OF
PARTIAL MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Plaintiffs' opposition mischaracterizes and attempts to minimize the changes the District has made to the relevant policy in this case, which now unambiguously and directly provides Plaintiffs with the prospective relief they sought, *i.e.*, religious student organizations can require that their student leaders agree with their religious beliefs. Far from trying to "shirk the consequences" of "unlawful actions," the District has amended its policies to prevent *the exact injury that Plaintiffs alleged*. Plaintiffs claim that there has been no showing "that the new policy solves the problem," but this is disingenuous—the amended policy clearly applies the D.C. Human Rights Act's exemption for religious organizations to religious student organizations at District of Columbia Public School (DCPS) campuses. Plaintiffs offer no evidence that any religious student group has been denied official recognition based on its leadership criteria since the policy changes were enacted, and no basis to conclude that the District will revert to its previous policy, especially in light of its express statement that it has no intention of doing so. Plaintiffs' claims for declaratory and injunctive relief are moot.

Plaintiffs' remaining arguments are similarly unpersuasive. On their Fifth Amendment due process claim, the facts alleged in Plaintiffs' Complaint show that Plaintiffs were given

notice and an opportunity to be heard as constitutionally required. On qualified immunity, it was not clearly established at the time that enforcing DCPS's Anti-Discrimination Policy—intended and understood by DCPS as an all-comers policy—was unconstitutional or violated any federal statute. This Court's subsequent opinion, at the preliminary injunction stage, that the policy was *not* an all-comers policy, does not retroactively change Defendants' interpretation or clearly establish the law post hoc. Defendants Chancellor Ferebee and Chief Integrity Officer (CIO) Ruiz are thus entitled to qualified immunity. Even if the Court does not grant him qualified immunity, Plaintiffs have not adequately stated any claims against Chancellor Ferebee *at all*. Finally, Plaintiffs concede that dismissal of the claims against Chancellor Ferebee and CIO Ruiz in their official capacities is proper because they are duplicative of the claims against the District.

The Court should thus grant Defendants' Partial Motion to Dismiss [39].

## ARGUMENT

I. **Plaintiffs' Claims for Injunctive and Declaratory Relief Should Be Dismissed as Moot Because the Guidance Provides Plaintiffs' Requested Relief, and the Voluntary Cessation Exception Does Not Apply.**

Defendants' change in policy, and express declaration that the District has no intention of reverting to the previous policy, moots Plaintiffs' claims for prospective relief because there is no reasonable expectation that the alleged violation will recur and because the change in policy completely and irrevocably eradicates the effects of the alleged violation. *See* Mem. of P. & A. in Supp. of Defs.' Partial Mot. to Dismiss Pls.' Compl. (Defs.' Mem.) at 8–10. Plaintiffs argue that the District's change in policy amounts to merely "moving the goalposts" and does not moot the need for forward-looking relief. Pls.' Opp'n [44] at 21[1] (quoting *Tandon v. Newsom*, 593

---

[1] Citations to page numbers of documents filed on the public docket are to ECF stamped page number and not necessarily the internal pagination of the document.

U.S. 61, 64 (2021)).[2] Instead, Plaintiffs argue that Defendants have voluntarily ceased the challenged practice and that under the voluntary cessation exception, their claims for injunctive and declaratory relief are not moot. Not so.

In support of an exception to mootness, Plaintiffs first argue that the District, because it can change its policies, could change its policy back at any time. *See* Pls.' Opp'n at 23. This is mere conjecture. To be sure, governments always have authority to create and change their policies; Plaintiffs' position would make it so no case against a government entity could ever be mooted by a change in policy. But courts have long held that an intervening change in policy or legislation can moot a claim. *See* Defs.' Mem. at 6 (citing cases). Next, Plaintiffs argue that the District's previous position that a religious exemption would undermine DCPS's goal of ensuring every student an equal opportunity to enjoy the benefits of student organizations precludes a finding of mootness because "[t]he District does not say whether it has now changed its mind." *See* Pls.' Opp'n at 23. But the District has done far more—it has changed its *policies and practices* to provide the exact relief Plaintiffs seek.

On the actual change in policy set forth in the Student Organizations and Clubs Guidance (Guidance), Plaintiffs argue that it does not "fix the problem" because, they claim, the Guidance does not prevent the District's other policies from being enforced against them. *See id.* at 23–24. Not so. First, the Guidance embodies the District's policy specifically governing student organizations—and most relevant here, religious student organizations—superseding any previous policies that may have applied. *See* Defs.' Ex. B [39-3] at 2. And the Guidance makes clear that DCPS faculty cannot bar any religious student organization from limiting admission to

---

[2] The Court in *Tandon* specifically wrote about "officials with a track record of 'moving the goalposts.'" *Tandon*, 593 U.S. at 64. Plaintiffs do not make any argument that the District has such a record.

3

or giving preference to persons of the same religion. *Id.* at 3. Plaintiffs present no basis for their speculation that the Guidance does not forbid DCPS faculty from engaging in the very conduct that the Guidance says they cannot commit.

Plaintiffs' argument that the existence of similar language in the D.C. Human Rights Act precludes a finding of mootness misses the point. Pls.' Opp'n at 24. For one, the D.C. Human Rights Act does not answer whether student organizations at public schools qualify as religious organizations under D.C. Code § 2-1401.03. *See* D.C. Code §§ 2-1401.02–03. Moreover, where previously there may have been inconsistency between the D.C. Human Rights Act and DCPS policy—which was intended to be an all-comers policy—there is now congruence. The Guidance formally adopts the position that DCPS schools must apply the same exception in the D.C. Human Rights Act to religious student organizations at DCPS campuses. Thus, the Guidance—while using similar language to the D.C. Human Rights Act's religious exemption—is a fundamentally different policy from the policy in place before the lawsuit was filed.[3] At this point, there is no "ambiguity in the District's position on the meaning of the exemption" in the Guidance going forward. *See* Pls.' Opp'n at 26. The Guidance makes it so that religious student groups, like Plaintiffs, "can now require that their student leaders share their religious beliefs without having the Anti-Discrimination Policy or DCHRA enforced against them by DCPS." Defs.' Mem. at 6; *see also* Compl. [1], Prayer for Relief ¶¶ a–b. And nothing in the Notice of

---

[3] Plaintiffs also argue that they have always been entitled to the religious exception contained in the D.C. Human Rights Act. *See* Pls.' Opp'n at 24–25. That question need not be answered now because under the Guidance, they indisputably are. *See* Defs.' Ex. B at 3. Still, DCPS and its schools themselves are not religious organizations entitled to the religious exception, and the grievance that started the issues here was not directed at the Fellowship of Christian Athletes of Jackson-Reed High School (FCA-Jackson Reed) but at Jackson-Reed High School itself. Even so, under the Guidance, a similar grievance would not have the same outcome.

Non-Discrimination allows DCPS staff to contravene the religious exemption in the Guidance—it is just that, an exemption to the general policy.

Plaintiffs next argue that the District's challenged behavior is not just an issue of policy, but of the District's "conduct" in derecognizing FCA[4] because of its religious leadership criteria. Pls. Opp'n at 24. But the Guidance makes clear that the District's policy now allows groups like FCA-Jackson Reed to retain and implement their religious leadership criteria and prevents any DCPS school from derecognizing such a group based on such a religious leadership criterion. *See* Defs.' Ex. B. at 3. And Plaintiffs offer no evidence of any ongoing "conduct" they challenge—there have been no instances of any FCA chapter being denied official recognition because of its religious leadership criteria during school year 2024–2025. *C.f.* Defs.' Ex. A [39-2] ¶ 8.

Finally, Plaintiffs argue that the District's previous defense of its no-exceptions policy for student organizations at DCPS campuses countenances against mootness. *See* Pls.' Opp'n at 25, 27. To Plaintiffs, the District's declared position that it has no intention of reverting to its previous policy is not sufficient to moot their claims for injunctive relief because the District has not stated that it will not derecognize FCA student groups based on their religious leadership criteria. Pls.' Opp'n at 25. But that is exactly what the District has done in changing its policy. *See* Defs.' Mem. at 6–7. The Guidance clearly prohibits any future derecognition of FCA based on its religious leadership criteria. And to the extent that Plaintiffs again question whether the District has changed its beliefs and thus whether the District will revert to its former policies after this litigation, *see* Pls.' Opp'n at 23, 27, the District has explicitly stated it has no intention

---

[4] Plaintiffs use "FCA" generally to refer to both Plaintiff FCA-Jackson Reed and Plaintiff Fellowship of Christian Athletes (FCA-National).

of doing so.  *See* Defs.' Mem. at 9; Defs.' Ex. A ¶ 7.  The law is clear: mere speculation and conjecture about future unlawful action is insufficient where the defendant is a governmental entity.  *See* Defs.' Mem. at 9 (quoting *Citizens for Resp. and Ethics in Wash. v. United States Securities and Exchange Comm'n*, 858 F. Supp. 2d 51, 63 (D.D.C. 2012) and *Akiachak Native Cmty. v. United States Dep't of Interior*, 827 F.3d 100, 106 (D.C. Cir. 2016)).  Plaintiffs mistake the District's good faith statement that it has no intention of changing its policy as asking the Court to create a special mootness standard.  *See* Pls.' Opp'n at 21–23.  It does no such thing.  But courts regularly find, in analyzing mootness, that there is less of a concern that a defendant will revert to a previously challenged policy when the defendant is a government actor rather than a private litigant.  *See* Defs.' Mem. at 8–9 (citing *Citizens for Responsibility and Ethics in Wash.*, 858 F. Supp. at 61–62 (listing cases); *Toriano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004); and *In re Navy Chaplaincy*, 850 F. Supp. 2d 86, 94 (D.D.C. 2012)).  In other words, "[g]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties.  Without evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing."  *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir.2009).

Plaintiffs claim that *FBI v. Fikre*, 601 U.S. 234 (2024) supports their argument that the Court should not adopt a "new," "special" standard for mootness for governmental entities.  Pls. Opp'n at 21–23.  Again, the District has not asked the Court to adopt a "new" standard.  The District did not argue that it does not bear the burden of establishing mootness, or that a different standard of mootness applies to government actors.  Rather, the District pointed to well-settled caselaw showing that courts presume governments will act in good faith when evaluating

6

whether claims for injunctive and declaratory relief are moot. *See* Defs.' Mem. 6–10. Nothing in *Fikre* disturbs the holdings of the cases cited by the District. And that makes sense; a presumption of good faith does not mean that government defendants are not still required to show that there is no reasonable expectation the challenged conduct will recur and that the effects of the challenged conduct have been completely and irrevocably eradicated. *See Aref*, 833 F.3d at 251. Indeed, the District meets that heavy burden here. See Defs.' Mem. at 6–9.

Regardless, *Fikre* is distinguishable. In *Fikre*, the Court articulated its concern with the federal government's mootness argument as resting solely on a sparse declaration and contention that Fikre had not been placed on the No Fly List since 2016. *See Fikre*, 601 U.S. at 242–243. The Court also pointed out that there was "no statute or publicly promulgated regulation describ[ing] the standards the government employs when adding individuals to, or removing them from, the list." *Id.* at 237. Here, in contrast, the District has changed its policy—not merely its practice—and, through the Guidance, has publicly promulgated its policy governing student organizations at DCPS campuses, explicitly prohibiting DCPS schools from barring religious student organizations from limiting admission to or giving preferences to persons of the same religious beliefs. Thus unlike in *Fikre*, the District does not rely solely on a sparse declaration, but on an unambiguous change in formal policy, and an express and unambiguous statement that the District has no intention of changing that policy.

In support of Plaintiffs' opposition, Amici argue that the Guidance is new and untested, and there is no reason to trust the District's representations of how the Guidance applies to religious organizations. At bottom, Amici argue that although FCA groups may have recognized status now, nothing guarantees that status in the future. *See* Br. Amici Curiae [52] at 11–13. Amici point to their past experiences at other campuses in other states in support for their

7

arguments, but such speculation about how the District will act based on other government actors in other states under other circumstances is unpersuasive. Amici point to DCPS's "recent history of discriminatory enforcement," Br. Amici Curiae at 13, but presumably that refers only to the single instance of derecognition of FCA-Jackson Reed as alleged in this case. It is undisputed that DCPS also has a long history of allowing FCA groups to operate on DCPS campuses. *See* Compl. ¶ 58. And as the Court found when limiting the scope of Plaintiffs' requested preliminary injunction, the allegations in the Complaint and facts on the record before the Court did not suggest that "FCA's huddles have faced identical treatment at other D.C. high schools." *See* Mem. Op. [26] at 30.

Amici also argue that this case is similar to *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 408 F. Supp. 3d 960, 989 (S.D. Iowa 2019). But in *Intervarsity*, in addressing cross-motions for partial summary judgment, the court there found that the change in statute left open a factual issue on which leadership criteria could be challenged in the future and because the University of Iowa could view discriminatory leadership practices as harassment which the statute did not preclude. *See Intervarsity*, 408 F. Supp. 3d at 989. The Court was also concerned with the statutory change's ability to survive judicial scrutiny, and that even if it did survive "it is unknown how the University will interpret its provisions." *Id.* Here, the District's change in policy does not leave open such a factual issue. The Guidance prohibits DCPS staff from preventing religious student organizations from limiting admission or providing preferences to students who share the organizations' religious beliefs. Defs.' Ex. B at 3. *Intervarsity* is thus distinguishable.

In sum, under the newly implemented Guidance, religious student organizations can select leaders who share the same religious beliefs without fear of their student organization

being derecognized based on that leadership selection requirement.  The Guidance, by explicitly incorporating a religious exemption to apply to religious student organizations at DCPS campuses, is fundamentally different from DCPS's former no-exceptions policy.  *See* Defs.' Mem. at 2–3, 9.  The Guidance explicitly prohibits DCPS from preventing religious student organizations, like FCA, from limiting admission to or giving preference to persons who share the group's religious beliefs.  And the District has no intention of changing that policy.  It is thus clear that the alleged wrongful behavior cannot reasonably be expected to recur under the District's new policy governing student organizations at DCPS campuses.  *See Aref v. Lynch*, 833 F.3d 242, 251; *see also Am. Freedom Def. Initiative v. Wash. Metro Area Transit Auth.*, 901 F.3d 356, 362 (D.C. Cir. 2018).  The Court should thus dismiss Plaintiffs' claims for injunctive and declaratory relief as moot.

**II.     Plaintiffs Fail To State a Fifth Amendment Due Process Claim.**

Plaintiffs' due process claim boils down to a dispute about the outcome of the process, not the process itself.  *See* Pls.' Opp'n at 41–42 (challenging the final decision based on requirement that leaders sign a purity statement); *id.* (questioning rationale of decision based on First Amendment, civil rights laws and other precedents); *id.* (alleging a failure to consider the substance of the appeals).  But to state a due process claim, Plaintiffs must allege a missing procedural step, which the government should have taken.  Plaintiffs fail to do so.  *See* Defs.' Mem. at 10–11.

The fact is, the Fifth Amendment's due process guarantee is flexible, and Plaintiffs were provided "the opportunity to be heard at a meaningful time and in a meaningful manner."  Defs.' Mem. at 10 (quoting *Kropat v. FAA*, 162 F.3d 129, 132 (D.C. Cir. 1998)).  Plaintiffs, through FCA-Jackson Reed's faculty advisor and FCA-National's Vice President of Field Ministry for the Mid-Atlantic region, had notice of and participated in DCPS's Comprehensive Alternative

9

Resolution and Equity (CARE) Team's grievance investigation. *See* Defs.' Mem. at 11–12; Compl. ¶¶ 82, 84; Pls.' Appl. for Prelim. Inj., Rich Decl. Ex. E [3-12]. Plaintiffs' involvement in the grievance investigation gave them both notice of the grievance of alleged discrimination and an opportunity to be heard on the same. And after CARE's decision to derecognize FCA-Jackson Reed, Plaintiffs were given an opportunity to be heard through two later appeals. Defs.' Mem. at 12. Again, that Plaintiffs disagree with the final outcome does not mean they were not given the process due under the Fifth Amendment.

Plaintiffs' Complaint alleges that they were deprived of due process when "Defendants failed to provide [them] notice concerning the basis for the *revocation of recognized status*." Compl. ¶ 245 (emphasis added); *id.* ¶ 242 ("By derecognizing Jackson-Reed FCA . . ."). In their opposition, Plaintiffs argue for the first time that the District violated due process by temporarily pausing FCA-Jackson Reed. Pls.' Opp'n at 40. This new claim should be rejected as Plaintiffs cannot amend their Complaint through the opposition to a motion to dismiss. *See Yoder v. Architect of the Capitol*, 2025 WL 915611, at *3 (D.D.C. Mar. 26, 2025) (citing *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 165 n.10 (D.D.C. 2014)). Even if the Court considers this argument, it fairs no better. Again, due process is flexible and does not require pre-deprivation hearings in all circumstances. Here, the circumstances support a temporary pause to prevent potential discrimination and to allow CARE to hear from Plaintiffs before CARE made its final determination. The temporary pause went into place on October 7, 2022. *See* Compl. ¶ 82; Pls.' Appl. for Prelim. Inj., Rich Decl. Ex. C [3-10] at 2; Pls.' Appl. for Prelim. Inj., Rich Decl. Ex. D [3-11] at 2. And CARE's initial decision, prior to Plaintiffs' appeals, was made on November 22, 2022, just over a single month later. *See* Pls.' Appl. for Prelim. Inj., Rich Decl. Ex. H [3-15] at 2. Such a short pause before issuing its determination does not require a pre-

deprivation hearing.  Plaintiffs were thus provided with the required due process under the Fifth Amendment.  Plaintiffs are simply incorrect that the District has "no interest in swift action" here.  The District of course has an interest in moving quickly to prevent its students from experiencing potential discrimination and temporarily pausing the organization's activities while the CARE team's investigation was explicitly tailored to that interest.

Thus, the Court should dismiss Plaintiffs' Fifth Amendment due process claim.

### III.     Chancellor Ferebee and CIO Ruiz Are Entitled to Qualified Immunity.

Plaintiffs' claims against Chancellor Ferebee and Defendant Ruiz should be dismissed because Ferebee and Ruiz are entitled to qualified immunity.  Defs.' Mem. at 13–16.  At the time of all the acts in the Complaint, it was not clearly established that enforcement of a *Martinez*-style all-comers policy was unconstitutional or otherwise unlawful.  *Id.* at 14.  Plaintiffs emphasize that, in its opinion granting a preliminary injunction, the Court determined that DCPS's former anti-discrimination policy was not an all-comers policy.  Pls.' Opp'n at 29.  But that does not retroactively mean the conduct complained of here violated "clearly established" law.  The fact remains that, at the time DCPS revoked FCA-Jackson Reed's status as a recognized student organization, there was no controlling caselaw that would have put Defendants Ferebee and Ruiz on notice that such action violated RFRA, the constitution, or any other law.  Defs.' Mem. at 15; *see also Fox v. Gov't of the District of Columbia*, 794 F.3d 25, 29 (D.C. Cir. 2015) (stating that qualified immunity inquiry requires courts to determine "whether the constitutional right was clearly established at the time of the incident." (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009))).

Citing a handful of cases, Plaintiffs kick up much dust to argue that the conduct at issue here—derecognizing FCA-Jackson Reed based on its leadership selection criteria—was "clearly established" as unlawful.  But at the time FCA-Jackson Reed was derecognized, and to this day,

11

there is no controlling caselaw in the D.C. Circuit that would have sufficiently put DCPS staff on notice.  *See* Defs.' Mot. at 15.  And Plaintiffs overemphasize the importance of the 9th Circuit's *en banc* holding in FCA-San Jose.  While that case is certainly persuasive authority, it is not binding and crucially, was not decided until a year after FCA-Jackson Reed was derecognized.  *Id.*  Nor do a handful of cases involving similar issues at the collegiate level arising out of Michigan and Iowa create a consensus sufficient to deny qualified immunity to Defendants Ferebee and Ruiz.  Pls.' Opp'n at 33–34; Defs.' Mot. at 14.  Plaintiffs hyperbolically assert that if the Court were to grant qualified immunity here, it would be the first to ever do so.  Pls.' Opp'n at 36.  If that is true, it is only because so few courts have considered the question in the first place.  A smattering of cases from three circuits far from the District—some postdating the incident in question—do not clearly establish the unlawfulness of DCPS's derecognition of FCA-Jackson Reed in 2022.  Defs.' Mot. at 14–15.

       Plaintiffs argue that regardless, Ferebee and Ruiz are not entitled to qualified immunity because at this stage, the Court must accept as true their allegations that "the District was selectively interpreting and enforcing D.C.'s nondiscrimination law" and allowing other student groups "to discriminate on grounds forbidden by its nondiscrimination policy."  Pls.' Opp'n at 28 (internal quotation marks omitted).  This self-serving framing aside, the Court is not, in fact, obligated to take *every* conclusory allegation as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007)).  Plaintiffs' only support for these allegations throughout this case has been their interpretation of the descriptions of student organizations on the internet—other than this, Plaintiffs' Complaint contains no allegations that any student organization was discriminating in violation of DCPS antidiscrimination policy, much less that DCPS was aware of this conduct and selectively enforced its policies.  Nor are

12

there any allegations that other student groups were similarly the subject of grievances based on an alleged violation of the non-discrimination policy but were not subject to enforcement. Because Plaintiffs have failed to allege that *at the time of the incident*, the unlawfulness of DCPS's conduct was clearly established, *see Fox*, 794 F.3d at 29, Defendants Ferebee and Ruiz are entitled to qualified immunity and the claims against them in their individual capacities (except for Plaintiffs' claim under the D.C. Human Rights Act, *see* Defs.' Mem. at 16, n.3) should be dismissed.

## IV.     Plaintiffs Have No Claims Against Chancellor Ferebee in His Individual Capacity.

Plaintiffs have not adequately alleged any action by Chancellor Ferebee to support their claims against him in his individual capacity. *See* Defs.' Mem. at 16–17. The Complaint does not mention Chancellor Ferebee or his actions, only alleging that he is the Chancellor and chief executive of DCPS. *Id.* at 16; Compl. ¶ 22. Because government officials may not be held liable in their personal capacity for the conduct of their subordinates, Plaintiffs have not stated a claim against Chancellor Ferebee. *See* Defs.' Mem. at 16.

In their opposition, Plaintiffs seek to remedy this defect by insisting that Chancellor Ferebee is liable for "his *own* unlawful conduct—his promulgation of the Anti-Discrimination Policy." Pls.' Opp'n at 42 (emphasis original). This is too little and too late for several reasons, not least because Plaintiffs' quarrel is not with DCPS's former Anti-Discrimination policy, but its alleged selective enforcement against FCA-Jackson Reed. *See, e.g.*, Compl. ¶ 206; Pls.' Opp'n at 14. Given this, it is not the text of the policy itself at the root of Plaintiffs' alleged injuries. Indeed, in minimizing the changes DCPS made to the policy, Plaintiffs argue that, at the time FCA-Jackson Reed was derecognized, "the District was *already bound* by a virtually identical religious exemption as the one" now incorporated into the Guidance. Pls.' Opp'n at 24

(emphasis original). That Chancellor Ferebee "promulgated" the policy thus has no bearing on any of Plaintiffs' claims.

Plaintiffs' reliance on *Shaw* is inapt. It may be true that "a government official may be held liable in damages for constitutional wrongs resulting from the 'establishment of unconstitutional policies,'" 944 F. Supp. 2d 43, 60–61 (D.D.C. 2013), but Plaintiffs have not alleged that it is DCPS's policy, rather than selective enforcement of that policy, that is the problem. In any event, Plaintiffs' Complaint does not allege—much less "sufficiently"—what they represent as the elements of this theory, Pls.' Opp'n at 42, or even make token reference to them. *See generally*, Compl. While Plaintiffs are correct that courts can take judicial notice of public documents, Pls.' Opp'n. at 43 n.2, that does not absolve them of their burden to plausibly allege the facts supporting their claims in the Complaint itself. It also is well-settled that Plaintiffs cannot amend their complaint in their opposition. *See, Yoder*, 2025 WL 915611, at *3. For these reasons, Plaintiffs' claims against Chancellor Ferebee in his individual capacity should be dismissed.

## CONCLUSION

For these reasons and those stated in Defendants' motion, the Court should grant Defendants' Partial Motion to Dismiss Plaintiffs' Complaint.

Dated: April 21, 2025

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Amanda C. Pescovitz*
AMANDA C. PESCOVITZ [1735780]
MARCUS D. IRELAND [90005124]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 805-7495
Email: amanda.pescovitz1@dc.gov

*Counsel for Defendants*