## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FELLOWSHIP OF CHRISTIAN ATHLETES, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br><br> *Defendants*. | No. 24-cv-01332 (DLF) |

## <u>MEMORANDUM OPINION</u>

The Fellowship of Christian Athletes—a religious ministry dedicated to engaging student-athletes in their Christian faith—and one of its local chapters bring this suit against the District of Columbia and two D.C. Public Schools (DCPS) officials.[1]  FCA claims that the defendants violated the Religious Freedom Restoration Act, the Equal Access Act, the D.C. Human Rights Act, the First Amendment, and the Fifth Amendment when they rescinded FCA's status as a recognized student organization at Jackson-Reed High School in Washington, D.C. Before the Court is the defendants' Partial Motion to Dismiss.  Dkt. 39.  For the reasons that follow, the Court will grant the motion in part and deny the motion in part.

## I.    BACKGROUND

### A.    FCA

FCA National is a Christian ministry that envisions a world "transformed by Jesus Christ through the influence of coaches and athletes."  Compl. ¶ 30, Dkt. 1.  To that end, it seeks "to lead

---

[1] In general, this opinion refers to the plaintiffs collectively as "FCA," to plaintiff Fellowship of Christian Athletes as "FCA National," and to the local chapter of the Fellowship of Christian Athletes that is a plaintiff to this case as "FCA Jackson-Reed."

every coach and athlete into a growing relationship with Jesus Christ and His Church." *Id.*  FCA National works to accomplish that goal through "huddles"—local on-campus student chapters on middle school, high school, and college campuses that encourage student-athletes "to grow in their faith through prayer and Bible study." *Id.* ¶ 31.  Thousands of FCA huddles meet regularly worldwide. *Id.* ¶¶ 31, 45.

"FCA's student leaders are the primary messengers for sharing FCA's beliefs and values to both the members of their huddles and the student bodies of their respective schools." *Id.* ¶ 45. Among other things, student leaders "determine the content of an FCA huddle's message"; "lead and participate in prayer, worship, and religious teaching"; "select guest speakers and identify religious topics to cover during events"; "personally minister to their peers individually"; and "plan outreach and student activities to advance the huddle's religious mission." *Id.* ¶ 48; *see id.* ¶ 63. In this way, "FCA's student leaders hold an important spiritual leadership role within their student groups and as representatives of FCA." *Id.* ¶ 63.

Although FCA huddles are open to all students, *id.* ¶ 46, FCA requires student leaders to "agree with FCA's core Christian beliefs," *id.* ¶ 47.  In particular, "[s]tudent leaders must affirm FCA's Christian Community Statement and fill out a Student Leader Application." *Id.* ¶ 64. FCA's Christian Community Statement "articulates [FCA's] religious vision, mission, beliefs, and expectations," including "FCA's convictions on sexual conduct," *id.* ¶ 44, and "the Bible's teachings on sexual morality," *id.* ¶ 92.  As relevant here, FCA student leaders are required to agree with FCA's "belief that sexual relations outside of marriage (biblically understood) are inconsistent with God's call to holiness in His followers' lives." *Id.*

**B.      Jackson-Reed High School And DCPS's Anti-Discrimination Policy**

Jackson-Reed High School is a public high school in the District of Columbia Public Schools System that is home to approximately 60 recognized student organizations.  *See id.* ¶ 54. These student organizations cover a broad range of non-curricular interests.  *See id.* ¶ 55 (listing, *e.g.*, Cooking Club, Dungeons & Dragons Club, Ping Pong Club, Wealth Club).  And many are centered around specific identities.  "Girls Who Code," for example, "provide[s] a space for girls interested in coding," while the Jewish Student Union provides a space for students to "learn about and celebrate Jewish traditions and culture."  *Id.* (citation modified).  Some student organizations also implement requirements for student leaders.  *See id.* ¶ 127 (explaining that the Ruling Our eXperiences student organization requires that its "facilitators" "identify as female" (citation modified)).

In order for a student organization to be recognized at Jackson-Reed, a faculty sponsor or prospective club member must "submi[t] information to the school, including proposed meeting times, the names of the faculty sponsor and involved students, and the club's purpose, objectives, and proposed activities."  *Id.* ¶ 52.  This approval process is relatively straightforward—"[c]lubs can be recognized within hours of submission."  *Id.*

Recognized student organizations have access to a number of benefits, including "the ability to meet on-campus and host school-sanctioned events during school hours," "inclusion in the school activity fair where faculty sponsors and/or club members are visible for prospective members to see and join clubs," "access to advertisement spaces in central locations on campus," "listing on the school website," "permission to use the name 'Jackson-Reed' in club social media handles," "the ability to apply for funds from the Jackson-Reed parent-teacher-student

organization," and "access to faculty sponsors, who are eligible for a stipend for sponsoring a club." *Id.* ¶ 53.

Recognized student organizations at Jackson-Reed are subject to the D.C. Human Rights Act and DCPS's Anti-Discrimination Policy.  The D.C. Human Rights Act makes it unlawful for an "educational institution" to:

> deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, political affiliation, source of income, disability, or homeless status of any individual.

D.C. Code § 2-1402.41(1).  DCPS's Anti-Discrimination Policy similarly conveys DCPS's "prohibition on discrimination of all kinds."  District of Columbia Public Schools, Anti-Discrimination Policy: Students 1 (Oct. 1, 2021), https://perma.cc/H6DC-H9EE.  The policy provides that:

> DCPS does not discriminate or tolerate discrimination against . . . students on the basis of actual or perceived race, color, religion, national origin, sex (including pregnancy), age, marital status, personal appearance, sexual orientation, gender identity or expression, family status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, status as a victim of an intrafamily offense, or place of residence or business.

*Id.* at 3.[2]

### C.    The FCA Huddle At Jackson-Reed And The DCPS Investigation

In September 2022, FCA was approved as a recognized student organization at Jackson-Reed.  Compl. ¶ 71.  Two weeks later, Paul Legere—a part-time freshman baseball coach at the school—sent local FCA staff a social media message stating that there was "no place for a

---

[2] This opinion cites to the October 2021 version of the policy, which was the operative policy at times material to this case.

group like FCA in a public school." *Id.* ¶ 76 (citation modified); *see id.* ¶ 75.  Legere proceeded

to file a grievance with DCPS's Comprehensive Alternative Resolution and Equity (CARE) Team,

alleging that FCA "discriminate[d] against the Lesbian, Gay, Bisexual, Transgender & Queer

. . . community" and that Jackson-Reed had violated the D.C. Human Rights Act and DCPS's Anti-

Discrimination Policy by allowing FCA to sponsor a student organization on its campus.  *Id.* ¶ 80;

*see id.* ¶¶ 77–80.

A DCPS investigator ordered Jackson-Reed to "immediately cease operations" of FCA

Jackson-Reed while DCPA investigated Legere's grievance.  *Id.* ¶ 82.  The investigator attributed

the order to "the allegations raised by the complainant and the content of certain information

distributed by" the student organization.  *Id.* ¶ 84.  When FCA Jackson-Reed's faculty sponsor

asked for further information, the investigator elaborated: "The premise of the organization is

discriminatory in that the pledge says that you must turn away from an impure lifestyle of which

they list as homosexual activities."  *Id.*  Jackson-Reed removed FCA Jackson-Reed from the

school's list of recognized student organizations and directed the organization's faculty advisor to

inform students that FCA Jackson-Reed was "on a pause."  *Id.* ¶ 82.

As part of its investigation, the DCPS CARE Team interviewed Legere, FCA

Jackson-Reed's faculty advisor, and FCA National's Vice President of Field Ministry for the Mid-

Atlantic region.  *Id.* ¶ 86.  The CARE Team also reviewed the student organization's Instagram

and page on the Jackson-Reed website; an email from Legere to the Jackson-Reed principal; and

an FCA student leadership application.  *Id.*  It also asked FCA Jackson-Reed's faculty advisor for

follow-up information, including "a list of names of students who participated in the group, who

attended the coach's meeting, what made Jackson Reed want to bring the club back into the school,

who used to run the club, and whether any meetings or planning sessions [had] taken place, [and]

if so, . . . some names of individuals who attended (coaches and students)." *Id.* ¶ 87 (citation modified). The CARE Team did not inform FCA Jackson-Reed where it obtained the copy of the student leadership application. *Id.* ¶ 88. The student organization did not use such an application for its huddle at that time. *Id.*

On November 22, 2022, the CARE Team issued a decision finding that FCA violated the D.C. Human Rights Act and DCPS's Anti-Discrimination Policy. *Id.* ¶ 89. In particular, the CARE Team found that Legere's complaint of discrimination was "substantiated" because "the language in the sexual purity statement prohibiting homosexuality constitute[d] a violation of policy." *Id.* ¶ 90. The CARE Team ordered Jackson-Reed to "disassociate from the national [FCA] organization" by November 28, 2022, including by "removing [FCA Jackson-Reed] from the online list of recognized clubs and deleting Jackson-Reed's club website," *id.* ¶ 94, though it "invited" the student organization "to break its affiliation with FCA National and 'create a new organization independent of FCA,'" *id.* ¶ 95.

DCPS provided a copy of its decision only to Legere and Jackson-Reed, *id.* ¶ 96; FCA and FCA Jackson-Reed's faculty advisor learned of the decision through a report in the student newspaper, *id.* ¶ 97. Although DCPS provided the faculty advisor with a copy of the decision on December 5, 2022, "he was instructed not to provide it to FCA." *Id.* ¶ 100. Around that time, FCA learned that the CARE Team decision instructed that any appeal of the decision must be filed within 10 days of receipt. *Id.* ¶ 101.

On December 15, 2022, FCA appealed the CARE Team's decision to DCPS. *See id.* ¶¶ 101–03. FCA asked that FCA Jackson-Reed be reinstated on two bases. First, FCA argued that the CARE Team "had incorrectly found that FCA required its leaders to sign a sexual purity statement—even though both FCA witnesses clarified that no such signing requirement existed."

*Id.* ¶ 102.  Second, FCA argued that, "regardless of any signed statement, excluding FCA for asking its leaders to agree with its faith violated the D.C. Human Rights Act, federal civil rights laws, and the First Amendment." *Id.*  Seven days after FCA filed its appeal, DCPS provided FCA with a copy of the decision. *Id.* ¶ 101.

DCPS denied FCA's appeal on January 11, 2023—two days after a response was due under the District's grievance appeal process. *Id.* ¶¶ 103–04.  The letter denying the appeal was "virtually identical" to the November 22, 2022, decision. *Id.* ¶ 106.  In it, DCPS concluded that Jackson-Reed had "allowed and supported a group on their campus that discriminated against the LGBTQ community by making people sign a purity pledge that prohibits homosexual acts," and that "the language in the sexual purity statement prohibiting homosexuality constitute[d] a violation of policy," even though "only student and adult leaders [we]re asked to sign the sexual purity statement and although signing the statement [wa]s voluntary." *Id.* ¶ 107.  The decision again invited FCA Jackson-Reed to disaffiliate from FCA National and to create a new, independent organization. *Id.* ¶ 108.  It also indicated that FCA could appeal the decision to the DCPS Chief Integrity Officer or to D.C. Superior Court within ten days. *Id.* ¶ 109.

On January 20, 2023, FCA filed a second appeal with DCPS Chief Integrity Officer (CIO) Cinthia Ruiz. *Id.* ¶ 110.  FCA again argued that the CARE Team decision "was based on the faulty premise that students were required to sign a 'sexual purity statement'" and that DCPS's exclusion of FCA Jackson-Reed violated D.C. and federal law. *Id.*  Furthermore, FCA asserted that it had been denied due process because DCPS "did not provide a copy of its November 22, 2022, decision," "did not timely reply to DCA's December 15, 2022, appeal," and "blatantly ignored the substance of FCA's appeal." *Id.*

DCPS upheld its previous decisions in a letter from CIO Ruiz dated February 10, 2023. *Id.* ¶ 112. In the letter, DCPS again recommended that Jackson-Reed students and staff "who were interested in joining FCA" create a new, independent organization. *Id.* ¶ 113 (citation modified). Alternatively, DCPS stated that it would "be in favor of reinstating" FCA Jackson-Reed if the student organization (1) "could prove that no sexual purity statement existed and that all students c[ould] serve as a club leader 'regardless of religious affiliation and personal belief'"; and (2) "would submit all training materials and leadership to DCPS for review." *Id.* ¶ 114. If FCA Jackson-Reed declined those conditions, however, DCPS stated that the group would not be recognized as a student organization or receive the benefits of recognition. *Id.* The letter represented that it was the "final DCPS administrative decision in the matter." *Id.* ¶ 118.

### D.    Ninth Circuit Litigation And FCA's Final Request For Reconsideration

As FCA was engaging with DCPS, FCA National and a local FCA huddle in California were suing the San Jose Unified School District for similar alleged violations of law. *Id.* ¶¶ 119–20. There, as here, the school district had revoked the huddle's status as an official student organization based on a finding that FCA's requirement that "students serving in a leadership capacity . . . affirm a Statement of Faith and . . . abide by a sexual purity policy" violated the district's nondiscrimination policies. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 671 (9th Cir. 2023) (en banc). FCA National, the local huddle, and two student leaders (FCA plaintiffs) sued the school district and several school officials, asserting various claims for relief, including under the Free Exercise Clause of the First Amendment. *Id.* at 677. The district court denied injunctive relief, and the FCA plaintiffs appealed. *Id.* at 679.

In 2023, the Ninth Circuit, sitting en banc, ruled in favor of the FCA plaintiffs. *See id.* at 696. As relevant here, the court held that the school district's nondiscrimination policies were subject to strict scrutiny because the policies permitted discretionary exemptions and were selectively implemented—and were thus "not neutral and generally applicable"—and because "religious animus infect[ed] the [d]istrict's decision making." *Id.* at 695–96; *see id.* at 687–93. As the district had not "offer[ed] any showing that it ha[d] even considered less restrictive measures," the court held that the policies "fail[ed] at least the tailoring prong of the strict scrutiny test." *Id.* at 694. As such, the court concluded that the FCA plaintiffs had demonstrated a likelihood of success on the merits of their Free Exercise claims. *Id.* After concluding that the remaining preliminary injunction factors supported relief, the Ninth Circuit reversed the district court's denial of the FCA plaintiffs' motion for a preliminary injunction and directed the district court to enter an order reinstating the local huddle's official recognition. *Id.* at 696.

After the Ninth Circuit's decision issued in September 2023, FCA "sent the decision to DCPS and asked it to reconsider its refusal to reinstate FCA on Jackson-Reed's campus." Compl. ¶ 123. DCPS did not respond to the request. *Id.* ¶ 125.

## E.    Proceedings Before This Court

On May 7, 2024, FCA brought this action against the District, as well as against Chancellor Ferebee and CIO Ruiz in their official and personal capacities, Dkt. 1, and simultaneously filed an Application for a Preliminary Injunction, Dkt. 3. The Complaint sets forth 12 claims for relief: violation of the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1 (Count I); violation of 42 U.S.C. § 1983 for deprivation of rights under the Free Exercise, Establishment, Free Speech, and Assembly Clauses of the First Amendment (Counts II–IV, VI–VIII, XI); violation of the Equal Access Act, 20 U.S.C. § 4071 (Count V); violation of 42 U.S.C. § 1983 for

deprivation of due process and equal protection under the Fifth Amendment (Counts IX–X); and violation of the D.C. Human Rights Act, D.C. Code § 2-1402 (Count XII).  Among other things, FCA seeks declaratory and injunctive relief, along with compensatory and nominal damages. Compl., Prayer for Relief (a)–(h).

On July 11, 2024, the Court granted in relevant part FCA's request for a preliminary injunction.  *See generally* Order on Mot. for Prelim. Inj., Dkt. 25; Mem. Op., Dkt. 26.  The Court found that FCA "ha[d] shown that the District's application of its Anti-Discrimination Policy [wa]s likely to run afoul of, at the very least, the Religious Freedom Restoration Act and the Free Exercise Clause," Mem. Op. 31, and that the remaining preliminary injunction factors weighed in FCA's favor, *see id.* at 27.  As such, the Court ordered the defendants to (1) "restore official recognition and all of the benefits, rights, and privileges of such status to the student chapter of the Fellowship of Christian Athletes at Jackson-Reed High School in Washington, D.C. for the duration of this litigation"; and (2) "not enforce their Anti-Discrimination Policy to exclude the student chapter of the Fellowship of Christian Athletes at Jackson-Reed High School in Washington, D.C. because of its leadership-selection practices, provided that those practices are not materially altered from those described in the Application for Preliminary Injunction."  Order on Mot. for Prelim. Inj. 1.

F.    **DCPS's Revised Guidance**

In November 2024, following the Court's preliminary injunction ruling, DCPS took steps to exempt religious groups from its Anti-Discrimination Policy, including through revisions to its "Student Organizations and Clubs Guidance."  *See* Mem. in Supp. of Mot. to Dismiss 3, Dkt. 39-1.  The revised guidance provided that, although student organizations could "have membership eligibility requirements to join and serve in leadership positions in alignment with their mission

statement," no eligibility requirement could be based on certain characteristics, including "race,"

"religion," "sex," "sexual orientation," and "gender identity or expression."  Mot. to Dismiss,

Ex. B (Student Organizations and Clubs Guidance), at 2, Dkt. 39-3.  The revised guidance further

clarified that nothing in its text "permit[ted] a DCPS school to bar any religious

organization . . . from limiting admission to or giving preference to persons of the same religion

as calculated by the organization to promote the religious principles of the organization."  *Id.*[3]

## II.    LEGAL STANDARDS

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may move to

dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  "A motion to

dismiss for mootness is properly brought under Rule 12(b)(1) because mootness itself deprives the

court of jurisdiction."  *Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C. 2017); *see*

*Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) ("Federal courts lack

jurisdiction to decide moot cases because their constitutional authority extends only to actual cases

or controversies." (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)).  If the

Court determines that a claim has become moot, it must dismiss the claim. Fed. R. Civ. P. 12(b)(1),

12(h)(3).

When reviewing a motion to dismiss for lack of jurisdiction, the Court must "assume the

truth of all material factual allegations in the complaint and construe the complaint liberally,

granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am.*

---

[3] The Court takes judicial notice of the revised guidance, which post-dates the Complaint.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) ("In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." (citation modified)); *Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017) (courts may take judicial notice of "official, public documents").

*Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (citation modified).  The Court may also "undertake an independent investigation" that examines "facts developed in the record beyond the complaint" in order to "assure itself of its own subject matter jurisdiction."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (citation modified).  A plaintiff bears the burden of establishing subject matter jurisdiction.  *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Rule 12(b)(6) allows a defendant to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").  While a complaint need not contain "detailed factual allegations," *Iqbal*, 556 U.S. at 678, alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility," *id.* (citation modified).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation modified).  The Court need not, however, accept "a legal conclusion couched as a factual allegation" or an inference unsupported by the facts alleged in the pleadings.

*Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  A Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial."  *Okusami v. Psychiatric Inst. of Wash., Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992).

## III.    ANALYSIS

The defendants move to dismiss the Complaint in part.  They move under Rule 12(b)(1) to dismiss FCA's claims for injunctive and declaratory relief as moot and under Rule 12(b)(6) to dismiss FCA's Fifth Amendment due process claim for failure to state a claim.  They further move to dismiss all personal capacity claims against Chancellor Ferebee and CIO Ruiz—except for FCA's D.C. Human Rights Act claim—on qualified immunity grounds and all official capacity claims against Chancellor Ferebee and CIO Ruiz as redundant of the claims against the District.  They separately move to dismiss all claims against Chancellor Ferebee on the basis that FCA fails to allege that he took any actions that caused FCA's alleged injuries.[4]

For the reasons that follow, the Court will grant the motion in part and deny the motion in part.

### A.    Mootness

The Court begins with the defendants' assertion that FCA's claims for prospective relief are moot.  A legal dispute becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Schmidt v. United States*, 749 F.3d 1064,

---

[4] With the exception of Count IX, "the District is not moving to dismiss [FCA's] claims to the extent they seek damages."  Mem. in Supp. of Mot. to Dismiss 2 n.1.

1068 (D.C. Cir. 2014) (citation modified).  As such, a court must dismiss a case or claim as moot if "intervening events make it impossible to grant the prevailing party effective relief," *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (citation modified), or when the court's decision "will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016) (citation modified). The party asserting mootness "bears the 'heavy burden' of establishing that the case is moot." *Zukerman v. USPS*, 961 F.3d 431, 441 (D.C. Cir. 2020) (quoting *Honeywell Int'l, Inc. v. NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010)).

One well established exception to mootness centers around a defendant's "voluntary cessation" of the challenged activity.  *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citation modified).  "[A]s a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *Id.* (citation modified).  "If the rule were otherwise, a defendant would be free to return to his old ways," and that fact, "together with a public interest in having the legality of the disputed practices settled, militates against a mootness conclusion."  *Zukerman*, 961 F.3d at 442 (citation modified). As such, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 190 (2000); *see Mehneh v. Rubio*, No. 25-5001, 2026 WL 125973, at *1 (D.C. Cir. Jan. 16, 2026) (courts in this Circuit impose this burden "only if there is some evidence that the party sought to manipulate the court's jurisdiction (citation modified)).

The defendants argue that DCPS's revised Student Organizations and Clubs Guidance renders FCA's requests for injunctive and declaratory relief moot.  *See* Mem. in Supp. of Mot. to

Dismiss 5–10.  In particular, they argue that the revised guidance and DCPS's recognition of FCA Jackson-Reed as an official student organization "make it impossible for the court to grant any effectual prospective relief, because the District has already effected the change that [FCA] request[s]." *Id.* at 7 (citation modified).  Because the revised guidance permits FCA Jackson-Reed to "require that [its] student leaders share [its] religious beliefs without having the Anti-Discrimination Policy or DCHRA enforced against them by DCPS," *id.* at 6, the defendants argue, injunctive relief is unnecessary and declaratory relief would be purely advisory, *see id.* at 6–7.

The revised  Student Organizations and Clubs Guidance does not moot FCA's claims.  To start, the fact that the defendants officially recognized FCA Jackson-Reed cannot moot FCA's request for prospective relief—this Court specifically ordered the defendants to "restore official recognition and all of the benefits, rights, and privileges of such status to the student chapter of the Fellowship of Christian Athletes at Jackson-Reed High School in Washington, D.C. for the duration of this litigation."  Order on Mot. for Prelim. Inj. 1.  Furthermore, the Court is skeptical that the revised guidance "completely and irrevocably eradicates the effects of the alleged violation."  Mem. in Supp. of Mot. to Dismiss 10 (citation modified) (quoting *Davis*, 440 U.S. at 631).  As revised, the Student Organizations and Clubs Guidance simply states that the guidance does not itself "bar any religious organization . . . from limiting admission to or giving preference to persons of the same religion as is calculated by the organization to promote the religious principles of the organization."   Student Organizations and Clubs Guidance 2.  It does not explicitly prohibit DCPS from enforcing its Anti-Discrimination Policy or the D.C. Human Rights Act against a religious student organization for requiring that student leaders agree with the organization's beliefs. *See* Compl., Prayer for Relief (d)–(e).

In any event, the defendants' voluntary revision of the Student Organizations and Clubs Guidance did not moot this case. The fact that, shortly after the Court issued a preliminary injunction in this case, DCPS revised its guidance and then moved to dismiss FCA's claims as moot "suggest[s]" at least "arguable manipulation" of the Court's jurisdiction. *Pub. Citizen, Inc. v. FERC*, 92 F.4th 1124, 1128 (D.C. Cir. 2024). *Contrast, e.g.*, *Samma v. DOD*, 136 F.4th 1108, 1113 (D.C. Cir. 2025) ("A suggestion of manipulation is even less likely if the party who ceased the challenged activity opposes mootness."); *Alaska v. USDA*, 17 F.4th 1224, 1229–30 (D.C. Cir. 2021) (voluntary cessation exception did not apply where defendant "could not have been seeking to erase an unfavorable decision from the books" because "[i]t had no unfavorable decision to erase" (citation modified)); *Oceana, Inc. v. Raimondo*, No. 20-5362, 2021 WL 4771915, at *1 (D.C. Cir. Oct. 1, 2021) (per curiam) (voluntary cessation exception did not apply where the government was "ordered in a different lawsuit" to issue the opinion that superseded the challenged opinion). As such, the defendants bear the burden of establishing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 597 U.S. 697, 720 (2022) (citation modified).

The defendants have not satisfied that "formidable burden." *Friends of the Earth*, 528 U.S. at 190. Even if the revised guidance explicitly prohibited the challenged conduct, nothing would prevent DCPS from reinstating its prior policy and guidance documents. *Cf. City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982) (case not moot where city's revision of challenged ordinance "would not preclude [the city] from reenacting precisely the same provision if the District Court's judgment were vacated"). *Contrast, e.g.*, *A.B.A. v. FTC*, 636 F.3d 641, 643–44 (D.C. Cir. 2011) ("new legislation addressing the matter in dispute" enacted by Congress mooted case). Federal courts do not dismiss a case as moot where, as here, the defendants "vigorously

defen[d]" the challenged conduct and nowhere suggest that they would not resume that conduct were the litigation to be resolved in their favor. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007); *see West Virginia*, 597 U.S. at 720.

In reaching this conclusion, the Court rejects the defendants' invitation to adopt a more lenient mootness burden for government defendants. *See* Mem. in Supp. of Mot. to Dismiss 8–10; Reply in Supp. of Mot. to Dismiss (Reply) 5–9, Dkt. 53. Although the defendants acknowledge that "[t]he party asserting mootness has the burden to show that the conduct cannot be expected to recur," they argue that "courts have repeatedly found that there is 'less concern about the recurrence of objectionable behavior' when the defendant is a government actor rather than a private litigant." Mem. in Supp. of Mot. to Dismiss 8 (quoting *Citizens for Resp. & Ethics in Wash. v. SEC*, 858 F. Supp. 2d 51, 61–62 (D.D.C. 2012)). The defendants thus suggest that, "[w]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will not recur." *Id.* at 9 (quoting *Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1283 (11th Cir. 2004)). Not so. The Supreme Court has made clear that the rule that a defendant may "show that a case is truly moot" only by proving that "no reasonable expectation remains that it will return to its old ways . . . holds for governmental defendants no less than for private ones." *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (citation modified). For the reasons explained, the defendants have not done so here.

### B.    Fifth Amendment Due Process

The defendants move to dismiss FCA's due process claim (Count IX) for failure to state a claim. Mem. in Supp. of Mot. to Dismiss 10–13. The Court agrees that FCA has not stated a viable due process claim.

Due process requires "notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950); *see also Propert v. District of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) ("Because D.C. is a political entity created by the federal government, it is subject to the restrictions of the Fifth Amendment, not the Fourteenth. The procedural due process components of the two Amendments are the same." (citation modified)). Courts typically consider three factors in determining whether a due process violation has occurred: (1) the private interest affected; (2) the risk of an erroneous deprivation of such interest and the probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Although the process due is "flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), "the government is never relieved of its duty to provide *some* notice and *some* opportunity to be heard prior to final deprivation of a property interest," *Propert*, 948 F.2d at 1332; *see id.* ("The notice provided must be reasonably certain to inform those affected, and the opportunity to be heard must be given at a meaningful time and in a meaningful manner." (citation modified)).

Here, FCA received all the process it was due.[5]  The District advised FCA of the grievance and the specific allegations against FCA Jackson-Reed, Compl. ¶ 84, initiated an investigation into the grievance that included interviewing the FCA Jackson-Reed faculty advisor and FCA National's Vice President of Field Ministry for the Mid-Atlantic, *id.* ¶ 86, and issued a written

---

[5] The Court assumes for the purposes of this analysis that FCA has asserted a protected due process interest. *See Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) ("We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." (citation modified)).

decision explaining its decision, *id.* ¶¶ 89–90.  FCA then had an opportunity to appeal that decision to DCPS and, ultimately, to DCPS's Chief Integrity Officer.  *See id.* ¶¶ 101–18.  Both of those appeals also resulted in written decisions explaining the revocation.  *See id.* ¶¶ 106–09, 112–18.  These procedures did not deprive FCA of due process.  Even assuming that FCA's private interest outweighs the government's interest, the procedures that DCPS employed—an investigation that offered FCA an opportunity to present evidence, resulted in written decisions, and provided multiple opportunities for review—minimized the risk of an erroneous deprivation and obviated the need for additional procedures to protect against that risk.  *See Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) ("notice" and a "fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations").

FCA asserts that it was deprived of due process because DCPS failed to provide it with notice of the basis for the revocation of recognized status until after FCA had appealed the revocation.  *See* Compl. ¶¶ 101, 245; Opp'n to Mot. to Dismiss (Opp'n) 31, Dkt. 44.  But while DCPS's alleged delay in providing FCA with a written copy of the initial decision is concerning, FCA's allegations do not amount to a due process violation.  To start, the Court cannot agree that DCPS "failed to give FCA *any notice at all* of its grievance decision until after FCA filed its appeal."  Opp'n 31 (emphasis added).  Indeed, the CARE Team informed FCA Jackson-Reed's faculty sponsor that a complainant had alleged that the "premise of the organization [w]as discriminatory" insofar as the alleged leadership pledge required student leaders to "turn away from an impure lifestyle of which they list as homosexual activities," and also provided FCA with an opportunity to respond to that allegation.  Compl. ¶ 84; *see id.* ¶¶ 86–87; *cf. Da'Vage v. D.C. Hous. Auth.*, No. 21-cv-1318, 2024 WL 1366786, at *8–11 (D.D.C. Mar. 31, 2024) (terminated

employee received sufficient notice where, pre-termination, he was informed of the basis of the investigation against him and offered the opportunity to respond).

In any event, FCA's factual allegations "belie any inference" that they were "deprived of adequate notice of [their] ability to contest th[e] decision" or hindered in their appeal. *Robinson v. Wash. Metro. Area Transit Auth.*, 167 F. Supp. 3d 118, 132–33 (D.D.C. 2016). FCA neither disputes that it ultimately received a copy of the written decision, *see* Compl. ¶ 101, nor alleges any harm associated with the delayed transmission. Under these circumstances, DCPS's delay in providing FCA with the written decision does not amount to a constitutional due process violation. *Cf. Robinson*, 167 F. Supp. 3d at 133 ("[N]othing in the record suggests that the plaintiff was unaware of the procedures afforded to him under the Settlement Agreement, or that he was precluded or otherwise prevented from contesting the rescission of his reinstatement through a new grievance."); *Gordon Coll. v. U.S. Small Bus. Admin.*, No. 23-cv-614, 2025 WL 1517208, at *18 (D.D.C. May 28, 2025) (plaintiff's due process claim failed where plaintiff "neither allege[d] nor argue[d] that any of the procedural defects affected the outcome of its administrative appeal").

FCA further argues that, throughout the appeal process, DCPS (1) declined to seek additional evidence; (2) failed to meaningfully reconsider its factual findings; and (3) did not allow FCA to correct the evidence upon which the revocation was based. Compl. ¶ 245; *see* Opp'n 32–33. These arguments, however, represent dissatisfaction with result, not disagreement with procedure. FCA does not and cannot dispute that DCPS collected evidence before issuing its initial decision and provided FCA with multiple opportunities to dispute DCPS's factual findings. The question whether DCPS reached the correct decision based upon the evidence and arguments before it is one of merit, not due process. *See Bishop v. Wood*, 426 U.S. 341, 350 (1976) ("The Due Process Clause . . . is not a guarantee against incorrect or ill-advised . . . decisions."); *Nat'l*

*Collegiate Preparatory v. D.C. Charter Sch. Bd.*, No. 19-cv-1785, 2019 WL 7344826, at *3 (D.D.C. Dec. 11, 2019) ("[T]he due-process clause does not protect any particular outcome; instead, it merely ensures that the procedures that led to such outcome are fair.").

Finally, the Court rejects FCA's suggestion that due process required that FCA be afforded an opportunity to "confront any accusers." Compl. ¶ 245. While it is true that due process sometimes "requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970), FCA does not offer any argument as to why such an opportunity was constitutionally required here.[6]

### C.    Qualified Immunity

Chancellor Ferebee and CIO Ruiz further raise a broad defense of qualified immunity as to FCA's claims against them in their personal capacities.[7] *See* Mem. in Supp. of Mot. to Dismiss 13–16. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). As such, courts evaluate qualified immunity claims using a two-pronged analysis, assessing (1) whether the plaintiff has

---

[6] In its opposition to the defendants' motion to dismiss, FCA further alleges that DCPS denied due process by (1) declining to give FCA an opportunity to defend itself before ordering FCA Jackson-Reed to cease operations while the complaint was pending; (2) failing to address specific arguments FCA raised in its appeal; and (3) deciding FCA's appeals in cursory written opinions. *See* Opp'n 32–33. FCA has forfeited these arguments by failing to raise them in its complaint. *See* Compl. ¶¶ 240–46; *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 165 n.10 (D.D.C. 2014) ("[I]t is well settled law that a plaintiff cannot amend its complaint by the briefs in opposition to a motion to dismiss.").

[7] Chancellor Ferebee and CIO Ruiz except from this assertion of qualified immunity Count XII, the alleged violation of the D.C. Human Rights Act. *See* Mem. in Supp. of Mot. to Dismiss 16 n.3.

alleged facts demonstrating that the officer's conduct violated a statutory or constitutional right;

and (2) whether that right was clearly established. *See id.* at 232; *see also Ashcroft v. al-Kidd*, 563

U.S. 731, 735 (2011) ("[L]ower courts have discretion to decide which of the two prongs of

qualified-immunity analysis to tackle first.").

"Clearly established means that, at the time of the officer's conduct, the law was

sufficiently clear that every reasonable official would understand that what he is doing is

unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citation modified).  Thus,

"[q]ualified immunity may be unavailable when plaintiffs identify 'cases of controlling authority

in their jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority

such that a reasonable officer could not have believed that his actions were lawful.'" *Bernier v.*

*Allen*, 38 F.4th 1145, 1152 (D.C. Cir. 2022) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

The Supreme Court has instructed that "the right allegedly violated must be established,

not as a broad general proposition, but in a particularized sense so that the contours of the right are

clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (citation modified).

At the same time, however, it has acknowledged that the appropriate level of generality depends

on the nature of the right at issue.  "In some circumstances, as when an earlier case expressly leaves

open whether a general rule applies to the particular type of conduct at issue, a very high degree

of prior factual particularity may be necessary."  *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).

"But general statements of the law are not inherently incapable of giving fair and clear warning,

and in other instances a general constitutional rule already identified in the decisional law may

apply with obvious clarity to the specific conduct in question, even though the very action in

question has not previously been held unlawful."  *Id.* at 741 (citation modified).

Once a defendant has raised the defense of qualified immunity, it is the plaintiff's "burden to show that the particular right in question . . . was clearly established." *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015). The court must accept as true all well-pleaded factual allegations in the complaint, construing them in the light most favorable to the plaintiff. *K.O. ex rel. E.O. v. Sessions*, No. 20-cv-5255, 2022 WL 3023645, at \*3 (D.C. Cir. July 29, 2022).

In asserting qualified immunity, the defendants do not contest that FCA's allegations, if true, establish violations of the law. *See* Mem. in Supp. of Mot. to Dismiss 13–16. As such, the only issue before the Court is whether the law was clearly established as to each of FCA's claims at the time of the alleged conduct.

For the reasons that follow, the Court will find that Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on some, but not all, of FCA's claims.[8]

  1.  *RFRA (Count I) And First Amendment (Counts II–IV, VI–XIII, XI)*

FCA alleges that the defendants' termination of FCA Jackson-Reed's recognized student organization status ran afoul of both RFRA and the First Amendment. As to the latter, FCA asserts selective enforcement and religious animus/targeting, in violation of the Free Exercise Clause (Counts II and III); interference with internal autonomy, in violation of the Free Exercise and Establishment Clauses (Count IV); viewpoint discrimination and interference with the right of

---

[8] The Court notes that, while it is FCA's burden to show that the law was clearly established, *see Dukore*, 799 F.3d at 1145, the Supreme Court has held that the question "[w]hether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right has no qualified immunity from suit, presents a question of law" that "must be resolved *de novo* on appeal," *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Mindful of this standard of review, the Court will consider the parties' qualified immunity arguments in light of the Court's "full knowledge" of all relevant precedents. *Id.* (citation modified); *see McDonald v. Salazar*, 831 F. Supp. 2d 313, 326 (D.D.C. 2011) ("[T]he trial court has an independent obligation to survey the relevant law to determine whether a constitutional right was violated and whether that right was clearly established."); *Rosser v. District of Columbia*, No. 20-cv-2941, 2023 WL 11762552, at \*9 n.7 (D.D.C. Jan. 3, 2023) (similar).

expressive association, in violation of the Free Speech Clause (Counts VI and VII); denial of the right to assemble, in violation of the Assembly Clause (Count VIII); and denominational discrimination, in violation of the Establishment Clause (Count XI).

i.    Counts VI And VII

Chancellor Ferebee and CIO Ruiz are not entitled to qualified immunity as to Counts VI and VII.  FCA alleges that the defendants selectively enforced DCPS's Anti-Discrimination Policy on the basis of viewpoint (Count VI) and that enforcement of the policy against FCA violated FCA's First Amendment right to expressive association (Count VII).  FCA's free speech and expressive association arguments "merge" for the purpose of this analysis—because "[w]ho speaks" on an organization's behalf impacts "*what* concept is conveyed," it makes "little sense to treat [FCA's] speech and association claims as discrete." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 680 (2010).

In this context, cases applying the First Amendment limited public forum analysis "supply the appropriate framework" for determining whether FCA's expressive association and free speech rights were clearly established.  *Id.*; *see id.* at 681–83.  A governmental entity, like a private property owner, "may legally preserve the property under its control for the use to which it is dedicated." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 390 (1993). "The necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the [government] in reserving it for certain groups or for the discussion of certain topics." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). As such, a governmental entity may "establish limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Martinez*, 561 U.S. at 679 n.11 (citation modified).  "[I]n such a forum, a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral." *Id.* (citation modified). "Once

it has opened a limited forum, however, the [government] must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. The government thus "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum," or "discriminate against speech on the basis of its viewpoint." *Id.* (citation modified).

The Supreme Court has repeatedly "considered clashes between public universities and student groups seeking official recognition or its attendant benefits." *Martinez*, 561 U.S. at 683. In *Healy v. James*, 408 U.S. 169 (1972), the Supreme Court held that a state college abridged a student group's associational rights when it denied school affiliation based on the group's mission and philosophy. *See id.* at 174–76, 181–85. While a college "may impose a requirement . . . that a group seeking official recognition affirm in advance its willingness to adhere to reasonable campus law," *id.* at 193, the Supreme Court explained, the college "may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent," *id.* at 187–88.

The Supreme Court later relied on *Healy* in *Widmar v. Vincent*, 454 U.S. 263 (1972), to hold that a public university violated a Christian student organization's free speech and associational rights when the university excluded the organization from a university forum based on the organization's desire to use the space "to engage in religious worship and discussion." *Id.* at 269; *see id.* at 267–77. The university had based the exclusion on a university regulation "prohibit[ing] the use of University buildings or grounds 'for purposes of religious worship or religious teaching.'" *Id.* at 265. Although acknowledging that "[a] university's mission is education," and that a university has "authority to impose reasonable regulations compatible with that mission upon the use of its campus and facilities," *id.* at 267 n.5, the Supreme Court subjected the regulation to strict scrutiny, finding that the university had excluded the organization based on

the religious content of its intended speech, *id.* at 269–70.  The Supreme Court held that the university could not satisfy that standard.  The university's "interest in maintaining strict separation of church and State," *id.* at 270, the Court concluded, was not "sufficiently compelling to justify content-based discrimination against [the student organization's] religious speech," *id.* at 276 (citation modified); *see id.* at 270–76.

In *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819 (1995), the Supreme Court "reiterated that a university generally may not withhold benefits from student groups because of their religious outlook."  *Martinez*, 561 U.S. at 685.  *Rosenberger* involved a challenge to a public university's denial of an officially recognized student group's request for payment for the printing costs of the group's publication on the basis of the publication's Christian editorial viewpoint.  *See Rosenberger*, 515 U.S. at 822–28.  By "select[ing] for disfavored treatment those student journalistic efforts with religious editorial viewpoints," the Supreme Court held, the university had engaged in viewpoint discrimination, *id.* at 831, "which is presumed impermissible when directed against speech otherwise within the forum's limitations," *id.* at 830.  As in *Widmar*, the Supreme Court held that the university's Establishment Clause interests were not sufficiently compelling to excuse this First Amendment violation.  *See id.* at 837–46.

Finally, in *Christian Legal Society Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010), the Supreme Court held that a public law school's "all-comers policy"—a policy requiring student groups to open membership and leadership eligibility to all students—was a "reasonable, viewpoint-neutral condition on access to the student-organization forum."  *Id.* at 669; *see id.* at 668, 678–98.  The case arose from Hasting Law School's denial of the Christian Legal Society's (CLS) application for recognized student organization status.  *See id.* at 672–73.  CLS's bylaws "require[d] members and officers to sign a 'Statement of Faith' and to conduct their lives

26

in accord with prescribed principles," including adherence to "the belief that sexual activity should not occur outside of marriage between a man and a woman." *Id.* at 672. CLS "interpret[ted] its bylaws to exclude from affiliation anyone who engage[d] in unrepentant homosexual conduct" or "h[eld] religious convictions different from those in the Statement of Faith." *Id.* (citation modified). Hastings rejected CLS's application for recognized student organization status on the ground that CLS's bylaws did not comply with the law school's all-comers policy, as they "barred students based on religion and sexual orientation." *Id.* at 673; *see id.* at 672–73. The law school subsequently denied CLS's request for an exemption from that policy. *See id.* at 673.

The Supreme Court rejected CLS's free speech and expressive association claims. *Id.* at 697. After finding that the law school's justifications for the all-comers policy were reasonable in light of the purposes of the recognized student group forum, *see id.* at 685–94, the Supreme Court concluded that the policy was viewpoint neutral, *see id.* at 694–98. It observed that it was "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers." *Id.* at 694. And it distinguished *Healy*, *Widmar*, and *Rosenberger*, reasoning that, while the universities in those cases "singled out organizations for disfavored treatment because of their points of view, Hastings' all-comers requirement dr[ew] no distinction between groups based on their message or perspective." *Id.* The law school's all-comers policy, the Supreme Court concluded, was "textbook viewpoint neutral," *id.* at 695—it neither referenced, nor was justified by, the content or viewpoint of the regulated speech, *see id.* at 695–97.

Courts of appeals have repeatedly applied these precedents to hold that public educational institutions violate the First Amendment's free speech and expressive association guarantees when they selectively enforce nondiscrimination policies to deny recognized status to student groups that require leaders to share specific religious views. *See Christian Legal Soc'y v. Walker*, 453

F.3d 853, 857, 859–60 (7th Cir. 2006) (student group likely to succeed on its claim that public university violated group's free speech and expressive association rights when it revoked group's official status based on finding that group's "membership policies, which preclude[d] membership to those who engage in or affirm homosexual conduct, violate[d the university]'s nondiscrimination policies"); *Fellowship of Christian Athletes*, 82 F.4th at 686 n.8 (similar); *Intervarsity Christian Fellowship/USA v. Univ. of Iowa*, 5 F.4th 855, 860, 863–65 (8th Cir. 2021) (selective application of viewpoint neutral nondiscrimination policy to deregister student group that required its leaders to "affirm the group's belief that same-sex relationships were against the Bible" violated group's free speech and expressive association rights); *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 985–86 (8th Cir. 2021) (similar).  And the Eighth Circuit has held that government officials are not entitled to qualified immunity for such alleged violations.  *See, e.g.*, *Bus. Leaders in Christ*, 991 F.3d at 985–86; *Intervarsity Christian Fellowship/USA*, 5 F.4th at 863–67

In light of this Supreme Court and circuit case law, the Court concludes that the law was "sufficiently clear" that a "reasonable official" would have known that the challenged actions violated FCA's First Amendment free speech and expressive association rights.  *Wesby*, 583 U.S. at 63 (citation modified).  First, at the time of the challenged events, it was clearly established that a public educational institution's official recognition of student groups constitutes a limited public forum for the purpose of the First Amendment.  *See Martinez*, 561 U.S. at 682.  Second, it was clearly established that a public educational institution may not engage in viewpoint discrimination in such a forum.  *See Healy*, 408 U.S. at 181–88; *Widmar*, 454 U.S. at 267–77; *Rosenberger*, 515 U.S. at 830–31; *Martinez*, 561 U.S. at 694–98.  And "a consensus of cases of persuasive authority" from the courts of appeals, *Bernier*, 38 F.4th at 1152 (citation modified), have applied these

principles to find free speech and expressive association violations in circumstances materially similar to those at issue in this case, *see Christian Legal Soc'y*, 453 F.3d at 857, 859–60; *Fellowship of Christian Athletes*, 82 F.4th at 671, 686 n.8; *Intervarsity Christian Fellowship/USA*, 5 F.4th at 860, 863–65; *Bus. Leaders in Christ*, 991 F.3d at 974–77, 985–86.  This case law was sufficiently particularized that the contours of these rights would have been clear to a reasonable official in defendants' position. *See Reichle*, 566 U.S. at 664–65.

The defendants argue that, because the former Anti-Discrimination Policy "was intended to model" the all-comers policy that the Supreme Court upheld in *Martinez*, it cannot have been clearly established that enforcement of such a policy against FCA violated FCA's First Amendment rights.  Mem. in Supp. of Mot. to Dismiss 14; *see id.* at 14–15; Reply 11.  This argument fails twice over.  As an initial matter, the operative issue for the Court is not the defendant officials' subjective beliefs, but what a reasonable official in their position would have known. *Pearson*, 555 U.S. at 231; *see id.* at 243–44.  And, as outlined above, such a reasonable official would have been aware that the challenged conduct was unlawful.  Furthermore, the Court must at this stage accept as true all well-pleaded factual allegations in the complaint.  FCA alleges that the defendants selectively enforced DCPS's Anti-Discrimination Policy against them on the basis of FCA's leadership selection criteria. *See* Compl. ¶¶ 12–13, 216.  The defendants do not dispute that such selective enforcement, if true, violated FCA's free speech and expressive association rights.  And the defendants' argument that the District's former policy was intended to model a *Martinez*-style all-comers policy is nonresponsive to the defendants' selective enforcement claims. *Cf. Martinez*, 561 U.S. at 697–98 (finding selective enforcement argument distinct from challenge to policy itself).

The defendants further argue that the "most on-point case"—*Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664 (9th Cir. 2023) (en banc)—was decided "too late" to have contributed to the clarity of the law at the time of the challenged actions.  Mem. in Supp. of Mot. to Dismiss 15; Reply 12.  The Court disagrees.  First, even setting aside *Fellowship of Christian Athletes*, the weight of the above authority from the Supreme Court and the courts of appeals was sufficient to clearly establish the unlawfulness of the challenged conduct.  Second, FCA challenges not only the revocation of FCA Jackson-Reed's student group status in 2022 but also the defendants' subsequent and repeated refusals to reconsider that revocation decision.  Indeed, FCA alleges that it notified the defendants of the Ninth Circuit's en banc decision in *Fellowship of Chrisian Athletes* and asked the District to reinstate FCA Jackson-Reed in light of that decision.  Compl. ¶¶ 119–25.  Accepting this allegation as true, the Court concludes that the Ninth Circuit's decision pre-dated at least some of the challenged conduct associated with the alleged free speech and expressive association violations.

Because Chancellor Ferebee and CIO Ruiz had "fair notice" that the challenged conduct violated FCA's free speech and expressive association rights, the Court holds that neither defendant is entitled to qualified immunity on Counts VI and VII.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

ii.    Counts II–IV

The Court concludes, however, that Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity as to Counts II–IV.  Those counts allege that the defendants violated (1) the Free Exercise Clause through selective enforcement of DCPS's Anti-Discrimination Policy and religious animus/targeting (Counts II & III), and (2) the Free Exercise and Establishment Clauses by interfering with FCA's internal autonomy (Count IV).  Although the Court has already held

that FCA is likely to succeed on at least some of these claims, *see* Mem. Op. 7–8, 21–27, Chancellor Ferebee and CIO Ruiz are nonetheless entitled to qualified immunity on Counts II–IV because FCA has not met its burden of showing that its alleged Free Exercise and Establishment Clause rights were clearly established.

As detailed above, the Supreme Court's case law concerning student organization speech in a public educational institution's limited public forum has centered upon free speech, rather than free exercise, claims.  Indeed, in *Widmar*, the Supreme Court specifically declined to "inquire into the extent, if any," to which the challenged regulation infringed upon the student group's free exercise interests.  *Widmar*, 454 U.S. at 273 n.13.  And while the plaintiffs in *Rosenberger* and *Martinez* brought free exercise claims, the Supreme Court decided both cases on free speech grounds.  *See Rosenberger*, 515 U.S. at 827–37; *Martinez*, 561 U.S. at 697 & n.27.  As such, the Court agrees with the Eighth Circuit's recent holding that "[n]one of these cases make[s] clear that [FCA] would have a free-exercise claim—as opposed to a free-speech claim—against the . . . defendants for selectively enforcing [the District's] nondiscrimination policy against [the plaintiffs] in a limited public forum."  *Bus. Leaders in Christ*, 991 F.3d at 987; *see id.* at 986–88. Nor does any case clearly establish that the challenged actions violated FCA's right to internal autonomy under the Free Exercise or Establishment Clauses.

FCA suggests that the Supreme Court's free exercise case law is sufficiently clear that the lawfulness of the challenged conduct is "beyond debate."  Opp'n 22 (quoting *al-Kidd*, 563 U.S. at 741); *see id.* at 22–23.  But FCA has not pointed to any Supreme Court case evaluating a free exercise claim in a context that is factually analogous to this case.  And where, as here, "an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue," a heightened degree of "prior factual particularity" is required.  *Hope*, 536 U.S. at 740–41 (citation

modified); *see Widmar*, 454 U.S. at 273 n.13.  In these circumstances, the Court finds that the Supreme Court's First Amendment case law was not capable of giving the defendants "fair and clear warning."  *Hope*, 536 U.S. at 741 (citation modified).

FCA's reliance on an en banc decision from the Ninth Circuit and a handful of out of circuit district courts also falls short of demonstrating that the law was clearly established as to FCA's free exercise claims.  FCA notes that, in *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664 (9th Cir. 2023), the Ninth Circuit, sitting en banc, held that a school district "violated the bedrock requirements of the Free Exercise Clause" when the district selectively enforced its nondiscrimination policy against a religious student group that required its student leaders to "affirm a Statement of Faith that included traditional beliefs about marriage and sexuality."  Opp'n 24 (citation modified).  Emphasizing that the Ninth Circuit's decision "is hardly alone," *id.*, FCA also points to a series of similar decisions from district courts in the Sixth and Eighth Circuits, *see id.* at 24–25.  But, here, case law from a single court of appeals and a smattering of district courts does not constitute a "consensus of cases of persuasive authority."  *Bernier*, 38 F.4th at 1152 (citation modified); *see Bus. Leaders in Christ*, 991 F.3d at 986–88; *see also Christian Legal Soc'y*, 453 F.3d at 860 n.1 (declining to reach free exercise claim); *Intervarsity Christian Fellowship/USA*, 5 F.4th at 863 n.10 (similar).

Having identified neither controlling precedent from the Supreme Court nor a consensus of cases of persuasive authority, the Court will conclude that Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on FCA's free exercise claims.

        iii.        Count I

Chancellor Ferebee and CIO Ruiz are similarly entitled to qualified immunity on FCA's RFRA claim (Count I).  RFRA prohibits the federal government from "substantially burden[ing]

a person's exercise of religion" unless the government "demonstrates that application of the burden to the person" is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1.  FCA alleges that the defendants violated RFRA by denying FCA "the ability to select the leaders that represent its values to the Jackson-Reed student body."  Compl. ¶ 159.

Although the Court previously held that FCA is likely to succeed on its RFRA claim, *see* Mem. Op. 8–21, Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity because FCA again has not identified—and the Court has not located—controlling precedent or a "consensus of cases of persuasive authority," *Bernier*, 38 F.4th at 1152 (citation modified), that would have put the defendants on notice that their enforcement of the Anti-Discrimination Policy violated RFRA. *See Bernier*, 38 F.4th at 1152.  FCA suggests that the text of RFRA itself was sufficient to clearly establish FCA's rights.  *See* Opp'n 23.  But even assuming that, "[o]ccasionally, the words of a federal statute . . . will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law," *Lassiter v. Alabama A&M Univ., Bd. of Trs.*, 28 F.3d 1146, 1150 n.4 (11th Cir. 1994), RFRA does not itself offer such clarity.  RFRA analyses are "necessarily fact-specific and context-dependent." *United States v. Christie*, 825 F.3d 1048, 1062 (9th Cir. 2016); *see Tagore v. United States*, 735 F.3d 324, 332 (5th Cir. 2013) (noting "the fact-intensive nature of the RFRA strict scrutiny test"); *In re Grand Jury Empaneling of the Special Grand Jury*, 171 F.3d 826, 837–39, 839 n.2 (3rd Cir. 1999) (McKee, J., dissenting) (similar).  As such, the "general statemen[t]" of law embodied in RFRA's statutory text is not, standing alone, sufficient to establish clearly the contours of the rights RFRA protects.  *Hope*, 536 U.S. at 741 (citation modified).

As such, the Court will conclude that Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on FCA's RFRA claim.

### iv.    Counts VIII And XI

So too are Chancellor Ferebee and CIO Ruiz entitled to qualified immunity on FCA's First Amendment freedom of assembly (Count VIII) and establishment (Count XI) claims.  FCA alleges that, "[b]y denying [FCA Jackson-Reed] recognized student group status because of its religious beliefs," the defendants infringed upon FCA's "First Amendment right peaceably to assemble to engage in otherwise lawful religious worship and speech activities with persons of their choosing." Compl. ¶ 235 (citation modified).  FCA further alleges that the defendants "have not penalized other religious groups on campus for their religious beliefs and leadership selection," and that the defendants' "preference for some religious beliefs and leadership selection practices over FCA's religious beliefs and leadership selection practices violates the Establishment Clause of the First Amendment." *Id.* ¶¶ 257–58.

FCA has not identified controlling precedent or a "consensus of cases of persuasive authority," *Bernier*, 38 F.4th at 1152 (citation modified), that would have put the defendants on notice that their enforcement of the Anti-Discrimination Policy violated the First Amendment Assembly or Establishment Clauses, *see also* Opp'n 30 n.1 ("[A]t minimum, the law supporting [FCA's] claims in Counts I–VII of the complaint was clearly established.").  Nor has the Court located any.  The Court will therefore find that Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on FCA's First Amendment freedom of assembly and establishment claims.

### 2.    *Equal Access Act (Count V)*

Chancellor Ferebee and CIO Ruiz are also entitled to qualified immunity on FCA's Equal Access Act claim.  The Equal Access Act makes it unlawful for "any public secondary school

which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings."  20 U.S.C. § 4071(a).  FCA alleges that the defendants violated the Act by, among other things, derecognizing FCA Jackson-Reed on the basis of its leadership selection criteria, *see* Compl. ¶¶ 203–05, and by denying FCA Jackson-Reed official recognition while granting "full recognition and its benefits" to other student groups that discriminate on the basis of sex, race, or other regulated characteristics, *id.* ¶ 206.

The Court will grant Chancellor Ferebee and CIO Ruiz qualified immunity on FCA's Equal Access Act claim.  FCA has identified—and the Court is aware of—only one circuit that has held that a school district violates the Equal Access Act by denying official status to a student organization based on its ideological leadership selection criteria.  *See Hsu ex rel. Hsu v. Roslyn Union Free Sch. Dist. No. 3*, 85 F.3d 839, 847–48, 854–62 (2d Cir. 1996); *see also Fellowship of Christian Athletes*, 82 F.4th at 710 (Forrest, J., concurring) ("I would join the Second Circuit and conclude that when a school applies its nondiscrimination policy to a student club that limits only who can serve as a club leader because of the club's ideological leadership criteria, such application is impermissibly content based.").  Absent further authority, the Court cannot conclude that a reasonable official in the defendants' position would have understood that enforcement of the Anti-Discrimination Policy against FCA violated the Act.  *See Bernier*, 38 F.4th at 1152.  FCA's Equal Access Act claim raises "difficult issues about the meaning of the statutory term 'speech.'"  *Hsu*, 85 F.3d at 856.  Indeed, a reasonable official in the defendants' position might have believed that DCPS's decision to derecognize FCA Jackson-Reed was based not on the "content" of the group's "speech at . . . meetings," 20 U.S.C. § 4071(a), but on "what could be

characterized as the [group's] 'act' of excluding non-Christians from leadership," *Hsu*, 85 F.3d at 856; *cf., e.g.*, *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 60 (2006) ("As a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*.").[9] First Amendment case law cannot resolve that statutory question. Putting aside the merits of FCA's Equal Access Act claim, the Court cannot conclude that, at the time of the defendants' conduct, "the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 583 U.S. at 63 (citation modified).

### 3.    *Equal Protection (Count X)*

Finally, Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on FCA's equal protection claim.[10] FCA alleges that the defendants have violated its Fifth Amendment equal protection rights "by denying [FCA Jackson-Reed] recognized status while allowing other religious and non-religious groups with leadership and membership qualifications to maintain recognized status." Compl. ¶ 249; *see id.* ¶ 251 ("Defendants' preference for one set of religious beliefs and against Plaintiffs' religious beliefs, and its preference for nonreligious groups against Plaintiffs, violates the Equal Protection Clause."). FCA's equal protection claim is largely a rephrasing of its free exercise and RFRA claims. For the reasons stated above, Chancellor Ferebee and CIO Ruiz are entitled to qualified immunity on those claims. And FCA has not identified—

---

[9] Although the Ninth Circuit has held that a school district likely violates the Equal Access Act by selectively enforcing a nondiscrimination policy against a student group on the basis of the group's ideological leadership selection criteria, *see Fellowship of Christian Athletes*, 82 F.4th at 694 n.12, this issue of statutory interpretation applies equally to FCA's selective enforcement allegations.

[10] Because the Court has dismissed FCA's Fifth Amendment due process claim (Count IX) for failure to state a claim, *see supra*, the Court need not address the defendants' qualified immunity arguments as to that claim.

nor has the Court located—any authority that would clearly establish the defendants' actions violated FCA's Fifth Amendment right to equal protection.

### D.    Personal Capacity Claims Against Chancellor Ferebee

The defendants also move to dismiss FCA's personal capacity claims against Chancellor Ferebee because "[a] government official can only be held liable in his or her personal capacity for his or her own actions," and the Complaint does not contain any "allegations specific to Chancellor Ferebee to show that he took any individualized actions that caused [FCA's] alleged harms." Mem. in Supp. of Mot. to Dismiss 16.

The Court agrees. The only allegations in the Complaint specific to Chancellor Ferebee—all of which appear in the section of the Complaint providing an overview of the parties to the case—are that Chancellor Ferebee (1) "is the Chancellor of DCPS and its chief executive officer"; (2) "exercises all powers necessary and appropriate to operate the schools and school system and to implement applicable provisions of District and federal law"; and (3) "was appointed by Mayor Bowser." Compl. ¶ 22. FCA does not allege that Chancellor Ferebee caused or was even aware of the challenged conduct. Nor does it contend that Chancellor Ferebee is liable for the conduct of his subordinates. *But see, e.g.*, *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011) ("[B]ecause the person sued must have 'caused' the deprivation of rights, section 1983 liability cannot rest on a respondeat superior theory." (italics omitted)); *Medrano v. Int'l Golden Foods*, No. 2021-CA-000058-B, 2021 D.C. Super. LEXIS 58, *11 (D.C. Super. Ct. Apr. 6, 2021) ("The plaintiff, however, has failed to identify any caselaw establishing an individual employer's liability under the DCHRA based on a theory of respondeat superior."). As such, FCA has failed to state any claim against Chancellor Ferebee in his personal capacity.

FCA attempts to salvage its personal capacity claims against Chancellor Ferebee by arguing that his liability in this case "arises from his *own* unlawful conduct—his promulgation of the Anti-Discrimination Policy under which the District purports to have illegally derecognized FCA." Opp'n 33. True, a government official may face personal liability "for constitutional infringements resulting from the establishment of unconstitutional policies." *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 61 (D.D.C. 2013) (citation modified). But a plaintiff asserting such a "policymaking liability claim" against a government official "must plausibly allege that the official (1) established a policy (2) that was unconstitutional and (3) caused the plaintiff to be injured." *Barroca v. Hurwitz*, 342 F. Supp. 3d 178, 190 (D.D.C. 2018) (citation modified). Here, FCA challenges the defendants' *enforcement* of DCPS's Anti-Discrimination Policy, not the policy itself. *See, e.g.*, Compl. ¶¶ 129, 135, 160, 163–76, 182–84, 206, 216, 227–29, 235–37, 249–51, 256–58. Because FCA has not alleged that the Anti-Discrimination Policy is itself unlawful, it has failed to state a policymaking liability claim against Chancellor Ferebee.

### E.    Official Capacity Claims Against Chancellor Ferebee And CIO Ruiz

Finally, the defendants move to dismiss the official capacity claims against Chancellor Ferebee and CIO Ruiz, arguing that the claims are "redundant to the claims against the District," Mem. in Supp. of Mot. to Dismiss 17 (citation modified), as FCA's "alleged harms can be remedied through their claims brought against the District" itself, *id.* at 18. FCA does not object to dismissal of those claims on that basis. *See* Opp'n 34–35.

The Court will dismiss the official capacity claims against Chancellor Ferebee and CIO Ruiz. In *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that "local government units can be sued directly [under § 1983] for damages and injunctive or declaratory relief." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985); *see Monell*, 436 U.S. at 690–91. As a result of that holding, "[t]here is no longer a need to bring

official-capacity actions against local government officials." *Graham*, 473 U.S. at 167 n.14.  As such, courts "regularly dismiss individuals sued in their official capacity where the municipality has also been sued for the same conduct." *A.U. v. District of Columbia*, No. 19-cv-03512, 2020 WL 4754619, at *15 (D.D.C. July 13, 2020).  As FCA does not object to dismissal of the official capacity claims against Chancellor Ferebee and CIO Ruiz as redundant to those against the district, and because "reasons of judicial economy and lack of prejudice" also counsel in favor of dismissal, *Day v. District of Columbia*, 894 F. Supp. 2d 1, 33 (D.D.C. 2012), the Court will dismiss those claims.

## CONCLUSION

For the foregoing reasons, the defendants' Partial Motion to Dismiss, Dkt. 39, is GRANTED in part and DENIED in part.  Counts I–V, VIII, X, and XI are dismissed with prejudice as to defendants Ferebee and Ruiz in their personal capacities, and Count IX is dismissed without prejudice as to all defendants for failure to state a claim.  The personal capacity claims against defendant Ferebee and the official capacity claims against defendants Ferebee and Ruiz are also dismissed without prejudice.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

February 3, 2026