BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELLOWSHIP OF CHRISTIAN ATHLETES, et al.,
Plaintiffs,
vs.
DISTRICT OF COLUMBIA, et al.,
Defendants.

Case Number 24-cv-1332

June 29, 2026
2:04 p.m.

- - - - - - - - - - - - - - - -

TRANSCRIPT OF DISCOVERY CONFERENCE
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:
RICH OSBORNE, ESQ.
JOSEPH DAVIS, ESQ.
DANIEL BLOMBERG, ESQ.
SIENA MARCELLE, ESQ.
The Becket Fund for Religious Liberty
1919 Pennsylvania Avenue Northwest
Suite 400
Washington, D.C. 20006

For the Defendants:
AMANDA PESCOVITZ, ESQ.
MARCUS IRELAND, ESQ.
Office of the Attorney General
400 Sixth Street Northwest
Suite 10100
Washington, D.C. 20001

Official Court Reporter:
SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present telephonically.)

COURTROOM DEPUTY: Good afternoon, Your Honor. We are on the record in Civil Action 24-1332, Fellowship of Christian Athletes, et al., versus District of Columbia, et al.

Starting with plaintiffs' counsel, please state your appearance for the record.

MR. OSBORNE: Good afternoon, Your Honor. This is Richard Osborne on behalf of plaintiffs, and I'm joined by my colleagues, Joe Davis, Daniel Blomberg, and Siena Marcelle.

MS. PESCOVITZ: Good afternoon, Your Honor. This is Amanda Pescovitz on behalf of defendants. With me is my co-counsel Marcus Ireland and Honey Morton.

THE COURT: Good afternoon, everyone.

This is a status hearing to address the e-mail that you all sent to chambers on Thursday, June 18. Thank you for following the discovery procedures in the standard order.

I have reviewed each side's respective position, and I do want to ask before we get started if there is any update to the search that the District was performing with the defendants' -- sorry, with the plaintiffs' revised search terms.

Has that been run, or are you still waiting on revised search terms?

MS. PESCOVITZ: Yes, Your Honor. So we received the revised search terms, and we submitted that search. We heard

last week that the search has been completed. We're waiting on head count. But we have not -- the search, our understanding, that was run were -- because it was impracticable, the e-discovery team ran an additional search that was omitting one of the terms that was having a lot of the large hits. So we're still confirming what the hit counts are of both what we have agreed to and what we would then potentially propose with plaintiffs. We don't have clarity on that at this time.

THE COURT: Have you shared it with the plaintiffs?

MS. PESCOVITZ: We don't have the hit counts as yet. So no, Your Honor, we have not. I am more than willing to as soon as we have some.

THE COURT: All right. Well, that certainly would be helpful to know. So this conversation may be premature. But let me hear -- I guess let me start with the plaintiffs.

It seems to me that contrary to your part of the e-mail, it does seem that the defendants do recognize that comparator evidence is relevant to your allegations, and the issue is how to produce information that's just not so cumbersome it seems like the initial search that was run that produced one and a half million e-mails was too burdensome. So perhaps until we have the outcome of the latest search, it's hard to figure out next steps.

But let me just hear your thoughts. Again, I've read what you've written. I do think that this is an interesting case,

because it seems that the kind of information that would be most helpful to you and your case just doesn't exist because there haven't been other CARE investigations relating to claims of discrimination as there were in the case of FCA.

But it does seem to the Court that we do need to narrow the request in a way that's not overly burdensome to the District. I don't know that searching more than 20 schools for every principal e-mail and every school member's e-mail that could be potentially involved in a determination about a student group would be feasible and not unduly burdensome.

But let me hear from you. If you have thoughts about how to proceed from here, I am somewhat sensitive to the District's concerns about the breadth of the request.

MR. OSBORNE: Yes, Your Honor. Thank you.

To clarify, when it comes to the e-mails, you know, plaintiffs, obviously, aren't looking to receive a million e-mails. What we're primarily looking for right now from the District would be, A, just a list of which student groups the District has recognized and then also, B, for the defendants to confer with the relevant school officials and tell us if they've ever derecognized or investigated anyone.

So I think regardless of how the search term revisement goes, those are two things that the parties could move forward on now that we have been waiting for, to get that sort of basic information that we know the District has to maintain somewhere.

And when it comes to the 20 secondary schools, the only thing we're asking for in that regard is as it pertains to the list of which groups have been recognized and which groups have ever been derecognized or investigated. Again, we're not looking for e-mails from all of the 20 schools and the various custodians and all of that.

So I think that section of this -- go ahead.

THE COURT: Well, with regard to student groups that have been derecognized or investigated, haven't they answered that, at least with respect to the investigation, that there have not been investigations?

MR. OSBORNE: That at least have not risen to a formal CARE investigation. That, obviously, doesn't mean that the schools themselves or school officials have never inquired. Even early on in this case, there was a declaration from the principal at Jackson-Reed talking to the various student groups that we had flagged in our preliminary injunction motion.

So I think there is certainly informal steps that could have been taken, and still, obviously, it would be relevant whether the District has first recognized some of these groups.

So to us, the only -- the relevant comparators aren't just limited to formal CARE investigations. It could be anything from whether the group was actually recognized in the first place by DCPS, or whether, on notice that a group may be discriminating, the DCPS officials never took any affirmative

action to investigate that.

THE COURT: As I understood it, you were interested in document production. No? Are you just interested in the information?

MR. OSBORNE: Well, yes, we would like documents from the schools showing us which student groups have been recognized. So --

THE COURT: How do you propose they do this? Presumably, they have a list of student groups for each school. That ought to be easy enough to give you.

MR. OSBORNE: Right. That's what we would be looking for. I don't think we're too particular about the form. It could be an old web site showing the student groups, spreadsheets, newsletters. Again, at the end of the day, all we're looking for is just the list.

THE COURT: But the informal derecognizing or investigations is going to be much harder to find.

MR. OSBORNE: Right; yes, you're right, Your Honor. As it pertains to those, that part is at least we just need them to talk to and respond to our interrogatory on that question, which is when they told us that information is not relevant and they're not going to talk to the various officials about whether that's ever happened before; at least the last we were told.

THE COURT: All right. Ms. Pescovitz, it seems to me that you do recognize this is relevant information and is -- are

you really refusing to ask the respective schools if they've derecognized or investigated anyone, any student group?

MS. PESCOVITZ: So because they are from different schools, we had negotiated with plaintiffs to start with looking at size, and we have spoken with the principals and relevant admin staff at those five schools. Our understanding is that to the extent anything exists, it is within the e-mails, that this is normally handled in e-mails. I think as Mr. Osborne referenced, the declaration that Principal Brown from Jackson-Reed submitted as to the -- after the preliminary injunction proceedings, I believe that declaration indicates that he reached out to those student organizations by e-mail as well.

So again, we had anticipated that this was likely going to be primarily handled on a school-by-school basis via e-mail, and that is borne out in our investigation.

THE COURT: All right. But presumably, at least for some period of time, people who are at the schools should be able to answer a question without looking at e-mail. And then once you know a certain group is investigated, you can run a search with that group's name.

MS. PESCOVITZ: We can certainly make that attempt. I will say, in speaking with the schools, the principals don't have -- they can't recall. They don't remember any, and our understanding is that this is not something that happens often.

We explained in our responses to the interrogatories and requests for production that the policy at issue here is not one that is specifically affirmatively enforced by schools. It's something that is a grievance-based system. And so the majority of information, when coming in response to complaints, are formally filed grievances, and people don't, unfortunately, tend to remember those, in our experience talking with them.

THE COURT: Well, if it's rare, all the more reason they might remember if you asked them.

MS. PESCOVITZ: Certainly. I think the difficulty is when they say that they cannot remember, we are concerned that that does not mean that it has not happened. It might just be the principal in that moment can't recall whether this occurred, and we don't want to affirmatively state that there is nothing and then come to find that there was something.

THE COURT: Well, I take it you have a group of student groups from each school that you ought to be able to produce easy enough.

MS. PESCOVITZ: We are working to get those from schools, yes.

THE COURT: Okay. And my guess is, once you have that list of groups, that there will be certain groups that may trigger memory. It just seems like when you have a list of groups, you might be able to run certain groups to see if there were informal inquiries or investigations relating to those

groups. Some would, perhaps, raise more red flags than others. That might be a way to narrow the e-mail search.

MS. PESCOVITZ: Yes.

THE COURT: This is, I think, important information for the plaintiffs' claims. At some point, folks from these schools are going to have to answer questions, whether it's interrogatories or depositions. So at some point, the District's going to need to do its best to ensure that they are prepared to answer those questions.

MS. PESCOVITZ: Certainly, Your Honor, and we are willing and working to do so.

THE COURT: Okay. But it does not sound like the plaintiffs are asking for you to produce all of these e-mails. They just want these questions answered. And I understand to represent your clients well, you need to do your due diligence. But I think it does seem like there's more work that the District could do on its end to try to zero in on what groups might have had informal questions, investigations, or issues raised in the process, and then that would further narrow both the schools and the groups such that your e-mail search will not be over a million e-mails.

MS. PESCOVITZ: I think that that would be helpful, Your Honor. I think it's also worth noting that the requests themselves seek information over -- from August 2017 to present or, in some cases, August 2012 to present. So even when we've

been able to try and negotiate or try to narrow on terms, we are looking at almost ten and sometimes almost 14 years' worth of time of information.

So if we were able to come to a more narrow determination on the length of time that we would be searching, that might also help narrow the search and make it not be 1.5 million e-mails.

THE COURT: All right. Mr. Osborne, is it possible to do this in stages? Is there a particular time period you're most interested in where we can start?

MR. OSBORNE: Well, I think from our perspective, it's important that we can establish a baseline for the kinds of groups that DCPS was and wasn't recognizing before the dispute started. So I think the years from 2017 up until at least the start of this dispute, if we were going to do it in phases, would be important. But we would, obviously, still want to get the information through the current date.

THE COURT: So the key window is 2017 to 2024?

MR. OSBORNE: Yeah, I mean, the actual underlying dispute started in 2022, but you're right that the litigation was in 2024, is when the preliminary injunction was going on.

THE COURT: So you're saying 2017 to 2022 is the most critical?

MR. OSBORNE: Yes, if we were going to do it in phases, that is where we would want to start at least.

THE COURT: Well, I'm not saying you're precluded from the rest. But it seems at least initially, in order to try to target the District's investigation here, why doesn't it make sense to start out with 2017 through 2022 and see what they produce for that time period?

MR. OSBORNE: Yes, plaintiffs would be fine with starting that way.

THE COURT: All right. Ms. Pescovitz, does that help? That doesn't mean the rest is off limits. I get your point that you're trying to narrow the scope, but I do think you're going to have to come up with this list and then show the list to people at the respective schools who were involved in these kinds of reviews and try to target those groups that may have been more controversial at the time with your e-mail searches.

MS. PESCOVITZ: Yes, and this does help, Your Honor.

For our clarification, is that trying to identify as to all 20 secondary schools from that period of 2017 to 2022?

THE COURT: Mr. Osborne? It's been a while since I've looked at these briefs. I seem to recall your briefing was focused on five schools. Is that not fair?

MR. OSBORNE: Well, our briefing, yes, at the time was focused on the five schools. Obviously, we didn't have the benefit of getting information from the District.

So from our perspective, any school that is recognizing groups that discriminate on these policies would be relevant

comparators.

THE COURT: I understand. Let's start with 2017 to 2022, and let's start with the five schools, and let's see what the result is, and then we can always broaden this.

MR. OSBORNE: Okay. That works for plaintiffs.

THE COURT: All right. And to be clear to both sides, I'm not ruling that the rest is not relevant. I'm trying to limit the burden on the District, and there may be a lot of information in that initial production that the plaintiffs need, and maybe there's not a need to go broader. But I'm willing to revisit that at the appropriate time. It just seems right now, let's get some exchange of information going, and let's reassess once that is produced.

And to the extent -- I guess I qualify what I'm saying by the point I made at the outset. Based on the revised search term, if this is a manageable amount, I don't know that it should be further limited.

That search was limited to the five schools; is that correct?

MS. PESCOVITZ: That's correct.

THE COURT: Okay. And it was also 2017 to present?

MS. PESCOVITZ: Yes, correct, Your Honor. And that was with a list of search terms that had been negotiated between the parties.

THE COURT: Okay. So I don't mean to narrow that.

Let's see if that's a reasonable response. I don't mean to, like, cabin that, but you can't tell me yet whether it is or is not a reasonable unburdensome response; correct?

MS. PESCOVITZ: Correct, Your Honor.

THE COURT: Okay. Well, why don't you all confer after the results of that search request are reviewed, and I'm happy to talk with you again based on that. But I would, in the interim, suggest that we focus on five schools for the 2017 to 2022 period, as the District tries to identify whether there are informal investigations or complaints raised with respect to certain student groups.

MR. OSBORNE: Your Honor, could plaintiffs raise one more point?

THE COURT: Sure.

MR. OSBORNE: At least with respect to that number of schools and time frame, the other category of evidence that plaintiffs have been looking for and defendants have refused to produce would relate to also school programs and district-wide programs.

And so we would ask that, you know, defendants would also look for responsive information to those requests within the parameters that you just set.

THE COURT: Okay. And remind me, is this -- does this relate to the FOIA issue, or is this something separate?

MR. OSBORNE: Yes, it partially does. So I would say

that there's sort of two categories. The first is just school programs, which an example of that would be Ruling Our Experience is one of the groups that we pointed out early on in this case, which are groups run by the school. And then there are programs run by the District itself, such as Empowering Males of Color and the Mayor's Office of Community Awards, and those ones do relate to the FOIA request that we flagged in our letter.

THE COURT: All right. So you're asking that the request be broad enough to include programs run by the school and programs run by the District, not just student-run groups?

MR. OSBORNE: I would just clarify, when it comes to the District-wide programs, the only two we are looking for are related to Empowering Males of Color and the Mayor's Office of Community Awards. But as far as school programs go, at least for those five schools that you've selected, we would ask that they search for those as well.

THE COURT: And remind me, what are examples of school programs?

MR. OSBORNE: So, for example, the Ruling Our Experiences group, which was a teacher-led group for girls to create a community space for them, and so groups like that that we have flagged in our earlier briefing.

The difference would be there are some groups on these campuses that operate like a student club but is run by

teachers.

THE COURT: And to be clear, you want the names of those groups? Presumably, there weren't investigations flagged of those school-run groups. What is it that exactly you're looking for in terms of documentation or answers to interrogatories?

MR. OSBORNE: Yes. We're looking for the names of the groups -- or the programs, sorry, at those schools that currently operate there, or at least did within the time frame.

THE COURT: All right. Any objection to providing those by the District? It seems reasonable.

MS. PESCOVITZ: Names of organizations that are, I guess --

THE COURT: Programs run by the school.

MS. PESCOVITZ: No. I think, Your Honor, we can do that. I think that our confusion has been about broadening this beyond D.C. Public Schools. Because we're -- that issue is the interpretation and enforcement of a DCPS school policy by an entity of DCPS.

THE COURT: So that concern -- I just want to make sure I'm understanding you. That concern doesn't apply to the school programs that the plaintiffs are seeking?

MS. PESCOVITZ: Correct, Your Honor. That's the district-wide programs, yes.

THE COURT: But it does apply to district-wide

programs?

MS. PESCOVITZ: Yes. So, for example, information about the Mayor's Office of Community Affairs is not subject to the policy that was at issue here, and there is no enforcement ability by the CARE team of anything that that entity of the mayor's office does.

THE COURT: And there are two groups in particular that the plaintiffs want information on that are run by the District? That's Empowerment of Color and what else?

MR. OSBORNE: The Mayor's Office of Community Affairs.

THE COURT: I'm confused. What is it that -- these are two separate District-run programs; correct?

MR. OSBORNE: Yes, Your Honor.

THE COURT: One, Empowerment of Color; is that right?

MR. OSBORNE: Empowering Males of Color.

THE COURT: Oh, Empowering Males of Color; am I hearing you right?

MR. OSBORNE: Yes, Your Honor.

THE COURT: And then the other is?

MR. OSBORNE: The Mayor's Office of Community Affairs.

THE COURT: And what is the Mayor's Office of Community Affairs? Is that a program, or is that just a part of the mayor's office?

MR. OSBORNE: Yeah, it's a program that awards grants to eligible groups, which is what we're trying to get better

information about.

I would say at least from our perspective, when the DCPS CARE team denied FCA Jackson-Reed official recognition, it wasn't just applying the DCPS antidiscrimination policy. It was also saying that FCA Jackson-Reed had violated the D.C. Human Rights Act itself, which these two programs are subject to.

And so, obviously, from our perspective, if there are exceptions being made for these programs under the D.C. Human Rights Act that take into account these projected characteristics, then that would also be evidence of selective enforcement.

And again, the District can't hold religious student groups to a stricter standard than they hold themselves. So we think these are squarely relevant in this dispute.

THE COURT: So, Ms. Pescovitz, why is this information not relevant if part of the reason for denying FCA access was based on the D.C. Human Rights Act?

MS. PESCOVITZ: Your Honor, that's because the CARE team was using its interpretation of D.C. Human Rights Act as implemented as to DCPS through the antidiscrimination policy when it made -- when it was doing its investigation and ultimately sustaining the grievance.

The CARE team does not have any ability to enforce or apply or interpret the D.C. Human Rights Act outside of the context of D.C. Public Schools. And particularly, there's no enforcement

by the CARE team as to what grant or programs the Mayor's Office of Community Affairs is going to issue or support.

THE COURT: And is the District itself beyond the school district a defendant here, Mr. Osborne?

MR. OSBORNE: Yes, Your Honor.

THE COURT: So understood, DCPS has no control over what the mayor's office is doing, but if the District has control over what DCPS is doing, why isn't it relevant?

MS. PESCOVITZ: Because the entity is outside of DCPS, recognizing that the District broadly is a defendant because DCPS is not separately subject to suit, DCPS was the entity of the district that was engaging in the allegedly wrongful behavior in this case.

They are -- the CARE team falls within DCPS, and there is no -- none of the allegations in the complaint have anything to do with -- besides looking for comparator evidence, which we understand and want to provide as to students in a school-run program, we don't know that there's any relevance to the much broader enforcement of the D.C. Human Rights Act, particularly by other agencies, like the Executive Office of the Mayor, that aren't at issue here. Because again, the way that DCPS interprets its policy that interprets the D.C. Human Rights Act is specific and is concrete action that's happened here that there's not any overlap between how DCPS and its CARE team understands the policies and the laws and enforce them as

opposed to other separate agencies of the District.

THE COURT: So you would object to providing either of these District-run programs?

MS. PESCOVITZ: It depends on what "information about" means. For example, things like the Mayor's Office of Community Affairs, there's a lot of information that's available online. But we have objected that we don't think that engaging in specific searches going to the Executive Office of the Mayor and the Mayor's Office of Community Affairs to collect specific documents and information is necessarily proportional to the needs of the case.

THE COURT: Mr. Osborne -- go ahead. This does seem a little far afield if the District itself is not managing DCPS and not involved in any of the decisionmaking here.

MR. OSBORNE: Yes, Your Honor, and I have two points on that.

And so the first would be at least that our requests as respect these programs are quite modest. All we're looking for essentially are, A, what the requirements are to be eligible for a grant under one of these two programs and, B, what grants were actually awarded by the District under these programs. That's all we're really looking for.

And just to the broader relevance point, as Your Honor said, the District of Columbia is the defendant in this case. The District is going to assert a particular compelling interest

that they have in enforcing these laws against plaintiffs. And so if the CARE team, who is exercising delegated authority on behalf of the District is saying and doing one thing and yet another arm of the District is saying and doing another thing, that certainly will be relevant to whether the District has a compelling interest here and whether they've used the most narrowly tailored means of pursuing it.

So we think it's plainly relevant, given the context of the case.

THE COURT: Ms. Pescovitz, why object to just the requirements in the grants that are awarded? Isn't that information that is, I would assume, publicly available?

MS. PESCOVITZ: I would have to review what the specific request was. Certainly, if it's publicly available information, we have no problem providing that.

I think the concern is more that they're trying to get into deeper discovery of these other organizations. We hear plaintiffs' position, but I think it's worth pointing that the interest that is being asserted -- or has been asserted in this case has been about protecting students at DCPS schools from discrimination.

And so again, to the relevant point and why we think that going broader or further in scope, because essentially in response to providing this information, I see further discovery as to these programs, and they're all far afield of both the

policy that was enforced, the entity that was doing the enforcing, and the asserted interests by the government.

THE COURT: All right. At this stage, I'm just going to ask that the District produce, to the extent it's public, the requirements to be eligible for the grant and the grants that were awarded.

MS. PESCOVITZ: Understood, Your Honor.

THE COURT: All right. Anything else, Mr. Osborne?

MR. OSBORNE: Nothing further from plaintiffs. Thank you.

THE COURT: All right. I'm hoping that you all can continue to work through this. Obviously, I stand ready to get back on the phone if there's a need to. But I'm hopeful that this will be a good start, and maybe, Mr. Osborne, you will have what you need, and if not, let me know.

All right?

MR. OSBORNE: Great. Thank you very much, Your Honor.

THE COURT: All right. Thank you, all.

(Proceedings adjourned at 2:35 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick July 23, 2026

SIGNATURE OF COURT REPORTER DATE